# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

U.S. DISTRICT COURT - N.D. OF N.Y.

**FILED**

MAR 2 5 2016

AT_____ O'CLOCK____

Lawrence K. Baerman, Clerk - Syracuse

| | | |
|---|---|---|
| UMESH HEENDENIYA, | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 5:15-CV-01238-GTS-TWD |
| | ) | |
| ST. JOSEPH'S HOSPITAL HEALTH CENTER | ) | Honorable Glenn T. Suddaby |
| ROGER GARY LEVINE, MD; LISA MARIE | ) | |
| O'CONNOR, MD; GEORGE O. TREMITI, MD; | ) | Honorable Therese Wiley Dancks |
| HORATIUS ROMAN, MD; JOANNE MARY | ) | |
| FRENCH, RN; WENDY BRISCOE, RN; SUSAN | ) | |
| LYNN CATE, LMFT; ROSALINE SPUNELKA, RN; | ) | |
| ROBERT MICHAEL CONSTANTINE, MD; | ) | |
| MITCHELL BRUCE FELDMAN, MD; CYNTHIA A. | ) | |
| RYBAK, NP; KATHRYN HOWE RUSCITTO, | ) | |
| PRESIDENT and CEO; LOWELL A. SEIFTER, JD, | ) | |
| SENIOR VP and GENERAL COUNSEL; MEREDITH | ) | |
| PRICE, VP of FINANCIAL SERVICES and CFO; | ) | Complaint for Monetary Damages, |
| DEBORAH WELCH, VP; GAEL GILBERT, RN, MBA, | ) | Injunctive Relief, and Declaratory |
| DIRECTOR; SJHHC DOES 1-5 INCLUSIVE; | ) | Judgment. |
| Defendants. | ) | |

## FIRST AMENDED COMPLAINT AND JURY DEMAND

COMES NOW the *pro se*, mentally and physically disabled plaintiff Umesh Heendeniya

(henceforth "Heendeniya"), and hereby alleges as follows:

## INTRODUCTORY STATEMENT

1. This legal action[1] is a medical malpractice case with relevant state tort claims arising out

   of the unlawful and unjust, involuntary admission of Heendeniya by defendants St. Joseph's

   Hospital Health Center (henceforth "SJHHC"); Roger Gary Levine, MD; Lisa Marie

   O'Connor, MD; George O. Tremiti, MD; Horatius Roman, MD; Joanne Mary French, RN;

   Wendy Briscoe, RN;  Susan Lynn Cate, LMFT; Rosaline Spunelka, RN; Robert Michael

   Constantine, MD; Mitchell Bruce Feldman, MD; Cynthia A. Rybak, NP; Kathryn Howe

---

[1] This complaint contains Exhibits "1" through "24."

Ruscitto, President and CEO of SJHHC; Lowell A. Seifter, JD, Senior VP and General

Counsel of SJHHC; Meredith Price, VP and CFO of SJHHC; Deborah Welch, VP for People

at SJHHC; Gael Gilbert, MBA, RN and Director of SJHHC's psychiatric ward; and SJHHC

Does 1-5 inclusive. These twenty-two (22) defendants will be referred to collectively as the

"SJHHC defendants."

## THE PARTIES

2. The *pro se*, mentally and physically disabled plaintiff Heendeniya is a resident of Hernando

County, Florida.

3. The defendant, St. Joseph's Hospital Health Center (henceforth "SJHHC" or "defendant

SJHHC"), is a health care delivery system, offering a wide range of services. It's located at 301

Prospect Avenue, Syracuse, NY-13203. SJHHC runs and maintains a unit/department of

psychiatry (officially called "Unit 3-6" and henceforth referred to as "unit 3-6") located

within the hospital and is licensed to provide psychiatric services by the New York State

Office of Mental Health (henceforth, "NY OMH" or "OMH").

4. In 2015, SJHHC joined together with Trinity Health (on information and belief, this

healthcare system is headquartered in the State of Michigan).

5. Defendant Kathryn Howe Ruscitto (henceforth, "defendant Ruscitto") is the President and

the CEO of SJHHC, and works at SJHHC in Syracuse, New York.

6. Defendant Meredith Price (henceforth, "defendant Price") is a VP and the CFO of SJHHC,

and works at SJHHC in Syracuse, New York.

7. Defendant Lowell A. Seifter, JD (henceforth, "defendant Seifter"), is the Senior VP and

General Counsel of SJHHC, and works at SJHHC in Syracuse, New York.

8. Defendant Deborah Welch (henceforth, "defendant Welch") is the VP for Mission

Integration and Organizational Development (at the time the original complaint was filed in

October, 2015, on information and belief, her title stated that she was the VP for People at SJHHC), and works at SJHHC in Syracuse, New York.

9. On information and belief, defendant Gael Gilbert, MBA, RN (henceforth, "defendant Gilbert") was a director of unit 3-6 and worked at SJHHC in Syracuse, New York. As such, defendant Gilbert is responsible for the operation and management of the psychiatric unit (unit 3-6) at SJHHC.

10. On information and belief, defendant Roger Gary Levine, MD (henceforth, "defendant Levine"), who at all times relevant hereto engaged in the practice of medicine under license from the State of New York, was a psychiatrist working in unit 3-6 under the grant of certain privileges provided to him by defendant SJHHC, was a director of unit 3-6 in April 2013, and he worked at SJHHC in Syracuse, New York. Because defendant Levine, on information and belief, was a director of unit 3-6, he was responsible for the operation and management of the psychiatric unit at SJHHC in April, 2013.

11. On information and belief, defendant Lisa Marie O'Connor, MD (henceforth, "defendant O'Connor"), who at all times relevant hereto engaged in the practice of medicine under license from the State of New York, was a psychiatrist working in unit 3-6 under the grant of certain privileges provided to her by defendant SJHHC, and she worked at SJHHC in Syracuse, New York.

12. On information and belief, defendant George O. Tremiti, MD (henceforth, "defendant Tremiti"), who at all times relevant hereto engaged in the practice of medicine under license from the State of New York, was a physician specializing in General Surgery while working at SJHHC under the grant of certain privileges provided to him by defendant SJHHC, and he worked at SJHHC in Syracuse, New York.

13. On information and belief, defendant Horatius Roman, MD (henceforth, "defendant Roman"), who at all times relevant hereto engaged in the practice of medicine under license from the State of New York, was a physician specializing in Anesthesiology while working at SJHHC under the grant of certain privileges provided to him by defendant SJHHC, and he worked at SJHHC in Syracuse, New York.

14. On information and belief, defendant Joanne Mary French, RN (henceforth, "defendant French"), was a registered nurse who worked in unit 3-6 under the grant of certain privileges provided to her by defendant SJHHC, and she worked at SJHHC in Syracuse, New York.

15. On information and belief, defendant Wendy Briscoe, RN (henceforth, "defendant Briscoe"), was a registered nurse who worked in unit 3-6 under the grant of certain privileges provided to her by defendant SJHHC, and she worked at SJHHC in Syracuse, New York.

16. On information and belief, defendant Susan Lynn Cate, LMFT (henceforth, "defendant Cate"), was a licensed marriage and family therapist who worked in unit 3-6 under the grant of certain privileges provided to her by defendant SJHHC, and she worked at SJHHC in Syracuse, New York.

17. On information and belief, defendant Rosaline Spunelka, RN (henceforth, "defendant Spunelka"), was a registered nurse who worked in unit 3-6 in an administrative capacity under the grant of certain privileges provided to her by defendant SJHHC, and she worked at SJHHC in Syracuse, New York.

18. On information and belief, defendant Robert Michael Constantine, MD (henceforth, "defendant Constantine"), who at all times relevant hereto engaged in the practice of medicine under license from the State of New York, was a physician specializing in Anesthesiology who worked at SJHHC's Intensive Care Unit ("ICU") under the grant of

certain privileges provided to him by defendant SJHHC, and he worked at SJHHC in Syracuse, New York.

19. On information and belief, defendant Mitchell Bruce Feldman, MD (henceforth, "defendant Feldman"), who at all times relevant hereto engaged in the practice of medicine under license from the State of New York, was a physician specializing in Emergency Medicine who worked at SJHHC's Emergency Room ("ER") under the grant of certain privileges provided to him by defendant SJHHC, and he worked at SJHHC in Syracuse, New York.

20. On information and belief, defendant Cynthia A. Rybak, NP (henceforth, "defendant Rybak"), is a nurse practitioner specializing in Emergency Medicine who worked at SJHHC's Emergency Room ("ER") under the grant of certain privileges provided to her by defendant SJHHC, and she worked at SJHHC in Syracuse, New York.

21. On information and belief, defendant SJHHC is a recipient of federal and state funding.

22. At all times relevant hereto, defendant Levine, defendant O'Connor, defendant Tremiti, defendant Roman, defendant French, defendant Briscoe, defendant Cate, defendant Spunelka, defendant Constantine, defendant Feldman, defendant Rybak, defendant Ruscitto, defendant Price, defendant Seifter, defendant Welch, and defendant Gilbert were the agents, ostensible agents, servants, workers and/or employees of defendant SJHHC and were acting within the course and scope of their employment.

23. At all times relevant hereto, defendant Levine, defendant O'Connor, defendant Tremiti, defendant Roman, defendant French, defendant Briscoe, defendant Cate, defendant Spunelka, defendant Constantine, defendant Feldman, defendant Rybak, defendant Ruscitto, defendant Price, defendant Seifter, defendant Welch, and defendant Gilbert were acting on behalf of and in furtherance of the business purposes of defendant SJHHC.

*Umesh Heendeniya v. St. Joseph's Hospital Health Center, et al.*

24. At all times relevant hereto, defendant SJHHC held itself out as a provider and an institution equipped and staffed to provide skilled and competent diagnosis, treatment and monitoring of psychiatric patients admitted to its emergency department, its intensive care department, its general medical department, and its psychiatric department (unit 3-6).

25. The fictitious defendants (both natural persons and artificial persons) are otherwise unknown to Heendeniya at this time. If their identities are known to Heendeniya at this time, their identities as proper party defendants are not known to him at this time. The true and correct names of the fictitious defendants will be substituted by amendments when the aforesaid information is ascertained. The fictitious defendants may be sued under the doctrines of *respondeat superior*, joint and several liability, agency and/or other doctrines.

26. At all relevant times, each natural person directly or indirectly involved was an agent, representative, official, and/or employee of the natural or artificial persons or defendants.

27. All natural persons are being sued in their individual and official capacities, unless specifically stated otherwise.

## JURISDICTION AND VENUE

28. This Court has jurisdiction over Heendeniya's claims against the defendants pursuant to 28 USC § 1331 [statute authorizes jurisdiction of civil actions arising under the constitution, laws and treaties of the United States]; 28 USC § 1332 [statute authorizes jurisdiction of civil actions arising under diversity of citizenship]; 28 U.S.C. § 1367 [statute authorizes jurisdiction of civil actions arising under supplemental jurisdiction]; and 28 U.S.C. §§ 2201 and 2202 [declaratory judgment statutes].

29. This Court is vested with authority to grant the requested declaratory relief by operation of 28 U.S.C. § 2201 and pursuant to Rule 57 of the Federal Rules of Civil Procedure.

30. This Court is vested with authority to grant the requested injunctive relief by operation of 28 U.S.C. § 2202 and pursuant to Rule 65 of the Federal Rules of Civil Procedure.

31. Venue is proper in this district pursuant to 28 U.S.C. 1391, and because a substantial part of the events or omissions giving rise to the claims occurred in Onandaga County, New York.

32. Heendeniya alleges that he is demanding compensatory damages exceeding $75,000, from the SJHHC defendants (See, for example, civil cover sheet, Dkt. No. 1).

## STATEMENT OF FACTS

### Brief Biography

33. Heendeniya was born in Sri Lanka, but has lived continuously in the United States for over 26 years, and has been a Lawful Permanent Resident ("LPR" or "Green Card" holder) for over 17 years.

34. Although Heendeniya is not a U.S. Citizen, but is instead a lawful permanent resident, the U.S. Constitution's use of the term "the people" in the Second Amendment context includes lawful permanent residents like him. See District of Columbia v. Heller, 554 U.S. 570, 580 (2008) (observing that the "provisions of the Constitution that mention 'the people' . . . refers to all members of the political community, not an unspecified subset") and

> "`[T]he people' seems to have been a term of art employed in select parts of the Constitution . . . . [Its uses] sugges[t] that `the people' protected by the Fourth Amendment, and by the First and Second Amendments, and to whom rights and powers are reserved in the Ninth and Tenth Amendments, refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community."

United States v. Verdugo-Urquidez, 494 U.S. 259, 265 (1990).

35. Heendeniya has a constitutional right under the Second Amendment "to keep and bear arms for lawful purposes, most notably for self-defense within the home." McDonald v. Chicago,

561 U.S. 742, 780 (2010) and District of Columbia v. Heller, 554 U.S. 570 (2008). See also, Fletcher v. Haas, 851 F. Supp. 2d 287, 301 (D. Mass. 2012) ("With this framework in mind, I find no justification for refusing to extend the Second Amendment to lawful permanent residents. They have necessarily "developed sufficient connection with this country to be considered part of [the] community." *Verdugo–Urquidez*, 494 U.S. at 265, 110 S.Ct. 1056."); Fotoudis v. City & County of Honolulu, 54 F.Supp.3d 1136, 1143 (D. Haw. Sept. 17, 2014) ("to deny Fotoudis the opportunity to apply for (and to obtain, if otherwise qualified) a permit to acquire firearms, solely because he is not a U.S. citizen, also violates the Second Amendment"); Smith v. South Dakota, 781 F. Supp. 2d 879 (D. SD. 2011).

36. Heendeniya has a B.Sc. in Computer Science from Virginia Commonwealth University located in Richmond, Virginia. A true and correct copy of his diploma from Virginia Commonwealth University granting him a bachelor's degree, is annexed hereto as Exhibit "1."

37. Heendeniya served in the U.S. Marine Corps, both active duty and the reserves, from June 1998 to April 2001. He was honorably discharged due to medical reasons as a result of a permanent physical disability in his right-knee from an injury sustained during training off-base in 1999. Three (3) true and correct copies of his military discharge papers are attached herein as Exhibit "2."

38. Having served in the U.S. Marine Corps, Heendeniya is familiar with many types of firearms and has owned several firearms in the past. He's a strong advocate and a firm believer in the Second Amendment to the U.S. Constitution, and the right of the people to purchase and possess firearms for lawful self-defense.

39. Heendeniya believes in the fundamental right to life, liberty and the pursuit of happiness, and consequently the right for people to lawfully purchase, possess, and carry firearms so they are able to defend themselves with firearms.

40. Hence, Heendeniya was gratified when the U.S. Supreme Court ruled in <u>Heller</u>, 554 U.S. at 570 and <u>McDonald</u>, 561 U.S. at 742 that the Second Amendment protects an individual's right to keep and bear firearms at home for self-defense.

41. Currently, Heendeniya has valid, concealed carry handgun permits from Florida and Utah. In the past, he has had a concealed carry handgun permit from Virginia which was valid from June, 2001 to June 2006.

42. Heendeniya is a current member and supporter of several national and local gun rights organizations such as the Second Amendment Foundation (SAF), National Rifle Association (NRA), Gun Owners of America (GOA), Jews for the Preservation of Firearms Ownership (JPFO), Florida Carry, and New York based S.C.O.P.E (SCOPE).

43. Heendeniya has been a member of several of these "Gun Rights" organizations for nearly 10 years because he believe that those who support and advocate an individual right of people to lawfully carry firearms to protect their lives ought to assist these organizations in whatever form they can, including paying membership dues. Heendeniya doesn't believe in letting other gun rights advocates fight for his rights and not contribute in any way, and getting a "free ride" or "piggy-back" on other peoples' hard work and sacrifices.

### Heendeniya's Mental and Physical Disabilities

44. Heendeniya has documented mental and physical disabilities.

45. His mental disabilities consist of Type-2 Bipolar Disorder (Manic Depression) and Post-Traumatic Stress Disorder (PTSD), which have <u>never</u> resulted in him having any

psychotic or delusional disorder episode or symptoms. In other words, Heendeniya has <u>never</u> been found or diagnosed by a medical or legal authority to have been insane, to have "lost touch with reality," or to have been incompetent. Consequently, he has never been diagnosed or treated for a very serious mental illness by any of his present or past, regular treating psychiatrists, psychologists, or mental health counselors. Two (2) true and correct copies of diagnosis and 'treatment plan' letters from his present and past psychiatrists are attached herein as Exhibit "3."

46. As a result of his mental disabilities, Heendeniya has stress and resultant fatigue, frequently has difficulty in his ability to focus when reading, ability to apprehend material he reads, and ability to remember what he researches and reads. Thus, unlike normal people, frequently, he has to read complex material several times in order to apprehend it and be able to remember it so he can use its relevant content to write an argument, etc. Hence, it takes him a longer time period to complete tasks involving complex subject matter such as law/jurisprudence, information technology, engineering disciplines, etc.

47. Because his mental disabilities cited in prior paragraph take effect, especially when the material Heendeniya reads or writes deal with complex subject matter, in hindsight, it makes sense why it took Heendeniya eleven (11) years to complete his bachelor's degree and why he had to attend five (5) colleges before being able to finally obtain his bachelor's degree in computer science in May, 2000.

48. However, Heendeniya has never been diagnosed with any form of psychotic or delusional disorder (i.e., <u>never</u> been diagnosed with a very serious mental illness, insanity, psychosis, delusions, or judged to be incompetent).

49. Heendeniya has never had psychotic symptoms, delusional symptoms (i.e., seeing or hearing things that don't exist, having a delusional belief that someone or some entity is conspiring to harm him), insanity, or "loss of touch with reality.

50. Heendeniya has never had any kind of very serious mental illness such as schizophrenia, schizoaffective disorder, a delusional disorder, paranoia, psychosis, etc.

51. In addition to his mental disabilities, Heendeniya has documented physical disabilities, which include some pain and limitations in movement in his right knee (due to 2 arthroscopic knee surgeries in 1995 and 1999), pain in his lower back (due to a twice injured, herniated disc injury), type-2 diabetes, neuropathy, and hypercholesterolemia. Nine (9) true and correct copies of the operative reports and the treatment for his right knee from his past orthopedic surgeons are attached herein as Exhibit "4." Seventeen (17) true and correct copies of the treatment for his lower-back, herniated disc injury from past emergency room physicians are attached herein as Exhibit "5." Two (2) true and correct copies that list the diagnoses and the treatments of his illnesses by past and present primary care physicians (PCPs) are attached herein as Exhibit "6" (please note: his current PCP changed his hypercholesterolemia medication from Simvastatin to Lipitor 40mg, in 2016).

52. Heendeniya has some pain when standing on his feet, and some limitations in movement in his legs-- particularly his right leg (due to significant Osteoarthritis in his right knee)-- and thus he has resultant physical disabilities. See Exhibit "4."

53. Heendeniya frequently has pain and limitation in his lower back due to the twice-injured, herniated disc injury in his lower back, and thus he has resultant physical disabilities. See Exhibit "5."

### Heendeniya's Need to Exercise His Second Amendment Gun Rights

**54.** In the Second Amendment and the Gun Rights community it's a well-known and generally accepted axiom that when an unexpected personal emergency takes place, law enforcement officers will not be immediately available to assist or to protect a person from imminent danger (i.e., they're on their own).

**55.** This has given rise to maxims or sayings that are well known in the gun rights community such as: "when seconds count, cops are only minutes away" or "I carry a gun because a cop is too heavy."

**56.** On September 01, 1995, approx. 1-week after Heendeniya had arthroscopic knee surgery, in the middle of the night, he was surrounded and attacked in his apartment by four (4) men who were originally from Sri Lanka. Heendeniya was forced to defend his life and limb by discharging his handgun. Consequently, one of the attackers was fatally injured and Heendeniya was charged with first degree murder by the State of Oklahoma. In June of next year, Heendeniya was <u>acquitted</u> by a 12-person jury. A true and correct copy of the verdict sheet signed by the jury foreperson, is annexed hereto as Exhibit "7."

**57.** At the time of the shooting incident, Heendeniya was attending Oklahoma State University (henceforth, "OSU") in Stillwater, Oklahoma, as were three of the attackers. Heendeniya found out later that the deceased man had been attending a college in Texas.

**58.** An official from OSU later met with Heendeniya and his mother and informed him, that after the shooting, an OSU student had gone for counseling that was offered at OSU, and had confided to a counselor that there were death threats against Heendeniya as a result of the shooting incident.

59. The OSU official told Heendeniya that because of the present danger that existed for him if he were to come back to OSU in the near future, OSU officials were requiring that he not attend OSU again for his own safety.

60. Heendeniya's father who was living in Sri Lanka at the time also received credible death threats that were directed at Heendeniya, that in no unmistakable terms informed his father that if Heendeniya were to ever set foot in Sri Lanka, that he would be killed to avenge the death of the deceased man. Thus, even though Heendeniya left Sri Lanka more than 26 (twenty-six) years ago, he has never gone back to visit Sri Lanka out of grave concern for his safety.

61. Heendeniya has never been convicted of a felony, and thus he has no felonies in his record.

62. One important life lesson Heendeniya learnt from the day he was attacked in 1995 was that, if and when you are attacked by someone/others, it's highly unlikely that anyone will come to your aid. Heendeniya's three (3) roommates (who knew the four attackers) were present in the apartment when he was being surrounded and being attacked, but did nothing to help him because they were scared and intimidated by the four attackers.

63. After Heendeniya was forced to discharge his pistol to protect his life, someone called 911. It took several minutes for the police to come to his apartment. He remembers waiting desperately for the police to arrive, fearing that the remaining three men might regroup and attack him again.

64. Heendeniya knows from personal life-experience the truth of the maxim: **"when seconds count, cops are only minutes away."**

65. Subsequent to the life-and-death, very traumatic incident in Oklahoma, Heendeniya was diagnosed with post-traumatic stress disorder (PTSD) in the later 90's by a psychiatrist in Virginia.

66. Nine years later, on July 07, 2004, while living in Virginia, Heendeniya was visiting his sister who had completed her medical residency program in New York City, in order to help her relocate for her first job. Heendeniya was attacked, approx. 2-blocks away from her apartment, by a knife wielding stranger/man (who must have been high on a strong, central nervous system stimulant given the way he was behaving and his homicidal aggression towards Heendeniya). Heendeniya narrowly escaped from being stabbed to death. Heendeniya got the vehicle tag number of the assailant's get-away SUV, and called 911 for help and to report the crime to the New York City Police Department (NYPD).

67. Heendeniya ended up having to call the NYPD four (4) times and had to wait nearly forty-five (45) minutes for the cops to finally come to his aid. After giving the 2 police officers all the information they would need to find and arrest the assailant, Heendeniya went with his sister to the 68th precinct (which had jurisdiction over the area where Heendeniya was attacked) to attempt to speak to a detective so the NYPD would know that, even though he lived out-of-state, he wanted the assailant to be caught and prosecuted, and that he would gladly travel from Virginia to New York City as many times as necessary to testify against the assailant. Heendeniya and his sister waited for several hours to speak to a detective but were unsuccessful. A few weeks later, a detective from the NYPD phoned Heendeniya in Virginia, to tell him that they were dropping the case, but never told him why they had decided to drop the case despite Heendeniya telling the detective that he was willing to travel to New York City as many times as necessary to testify against the assailant.

**68.** A true and correct copy of the 'Verification of Crime' report from the NYPD Criminal Records Section regarding the incident described above in ¶¶ 66 and 67, is annexed hereto as Exhibit "8."

**69.** Ten years later, in September, 2014, while driving in Hernando County, Florida, Heendeniya was injured and the vehicle he was driving was damaged, by a hit-and-run driver who was driving a powerful, 2010 Dodge Charger car. Because the driver didn't stop, and instead attempted to flee, Heendeniya followed the driver (while honking the horn in an attempt to get the driver to stop so the two parties could wait for the police to arrive) and immediately called 911 for help. Heendeniya followed the hit-and-run driver for approx. ten (10) minutes while talking to the 911 operator and asking for the police to come and stop the reckless driver who was attempting to flee. Finally, the 911 operator told him that the other driver had subsequently called 911, and thus they know the identification information of the hit-and-run driver and that Heendeniya can stop and wait for the police to come and hear his side of the story regarding the auto accident.

**70.** Heendeniya had to wait for over ten (10) more minutes before two (2) deputies from the Hernando County Sheriff's office came to where he was parked on the side of the road. From the beginning, these deputies were both hostile to him, and treated him in a somewhat threatening manner, and made it appear like he was on the wrong for following the other driver (who, as it turned out, was a 31-year old woman). One of the 2 responding deputies-- Deputy Richard Kramer-- tried to intimidate Heendeniya when he politely insisted that the hit-and-run driver be held accountable, and at one point, he loudly threatened to arrest Heendeniya, even though Heendeniya was the first to call 911 and was the original complainant.

71. Later, Heendeniya found out that his call to 911, as the victim of the hit-and-run incident, took place at approx. 3:54PM. According to the call-log of the Viper CAD Call Report # 2014-197096, the aggressive and reckless driver of the 2010 Dodge Charger only called 911 at approx. 4:02PM-- at least 8 minutes after Heendeniya first called 911 asking for help from the police.

72. In the end, the two responding Hernando County Sheriff's deputies refused to even write a traffic ticket against the hit-and-run driver. A true and correct copy of the 3-page CAD Call Report # 2014-197096 (the transcript of the "911 tape"), is annexed hereto as Exhibit "9." The reason personal identifying information has been redacted by the 911 call center is due to a Florida privacy law pertaining to 911 calls.

73. A few hours later, as a result of the above auto accident, Heendeniya had to go to the emergency room. Subsequently, he had to go to several other medical specialists for treatment. It cost approx. $9,400.00 for his medical treatment. It cost approx. $2,200.00 for repairs to the car he was driving. A true and correct copy showing the total cost of his medical treatment (paid for by Geico auto insurance) as of February 04, 2015, is annexed hereto as Exhibit "10." A true and correct copy of the total cost for the repair of the car that Heendeniya was driving that was damaged by the hit-and-run incident, is annexed hereto as Exhibit "11," which has Heendeniya's home address redacted due to privacy reasons.

74. Heendeniya subsequently found out that, had the two responding deputies followed Florida law properly, they could have charged the hit-and-run driver of the 2010 Dodge Charger with the following violations, where at least one violation is a felony, while several others are misdemeanors, and two are moving violations: F.S. § 316.027 - Crash involving death or personal injuries; F.S. § 316.061 - Crashes involving damage to vehicle or property;

F.S. § 316.062 - Duty to give information and render aid; F.S. § 316.192 - Reckless driving;

F.S. § 316.1923 - Aggressive careless driving; and F.S. § 316.1925 - Careless driving.

**75.** Early in 2015, a few months after the hit-and-run accident, thought the auto insurance companies, Heendeniya found out several personal identification information of the hit-and-run driver and the VIN number of the 2010 Dodge Charger. Thus, Heendeniya submitted several of Florida's version of FOIA (called "Florida Sunshine Law") to the Hernando County Sheriff's office (the county agency of the two responding deputies) and a 'Motor Vehicle Records Request' to the Florida Department of Highway Safety and Motor Vehicles.

**76.** Through the Florida FOIA requests, Heendeniya discovered that either the female hit-and-run driver <u>or</u> her husband was a sheriff's deputy working for the Hernando County Sheriff's office. In other words, either the hit-and-run driver or her husband was a <u>colleague</u> and a <u>fellow officer</u> of the two responding deputy sheriffs. In hindsight, it's self-evident why the two responding deputies were so hostile and accusatory towards Heendeniya (who was the original complainant, the first 911 caller, and the victim of the auto accident). A true and correct copy of the response to his Florida FOIA request to the Hernando County Sheriff's office, is annexed hereto as Exhibit "12." A true and correct copy of the response to his Motor Vehicle Records Request to the Florida Highway Safety and Motor Vehicles Department, is annexed hereto as Exhibit "13," which has Heendeniya's home address redacted due to privacy reasons.

**77.** The above described personal crises and life experiences have clearly shown Heendeniya that when you need the assistance of law enforcement officers in an emergency situation, most of the time, they are not around to save you or protect you from imminent danger. And, as described above, Heendeniya has personally observed law enforcement <u>corruption</u> (i.e., the

conduct of the Hernando County Sheriff's office described above in ¶¶ 69-76) and

<u>incompetence</u> (i.e., the conduct of the New York City Police Department described above in

¶¶ 66-67) up-close and personal. When seconds count, cops are indeed minutes away.

**78.** The inept and corrupt conduct of law enforcement officers is well known, particularly among

racial minorities.

**79.** There is a well-known example from 2012 where law enforcement officers did not come to

the aid of a New York City man who was attacked and seriously injured by a knife wielding

man. When he sued the NYPD and New York City because the NYPD officers didn't help or

assist him, he found out that according to the law, law enforcement officers had no special

duty to protect him or come to his aid. A true and correct copy of the 2-page New York Post

article titled "Zero for Hero: Judge Snubs Man Hurt Stopping the Butcher of Brighton

Beach" that describes the ordeal that Mr. Lozito went through, is annexed hereto as Exhibit

"14."

**80.** Heendeniya is aware, and it's a fact according to the law, that law enforcement officers have

no duty to protect a person being attacked and they have no duty to protect a person facing

imminent danger. A true and correct copy of the <u>Lozito v. The City of New York</u> containing

three (3) pages is annexed hereto as Exhibit "15."

**81.** There are two (2) prominent legal cases that are on point in regard to the issue of law

enforcement officers having no legal duty to protect someone in distress and having no legal

duty come to the aid of a person: <u>See</u> <u>Warren v. District of Columbia</u>, 444 A.2d 1 (DC Court

of Appeals 1981) and <u>Town of Castle Rock, Colo. v. Gonzales</u>, 545 U.S. 748 (2005). A true

and correct copy of the <u>Warren</u> decision containing eleven (11) pages is annexed hereto as

Exhibit "16." A true and correct copy of the <u>Town of Castle Rock</u> decision containing

twenty-three (23) pages is annexed hereto as Exhibit "17."

### The SJHHC Defendants Engaged in Unlawful Conduct in Order to Justify Involuntarily Admitting Heendeniya to the Psychiatric Unit.

**82.** At all times herein relevant, defendant Levine, defendant O'Connor, defendant Tremiti,

defendant Roman, defendant French, defendant Briscoe, defendant Cate, defendant Spunelka,

defendant Constantine, defendant Feldman, and defendant Rybak, expressly and/or impliedly

held themselves out to the general public-- including to Heendeniya-- to be competent,

qualified and skilled physicians, nurses, or health-care professionals, capable of and qualified

to properly, <u>accurately</u>, promptly and timely diagnose disease, injury, illness and/or other

medical conditions and emergencies, and to administer timely and appropriate treatment and

care thereto, and otherwise attend upon the patient in accord with the patient's medical,

physical, and mental condition, needs and requirements.

**83.** Upon information and belief, all 22 SJHHC defendants referred to in ¶ 1, were acting within

the scope of their employment and under the direction of defendant SJHHC and its policies,

customs, usage, practices, and procedure.

**84.** On or about April 05, 2013, Heendeniya, who was a resident of Massachusetts, was brought

to the SJHHC by EMS.

**85.** Heendeniya was kept first in the emergency room, next in the intensive care unit, and finally

in the general medical wing of the SJHHC for seven (7) days, from <u>April 05, 2013</u> to <u>April</u>

<u>12, 2013</u>, while being treated for prescription medication overdose and pneumonia.

**86.** The prior cited prescription medication had been prescribed to him by his regular treating

psychiatrist-- Dr. Kimberly Lovett of Island Counseling Center, Worcester, Massachusetts--

for a period of approx. four (4) years.

87. While Heendeniya was at the SJHHC for the first 7-days (prior to his unlawful, involuntary admission to the psychiatric department of defendant SJHHC on April 12, 2013), he didn't exhibit any suicidal, homicidal, delusional, paranoid, or psychotic symptoms whatsoever.

88. While Heendeniya was at the SJHHC for the first 7-days, at no time was he behaving in a manner that could cause harm to himself or others, and he didn't exhibit any suicidal or homicidal ideations.

89. Throughout his stay at SJHHC Heendeniya behaved calmly, and in a manner not causing or not imminently likely to cause harm to himself or others, within the hospital setting.

90. While Heendeniya was at the SJHHC for the first 7-days, he was polite and respectful to all the medical providers and hospital staff throughout those 7-days.

91. While Heendeniya was at the SJHHC for the first 7-days, he answered all the questions that were asked from him by the medical providers (including nurses), and he answered all their questions truthfully and in a non-hostile manner.

92. While Heendeniya was in the emergency department at SJHHC, defendant Dr. Feldman falsely or negligently wrote in hospital records that Heendeniya had a "long history of schizoaffective disorder."

93. While Heendeniya was in the intensive care unit at SJHHC, defendant Dr. Constantine and defendant Rybak falsely or negligently wrote in hospital records that Heendeniya had a "history of schizoaffective disorder."

94. The fact is, Heendeniya has never been diagnosed or treated for an extremely serious mental illness such as schizoaffective disorder or schizophrenia, or for any other type of psychotic, paranoia, or delusional mental disorder.

*Umesh Heendeniya v. St. Joseph's Hospital Health Center, et al.*

95. While Heendeniya was in the intensive care unit of the SJHHC, he was visited by Dr. Lisa O'Connor ("defendant O'Connor"), who was a psychiatrist in SJHHC's psychiatric unit ("unit 3-6"), on two (2) different occasions.

96. While Heendeniya was in the intensive care unit of the SJHHC, he was visited by a registered nurse who worked in SJHHC's psychiatric unit on approx. three (3) different occasions. On information and belief, her name is Joanne French, RN ("defendant French").

97. When defendant O'Connor visited Heendeniya on the 2 different occasions, and she inquired from him, whether he was feeling suicidal or homicidal, Heendeniya clearly and unambiguously stated "No."

98. Heendeniya clearly informed defendant O'Connor that as soon as his pneumonia illness was successfully treated, he wanted to return to his apartment in Massachusetts, and for her to not worry about him because he had no suicidal or homicidal intentions.

99. Heendeniya clearly informed defendant O'Connor that as soon as his pneumonia illness was successfully treated, he wanted to go back to his apartment in Massachusetts because he had an appellate brief that he had to start working on (Heendeniya's employment discrimination lawsuit that was, in April, 2013, before the Massachusetts Appeals Court-- docket # 2013-P-0379). A true and correct copy of the docketing statement, consisting of three (3) pages, of Heendeniya's employment discrimination case that was pending before the Massachusetts Appeals Court, is annexed hereto as Exhibit "18."

100. Defendant O'Connor questioned Heendeniya at length, and he told her his complete biographic, physical and mental health, social, and educational history and background truthfully, and in a non-hostile manner.

**101.**  When asked by defendant O'Connor about any past arrests, Heendeniya told her about his

first degree murder charge in Oklahoma in 1995, and that a 12-person jury acquitted him in

June, 1996.

**102.**  Heendeniya told defendant O'Connor that he had been arrested twice in the past for

carrying firearms while not having the correct concealed carry permit (due to lack of

reciprocity agreements between the States) in his possession.

**103.**  Heendeniya told defendant O'Connor that he was arrested in Iowa (while relocating) in

2002 for possessing firearms, even though at the time, he had a concealed carry permit from

Virginia which unfortunately was not recognized in Iowa (due to lack of reciprocity

agreements between the two states in 2002).

**104.**  Heendeniya told defendant O'Connor that he has no firearm convictions as a result of the

Iowa arrest.

**105.**  Heendeniya told defendant O'Connor that he was arrested in Massachusetts in 2007 for

possessing a firearm, even though at the time, he had a concealed carry permit from Utah

which unfortunately was not recognized in Massachusetts (due to lack of reciprocity

agreements between the two states in 2007).

**106.**  Heendeniya told defendant O'Connor that he has no firearm convictions as a result of the

Massachusetts arrest.

**107.**  When asked by defendant O'Connor whether he had any firearms or access to any firearms

at home, Heendeniya clearly stated "No."

**108.**  When defendant O'Connor asked Heendeniya why he continues to possess guns,

Heendeniya told her that he has death threats after the Oklahoma shooting incident in 1995,

and thus he wanted to protect himself, and also that he was a firm believer in the Second Amendment and firearm rights.

109.    Heendeniya knew at the time, based on his employment discrimination lawsuit that he had been litigating since 2011, that information regarding his Iowa and Massachusetts firearm related arrests were readily available online for anyone doing a Google or Yahoo search by typing his name as a search term.

110.    Heendeniya told defendant O'Connor that his sister, who was a physician, worked in the emergency room at SJHHC and that she and her family lived in a close by suburb.

111.    Heendeniya told defendant O'Connor that he was currently unemployed, that he was dependent on Social Security Disability Insurance (SSDI) payments, and that he lived by himself in his apartment in Massachusetts.

112.    Heendeniya told defendant O'Connor that he was being treated by his regular psychiatrist in Massachusetts for type-2 bipolar disorder (manic depression) and post-traumatic stress disorder (PTSD) for the past approx. five years.

113.    Heendeniya told defendant O'Connor the names of all the psychiatric medications he took daily, that had been prescribed to him for the past approx. four (4) years by his psychiatrist in Massachusetts.

114.    Heendeniya told defendant O'Connor that the psychiatrist who had been treating him for the past approx. five (5) years was Dr. Kimberly Lovett (herein, referred to as "his psychiatrist," "treating psychiatrist," "regular psychiatrist," or "Dr. Lovett"), and that she worked at the Island Counseling Center in Worcester, Massachusetts.

115.    Heendeniya told defendant O'Connor that he was being treated by his regular primary care physician ("PCP") in Massachusetts for type-2 diabetes and high cholesterol.

116.    Heendeniya told defendant O'Connor the names of all the medications he took daily that had been prescribed to him for the past approx. three (3) years by his primary care physician in Massachusetts-- Dr. Asha Naidu.

117.    While Heendeniya was in the intensive care unit at SJHHC, defendant O'Connor falsely or negligently wrote in hospital records that Heendeniya had a "history of schizoaffective disorder."

118.    This was done in spite of Heendeniya clearly and unambiguously informing defendant O'Connor that his psychiatric diagnosis was manic depression and PTSD, and that he had been receiving treatment from his psychiatrist for these two mental disorders for approx. five years.

119.    Even after Heendeniya had informed defendant O'Connor his two psychiatric diagnosis (manic depression and PTSD), the name of his current treating psychiatrist (Dr. Lovett), the name of the psychiatric facility where Dr. Lovett worked at, and the city and State where the psychiatric facility was located, defendant O'Connor failed to make a meaningful effort to get in touch with Dr. Lovett to resolve the discrepancy that existed between what was in the SJHHC hospital records as to Heendeniya's historical psychiatric diagnosis (i.e., what defendant Feldman, defendant Constantine, defendant Rybak, and defendant O'Connor had falsely or negligently written: that Heendeniya had a history of being treated for schizoaffective disorder) and what Heendeniya clearly told defendant O'Connor his two psychiatric illness diagnosis were (i.e., manic depression and PTSD). See NY Mental Hygiene Law § 9.27(d).

120.    Thus, by writing in the hospital records false/incorrect medical diagnosis information as to Heendeniya's prior/historical mental health diagnosis and condition, and doing so without

making a meaningful effort to get in touch with Dr. Lovett to resolve the above noted

significant and material discrepancy, defendant O'Connor engaged in negligence,

carelessness, deviations from accepted standards of care and failure to comply with good,

acceptable medical practice, separate and apart from the negligence, carelessness, deviations

from accepted standards of care and failure to comply with good and acceptable medical

practice of any other responsible party.

121.  There is a significant difference between manic depression and PTSD in comparison to

schizoaffective disorder.

122.  Unlike manic depression and PTSD, schizoaffective disorder is a psychotic mental illness

that leads to hallucinations, psychosis, and frequently leads to detachment from reality (i.e.,

insanity, mental incompetence).

123.  Hence, by falsely or negligently writing in the hospital records that Heendeniya had in the

past been diagnosed and had a history of being treated by his regular treating psychiatrist for

schizoaffective disorder, defendant O'Connor exaggerated and/or increased the (artificial)

justification under which Heendeniya could be involuntarily admitted to SJHHC's

psychiatric ward (unit 3-6) under New York M.H.L. § 9.27, by her resorting to falsity.

124.  Also, by falsely or negligently writing in the hospital records that Heendeniya had in the

past been diagnosed and had a history of being treated by his regular treating psychiatrist for

schizoaffective disorder, defendant O'Connor significantly increased the (artificial)

justification under which Heendeniya could be denied a request to be voluntarily admitted to

unit 3-6 under New York M.H.L. § 9.13, by her resorting to falsity.

125.  Thus, defendant O'Connor (and, as will be shown/ asserted later, defendant Dr. Levine,

defendant Dr. Tremiti, and defendant Dr. Roman) preemptively negated the

opportunity/ability for Heendeniya to avoid an involuntarily admission under NY MHL § 9.27 (and its attendant negative consequences and stigma) by him later attempting to compromise with the SJHHC defendants by agreeing to voluntarily admit himself (as a last resort).

126.    The fact is, defendants O'Connor, Levine, Tremiti, Roman, and Spunelka knew what to do (See prior three paragraphs) to minimize theirs's and SJHHC's legal liability exposure and what to do to maximize SJHHC's profit based on their numerous past individual and collective experiences at admitting patients involuntarily (i.e., NY MHL § 9.27) and under emergency conditions (i.e., NY MHL § 9.39) to SJHHC's psychiatric unit ("unit 3-6").

127.    When Registered Nurse Joanne French ("defendant French") visited Heendeniya on approx. three (3) different occasions, Heendeniya freely spoke to her and told her clearly about his biographic, physical and mental health, social, and educational history and background.

128.    The information Heendeniya gave nurse French covered the gamut of topics and subjects of conversation he had with defendant O'Connor that are cited above in ¶¶ 97-116.

129.    Defendant French informed Heendeniya on her second visit, while he was in the intensive care unit, that they had decided that he would be involuntarily admitted to the SJHHC psychiatric unit after he had sufficiently recovered from pneumonia.

130.    Upon hearing this, Heendeniya expressed his concern to defendant French regarding whether his involuntary admission to the psychiatric unit might negatively impact his right to purchase and possess firearms in the future.

131.    Defendant French told Heendeniya that someone like him should never have access to firearms.

**132.**   Defendant French told Heendeniya that "they are going to make sure that you cannot have firearms in the future."

**133.**   When Heendeniya asked defendant French why they were going to do that, she reminded him about his Oklahoma murder charge.

**134.**   Heendeniya informed defendant French in a non-hostile manner that he was acquitted by a 12-person jury in Oklahoma, and that it was wrong for them to hold that against him.

**135.**   Defendant French responded by reminding Heendeniya about the circumstances of his present admission to SJHHC.

**136.**   Heendeniya told defendant French that he had no suicidal intentions whatsoever and that he was not a danger to anyone.

**137.**   Heendeniya explained to defendant French that the Second Amendment gives him a constitutional right to possess firearms and that he wants to make sure that his right to bear firearms in the future-- when he chooses to-- is not endangered because of the involuntary admission to SJHHC's psychiatric unit.

**138.**   Heendeniya explained to defendant French that when a person goes to a Federal Firearms License (FFL) dealer to buy a firearm, he is required to fill out a form that asks certain questions including whether he has been convicted of a felony and whether he has been involuntarily committed to a psychiatric facility.

**139.**   On hearing this, defendant French asked Heendeniya what makes him think that he has to say "yes" when the question on the form asks him whether he has been involuntarily committed.

140.  Defendant French told Heendeniya that <u>no one will know</u> that he had been involuntary

admitted to SJHHC's psychiatric unit if he doesn't naively tell them, after all, she said it's

protected, private health information.

141.  Heendeniya informed defendant French that he is not going to lie on an official form and

risk being charged with perjury and consequently end up having a felony conviction, given

that he has never been convicted of a felony.

142.  Defendants Dr. Levine, Dr. O'Connor, Dr. Tremiti, Dr. Roman, registered nurse Spunelka,

Dr. Constantine, Dr. Feldman, and nurse practitioner Rybak, <u>negligently or fraudulently</u>,

documented and continued to falsely assert (or vouch for the accuracy of same), until

Heendeniya's unlawful, involuntary admission on April 12, 2013, that he has a history or a

long history of Schizoaffective Disorder.

143.  This was done even though the SJHHC defendants had the weekend of April 06 and 07,

2013, as well as Monday April 08, 2013, to contact Heendeniya's psychiatrist Dr. Lovett by

phone at the Island Counseling Center, to verify whether Heendeniya did have (or whether in

the past, he had been diagnosed with) schizoaffective disorder or some other extremely

serious mental illness (i.e., a psychotic or delusional mental disorder, detachment from

reality, insanity, found to be incompetent).

144.  If the SJHHC defendants had made a reasonable and meaningful effort to contact Dr.

Lovett at the Island Counseling Center by phone, they would have <u>at least</u> been able to talk

on the phone to the doctor-on-call who would have contacted Heendeniya's psychiatrist

during off-hours (given the emergency nature of the call) to get their questions answered, or

the on-call-physician could have checked Heendeniya's medical records-- to the extent

permissible-- to confirm that Heendeniya did not have a history of schizoaffective disorder

and that he did not have an extremely serious mental illness (as the SJHHC defendants were falsely stating on hospital records and New York state official forms). See NY M.H.L. § 9.27(d).

**145.**  If the SJHHC defendants had made a reasonable and meaningful effort to contact Heendeniya's psychiatrist Dr. Lovett by phone at the Island Counseling Center, they may have been able to release Heendeniya to Dr. Lovett's care instead of resorting to the drastic step of involuntarily admitting Heendeniya to unit 3-6 under New York Mental Hygiene Law § 9.27. See NY Mental Hygiene Law § 9.27(d).

**146.**  The fact is, the SJHHC defendants had both, an unfair bias against Heendeniya's ability to exercise his Second Amendment rights and a financial incentive, as reasons to not make a reasonable and meaningful effort to contact Heendeniya's psychiatrist Dr. Lovett by phone at the Island Counseling Center so they could **(i)** find out whether Heendeniya had a history of a psychotic or delusional disorder, **(ii)** find out whether Dr. Lovett would be willing to accept responsibility for Heendeniya if the SJHHC defendants were to release him to the care of Dr. Lovett. See NY Mental Hygiene Law § 9.27(d).

**147.**  This is why defendants Levine, Tremiti, and Roman never visited Heendeniya throughout April 05, 2013 through April 12, 2013, to personally observe him and talk to him in order to make a medical determination whether Heendeniya needed to be involuntarily admitted under New York Mental Hygiene Law § 9.27, instead of, for example, being voluntarily admitted under New York Mental Hygiene Law § 9.13.

**148.**  In fact, defendants Dr. Tremiti, and Dr. Roman never visited Heendeniya throughout his stay at SJHHC from April 05, 2013 to April 17, 2013 to observe him and to speak to him.

149.    The fact is, if defendants Levine, Tremiti, and Roman had visited Heendeniya between

April 05, 2013 through April 12, 2013 (prior to him being unlawfully, involuntarily admitted

to unit 3-6) to personally talk to him and observe him, they would have been able to observe

that he was behaving calmly, that he was polite to everyone, that he was not expressing any

suicidal or homicidal intentions or ideations whatsoever, and that he was not causing or

imminently likely to cause harm to himself or others.

150.    This was manifested by Heendeniya's calm and polite behavior to everyone, him not

expressing any suicidal or homicidal intentions or ideations whatsoever, him clearly telling

"No" when asked by defendants O'Connor and French whether he had any suicidal or

homicidal intentions, him clearly informing defendants O'Connor and French that he wished

to go back to his apartment in Massachusetts in order to start working on his appellate brief

pertaining to his employment discrimination case that was pending in the Massachusetts

Appeals Court in April, 2013.

151.    Even assuming that Heendeniya did engage in self-harm behavior that lead to him being

admitted to the SJHHC emergency room on April 05, 2013, any further risk that he would

subsequently harm himself or subsequently engage in self-harming behavior had attenuated

significantly over the seven (7) days following his admission to the emergency room, before

being unlawfully, involuntarily admitted to the psychiatric unit at SJHHC (in spite of his

calm protests and subsequent plea to be allowed to voluntarily admit himself to unit 3-6 in

order to avoid the involuntary admission status).

152.    Thus, given the 7-day time duration from Heendeniya's admission to SJHHC's emergency

room to the unlawful, involuntary admission to unit 3-6, any risk that he would harm himself

or others, or engage in self-harming or homicidal behavior had attenuated significantly, and

thus Heendeniya no longer posed a substantial risk of physical harm to himself or a substantial risk of physical harm to others, and this was manifested by his calm and respectful behavior during the 7-day period.

153.  On Monday, April 08, 2013, defendants Dr. Tremiti, Dr. Roman, and registered nurse Spunelka fraudulently and/or negligently filled-out the necessary official NY M.H.L § 9.27 involuntary admission forms and signed them, so that Heendeniya could be unlawfully, involuntarily admitted to SJHHC's psychiatric unit against his will on Friday, April 12, 2013.

154.  On Friday, April 12, 2013, defendant Dr. Levine fraudulently and/or negligently filled-out and/or vouched for the accuracy of the false statements and verifications made by defendants Tremiti, Roman, and Spunelka, and defendant Levine signed two (2) of the necessary official NY M.H.L § 9.27 involuntary admission forms, so that Heendeniya could be unlawfully, involuntarily admitted to SJHHC's psychiatric unit against his will on that day.

155.  When defendants Tremiti and Roman filled-out the necessary official NY M.H.L § 9.27 involuntary admission forms and signed them on April 08, 2013, they were required to personally examine Heendeniya "with care and diligence" prior to forming their opinion whether the drastic remedy of  involuntary admission is necessary and indispensable. See the requirements of NY MHL § 9.05(b), MHL § 9.27(a), MHL § 9.27(c), and MHL § 9.27(i).

156.  Defendant Tremiti failed to personally examine Heendeniya prior to completing the official NY M.H.L § 9.27 involuntary admission forms, even though he had three days-- from the time of Heendeniya's admission to SJHHC's emergency room to the time the filled-out the official forms (on 04/08/2013)-- to personally examine him.

157.  Defendant Roman failed to personally examine Heendeniya prior to completing the official NY M.H.L § 9.27 involuntary admission forms, even though he had three days--

from the time of Heendeniya's admission to SJHHC's emergency room to the time he

filled-out the official forms (on 04/08/2013)-- to personally examine him.

158.    Therefore, defendant Tremiti fraudulently or negligently wrote false statements and/or

committed perjury (i.e., MHL § 9.27(c)) by affixing his signature on the official NY state

form, stating falsely that, for example, he "with care and diligence personally examined the

above named person," and "I have formed my opinion on the basis of facts and information I

have obtained (described below and on the reverse side) and my examination of this person,"

and "to the best of my knowledge and belief, the facts stated and information contained in

this certificate are true." This violated the law. See the requirements of NY MHL § 9.05(b),

MHL § 9.27(a), MHL § 9.27(c), and MHL § 9.27(i).

159.    Therefore, defendant Roman fraudulently or negligently wrote false statements and/or

committed perjury (i.e., MHL § 9.27(c)) by affixing his signature on the official NY state

form, stating falsely that, for example, he "with care and diligence personally examined the

above named person," and "I have formed my opinion on the basis of facts and information I

have obtained (described below and on the reverse side) and my examination of this person,"

and "to the best of my knowledge and belief, the facts stated and information contained in

this certificate are true." This violated the law. See the requirements of NY MHL § 9.05(b),

MHL § 9.27(a), MHL § 9.27(c), and MHL § 9.27(i).

160.    Defendants Levine, Tremiti, Roman, and Spunelka falsely or negligently stated,

represented, and/or verified in official NY M.H.L § 9.27 involuntary admission forms that

Heendeniya had a long history of schizoaffective disorder, and thus they knowingly or

negligently either made false statements and/or committed perjury (i.e., MHL § 9.27(c)) by

affixing their signatures in the forms representing this false assertion. This violated the law.

See the requirements of NY MHL § 9.05(b), MHL § 9.27(a), MHL § 9.27(c), and MHL § 9.27(i).

161.    Defendant Tremiti falsely or negligently stated in the official NY M.H.L § 9.27 involuntary admission form that Heendeniya has a long history of schizoaffective disorder, and thus he knowingly or negligently made false statements and/or committed perjury (i.e., MHL § 9.27(c)) by affixing his signature on the form, representing these false assertions. This violated the law. See the requirements of NY MHL § 9.05(b), MHL § 9.27(a), MHL § 9.27(c), and MHL § 9.27(i).

162.    Defendant Roman falsely or negligently stated in the official NY M.H.L § 9.27 involuntary admission form that Heendeniya has a long history of schizoaffective disorder, and thus he knowingly or negligently made false statements and/or committed perjury (i.e., MHL § 9.27(c)) by affixing his signature on the form, representing these false assertions. This violated the law. See the requirements of NY MHL § 9.05(b), MHL § 9.27(a), MHL § 9.27(c), and MHL § 9.27(i).

163.    Defendant Levine falsely or negligently represented or verified on the two official NY M.H.L § 9.27 involuntary admission forms that he signed, that Heendeniya has a long history of schizoaffective disorder, and thus he knowingly or negligently made, represented, and/or verified (statements by defendants Tremiti, Roman, and Spunelka) false statements and/or committed perjury (i.e., MHL § 9.27(c)) by affixing his signature on the two forms representing these false assertions. This violated the law. See the requirements of NY MHL § 9.05(b), MHL § 9.27(a), MHL § 9.27(c), and MHL § 9.27(i).

164.    Defendant Spunelka falsely or negligently represented or verified in the official NY M.H.L § 9.27 involuntary admission form that she signed, that Heendeniya has a long history

*Umesh Heendeniya v. St. Joseph's Hospital Health Center, et al.*

of schizoaffective disorder, and thus nurse Spunelka knowingly or negligently made, represented, and/or verified (statements by defendants Tremiti and Roman) false statements and/or committed perjury (i.e., MHL § 9.27(c)) by affixing her signature on the application forms representing these false assertions, and also vouched for the veracity of multiple false assertions by defendants Tremiti and Roman. This violated the law. See the requirements of NY MHL§ 9.05(b), MHL § 9.27(a), MHL § 9.27(c), and MHL § 9.27(i).

165.   Defendant Tremiti falsely or negligently stated in the official NY M.H.L § 9.27 involuntary admission form that "if this person has to my knowledge received prior treatment, I have, insofar as possible, consulted with the physician or psychologist furnishing such prior treatment." The fact is, he did not make a sufficient or meaningful effort to get in touch with Dr. Lovett. This violated the law. See the requirements of NY MHL § 9.27(d) which defendant Tremiti violated.

166.   Defendant Roman falsely or negligently stated in the official NY M.H.L § 9.27 involuntary admission form that "if this person has to my knowledge received prior treatment, I have, insofar as possible, consulted with the physician or psychologist furnishing such prior treatment." The fact is, he did not make a sufficient or meaningful effort to get in touch with Dr. Lovett. This violated the law. See the requirements of NY MHL § 9.27(d) which defendant Roman violated.

167.   By writing in the official NY M.H.L § 9.27 involuntary admission form false/incorrect medical diagnosis information as to Heendeniya's prior/historical mental health diagnosis and condition, doing so without making a meaningful effort to get in touch with Dr. Lovett to resolve the above noted (¶¶ 92-93, 117-119) significant and material discrepancy, and making false statements that he personally examined Heendeniya on April 08, 2013,

defendant Tremiti engaged in negligence, carelessness, deviations from accepted standards of care and failure to comply with good, acceptable medical practice, separate and apart from the negligence, carelessness, deviations from accepted standards of care and failure to comply with good and acceptable medical practice of any other responsible party.

168.    By writing in the official NY M.H.L § 9.27 involuntary admission form false/incorrect medical diagnosis information as to Heendeniya's prior/historical mental health diagnosis and condition, doing so without making a meaningful effort to get in touch with Dr. Lovett to resolve the above noted (¶¶ 92-93, 117-119) significant and material discrepancy, and making false statements that he personally examined Heendeniya on April 08, 2013, defendant Roman engaged in negligence, carelessness, deviations from accepted standards of care and failure to comply with good, acceptable medical practice, separate and apart from the negligence, carelessness, deviations from accepted standards of care and failure to comply with good and acceptable medical practice of any other responsible party.

169.    By writing, representing, or verifying (falsely vouching for the veracity of assertions by defendants Tremiti, Roman, and Spunelka) in the official NY M.H.L § 9.27 involuntary admission forms false/incorrect medical diagnosis information as to Heendeniya's prior/historical mental health diagnosis and condition, doing so without making a meaningful effort to get in touch with Dr. Lovett to resolve the above noted (¶¶ 92-93, 117-119) significant and material discrepancy, defendant Levine engaged in negligence, carelessness, deviations from accepted standards of care and failure to comply with good, acceptable medical practice, separate and apart from the negligence, carelessness, deviations from accepted standards of care and failure to comply with good and acceptable medical practice of any other responsible party.

170.    By writing, representing, or verifying (falsely vouching for the veracity of assertions by

defendants Tremiti and Roman) in the official NY M.H.L § 9.27 involuntary admission form

false/incorrect medical diagnosis information as to Heendeniya's prior/historical mental

health diagnosis and condition, doing so without making a meaningful effort to get in touch

with Dr. Lovett to resolve the above noted (¶¶ 92-93, 117-119) significant and material

discrepancy, defendant Spunelka engaged in negligence, carelessness, deviations from

accepted standards of care and failure to comply with good, acceptable nursing practice,

separate and apart from the negligence, carelessness, deviations from accepted standards of

care and failure to comply with good and acceptable medical practice of any other

responsible party.

171.    All of the statements that defendants Tremiti and Roman affixed their signatures to, that

were noted in ¶¶ 155-166, were false, and they signed the official forms knowing they were

making false statements, but did so to accomplish their goal of involuntarily admitting

Heendeniya, and thus *via* 18 USC § 922(g)(4), depriving him of his ability to purchase or

possess firearms and ammunition in the future (See ¶¶ 130-141, *supra*).

172.    All of the statements that defendants Tremiti and Roman affixed their signatures to, that

were noted in ¶¶ 155-166 (those statement were false), and which statements defendants

Levine and Spunelka affixed their signatures to (in the official NY state forms), knowing that

they (defendants Levine and Spunelka) were either making false statements or they were

vouching for the veracity of false statements (made by defendants Tremiti and Roman), they

all (defendants Levine, Tremiti, Roman, and Spunelka) did so to accomplish their goal of

involuntarily admitting Heendeniya and thus, *via* 18 USC § 922(g)(4) depriving Heendeniya

of his ability to purchase or possess firearms and ammunition in the future (See ¶¶ 130-141, *supra*).

173.  All of the statements that defendants Levine, Tremiti, Roman, and Spunelka affixed their signatures to, that were noted above in ¶¶ 155-166, were false, and they all signed the official forms knowing they were making false statements, but did so to increase the revenue and profitability of the SJHHC psychiatric unit and SJHHC.

174.  And, as employees of SJHHC, they were well aware that SJHHC had begun a $140 million expansion project the prior year. A true and correct copy of a 2-page article from the Syracuse based 'The Post-Standard' newspaper's website, is annexed hereto as Exhibit "19."

175.  The fact is, in 1983, both federal and state courts held that the United States Constitution prohibits the involuntary hospitalization of a nondangerous mentally ill person. See Project Release v. Prevost, 722 F.2d 960, 971 (2d Cir. 1983) and Matter of Harry M., 96 A.D. 2d 201, 208, 468 N.Y.S. 2d 359, 365 (2d Dep't 1983). See also 14 N.Y.C.R.R § 527.8(a)(4), 14 N.Y.C.R.R § 527.8(c), Scopes v. Shah, 59 A.D.2d 203, 205-06 (3d Dep't 1977), and Matter of Carl C., 126 A.D. 640, 640 (2d Dep't 1987).

176.  As a result of these court decisions, if a physician believes that a mentally ill person required inpatient hospitalization, the physician is also required to certify, under penalty of perjury, that the mentally ill person poses a danger to self or others.

177.  Before the hospital admits the patient, a third physician, who is a member of the psychiatric staff of the hospital, must also certify that the patient satisfies the criteria for admission that is set forth in N.Y. MHL § 9.01, N.Y. MHL § 9.05, and N.Y. MHL § 9.27(e).

178.   Under New York law, a person is said to be dangerous when he poses a substantial threat of causing physical harm to himself or others. See Matter of Harry M., 96 A.D. 2d at 208 (2d Dep't 1983).

179.   There is no necessary co-relation between suffering from mental illness and posing a danger to oneself or others.

180.   Many symptoms of mental illness have no bearing on whether a person poses a danger to oneself or others.

181.   Thus, the criteria for assessing dangerousness are distinct from symptoms of mental illness.

182.   A determination of dangerousness is a risk assessment in which a physician evaluates the likelihood or probability that the mentally ill person will cause harm to either self or others.

183.   When looking at whether a person is dangerous, a physician must look at a number of factors related to the potential of a person for causing harm to oneself or others and, based upon an application of such factors, assesses the likelihood that a person will cause harm.

184.   Significant criteria for assessing a threat of harm to self because of suicidal tendencies include the following: **(i)** the presence of hallucinations or delusions; **(ii)** current or previous attempts at suicide that could have resulted in death; **(iii)** divorced, separated or single marital status, hopelessness, impulsivity; **(iv)** lack of future plans; **(v)** signals of an intent to die; and, **(vi)** a recent loss.

185.   Of the above six criteria for assessing a threat of harm to self because of suicidal tendencies, Heendeniya satisfied only the second criteria, but did not meet any of the other five criteria. In other words, Heendeniya met only one out of the six (1 out of 6) criteria for assessing threat of harm to self.

*Umesh Heendeniya v. St. Joseph's Hospital Health Center, et al.*

**186.**   Significant criteria for assessing a threat of harm to self because of an inability to meet one's essential needs for food, clothing and shelter include the following: **(i)** whether a mentally ill person has suffered from malnutrition or dehydration; **(ii)** whether a mentally ill person has a plan to obtain adequate food, clothing and shelter, if a person is not meeting such needs independently; **(iii)** whether a mentally ill person has left serious medical problems go unattended; **(iv)** whether a mentally ill person understands the need to obtain adequate food, clothing and shelter and treat serious physical disorders; **(v)** the availability of personal support; and, **(vi)** in the absence of personal support, the ability to live independently.

**187.**   Of the above six criteria for assessing a threat of harm to self because of an inability to meet one's essential needs for food, clothing and shelter, Heendeniya <u>did not satisfy a single criteria</u> (<u>0 out of 6</u>).

**188.**   The mental health profession recognizes that an assessment of risk requires an evaluation of empirically-based factors known as 'risk factors' that enhance the risk of harm that an individual poses to self or others.

**189.**   These factors include the following: **(i)** a history of violence; **(ii)** the level of anger inappropriate to situations that an individual manifests; **(iii)** the level of impulse control that an individual manifests; **(iv)** the presence of substance abuse and a history of substance abuse; **(v)** whether intoxication associated with violence or self-destructive behavior; **(vi)** whether the patient has insight into the relationship between substance use and violence or self-destructive behavior; **(vii)** an individual's ability to cause harm as a result of physical size and strength or the presence of weapons; **(viii)** the presence of certain symptoms of extremely serious mental illness, including some command hallucinations, paranoia, and

some delusions; **(ix)** stressors, which may include financial stressors and some family relationships.

**190.**   Of the above noted nine (9) 'risk factors' that enhance the risk of harm that an individual poses to self or others, Heendeniya only meets the ninth risk factor, and worst-case scenario, also perhaps the first. Thus, worst-case scenario, he satisfies only two out of the nine risk factors (2 out of 9).

**191.**   The fact is, even assuming that what lead Heendeniya to be brought to the SJHHC emergency room was a suicide attempt or suicidal behavior, given that during the seven days that he was kept in the emergency room, the intensive care unit, and the general medical wing of SJHHC, his calm behavior, him answering all questions posed to him in a non-hostile and truthful manner, him being fully cooperative throughout his questioning and his treatment, him showing no suicidal or homicidal ideations during the seven (7) days the SJHHC defendants were able to observe him, and the fact that the SJHHC defendants had seven days to observe his above cited consistent, positive behavior should have made them realize that any risk that Heendeniya would engage in self-harm behavior or homicidal behavior had significantly attenuated or significantly diminished since his admission to SJHHC.

**192.**   Therefore, in consideration of the above cited, well-accepted 'risk factors' and 'criteria for assessing a threat of harm to self,' the SJHHC defendants should not have made the medical determination that Heendeniya was presently or in the near future likely to engage in conduct that would likely result in serious physical harm to himself or others. See 14 N.Y.C.R.R § 527.8(a)(4), 14 N.Y.C.R.R § 527.8(c), Scopes v. Shah, 59 A.D.2d 203, 205-06 (3d Dep't 1977), and Matter of Carl C., 126 A.D. 640, 640 (2d Dep't 1987).

193.    Therefore, in consideration of the above cited, well-accepted 'risk factors' and 'criteria for
assessing a threat of harm to self,' the SJHHC defendants <u>should not have</u> made the medical
determination that Heendeniya was presently in need of involuntary care and treatment under
NY MHL § 9.27. <u>See</u> 14 N.Y.C.R.R § 527.8(a)(4), 14 N.Y.C.R.R § 527.8(c), <u>Scopes v. Shah</u>,
59 A.D.2d 203, 205-06 (3d Dep't 1977), and <u>Matter of Carl C.</u>, 126 A.D. 640, 640 (2d Dep't
1987).

194.    The SJHHC defendants unlawfully, involuntarily admitted Heendeniya to unit 3-6 because
of financial reasons and in consideration of SJHHC's profit.

195.    The SJHHC defendants unlawfully, involuntarily admitted Heendeniya to unit 3-6 because
they wanted to deprive him of his ability to purchase and possess firearms in the future (*via*
the prohibition of federal penal statute 18 USC § 922(g)(4)).

196.    The SJHHC defendants unlawfully, involuntarily admitted Heendeniya to unit 3-6 because
SJHHC executives and supervisors (that is, defendant Ruscitto, defendant Gilbert, defendant
Price, defendant Seifter, defendant Welch, and other responsible SJHHC defendants to be
determined during the pre-trial discovery stage) did not provide sufficient training to ensure
that physicians and nurses at SJHHC have developed sufficient expertise in assessing the
present dangerousness of patients who have attempted suicide or exhibited suicidal behavior
prior to admission to the hospital.

197.    The SJHHC defendants unlawfully, involuntarily admitted Heendeniya to unit 3-6 because
SJHHC executives and supervisors (that is, defendant Ruscitto, defendant Gilbert, defendant
Price, defendant Seifter, defendant Welch, and other responsible SJHHC defendants to be
determined during the pre-trial discovery stage) did not engage in sufficient oversight of their
clinical staff to ensure that SJHHC physicians and nurses routinely focus on and apply all

relevant factors related to a person's dangerousness when deciding if a person warrants such a drastic remedy as involuntary psychiatric hospitalization.

198.   The fact that SJHHC defendants had a financial motive to unlawfully, involuntarily admit Heendeniya to unit 3-6 is shown in part, by the fact that in 2012, SJHHC had engaged in a large expansion of its facilities that would cost $140 million. A true and correct copy of a 2-page article from the Syracuse based 'The Post-Standard' newspaper's website, is annexed hereto as Exhibit "19."

199.   Even before the 2012 expansion costing $140 million, SJHHC was known to have engaged in questionable ethical practices and aggressive business practices. A true and correct copy of a 4-page article titled "St. Joe's 'Dead' Patient Awoke as Docs Prepared to Remove Organs" from the Syracuse based 'The Post-Standard' newspaper's website, is annexed hereto as Exhibit "20," that is an example of SJHHC's aggressive organ-harvesting process, and where SJHHC was found-out and rightfully criticized by experts.

200.   In 2014, the Center for Medicare & Medicaid Services ("CMS") notified defendant Ruscitto and the other SJHHC executives that SJHHC was failing to meet the standards required in order for a hospital to meet the "Medicare Conditions of Participation." CMS noted that SJHHC was failing compliance in:

   (i)   42 CFR 482.12 Governing Body.

   (ii)  42 CFR 482.13 Patient Rights.

   (iii) 42 CFR 482.42 Infection Control.

A true and correct copy of the 3-page letter from CMS to defendant Ruscitto (and to the other SJHHC executives at SJHHC), is annexed hereto as Exhibit "21."

201.  This doesn't come as a surprise to Heendeniya given some of the unlawful and unethical conduct that he was subjected to by the SJHHC defendants while he was a patient at SJHHC between April 05, 2013 and April 17, 2013.

202.  There is other evidence that SJHHC was under financial stress on or about the time Heendeniya was a patient at SJHHC. This financial stress was a significant reason why in 2015, SJHHC joined with 'Trinity Health' (apparently, one of the largest healthcare systems in the United States). See, a true and correct copy of a 2-page article titled "Syracuse Hospital Loses $21.6 Million, Wants to Join Big Health System" from the Syracuse based 'The Post-Standard' newspaper's website, which is annexed hereto as Exhibit "22." See also, a true and correct copy of a 2-page article titled "Syracuse Hospital Joining Trinity Health, One of the Biggest U.S. Health Systems" from the Syracuse based 'The Post-Standard' newspaper's website, which is annexed hereto as Exhibit "23."

203.  Naturally, in the environment as it existed at the time Heendeniya was admitted to SJHHC, its executives and supervisors expected SJHHC physicians and nurses to carry their duties and responsibilities in a manner that would maximize the revenue and minimize the expense at SJHHC.

204.  It was well known among the SJHHC executives and supervisors, and the SJHHC physicians and nurses that the SJHHC psychiatric unit (unit 3-6) was a very profitable enterprise.

205.  This is acknowledged, to some extent, in the biographic information for defendant Welch provided on the SJHHC website[2] (i.e., "Deborah Welch is responsible for mission integration, as well as organizational development. A 32-year employee at St. Joseph's,

---

[2] https://www.sjhsyr.org/administration

*Umesh Heendeniya v. St. Joseph's Hospital Health Center, et al.*

Welch has been responsible for the overall operation, administration and management of mental health services for 22 years. ***Under her leadership, St. Joseph's mental health services has grown exponentially*** and has led the way in providing mental health services to those most in need in the Central New York community.") (emphasis added).

206.    Therefore, given SJHHC's aggressive business culture in 2013, it is not surprising that the SJHHC defendants (particularly defendant Levine, defendant O'Connor, defendant Tremiti, defendant Roman, defendant French, defendant Briscoe, defendant Cate, and defendant Spunelka) engaged in unlawful and/or unethical conduct, engaged in perjury, and very aggressive involuntary admission decision-making in light of their personal financial considerations, the expectations of the SJHHC executives and supervisors, and their goal of making SJHHC profitable.

207.    Thus, particularly in regard to involuntary admissions facilitated pursuant to the involuntary provisions of New York's M.H.L., physicians at SJHHC will certify, a mentally ill person or a person who has exhibited suicidal behavior prior to being brought to the hospital, for hospitalization without determining whether or not such person satisfies the criteria for hospitalization set forth in the statute under which the person was involuntarily admitted (for example, N.Y. MHL § 9.27).

208.    This is done, even though a determination of whether a mentally ill person is dangerous requires a physician to determine whether the risk of harm is sufficiently great to warrant the deprivation of liberty that involuntary admission entails. See O'connor v. Donaldson, 422 US 563, 580 (1975), Vitek v. Jones, 445 U.S. 480, 491-92 (1980), and Addington v. Texas, 441 US 418, 425-426 (1979).

209.    Hence, many physicians and psychiatrists at SJHHC pay lip service to the legal constraints

imposed by the NY Mental Hygiene Law and the U.S. Constitution while they make

decisions based on financial considerations that benefit SJHHC and themselves, and

sometimes also the financial status of the subject of the commitment evaluation (in this case,

Heendeniya had health insurance through Medicare and Medicaid).

210.    The latter point in the prior paragraph is significant, given that the NY OMH has

undertaken initiatives which are intended to achieve increased participation by general

hospitals-- both public and private-- in their role in the civil involuntary admission process.

211.    Such initiatives include financial incentives to community hospitals-- both public and

private-- who provide involuntary care and treatment to mentally ill individuals.

212.    Such incentives include the development of Medicaid rate methodologies that are

designed to increase the number of mentally ill individuals to whom inpatient care and

treatment is provided.

213.    On information and belief, at no time has the New York OMH or SJHHC issued

guidelines for physicians employed at SJHHC that inform them of the likelihood and

magnitude of harm that must exist before a physician certifies, a mentally ill person or a

person who has exhibited suicidal behavior prior to being brought to the hospital, for

involuntary psychiatric hospitalization.

214.    As a result, each physician who evaluates a mentally ill person for involuntary admission

purposes imposes his or her values regarding the value of personal liberty when determining

whether the threat of harm posed by a mentally ill person (such as Heendeniya) is sufficiently

great as to warrant depriving such person of liberty. This violates the law. See Project

Release v. Prevost, 722 F. 2d 960, 65-66 (2d Cir. 1983), Vitek v. Jones, 445 US 480, 492-493 (1980), and Project Release, 722 F. 2d at 972.

215. The fact is, when defendant Levine, defendant O'Connor, defendant Tremiti, defendant Roman, and defendant Spunelka made the medical determination and filled the official New York state paperwork necessary to involuntarily admit Heendeniya to unit 3-6, by writing false and material information or knowingly vouching for the veracity of false statements on hospital records and NY state official forms, they in fact involuntarily admitted a mentally ill person who was not a present danger to himself or others.

216. The fact that the four defendants cited in the prior paragraph involuntarily admitted a mentally ill person who was not a present danger to himself or others was apparent given that there was ample evidence that Heendeniya was not a danger to himself or others given his behavior and interactions with SJHHC defendants and others after his admission to SJHHC on April 05, 2013, and the seven (7) days thereafter, combined with the fact that had defendants Levine, O'Connor, Tremiti, and Roman correctly applied the empirically based, well-accepted 'risk factors' and 'criteria for assessing a threat of harm to self' depicted in ¶¶ 184, 186, and 189 to Heendeniya, they would have had to conclude that Heendeniya did not meet the criteria for being involuntarily admitted under N.Y. MHL § 9.27.

217. In certifying Heendeniya for hospitalization, defendants Levine, O'Connor, Tremiti, Roman, and Spunelka made false statements on official New York State forms, and/or committed perjury, and incorrectly concluded that Heendeniya posted a present danger to himself or others.

218. In unlawfully, involuntarily admitting Heendeniya to unit 3-6, defendants Levine, O'Connor, Tremiti, Roman, and Spunelka failed to correctly address and determine whether

or not he **(i)** was presently abusing drugs or alcohol; **(ii)** had a history of unlawful violent or

otherwise dangerous behavior; **(iii)** presently manifested suicidal or homicidal ideation;

**(iv)** had the capacity to cause harm by having possession of weapons; **(v)** manifested

hallucinations, particularly command hallucinations, paranoia and some delusions; or

**(vi)** lacked impulse control.

219.    Instead, defendants Levine, O'Connor, Tremiti, Roman, and Spunelka falsely or

negligently certified and/or committed perjury by stating in official NY state involuntary

admission forms that Heendeniya had a long history of schizoaffective disorder, thus falsely

or negligently artificially increasing the justification for involuntarily admitting Heendeniya

under New York Mental Hygiene Law section 9.27, rather than for example: **(i)** allowing

Heendeniya to voluntarily admit himself under NY MHL section 9.13; **(ii)** making a realistic

and meaningful effort to get in touch with Heendeniya's current treating psychiatrist (Dr.

Lovett) so they could find out whether they could release Heendeniya to Dr. Lovett's care

rather than resorting to the drastic remedy of involuntarily admitting him to unit 3-6;

**(iii)** using a less drastic treatment option such as Assertive Community Treatment ("ACT")

services, given that Heendeniya's sister-- who was an emergency room physician at SJHHC--

lived in a Syracuse suburb and would have gladly let him stay at her home while Heendeniya

received ACT services, thus providing Heendeniya a safe environment where he could live

safely in freedom with the help of willing and able family members. See Scopes v. Shah, 59

A.D.2d 203, 205-06, 398 N.Y.S.2d 911, 913 (3d Dep't 1977) and Project Release v. Prevost,

722 F. 2d 960, 971 (2d Cir. 1983).

220.    SJHHC defendants did not have just cause or legal justification to resort to involuntarily

admitting Heendeniya under NY M.H.L § 9.27, when there were less drastic ways to make

sure that Heendeniya received sufficient mental health treatment and care given that his

sister, who was an ER physician at SJHHC, lived approx. 45 minutes away from the hospital

and consequently, they could have released him to her-- See Scopes v. Shah, 59 A.D.2d 203

(3d Dep't 1977) ("who is capable of surviving safely in freedom by himself or with the help

of willing and able family members or friends").

221.    SJHHC defendants did not have just cause or legal justification to resort to involuntarily

admitting Heendeniya under NY M.H.L § 9.27, when there were less drastic ways to make

sure that Heendeniya received sufficient mental health treatment and care such as *via*

Assertive Community Treatment ("ACT") services given that Heendeniya's sister who was

an ER physician at SJHHC had a home approx. 45-minutes from SJHHC and would have

gladly let him stay with her while he received treatment through ACT services, and if in the

unlikely event Heendeniya were to refuse compliance, then forcing use of ACT services by

way of New York's outpatient commitment law-- NY MHL section 9.60-- popularly known

as Kendra's Law.

222.    After defendants Levine, O'Connor, Tremiti, and Roman wrote some false and material

medical information about Heendeniya in hospital records and official NY state forms in

order to involuntarily admit him to unit 3-6, the administrative coordinator in the psychiatric

unit-- registered nurse Rosaline Spunelka (defendant Spunelka)-- completed the application

for 'involuntary admission on medical certification' to be submitted and filed with the NY

OMH.

223.    Heendeniya admits that SJHHC defendants unlawfully and unjustly, involuntarily

admitted him to SJHHC's psychiatric unit on Friday, April 12, 2013. However, Heendeniya

denies that this involuntarily admission by SJHHC defendants is a legally valid or sufficient

NY M.H.L § 9.27 admission and he denies that his involuntary admission on 04/12/2013 is

an 'involuntary commitment' for purposes of federal statute 18 USC § 922(g)(4) firearm

prohibition.

**224.**   When Heendeniya found out that he was being involuntarily admitted, he politely but

earnestly objected to the involuntary admission under NY M.H.L § 9.27.

**225.**   When Heendeniya realized that the SJHHC defendants were going to insist on

involuntarily admitting him to unit 3-6, to avoid this, out of desperation he asked SJHHC

defendants to let him voluntarily admit himself to the psychiatric unit (rather than under

involuntarily admission status), so the SJHHC defendants could observe him over a period of

time and know that he has no suicidal or homicidal intentions or impulses.

**226.**   He clearly informed two, possibly three, of the SJHHC defendants that he objected to

being involuntarily admitted to SJHHC's psychiatric unit due to his concern that he might

lose his right or ability to purchase or possess firearms in the future.

**227.**   Those two defendants were defendant French (who visited Heendeniya on approx. three

occasions prior to his involuntary admission on 04/12/2013) and a presently unknown

woman (henceforth, "SJHHC Doe #1") who filled out several intake forms in front of

Heendeniya in SJHHC's psychiatric unit on April 12, 2013.

**228.**   Heendeniya told both defendant French and SJHHC Doe #1 of his concern that he might

lose his right or ability to purchase or possess firearms in the future if he were to be

involuntarily admitted to SJHHC's psychiatric unit, and that to avoid this, he would be

willing to voluntarily admit himself to SJHHC's psychiatric unit so that the SJHHC

defendants could observe him over a period of time and be satisfied that he is no longer a

danger to himself or others.

229.    Conveniently (for the SJHHC defendants), SJHHC Doe #1 makes it a point to note that Heendeniya refused to sign SJHHC psychiatric unit's intake forms "Pt refuses to sign citing 2nd Amendment Rights And Green Card."

230.    However, there is no mention by SJHHC Doe #1 regarding Heendeniya's sincere attempt to compromise with her and the SJHHC defendants, by agreeing to voluntarily admit himself to unit 3-6 to appease them, in order to avoid the involuntary admission and its potential negative impact on his ability to purchase and possess firearms and ammunition in the future.

231.    Heendeniya told SJHHC Doe #1 that he will sign the unit 3-6 intake forms if they would not involuntarily admit him, and instead admit him voluntarily to SJHHC's psychiatric unit.

232.    But SJHHC Doe #1 refused and informed Heendeniya that the SJHHC doctors will only take him to unit 3-6 under involuntary condition.

233.    Because of this, Heendeniya refused to sign any of the intake forms except, on information and belief, one form that listed the names and cell phone numbers of his mother and his sister (apparently, since Heendeniya's sister was a physician at SJHHC and thus SJHHC had her contact information, SJHHC Doe #1 wrote down only his mother's phone number).

234.    On the same day (April 12, 2013), nurse Wendy Briscoe interviewed Heendeniya and she completed a "unit 3-6 Progress Notes" form where she noted down that he had informed her that he was diagnosed and treated for PTSD, but conveniently (for the SJHHC defendants) left out the fact that he had also told her that he had been diagnosed and was being treated for manic depression.

235.    Conveniently (for the SJHHC defendants), defendant Briscoe makes it a point to note that Heendeniya refused to sign SJHHC psychiatric unit's intake forms, and noted down that "He

signed disclosures but declined his treatments and procedures stating his second amendment rights and that he is not an American Citizen. He also added that on a pistol permit he would have to admit that he was involuntarily admitted and he believes that if he does not sign this, then he would not perjure himself and commit a felony."

236.    However, there is no mention anywhere by defendant Briscoe regarding Heendeniya's attempt to compromise with her and SJHHC defendants by agreeing to voluntarily admit himself to unit 3-6 to appease them, in order to avoid the involuntary admission and its potential negative impact on his ability to purchase and possess firearms in the future.

237.    Additionally, defendant Briscoe falsely stated in SJHHC unit 3-6 forms that Heendeniya had been provided with documents that informed him of his legal rights.

238.    SJHHC Doe #1, defendant Briscoe, and other SJHHC defendants made it a point to note down statements that Heendeniya made to them that could be used to make him look imminently dangerous or unstable, so as to exaggerate or increase the modicum of evidence they could point to, in order to justify the need to involuntarily admit Heendeniya to unit 3-6, rather than use a less drastic method in order to provide him treatment and verify that he is not a present danger to himself or others.

239.    SJHHC Doe #1, defendant Briscoe, and other SJHHC defendants made it a point to leave out some positive factors in Heendeniya's statements such as his accurate psychiatric diagnosis (as he calmly, unambiguously, and accurately told them), and his calm, polite, and reasonable attempts to compromise with the SJHHC defendants by agreeing to voluntarily admit himself to unit 3-6 so that they could observe him and treat him (and which would not have had a negative impact on Heendeniya's future ability to purchase and possess firearms).

240.    The fact is, from the time Heendeniya was admitted to SJHHC emergency room on April

05, 2013 to the time he was released on April 17, 2013, he informed all the physicians and

nurses who questioned him that he had been diagnosed and was being treated for manic

depression and PTSD for several years.

241.    The reason why the SJHHC defendants-- a majority of whom are healthcare providers

(i.e., physicians and nurses)-- did not write down that Heendeniya had informed them that he

had been diagnosed and was being treated for manic depression and PTSD (and not a

psychotic mental illness such as schizoaffective disorder or a delusional disorder) was

because they wanted to make certain to increase and exaggerate the (artificial/non-existent)

justification they would have in order to exceed the necessary threshold to involuntarily

admit Heendeniya under involuntary admission procedure.

242.    By leaving out and not documenting Heendeniya's multiple statements to multiple

SJHHC healthcare providers during his stay at SJHHC between 04/05/2013 and 04/12/2013

that he had been diagnosed and had been treated for several years for manic depression and

PTSD, and instead falsely writing down that Heendeniya had been diagnosed and had been

treated for a long period for schizoaffective disorder, SJHHC defendants wanted to

sufficiently exceed the threshold (as they saw it) and justification necessary to involuntarily

admit Heendeniya pursuant to NY M.H.L § 9.27, and thereby deprive him of his ability to

purchase and possess firearms and ammunition in the future (*via* 18 USC §922(g)(4) and

its state counterparts), while simultaneously increase revenue and decrease expenses at

SJHHC's psychiatric unit.

243.    That allowed the SJHHC defendants to accomplish two goals simultaneously:

(i) maximize revenue and minimize expenses at SJHHC psychiatric unit when admitting

Heendeniya for treatment under involuntary admission conditions; **(ii)** since the SJHHC defendants knew that once Heendeniya was involuntarily admitted under NY M.H.L § 9.27, he would be implicated under 18 USC §922(g)(4) statute's firearm prohibition and thus he would be prohibited from purchasing and possessing firearms from then on, the SJHHC defendants would be able to achieve their goal of depriving Heendeniya of his right to have firearms in the future.

244.    The fact is, the SJHHC defendants engaged in numerous deceptive and unlawful conduct in their attempt to involuntarily admit Heendeniya to SJHHC's psychiatric unit (for financial reasons and also to deprive Heendeniya of his ability to purchase and possess firearms in the future), and once he was admitted, they similarly attempted to justify on paper (i.e., CYA) their reasons for involuntarily admitting him.

245.    Susan Lynn Cate, LMFT (henceforth, "defendant Cate"), a psychiatric counselor in unit 3-6 spoke to Heendeniya kindly and displayed a very sympathetic manner. But, Heendeniya found out only much later (*via* the 735 pages of medical documents that he requested from SJHHC and subsequently received in early 2015) that behind his back, on an "Intake Assessment – Clinician" form, she made exaggerated statements regarding facts that Heendeniya told her about him, and made mocking statements about him that attempts to paint him in a disparaging manner.

246.    For example, on April 15, 2013, defendant Cate wrote: **"**Patient also has forensic hx of four different weapons possession charges in different states… continue to get caught out of state where he had gun permit with his guns, *each time having a plausible story*. Patient is aware he could easily be deported… *his various forays* into undergrad and grad school… Patient presents…re: his abilities as a "lawyer" representing himself, despite of dropping out

of law school after six months. *Patient acknowledges he's not a lawyer, but spent a lot of time singing his own praises in describing his work on his own legal defenses* both against companies that fired him because of his forensic/criminal record, and also in the defense of at least two, possibly three of the weapons possession charges... *Patient is focused on/full of his ability to do various tasks*, but then cannot stay on task, or complete his education. *Patient is quick to make excuses, while trying to sound like he accepts responsibility*."

247.    The fact is, Heendeniya was in no state of mind to be singing praises about himself or be exaggerating his "deeds," given that he was <u>well aware</u> of the circumstances of his admission to SJHHC on April 05, 2013. Heendeniya was also well aware of his <u>involuntary admission status</u> to a psychiatric hospital and the persistent, grim environment all around him. Thus, all Heendeniya was doing was to simply answer the probing questions that defendant Cate asked of him. Little did he know that defendant Cate, while speaking kindly to him and pretending to be sympathetic to him, was tearing his life-history to shreds and mocking him behind his back. In hindsight, Heendeniya realizes that defendant Cate is a typical SJHHC unit 3-6 employee.

248.    One SJHHC physician-- Dr. Parvaiz Naseem (who is not a defendant in this lawsuit)-- who did not have any ulterior motives (such as depriving Heendeniya of his ability to purchase and possess firearms) behaved ethically and did document truthfully the statements that Heendeniya made to him while Heendeniya was in the SJHHC general medical wing for several days-- that Heendeniya had been diagnosed and had been treated for several years for PTSD and Bipolar Disorder (type-2 bipolar disorder a/k/a manic depression).

249.    Heendeniya was never given any paperwork during his intake to unit 3-6 and throughout his stay in the psychiatric unit that informed him that he had the legal right to challenge his

continuing involuntary admission, using the free legal services offered by the NY Mental Hygiene Legal Services (henceforth, "NY MHLS" or "MHLS"), even though the SJHHC defendants were required by law to do so. See NY MHL § 9.07(a), NY MHL § 9.29(b), NY MHL § 9.11, NY MHL § 47.01, NY MHL § 47.03, and 14 N.Y.C.R.R. § 27.8(d).

**250.** Heendeniya was never told by anyone throughout his stay that he had the legal right to challenge his continuing involuntary admission, using the free legal services offered by the NY MHLS. See NY MHL § 9.31, NY MHL § 9.35, NY MHL § 47.01, NY MHL § 47.03, and 14 N.Y.C.R.R. § 27.8(d).

**251.** Because Heendeniya was indigent at the time in April, 2013, he qualified for free legal representation from the NY MHLS to challenge his retention in unit 3-6 under NY MHL § 9.27 status. See NY MHL § 9.07(a), NY MHL § 9.29(b), NY MHL § 9.11, NY MHL § 47.01, NY MHL § 47.03, and 14 N.Y.C.R.R. § 27.8(d).

**252.** Prior to Heendeniya's unlawful and unjust, involuntary admission to SJHHC's psychiatric unit, he had never been admitted to any psychiatric facility anywhere, as an in-patient or as an out-patient.

**253.** Heendeniya was kept in SJHHC's psychiatric unit for five (5) days and was released on April 17, 2013.

**254.** The fact is, the SJHHC defendants had a strong moral bias to make sure that Heendeniya would lose his firearm rights (*via* his involuntary admission under NY Mental Hygiene Law § 9.27 and thus be prohibited from possessing firearms or ammunition under 18 USC § 922(g)(4)), given that SJHHC is managed, controlled, and/or heavily influenced by the Catholic Church.

255.    Because Heendeniya had been involved in a tragic shooting incident in Oklahoma that

unfortunately resulted in the death of someone, combined with the circumstances that had

brought Heendeniya to SJHHC on April 05, 2013, caused the SJHHC defendants to

unethically and unlawfully resort to taking steps (including lying on official NY state forms

and also committing perjury) to make sure that Heendeniya would lose his ability to purchase

and possess firearms in the future.

256.    The SJHHC defendants also had good legal cover to unlawfully, involuntarily admit

Heendeniya to unit 3-6 because certain NY M.H.L. statutes and caselaw decisions handed

down by New York courts, subsequent to Project Release v. Prevost, 722 F. 2d 960 (2d Cir.

1983), have created a loophole that they could exploit as needed.

257.    This is because, under NY M.H.L. § 9.11, once a patient is involuntarily admitted under

NY M.H.L. § 9.27, the director of the hospital has, by law, five (5) days (excluding Sunday

and holidays) before having to forward the patient's records to the NY MHLS.

258.    Also, under NY M.H.L. § 9.29(b), once a patient is involuntarily admitted under NY

M.H.L. § 9.27, it takes a minimum of five (5) days (excluding Sunday and holidays), before

the director of the hospital has to, by law, provide notice of the patient's legal rights to the

nearest relative of the patient or three designated additional persons.

259.    In Heendeniya's case, he had designated his mother and his sister (See ¶ 233, supra), and

thus the director would have had to give notice of Heendeniya's legal rights to them

personally or by mail.

260.    In addition, under NY M.H.L. § 9.31(c), once a patient, his nearest relative, or a

designated person gives notice to the director of the hospital that s/he wants a hearing to

challenge the retention of the patient in the psychiatric unit, the director, by law, has to

forward a copy of the notice and the patient's record to the supreme court or county court, and also forward a copy of the notice and the patient's record to the NY MHLS.

261.   In Heendeniya's case, had he, one of his relatives, or one of his designated persons had given notice to the hospital director that s/he wants a retention hearing on behalf of Heendeniya before a judge, the director would have had to forward the notice and Heendeniya's hospital records to the Onondaga supreme court or the Onondaga county court.

262.   Therefore, considering the prior five paragraphs, it is not difficult to see that it creates a lot less hassle and a lot less expense for SJHHC to take Heendeniya to the psychiatric unit-- under false and unlawful involuntary admission status-- and then keep him only for a short period, knowing that his firearm rights have been neutralized (due to 18 USC § 922(g)(4)), and then release him before the maximum 5-days (excluding Sundays and holidays) have elapsed (deadline before hospital director has to satisfy ¶¶ 257 and 258 conditions-- NY MHL § 9.11 and NY MHL § 9.29(b) requirements).

263.   The convenient part (for the SJHHC defendants) about this 5-day loophole is that SJHHC wins, NY state wins (i.e., both SJHHC and NY state get to avoid incurring additional expenses), but the patient (in this case, Heendeniya) loses his legal rights and his opportunity to challenge his involuntary retention using the free legal representation by NY MHLS that he was entitled to.

264.   Even if a patient, his nearest relative, or one of his designated persons does give notice to the hospital director that s/he wants a retention hearing to challenge the continued confinement of the patient under NY MHL § 9.27, using the legal services of the MHLS paid for by NY state, once the director forwards the notice and the patient's records to the state

courthouse, NY M.H.L. § 9.31(c) allows up to five (5) more days before a hearing has to be held before a state judge.

265.    Thus, in considering Heendeniya and the SJHHC defendants: after unlawfully, involuntarily admitting Heendeniya to unit 3-6, there are multiple opportunities (in terms of the number of days to keep Heendeniya in the psychiatric ward before he gets a realistic opportunity to go before a judge to assert his legal rights) for the SJHHC defendants to keep him under involuntary admission status and then release him (before there is any opportunity for any court hearing to take place) and not incur additional expenses or attendant administrative burden, but yet be confident that Heendeniya's firearm rights have been neutralized (and thus, knowing that the SJHHC defendants' goal has been achieved).

266.    New York's M.H.L. works currently in such a way that if the patient, one of his relatives, or one of his designated persons were to get a hearing before the judge, that would mean additional expenses and hassle/inconvenience for both the psychiatric hospital staff and the State of New York (i.e., for the court staff, and the NY MHLS system which is overburdened as it is).

267.    This is because of having to transfer the psychiatric patient (under security) to and from the state courthouse; having to make traveling arrangements and incur attendant expenses for at least one-- possible more-- of the psychiatrists and physicians who completed the patient's involuntary admission paperwork to appear in court to testify and to be cross-examined by the NY MHLS counsel paid for by NY state; having to bear the burden of this extra travel time and court time which would take the SJHHC physicians away from bringing in new revenue opportunities for the hospital; and SJHHC having to bear additional administrative

costs and the hospital staff having to bear inconvenience/hassle, acts together as a significant dissuasion as far as the SJHHC defendants are concerned.

268.   And due to controlling caselaw, it works even more to the hospital's advantage-- a patient who is deemed indigent (such as Heendeniya) and thus qualifies for NY state-paid legal representation from NY MHLS counsel, immediately loses his access to the free legal services from MHLS upon his release/discharge from the psychiatric unit.

269.   This is because of controlling legal authority that developed subsequent to the Project Release v. Prevost, 722 F. 2d 960 (2d Cir. 1983) decision-- See Christine Q.Q. v. Capital Dist. Psychiatric Ctr., 487 N.Y.S.2d 167, 168 (N.Y. App. Div., 3d Dep't 1985) (dismissing appeal from order denying as moot patient's application for a hearing pursuant to N.Y. Mental Hygiene Law § 9.39 because she was no longer being confined to psychiatric center pursuant to N.Y. Mental Hygiene Law § 9.39).

270.   This means, the indigent patient (such as Heendeniya) has no way to challenge his involuntary admission to the psychiatric unit in a New York court of law, unless he can come up with adequate funds to retain a private attorney to represent him in court.

271.   By keeping Heendeniya for five (5) days in the psychiatric unit and not informing him, nor giving him any paperwork throughout that time that notified him of his right to challenge his involuntary admission in New York state court using the free, NY MHLS attorneys' assistance, SJHHC defendants violated the law on multiple occasions, because they were biased against Heendeniya being able to exercise his Second Amendment rights and because they were motivated by financial incentives.

272.   Since SJHHC defendants knew that after five days, NY M.H.L. requires that they provide Heendeniya's family members paperwork that notified them of his right (and their right) to

challenge the involuntary admission using the NY MHLS at cost to New York state (i.e., NY M.H.L. § 9.29(b) and NY M.H.L. § 9.11), SJHHC defendants released Heendeniya on the fifth day after his involuntary admission, knowing that Heendeniya's Second Amendment rights had already been implicated through the firearm prohibition contained in 18 USC § 922(g)(4). A true and correct copy of a document from the BATFE website, consisting of one page, showing the draconian effects of the 18 USC § 922(g)(4) statute, is annexed hereto as Exhibit "24."

273.  Even though the Second Circuit stated 32-years ago in <u>Project Release v. Prevost</u>, 722 F. 2d at 960, that the New York State involuntary civil commitments laws satisfy psychiatric patients' due process rights requirements, Heendeniya in fact was intentionally not provided with even the minimal due process safeguards under M.H.L. in his unlawful, involuntary admission to SJHHC's psychiatric ward.

274.  Heendeniya believes that SJHHC defendants have utilized the above cited legal loophole in the NY M.H.L. for several years as an unofficial custom, policy, usage, and practice to minimize expenses and maximize profits in the psychiatric ward, and thereby assist in maximizing SJHHC profits.

275.  Since his release from SJHHC, Heendeniya has not been admitted to any psychiatric facility anywhere, either as an in-patient or as an out-patient.

276.  In early 2015, Heendeniya found out about the existence of 18 USC §922(g)(4) penal statute that allegedly/supposedly prohibits him from being able to exercise his Second Amendment rights, due to his unlawful, involuntary admission to SJHHC's psychiatric unit, as a result of the unlawful and unethical actions of the SJHHC defendants.

**277.**   On January 08, 2015, Heendeniya called SJHHC and spoke to the director of its

psychiatric unit-- Ms. Gael Gilbert (defendant Gilbert).

**278.**   When Heendeniya informed defendant Gilbert about the circumstance he finds himself in

due to his unlawful, involuntary admission to unit 3-6 in April, 2013, she told him that

SJHHC psychiatric unit only started reporting the identification of its patients to the New

York State Division of Criminal Justice Services ("DCJS") from June, 2013-- approx. 1 ½

months after Heendeniya was discharged from unit 3-6.

**279.**   Under New York law, it is the responsibility of DCJS to forward the identification

information of patients, who have been involuntarily admitted to a psychiatric facility in New

York State, to the National Instant Background Check System ("NICS"), which is a

computerized database system that is managed by the Federal Bureau of Investigation (FBI).

**280.**   Defendant Gilbert informed Heendeniya that he can file a grievance with SJHHC if he

wants.

**281.**   Therefore, Heendeniya wrote to the SJHHC defendants informing them about how their

decision to unlawfully, involuntarily admit him to unit 3-6 in April, 2013, has now led to him

being unable to purchase or possess firearms and ammunition, and asking them to rectify the

circumstance and impediment that they unjustly created for him.

**282.**   SJHHC defendants wrote back to Heendeniya refusing to rectify the circumstance and

impediment that they unjustly and unlawfully imposed on him in regards to his gun rights, as

a result of their actions and/or omissions during April 05, 2013 to April 17, 2013.

**283.**   There are no viable federal or NY state remedies available that Heendeniya could turn to

in order to overcome the firearm prohibition existing due to the 18 USC § 922(g)(4) statute

as a result of his NY M.H.L. § 9.27 involuntary admission to SJHHC's psychiatric unit between 04/12/2013 and 04/17/2013.

284.    Under 18 USC § 925(c), an individual prohibited from acquiring a firearm may apply to the U.S. Attorney General for relief from the prohibition, which the Attorney General may grant if "the applicant will not be likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest."

285.    The Bureau of Alcohol, Tobacco, Firearms, and Explosives (henceforth, "ATF") has promulgated a rule detailing the manner that review under 18 USC § 925(c) may be sought-- 27 C.F.R. § 478.144.

286.    However, notwithstanding the provisions of 18 USC § 925(c) and 27 C.F.R. § 478.144, which purport to provide a means to request relief for an individual prohibited from acquiring a firearm, The United States Congress has specifically denied any funding "to investigate or act upon applications for relief from federal firearms disabilities under 18 USC § 925(c)." The Consolidated Appropriations Act, 2010, Pub. L. No. 111-117, 123 Stat. 3034, 3128.

287.    Due to the above lack of funding, the ATF does not, in fact, provide any review under 18 USC § 925(c) to provide relief from a federal prohibition on acquiring or possessing a firearm.

288.    Because the ATF does not provide a review for relief from a federal prohibition on acquiring or possessing a firearm, Heendeniya cannot avail himself of any federal procedure to regain his Second Amendment rights on the grounds that he does not present a threat to himself or others.

289.    Under the NICS Improvement Amendments Act of 2007 (NIAA), Congress provided an alternate route for relief from a federal prohibition on acquiring a firearm in which the

*Umesh Heendeniya v. St. Joseph's Hospital Health Center, et al.*

various states may elect to provide an ATF-approved program to review, approve, or deny applications for such relief. See NICS Improvement Amendments Act of 2007, Pub. L. 110-180, 121 Stat. 2559, 2569-70.

290.    However, even though the State of New York allegedly has an aforementioned ATF-approved program, nonetheless, because SJHHC began reporting the identities of its patients who were involuntarily admitted to its psychiatric unit to the NY State Division of Criminal Justice Services (DCJS) from June, 2013 (after Heendeniya's discharge from unit 3-6), Heendeniya is unable to make use of such alleged NY state relief program.

291.    In addition, NY M.H.L. § 9.27-- the statute under which Heendeniya was unlawfully, involuntarily admitted to SJHHC's psychiatric unit for five days-- is both facially and as-applied unconstitutional.

### New York Mental Hygiene Law § 9.27 is Unconstitutional.

292.    NY M.H.L. § 9.27 is, on its face, unconstitutional because as mentioned in ¶¶ 265, 268-69, there is a legal loophole for healthcare professionals (i.e., physicians and nurses) and hospital administrators to, if they choose to, deprive an indigent patient in unit 3-6 of his firearm rights, by taking in the patient under NY M.H.L. § 9.27 for a very short time period (i.e., a few days of pre-hearing confinement[3]) and then releasing him before the legal requirements to either notify NY MHLS, the patient's nearest relative , or one of his designated persons goes into effect (i.e., the maximum 5-day period, excluding Sundays and holidays, has elapsed).

---

[3] The "pre-hearing confinement" refers to the confinement period that a patient involuntarily admitted to a psychiatric facility is kept, prior to being brought before a judge pursuant to, for example, NY M.H.L. § 9.31.

293.  In Heendeniya's case, the above circumstance was made much worse because he was
      never given any paperwork nor notified verbally of his legal rights, including the availability
      of the free, NY MHLS to challenge his retention as an involuntarily admitted patient.

294.  Another aspect that makes NY M.H.L. § 9.27 facially unconstitutional is the fact that, due
      to the immediate association/implication of a patient involuntarily admitted under NY
      M.H.L. § 9.27 with the firearm prohibition of 18 USC § 922(g)(4) federal statute, there is
      no due process protection that protects the pre-hearing confinement of the patient
      (i.e., the actual admission decision and admission process itself is not examined or
      reviewed under the adversarial judicial process to verify that it comports with
      substantive and procedural due process requirements under the Fourteenth
      Amendment).

295.  Even though Project Release v. Prevost, 722 F.2d 960, 967 (2d Cir. 1983) stated 32 years
      ago that NY Mental Hygiene Law has adequate substantive and procedural due process
      protections under the Fourteenth Amendment to safeguard the rights of those involuntarily
      admitted in New York under M.H.L. § 9.27, that ruling came during the time when there was
      no fundamental constitutional right for people to possess firearms at home for self-defense.
      In other words, Project Release, Id., was decided in 1983 when the Second Amendment to
      the U.S. Constitution was not held to be a fundamental constitutional right bestowing upon
      the people to lawfully possess firearms at home for self-defense.

296.  Thus, if the 3-judge panel that ruled in 1983 in Project Release, supra, had the same
      appellate case before them today, by controlling legal authority (U.S. Supreme Court), the
      panel would have to consider the draconian consequences for patients of their firearm rights

under the Second Amendment, when the patients are involuntarily admitted under NY

M.H.L. § 9.27.

297.    The point is, when the U.S. Supreme Court's District of Columbia v. Heller, 554 U.S. 570

(2008) and McDonald v. Chicago, 561 U.S. 742 (2010) decisions ruled that people have a

fundamental constitutional right to possess firearms at home for self-defense, Project

Release, supra, holding that NY M.H.L. § 9.27 has adequate substantive and procedural due

process protections under the Fourteenth Amendment was made invalid, or at minimum,

highly suspect.

298.    Therefore, Heendeniya alleges, with the utmost respect to the Honorable United

States Court of Appeals for the Second Circuit, that Project Release, 722 F.2d at 960

has been made invalid due to the U.S. Supreme Court's Heller, 554 U.S. at 570 and

McDonald, 561 U.S. at 742 decisions, and also, that the Project Release ruling should

be curtailed for the same reason.

299.    In addition, Project Release left open the possibility for an "as applied" challenge to

the unconstitutionality of NY M.H.L § 9.27 involuntary admission:

> 'We therefore see no basis for overturning Judge Neaher's handling of this case as
> a broad facial challenge to the statute, and we affirm his action. However, we do
> not view his disposition of the alleged "as applied" challenge to the statute as a
> dismissal thereof. Rather, since the appellants' case did not amount to an attack on
> the application of the statutory provisions at issue herein, whether the statute is
> applied constitutionally remains an open question, the resolution of which may be
> accomplished only in the context of an appropriate "as applied" challenge.'

Project Release v. Prevost, 722 F.2d 960, 967, 971 (2d Cir. 1983).

300.    In theory, an indigent patient who is involuntarily admitted under NY M.H.L.

§ 9.27 to a psychiatric facility has, pursuant to NY MHL § 9.07(a), access to counsel

via the NY MHLS.

301.    However, this only works if the psychiatric unit's staff actually inform the patient of his legal rights or give the patient paperwork that lets the patient know of his legal rights.

302.    Thus, unless there is sufficient oversight to make sure that the hospital staff provide the paperwork to the patient that informs him of his legal rights, there is nothing stopping hospital staff from violating the requirements of NY M.H.L.S. § 9.07(a).

303.    In Heendeniya's case, the SJHHC defendants had both ideological reasons based on bias (i.e., Heendeniya's murder charge, even though he was acquitted, and the circumstance that brought him to SJHHC on April 05, 2013), and financial reasons to violate the NY M.H.L.S. § 9.07(a) provision.

304.    Additionally, even if an indigent patient was provided with the paperwork that gave him notice of his legal rights, his access to the legal services of the NY MHLS can be nullified if the hospital discharges the patient prior to the actual state court hearing. See ¶¶ 268-269, *supra*.

305.    This is because the court hearing under NY M.H.L. § 9.31 or NY M.H.L. § 9.35 essentially only operates to determine whether the patient should continue to be retained under the NY M.H.L. statute under which the patient was admitted.

306.    The patient, one of his relatives, or one of his designated persons is never entitled-- under an Article 9 statute of NY M.H.L-- for an opportunity for a hearing before a judge to determine whether his initial admission (not his retention but his initial, pre-hearing confinement) under the NY M.H.L § 9.27 statute was lawful (in Heendeniya's case, it was unlawful given that the SJHHC defendants engaged in

fraud and/or perjury, they did not give any paperwork informing Heendeniya of his

legal rights, and consequently, Heendeniya was not afforded even minimal due

process protections).

307.    Thus, given <u>Heller</u>, 554 U.S. at 570 and <u>McDonald</u>, 561 U.S. at 742, which held

that people have a constitutional right to possess firearms in their homes for

self-defense purposes, there is no adequate due process protection afforded under NY

M.H.L to protect the loss of a patient's Second Amendment rights when he is

involuntarily admitted in New York state under the NY M.H.L § 9.27 statute.

308.    This is particularly true when the patient is indigent, as Heendeniya was in April,

2013, and could not afford the legal services of a private attorney, and thus was

completely dependent on help from the NY MHLS (whose services he was not aware

of, in April, 2013, given that the SJHHC defendants violated the provision of NY

M.H.L.S. § 9.07(a)).

309.    This is precisely why the SJHHC defendants felt, in part, confident in engaging in

the egregious and illegal conduct to ensure that Heendeniya would lose his ability to

purchase and possess firearms in the future: **(i)** because they knew that since

Heendeniya was indigent and unemployed in April, 2013, his chances of being able to

afford a private attorney after being discharged from the hospital (and thus losing

access to free, legal representation by the NY MHLS) was probably non-existent;

**(ii)** because of the <u>very sensitive circumstance</u> under which Heendeniya was admitted

to the SJHHC emergency room, the SJHHC defendants made a calculated

determination-- based on their past, numerous work experiences-- that Heendeniya

probably would not want to fight for his rights in Court where there would be risk of

public disclosure of potentially embarrassing and sensitive personal information;
(iii) because of the very sensitive circumstance of being <u>involuntarily admitted</u> to the
SJHHC psychiatric unit, the SJHHC defendants made a calculated determination--
based on their past, numerous work experiences-- that Heendeniya probably would
not want to fight for his rights in Court where there would be risk of public disclosure
of potentially embarrassing and sensitive personal information; (iv) because the
SJHHC defendants made a calculated determination-- based on their past, numerous
work experiences-- that Heendeniya probably <u>would not be taken seriously</u> by legal
authorities or others,  given that they knew Heendeniya had a record of being arrested
and that it was easily discoverable on the internet via a quick search on Google or
Yahoo (as most people are apt to do these days), that his version of the events and
facts would probably be discounted given that he is a mentally ill person (in
comparison to the defendant SJHHC professionals, many of whom have advanced
degrees and impressive careers, and combined with (ii) and (iii) stated prior,
Heendeniya had an uphill battle to regain his lost Second Amendment rights.

310.    The fact is, NY M.H.L § 9.27 statute and the involuntary admission procedure can
be made constitutional on its face-- given <u>Heller</u>, 554 U.S. at 570 and <u>McDonald</u>, 561
U.S. at 742 rulings-- by requiring that, due to the operation of 18 USC § 922(g)(4)
and its state counterparts, when a patient is involuntarily admitted under NY
M.H.L § 9.27, s/he is entitled to an adversarial judicial hearing in order to determine
the constitutionality (under due process) of the initial admission decision (i.e., the
<u>initial, pre-hearing confinement</u>).

311.    And, by requiring that if the involuntarily admitted patient is indigent (as Heendeniya was in April, 2013), then by operation of the law, he should have immediate access to free, legal representation by the NY MHLS to challenge his initial admission decision (i.e., the initial, pre-hearing confinement) if he chooses to.

312.    And, because of the subsequent caselaw that has arisen (See, ¶ 269, *supra*), by operation of the law, an indigent, involuntarily admitted patient should have the right to free, legal representation by the NY MHLS to challenge his initial admission decision (i.e., the initial, pre-hearing confinement) if he chooses to, even after he is discharged (up to a reasonable time period) by the hospital (i.e., this is a crucial point given the legal loophole that exists by operation of NY M.H.L § 9.11, NY M.H.L § 9.29(b), NY M.H.L § 9.31(c), NY M.H.L § 9.07(a), and ¶ 269, *supra*).

## STATEMENT OF CLAIMS

### COUNT I
Medical Negligence.
(Against the SJHHC Defendants)

313.    Heendeniya repeats the allegations contained in Paragraphs 1 through 312 and, by this reference, incorporates them herein.

314.    During April 05, 2013 to April 17, 2013, Heendeniya came under the care and treatment of SJHHC defendants.

315.    During this period, SJHHC defendants represented, expressly or impliedly, that the care, treatment, management, evaluation, testing, observation and monitoring of Heendeniya was within the scope of their medical practice and was within the scope of their medical knowledge, training, skill, experience and ability.

316.    At all times herein relevant, SJHHC defendants were under a duty to provide Heendeniya
        with proper, competent, comprehensive and timely examination, evaluation, diagnosis, care,
        treatment, and/or consultation.

317.    That during April 05, 2013 to April 17, 2013, SJHHC defendants, expressly and/or
        impliedly agreed to accurately and competently examine, treat, diagnose and care for
        Heendeniya; agreed to provide Heendeniya with proper, competent, comprehensive, timely
        and accurate examination, evaluation, diagnosis, care, treatment, and/or consultation; agreed
        to follow a generally recognized and proper practices and procedures adopted by physicians
        specializing in psychiatry, anesthesiology, emergency medicine, general medicine, general
        surgery, and nursing; and agreed to use reasonable and proper skills and attention to care for
        Heendeniya.

318.    In rendering such services to Heendeniya, SJHHC defendants owed him the duty of
        possessing and exercising the degree of learning, knowledge, skill, care and diligence which
        is ordinarily possessed and exercised by physicians holding themselves out as possessing
        particular knowledge and skill in psychiatry, anesthesiology, emergency medicine, general
        surgery, and general medicine.

319.    During April 05, 2013 to April 17, 2013, Heendeniya presented to the SJHHC defendants
        with signs, symptoms, conditions and/or complaints consistent with Type-2 Bipolar Disorder
        (Manic Depression) and Posttraumatic Stress Disorder (PTSD).

320.    During April 05, 2013 to April 17, 2013, Heendeniya accurately and unambiguously
        conveyed to the SJHHC defendants his correct psychiatric diagnosis, and the list of
        psychiatric medications he had been prescribed by his long-term psychiatrist (Dr. Lovett).

321.    During April 05, 2013 to April 17, 2013, Heendeniya accurately and unambiguously conveyed to the SJHHC defendants the name and place of employment of his long-term psychiatrist.

322.    The SJHHC defendants breached the aforesaid duty to Heendeniya and negligently deviated from proper medical practice, such negligence included, but was not limited to: **(i)** failing to accurately diagnose his psychiatric illnesses; **(ii)** failing to take into account the psychiatric medical diagnosis that Heendeniya accurately and unambiguously conveyed to them; **(iii)** failing to talk to Heendeniya's long-term psychiatrist to find out Heendeniya's accurate psychiatric medical diagnosis, given the permanent and serious repercussions that resulted from Heendeniya's unlawful, involuntary admission under NY M.H.L § 9.27 that included resultant firearm disability due to the operation of 18 USC § 922(g)(4), social stigma, and negative consequences on his future employment opportunities; **(iv)** failing to talk to Heendeniya's long-term psychiatrist to find out Heendeniya's accurate psychiatric medical diagnosis after Heendeniya implicitly denied having schizoaffective disorder and denied having psychotic or delusional symptoms, given the permanent and serious repercussions that resulted from Heendeniya's unlawful, involuntary admission under NY M.H.L § 9.27 that included resultant firearm disability due to the operation of 18 USC § 922(g)(4), social stigma, and negative consequences on his future employment opportunities.

323.    Failing to immediately institute appropriate medical care, treatment and procedures as were indicated and necessary in the treatment of Heendeniya's signs, symptoms, and medical conditions; rendering improper, insufficient and untimely medical care and attention to Heendeniya; and the SJHHC defendants were in other ways negligent, reckless and careless.

324.    As a proximate result of the aforesaid negligence, carelessness and breach of duty by the SJHHC defendants, Heendeniya sustained certain permanent injuries, damages, losses, and disabilities to his legal rights and to his property rights, of which he still suffers and will suffer for an indefinite period of time into the future.

325.    The injuries, damages and disabilities sustained by Heendeniya were caused wholly and solely by the negligent acts, omissions and/or conduct on the part of the SJHHC defendants, and their departures from the accepted and approved standards of medical practice, without any fault on the part of Heendeniya contributing thereto.

326.    In addition to the proof of specific acts of negligence of the SJHHC defendants, Heendeniya reserves the right to rely upon the doctrine of *Res Ipsa Loquitur* to establish the negligence of the SJHHC defendants.

327.    By reason of all the foregoing, some of Heendeniya's legal and property rights have been permanently injured, damaged and disabled, and he demands judgment against the SJHHC defendants in a substantial sum of money therefor, and compensation for the maximum pecuniary amount allowed by law and equity.

### COUNT II
Intentional and/or Reckless Infliction of Emotional Distress.
(Against the SJHHC Defendants)

328.    Heendeniya repeats the allegations contained in Paragraphs 1 through 327 and, by this reference, incorporates them herein.

329.    The conduct of the SJHHC defendants was outrageous, given that they engaged in extrajudicial behavior to ensure that Heendeniya's firearm rights are permanently neutralized (*via* 18 USC § 922(g)(4)) as a result of his unlawful, involuntary admission under NY M.H.L § 9.27 to SJHHC's psychiatric unit.

330. The defendants acted intentionally or recklessly by colluding with each other, committing

perjury or lying on official NY state involuntary admission forms and SJHHC forms,

continuing to write incorrect medical diagnosis regarding Heendeniya's mental illness (i.e.,

schizoaffective disorder instead of manic depression) in order to (artificially) exceed the

threshold necessary to justify resorting to NY M.H.L § 9.27 involuntary admission (that

would permanently neutralize Heendeniya's firearm rights, given that SJHHC only began

reporting its patient identification information to NY DCJS in June, 2013).

331. Heendeniya suffered severe emotional distress because of the death threats he incurred

after the 1995 Oklahoma shooting and his inability to purchase and possess firearms in order

to protect himself, given that **(i)** from his life experiences, he knows that law enforcement

officers are a reactive force and arrive, usually after a violent incident has happened, and not

before so they can prevent or stop it from happening in the first place; **(ii)** law enforcement

have no legal duty to come to his aid or to protect him.

332. The conduct of the defendants was the proximate cause of the emotional distress suffered

by Heendeniya.

333. Heendeniya suffered damages, as a result of defendants' actions and/or omissions and thus

should be compensated for the maximum pecuniary amount allowed by law and equity.

## COUNT III
Negligent Infliction of Emotional Distress.
(Against the SJHHC Defendants)

334. Heendeniya repeats the allegations contained in Paragraphs 1 through 333 and, by this

reference, incorporates them herein.

335. The defendants were negligent in their conduct and/or their omissions because they failed

to take into account that by not making a sufficient and meaningful effort to get in touch with

Heendeniya's treating psychiatrist to resolve the discrepancy that existed in regards to his mental illness diagnosis (i.e., schizoaffective disorder vs. manic depression), they were artificially increasing the justification necessary to exceed the threshold to involuntarily admit Heendeniya under involuntary admission status.

336. As a result, Heendeniya suffered emotional distress.

337. The defendants' actions or omissions caused Heendeniya's distress, fear, feeling of helplessness and sense of vulnerability given that Heendeniya has documented physical disabilities, and consequently, his ability to repel a possible physical assault on him is very limited.

338. Heendeniya suffered physical harm and/or emotional harm including loss of sleep, diarrhea, fear, extreme social isolation (to minimize contact so as to avoid a possible conflict with anyone), and increase in his depression.

339. A reasonable person would have suffered emotional distress under the circumstances that Heendeniya had to endure.

340. Heendeniya suffered damages, as a result of defendants' actions and/or omissions and thus should be compensated for a maximum pecuniary amount allowed by law and equity.

### COUNT IV
Violation of Title III and Title V of the ADA, and Section 504.
(Against the SJHHC Defendants)

341. Heendeniya repeats the allegations contained in Paragraphs 1 through 340 and, by this reference, incorporates them herein.

342. The SJHHC defendants knew that Heendeniya was mentally disabled.

343.    However, the SJHHC defendants knew that Heendeniya was not a person who had an extremely serious mental illness such as schizophrenia, paranoia, a delusional disorder, insanity, detached from reality, etc.

344.    The SJHHC defendants knew that, in consideration of the aforementioned, well-accepted 'risk factors' and 'criteria for assessing a threat of harm to self,' that Heendeniya did not pose a present or imminent threat of physical harm to himself or others. See ¶¶ 184, 186, and 189.

345.    The SJHHC defendants are subject to the Title III (42 U.S.C. §§ 12,181-12,189; ADA §§ 301-310) and Title V (42 U.S.C. §§ 12,201-12,213; ADA §§ 501-513) of the ADA, and to Section 504 of the Rehabilitation Act (29 U.S.C. §§ 701-794).

346.    When Heendeniya found out that he was going to be involuntarily admitted to SJHHC's psychiatric unit under NY M.H.L § 9.27, he immediately voiced his concern to the SJHHC defendants regarding possible adverse consequences to his Second Amendment rights due to such involuntary admission.

347.    The SJHHC defendants had an institutional, extrajudicial, and moral bias against Heendeniya being able to exercise his Second Amendment constitutional rights, given the 1995 Oklahoma shooting incident (of which he was acquitted by a 12-person jury) and the incident surrounding his admission to SJHHC on April 05, 2013.

348.    When Heendeniya spoke to defendant O'Connor, defendant French, defendant Briscoe, and defendant SJHHC Doe #1 about his concern for his firearm rights, the SJHHC defendants were even more determined (due to the SJHHC defendants retaliating against Heendeniya for voicing his constitutional rights in regards to firearms) to make certain to use the combination of NY M.H.L § 9.27 and 18 USC

§ 922(g)(4) to retaliate against Heendeniya, and thus ensure that his firearm

rights are lost permanently.

**349.**    The SJHHC defendants took steps to make sure to unlawfully, involuntarily admit

Heendeniya under false reasons, per NY M.H.L § 9.27, because they wanted to make

sure to deprive him of his ability to purchase and possess firearms *via* 18 USC

§ 922(g)(4).

**350.**    The SJHHC defendants knew that Heendeniya could be kept for a short period in

the psychiatric unit and then quickly be discharged, before his nearest relatives (i.e.,

his mother and his sister) had to be notified of his legal rights and his right to free

legal representation by the NY MHLS legal services.

**351.**    The SJHHC defendants knew that as soon as Heendeniya was discharged by the

hospital after a short stay, that he would immediate lose his right to free, NY MHLS

legal representation, in spite of having been an indigent, involuntarily admitted

patient of unit 3-6.

**352.**    The SJHHC defendants who were the medical care providers, intentionally or negligently

harmed Heendeniya's right and ability to purchase or possess firearms because SJHHC

executives and supervisors (that is, defendant Ruscitto, defendant Gilbert, defendant Price,

defendant Seifter, defendant Welch, and other responsible SJHHC defendants to be

determined during the discovery stage) did not provide sufficient training to physicians and

nurses at SJHHC regarding the dictates and requirements of NY M.H.L, The Second

Amendment constitutional right, and 18 USC § 922(g)(4).

**353.**    The SJHHC defendants who were the medical care providers, intentionally or

negligently harmed Heendeniya's right and ability to purchase or possess firearms

because SJHHC executives and supervisors (that is, defendant Ruscitto, defendant

Gilbert, defendant Price, defendant Seifter, defendant Welch, and other responsible

SJHHC defendants to be determined during the pre-trial discovery stage) did not

engage in sufficient oversight of their clinical staff to ensure that SJHHC physicians

and nurses routinely follow the dictates and requirements of NY M.H.L, The Second

Amendment constitutional right, and 18 USC § 922(g)(4).

354. Consequently, Heendeniya suffered resulting damages and currently, he is unable to

purchase or possess any firearm or ammunition due to the operation of 18 USC § 922(g)(4)

as a direct consequence of his NY M.H.L § 9.27 unlawful, involuntary admission in April,

2013.

355. Heendeniya suffered damages, as a result of defendants' actions and/or omissions and thus

should be compensated for the maximum pecuniary amount allowed by law and equity.

## COUNT V
Civil Conspiracy.
(Against the SJHHC Defendants)

356. Heendeniya repeats the allegations contained in Paragraphs 1 through 355 and, by this

reference, incorporates them herein.

357. There was an association of two or more of the defendants among the SJHHC defendants in

order to deprive Heendeniya of his ability to purchase and possess firearms in the future, and

also in order to minimize the expense to unit 3-6 and maximize profit for SJHHC.

358. The SJHHC defendants had an unlawful objective which was to unlawfully, deprive

Heendeniya of his Second Amendment rights *via* the NY M.H.L § 9.27 involuntary

admission to unit 3-6 even when they knew that Heendeniya did not pose a present or

imminent threat of harm to himself or others.

359. The defendants had an agreement, understanding, or "meeting of the minds" regarding the objective and the means of pursuing it.

360. Pursuant to the agreement, the SJHHC defendants perpetrated an unlawful act against Heendeniya by committing perjury, writing or certifying false information on official NY state forms, and writing falsity in SJHH forms in order to increase the justification necessary to exceed the threshold required for a NY M.H.L § 9.27 involuntary admission.

361. Consequently, Heendeniya suffered resulting damages, some of which include damage to his legal rights and his property rights permanently such that he is unable to purchase or possess any firearms or ammunition due to the 18 USC § 922(g)(4) prohibition.

362. Heendeniya suffered damages, as a result of defendants' actions and/or omissions and thus should be compensated for the maximum pecuniary amount allowed by law and equity.

## REQUESTS FOR RELIEF

WHEREFORE, Heendeniya prays for judgment against the defendants, and each of them, jointly and severally, as follows:

1. Order that, and treat Heendeniya's complaint and Court filings (motions, briefs, etc.) be liberally construed to less stringent standards than formal pleadings filed by bar members. See Erickson v. Pardus, 551 US 89, 94 (2007) ("petitioner has been proceeding, from the litigation's outset, without counsel. A document filed *pro se* is 'to be liberally construed,' *Estelle*, 429 U. S., at 106, and 'a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers,' ibid. (internal quotation marks omitted). Cf. Fed. Rule Civ. Proc. 8(f) ('All pleadings shall be so construed as to do substantial justice')."); Hill v. Curcione, 657 F.3d 116, 122 (2d Cir. 2011) ('We read pro se

complaints with "special solicitude" and interpret them "to raise the strongest [claims] that [they] suggest[]."");

2. By exercising the Court's equity power, order that any and all records pertaining to Heendeniya's involuntary admission to SJHHC's psychiatric unit, that are in the possession and/or control of any and all defendants to this legal action, be permanently expunged. See Goss v. Lopez, 419 U.S. 565, 571-72 (1975) (affirming decision that had provided for expungement as remedy in § 1983 action); Bradley v. Coughlin, 671 F.2d 686, 690 n. 9 (2d Cir. 1982) (section 1983 plaintiff may be entitled to expungement of prison disciplinary proceeding); Thomson v. Harmony, 65 F.3d 1314, 1321 (6th Cir. 1995) (reversing dismissal of claims seeking expungement as remedy in § 1983 action); Wolfel v. Morris, 972 F.2d 712, 719 (6th Cir. 1992) (affirming expungement of prison records as an appropriate § 1983 remedy); Monroe v. Thigpen, 932 F.2d 1437, 1443 (11th Cir. 1991) (remanding with instructions to expunge prison records); Knapp v. Whitaker, 757 F.2d 827, 846-47 (7th Cir. 1985) (district court in § 1983 action properly expunged material in teacher's personnel records);

3. Order judgment in Heendeniya's favor in such amount as will fully compensate him for his losses to the greatest extent allowed by law;

4. Award such compensatory damages, punitive damages, reliance damages, expectation damages, consequential damages, incidental damages, and hedonic damages as allowed by law against the SJHHC defendants in an amount to be decided by a fair and impartial jury;

5. Award fees, costs and disbursements, and attorneys' fees (if Heendeniya is able to get an attorney to represent him, sometime in the future); and

**6.** Grant such further relief as this Court deems fair and just.

<u>**TRIAL BY JURY**</u>

Pursuant to the Seventh Amendment to the United States Constitution and Rule 38 of the

Federal Rules of Civil Procedure, Heendeniya hereby demands a trial by jury on all issues so

triable.

Respectfully submitted,
*pro se*, mentally and physically disabled plaintiff,

Umesh Heendeniya
P. O. Box 5104
Spring Hill, FL-34611
(508)-263-0145
heendeniyavsjosephshospitalny@gmail.com

Dated : March 24, 2016.

*Umesh Heendeniya v. St. Joseph's Hospital Health Center, et al.*