# EXHIBIT 7

**IN THE DISTRICT COURT OF THE 9th JUDICIAL DISTRICT OF**
**THE STATE OF OKLAHOMA SITTING IN AND FOR PAYNE COUNTY**

|  |  |  |
|---|---|---|
| THE STATE OF OKLAHOMA, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. CF-95-466 |
| | ) | |
| UMESH HEENDENIYA, | ) | |
| Defendant. | ) | |

## VERDICT

### MURDER in the first degree

We, the jury, empaneled and sworn in the above-entitled cause, do, upon our oaths, find as follows:

Defendant is:

_____ Guilty and fix punishment at _____.

__X__ Not Guilty.

_____
FOREPERSON

CR 10-14

State of Oklahoma
County of Payne
I, Lisa S. Lambert, Court Clerk, in and for Payne County,
OK, do hereby certify that the above and foregoing is a true
and correct copy of the original instrument now on file and
of record in my office at Stillwater, OK. In testimony hereof
I have hereunto set my hand and affixed my official seal
this ___ day of _____, 20___.
LISA S. LAMBERT, Court Clerk

39

# EXHIBIT 8



**VERIFICATION OF CRIME/ LOST PROPERTY**
PD 542-061 (Rev. 9-66)-16

Search and service fee of $15.00 MUST accompany this application. Except that CRIME VICTIMS will be entitled to a FREE COPY of this report.  MAKE CHECK OR MONEY ORDER PAYABLE TO THE POLICE DEPARTMENT, CITY OF NEW YORK. Mail all requests to the Police Department, Criminal Records Section, P.O. Box 2528, New York 10272-2528. No refund of the search and service fee will be made in any case. ALL APPLICANTS must enclose a stamped self-addressed envelope.

* Complaint Number **6430**  Precinct of Report **65th Precinct-Brooklyn** FOR USE BY CRIMINAL RECORDS SECTION

Mail record to: **Umesh Heendeniya (victim)**
**188 Stearns Road**
**Marlborough, MA-01752**   Applicant's File No.:

1. Exact location where crime/loss took place

Precinct of occurrence **68**

2. Date reported to Police **07|07|04**   Time (if known) **1740 approx 5PM**   This report concerns: ☑ Crime  ☐ Lost Property  ☐ Other (describe)

3. Full name and address of complainant/victim as reported to Police Department

**Umesh Heendeniya  1918 Briarcliff Road, Richmond, VA-23225**

Date and Time of Crime/ Loss of Property (if different then date of report)   DATE **7/7/04**   TIME **1640**   Name of officer who received your report, if known.  NO.

Any additional information which may aid in searching for your report **Italian man put the name of Vinnie - attacked a little east of 08 and then pursued me with a knife and then stabbed both front tires of my Dodge Ram-1500 pickup with his knife.**

*INSTRUCTIONS: In order to find this record you MUST furnish all information requested above, particularly the complaint number and precinct of record (Occurrences). Verification of your request cannot be made without this information. The complaint number may be obtained by calling the precinct or detective squad concerned during the hours of 9 a.m. to 5 p.m. Do Not Detach—Submit in Duplicate.

Applicant's signature **Umesh Heendeniya**   Date **11/17/2006**   Name and address of insurance company   Date

**FOR POLICE DEPARTMENT USE ONLY**

FOLLOWING IS A VERIFICATION OF THE ABOVE REQUEST

MOTOR VEHICLES

CURRENCY

JEWELRY

FURS—CLOTHING

FIREARMS

OFFICE EQUIPMENT

T.V., RADIOS, CAMERAS, ETC.

HOUSEHOLD GOODS

CONSUMABLE GOODS

MISCELLANEOUS

BRIEFLY DESCRIBE MANNER OF CRIME/LOSS OF PROPERTY
**Menacing/Street**
**See narrative attach**

NARRATIVE:
AT T/P/O ABOVE COMPL STATES LISTED PERP DID THREATEN PHYSICAL HARM AFTER BRIEF TRAFFIC INCIDENT. COMPL FURTHER STATES PERP EXITED HIS VEHICLE, SLASHED FRONT TIRES WITH KNIFE AND PROCEEDED TO MENACE COMPL WHILE VERBALLY THREATENING HIM WITH PHYSICAL HARM. VEHICLE FLED N/B ON FORT HAMILTON PARKWAY IN A VAN BLUE/GREEN IN COLOR WITH POSSIBLE NY REG BZF3240 OR BZE3240.

ALARM NO.   Report verified by   Date **12/01/06**

# EXHIBIT 9

## Detail For Response ID: 1991845045492973583

| | |
|---|---|
| Creation Date And Time | 09/11/2014 15:56:04 |
| First Dispatched | 09/11/2014 16:04:32 [508s Create To Dispatch] |
| First Arrived | 09/11/2014 16:16:28 [716s Dispatch To Arrived] |
| Sequence Number | HCSO:2014:197096 |
| | 1223 |
| Primary Resource | Kramer, Richard (HCSO239) |
| | Boylan, James (HCSO362) |
| Status | Disposed |
| Response Type | Information |
| Location | POWELL RD/ENDSLEY RD |
| Address | |
| Zone | 1-5 |
| Priority | 5 Priority 5 |
| Call Origin | P911 |
| Caller Name | |
| Caller Number | |
| Case Numbers | |
| Disposition Codes | _Assistance Rendered |

### First Statuses Per Resource

| 1223 | Dispatch | 09/11/2014 16:04:32 |
|---|---|---|
| 1223 | 10-51 | 09/11/2014 16:05:45 |





Record of Hernando
County Sheriff Office

I attest to the authenticity of this seal

_Lane Erickson_

Records Custodian of Hernando County
Sheriff's Office Designee

Certified on ___

Notary ___

Notary stamp or seal

LANA KAYE ERICKSON
MY COMMISSION # EE173330
EXPIRES February 27, 2016
(407) 398-0153   FloridaNotaryService.com

Record of Hernando
County Sheriff Office

I attest to the authenticity of this seal

Records Custodian of Hernando County
Sheriff's Office Designee

Certified on 4/15/15

| 1223 | 10-97 | 09/11/2014 16:16:28 |
| 1223 | 10-98 | 09/11/2014 16:40:52 |

## Notes

| 09/11/2014 15:54:30 | hdoyle | What does the suspect vehicle look like?--WHI CAR 4DR |
| 09/11/2014 15:55:09 | hdoyle | What is the vehicle description? Make, model, color, year, tag #, etc.--LAST PART OF TAG 2YG |
| 09/11/2014 15:55:36 | hdoyle | What is the driver doing? How is the vehicle reckless?--MADE CALLER RUN OFF THE RDWAY AND DAMAGED HIS VEH |
| 09/11/2014 15:56:02 | hdoyle | Time lapse?--NOW |
| 09/11/2014 15:56:11 | hdoyle | CALLER IS FOLLOWING VEH |
| 09/11/2014 15:56:25 | hdoyle | PASSING GRASS FINCH |
| 09/11/2014 15:56:30 | hdoyle | SB ON EMERSON |
| 09/11/2014 15:57:25 | hdoyle | TURNED ON POWELL |
| 09/11/2014 15:57:33 | hdoyle | WB ON POWELL |
| 09/11/2014 15:58:13 | hdoyle | CALLER IS FOLLOWING IN A 2005 GRN TOY COROLLA |
| 09/11/2014 15:58:48 | hdoyle | TURNING ONTO ENDSLEY SB |
| 09/11/2014 15:58:53 | hdoyle | Address of HCSO:2014:197096 has been modified from |
| 09/11/2014 15:58:56 | hdoyle | Address of HCSO:2014:197096 has been modified from |
| 09/11/2014 15:59:46 | hdoyle | CALLER HAS BEEN NON STOP HONKING HIS HORN TRYING TO GET THE VEH TO STOP |



LANA KAYE ERICKSON
MY COMMISSION # EE173330
EXPIRES February 27, 2016
(407) 398-0153   FloridaNotaryService.com

| | | |
|---|---|---|
| 09/11/2014 16:00:53 | hdoyle | TURNING WB ONTO SATURN |
| 09/11/2014 16:01:47 | hdoyle | POSS A WHI DODGE 4DR CAR |
| 09/11/2014 16:01:58 | hdoyle | NOW NB ON RACKLEY |
| 09/11/2014 16:02:51 | dsouth | CALLER IN THE WHI DODGE LL |
| 09/11/2014 16:03:16 | dsouth | ADV THAT SHE ACCIDENTALLY RAN HIM OFF OF THE ROAD DUE TO A BLIND SPOT |
| 09/11/2014 16:03:29 | dsouth | CALLER NOW ADV THAT SHE DOES NOT WANT TO GO HOME BECAUSE THE SUBJ IS NOW FOLLOWING |
| 09/11/2014 16:03:42 | dsouth | CALLER IS<br><br>... CALLER ALSO HAS KIDS IN THE CAR |
| 09/11/2014 16:04:04 | dsouth | CALLER DOES NOT WANT TO STOP AT ALL |
| 09/11/2014 16:04:39 | dsouth | CALLER IS CONCERNED AND DOES NOT WANT TO STOP BECAUSE HE IS FOLLOWING HER |
| 09/11/2014 16:05:14 | hdoyle | CALLER WILL BE AT |
| 09/11/2014 16:05:35 | hdoyle | 1025 |
| 09/11/2014 16:06:25 | dsouth | 1045          REF THE INCIDENT |
| 09/11/2014 16:40:36 | rkramer | Response HCSO:2014:197096. Call code changed from Reckless Driver to Information. |
| 09/11/2014 16:40:36 | PPSS | HCSO:2014:197096 Priority 3 Priority 3 has been changed to 5 Priority 5 Agent:rkramer Workstation:HCSO-06886 |



LANA KAYE ERICKSON
MY COMMISSION # EE173330
EXPIRES February 27, 2016
(407) 398-0153    FloridaNotaryService.com

Record of Hernando
County Sheriff Office
I attest to the authenticity of this seal
Lana Erickson
Records Custodian of Hernando County
Sheriff's Office Designee
Certified on _____
Notary _____

# EXHIBIT 10

 Medical Info

## Medical Claim Status

Medical Claim Status:                          Open

Total Billed:                                  $21,382.23

Total Paid:                                    $9,475.37

Your medical claim is being handled by Ann Allred. Get Contact
Info.

Do you have new information about your treatment? Send a
treatment update

## Medical Providers
**OTHER**

Total for this provider: $6.32 Billed  $5.06 Paid

| Service Date | Bill Amount | Paid Amount | Status | EOB | Details |
|---|---|---|---|---|---|
| 10/01/2014 | $6.32 | $5.06 | Paid | Not Available | View |

**National Radiology Consultants Pa**

Total for this provider: $230.00 Billed  $184.00 Paid

| Service Date | Bill Amount | Paid Amount | Status | EOB | Details |
|---|---|---|---|---|---|

 FAQ

› How long should it take to
  review and pay medical
  bills?

› How can I send you my
  medical bills?

› Will my examiner be
  notified of my uploaded
  bills?
  See More FAQ

 Resource
Center

› About the Claims Process

› How an Accident Affects
  My Rate

› Insurance Terms

› Reporting a Claim Online

› About GEICO Auto Repair
  Xpress®

# EXHIBIT 11

CUSTOMER #: 127773                          113520

                                            *INVOICE*

**ED MORSE**
*AUTO PLAZA*
BUICK · mazda · SUZUKI · GMC

10133 US Highway 19
Port Richey, FL 34668
(727) 862-5411
MV-24547

PAGE 1

BUS:                    CELL:
SERVICE ADVISOR: 16211 STEVEN A. JOHNSON

| COLOR | YEAR | MAKE/MODEL | VIN | LICENSE | MILEAGE IN / OUT | TAG |
|-------|------|------------|-----|---------|------------------|-----|
|  | 05 | TOYOTA COROLLA |  |  | 140285/140285 |  |

| DEL. DATE | PROD. DATE | WARR. EXP. | PROMISED | P.O. NO. | RATE | PAYMENT | INV. DATE |
|-----------|-----------|-----------|----------|----------|------|---------|-----------|
| 21OCT14 DD |  |  | 17:30 30OCT14 |  |  | 221G | 30OCT14 |

| R.O. OPENED | READY | OPTIONS: | ENG:1.8 Liter DOHC |
|-------------|-------|----------|--------------------|
| 13:07 21OCT14 | 13:06 30OCT14 | | |

| LINE OPCODE TECH TYPE HOURS | LIST | NET | TOTAL |
|---|---|---|---|

**A REPAIR PER BODY SHOP EST**
    BODYEST REPAIR PER BODY SHOP EST
        14967   CBM                                            660.00      660.00
        6 90467A008 RETAINER                    0.89      0.89        5.34
        14 90467-10183 CLIP                     1.12      1.12       15.68
        1 TO1039107 HOLE CVR                   30.00     30.00       30.00
PARTS:   51.02  LABOR:   660.00  OTHER:   0.00  TOTAL LINE A:      711.02
        **********************************************************

**B BODY PAINT**
    BODYPNT BODY PAINT
        15880   CBP                                           519.20      519.20
PARTS:   0.00  LABOR:   519.20  OTHER:   0.00  TOTAL LINE B:      519.20
        **********************************************************

**C** SUSPENSION ALIGNMENT**
    DSGM GENERAL MAINTENANCE
        14800CBMEC                                             69.95       69.95
PARTS:   0.00  LABOR:   69.95  OTHER:   0.00  TOTAL LINE C:       69.95
        **********************************************************

**MISC PAINT AND MATERIALS**
        CMAT                                                  309.30      309.30
SUBL R M P AUTOMOTIVE INC NO INVOICE # VIN 5C431943
        CBM                                                   466.80      466.80

Thank you for the opportunity to service your
vehicle today. Your satisfaction is our #1
Goal. If you are not "COMPLETELY SATISFIED"
with your service experience Please contact
Joe Humet by telephone at 727-862-5411 or by
email at joehumet@edmorse.com

---

**WARRANTY STATEMENT AND DISCLAIMER: PLEASE SEE THE DEALERSHIP'S LIMITED WARRANTY ON THE REVERSE SIDE OF THIS REPAIR INVOICE.**

By signing below, you acknowledge that you were notified of and authorized the Dealership to perform the services/repairs itemized in this Invoice and that you received (or had the opportunity to inspect) any replaced parts as requested by you. The vehicle is being returned to you in exchange for your payment of the Amount Due.

X _____
DATE     CUSTOMER SIGNATURE

**\*SHOP SUPPLY COSTS:** We have added a charge equal to 10% of the total cost of labor and parts, not to exceed $25.00, on the Repair Order. This charge represents costs and profits to the motor vehicle repair facility for miscellaneous shop supplies and waste disposal. The State of Florida requires a $1.00 fee to be collected for each new tire sold in the state (s.403.7181, and a $1.50 fee to be collected for each new or remanufactured battery sold in the state (s.403.7185).

**ALL PARTS ARE NEW UNLESS OTHERWISE INDICATED.**

X _____
AUTHORIZED DEALERSHIP REPRESENTATIVE SIGNATURE

| DESCRIPTION | TOTALS |
|-------------|--------|
| LABOR AMOUNT | 1249.15 |
| PARTS AMOUNT | 51.02 |
| GAS, OIL, LUBE | 0.00 |
| SUBLET AMOUNT | 466.80 |
| MISC. CHARGES * | 309.30 |
| TOTAL CHARGES | 2076.27 |
| LESS INSURANCE | 0.00 |
| SALES TAX | 145.34 |
| PLEASE PAY THIS AMOUNT | 2221.61 |

FILE COPY BODY

DealerCAP ©2008 ADP [0808] SERVICE INVOICE TYPE 2 - SIZC - "LIMITED WARRANTY" - FLORIDA  9630021

# EXHIBIT 12



www.hernandosheriff.org

─── SHERIFF ───
Al Nienhuis

## Hernando County Sheriff's Office

P.O. BOX 10070 – BROOKSVILLE, FL 34603-0070    FAX 352 796-0493    PHONE 352 754-6830

March 23, 2015

To: Umesh Heendeniya

This is in response to your request dated March 21, 2015, pursuant to the Florida Constitution Article I, section 24, and Florida's Public Records Law, Florida Statute Chapter 119.

1. Information on deputies that would identify the location of their home addresses is exempt under Florida State Statute 119.071(4)(d)(2).

Reference items numbered two through six; the Hernando County Sheriff's Office has no records responsive to these requests.

Sincerely,

Lana Erickson
Records Manager
Hernando County Sheriff's Office

LAURA B. JONES
Commission # EE 117744
Expires August 21, 2015
Bonded Thru Troy Fain Insurance 800-385-7019

Record of Hernando
County Sheriff Office
I attest to the authenticity of this seal

Records Custodian of Hernando County
Sheriff's Office Designee
Certified on  3.23.15
Notary
Notary stamp or seal

# EXHIBIT 13



**A SAFER**

**HIGHWAY SAFETY AND MOTOR VEHICLES**

Terry L. Rhodes
Executive Director

2900 Apalachee Parkway
Tallahassee, Florida 32399-0500
www.flhsmv.gov

March 23, 2015

Umesh Heendeniya

Dear Mr. Heendeniya:

Thank you for your recent request regarding motor vehicle/vessel records.

We regret to inform you that the department cannot process your request.  The personal information you are requesting is that of law enforcement personnel.  Pursuant to Section 119.071, Section 4, Part 2d, Florida Statutes, this information is exempt from the provisions of Section 119.07(1), Florida Statutes.

The Driver Privacy Protection Act, 18 United States Code, Sections 2721-2725 (DPPA), exempts personal information contained in motor vehicle or driver license records from disclosure except to individuals/companies which qualify under any of the 15 exceptions outlined therein.  Personal information includes social security number, driver license/identification (ID) card number, name, address, telephone number and medical or disability information.

RECORDS INFORMATION & RESEARCH UNIT
2900 APALACHEE PARKWAY, MS91
TALLAHASSEE, FL 32399
(850) 617-2908

ktg

# EXHIBIT 14

# Zero for Hero: Judge Snubs Man Hurt Stopping 'Butcher of Brighton Beach'

**By Julia Marsh**
**July 26, 2013 | 4:00am**
http://www.nypost.com/2013/07/26/zero-for-hero-judge-snubs-man-hurt-stopping-butcher-of-brighton-beach/





NYPD SCREW: Joseph Lozito (above) sued the NYPD for not helping him when he fought killer Maksim Gelman.
Photo: Steven Hirsch

He's a bona-fide hero who stopped the so-called "Butcher of Brighton Beach" at the end of a 28-hour city killing spree — but a Manhattan judge yesterday said a father of two is entitled to zero from the city for his injuries in the harrowing 2011 subway encounter.

Joseph Lozito sued the NYPD in January 2012, claiming police officers did nothing to help him as he confronted violent madman Maksim Gelman on a packed No. 3 train.

But Judge Margaret Chan tossed the case yesterday, saying that while she lauded Lozito's bravery, cops did not have a specific charge of saving him from Gelman.

**Because "no direct promises of protection were made to Mr. Lozito," the police had "no special duty" to protect him.**

The psycho killer was sentenced to 200 years to life in prison for carving up Lozito with a knife and killing four other people in a drug-fueled spree.

Chan added, "The dismissal of this lawsuit does not lessen Mr. Lozito's bravery or the pain of his injuries. It merely provides a resolution to this litigation."

Lozito, 42, a martial-arts enthusiast, claimed cops hid in the motorman's cab while he disarmed Gelman as the madman slashed at his face, hands, neck and head.

"Mr. Lozito heroically maneuvered the knife away from Gelman and subdued him on the subway floor," Chan wrote in the Manhattan Supreme Court decision.



Maksim Gelman

# EXHIBIT 15

SCANNED ON 7/25/2013

# SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY

PRESENT:   <u>Hon. Margaret A. Chan</u>                    PART 52
                        *Justice*                                        *INDEX* 101088/12

                                                            MOTION DATE   **4/22/13**
                                                            MOTION SEQ. NO.  **002**

JOSEPH LOZITO and ANDREA LOZITO,
                                    **Plaintiffs,**

                        - vs. -

THE CITY OF NEW YORK, THE NEW YORK CITY
POLICE DEPARTMENT, and NEW YORK TRANSIT
AUTHORITY,
                        **Defendants.**   **FILED**

|                                                    | PAPERS NUMBERED |
|----------------------------------------------------|-----------------|
| Moving Papers                                      | 1               |
| Opposition Papers                                  | 2               |
| Reply Papers                                       | 3               |

JUL 25 2013

NEW YORK
COUNTY CLERKS OFFICE

        Defendant City of New York (the City) moved to dismiss this action and plaintiffs submitted opposition *pro se*, although they had an attorney of record. The City served its reply papers on the attorney of record. The motion was held in abeyance until the plaintiffs and their counsel submitted a Consent to Withdraw as Attorney dated April 10, 2013. The City has since provided its reply papers to the Lozitos. Plaintiffs also mailed an unsolicited letter to this Court dated April 23, 2013. The letter was not considered by the court as the motion was fully submitted. The decision on this motion to dismiss is as follows:

        This is an action to recover for personal injures sustained by Mr. Lozito and a derivative action by Ms. Lozito. Mr. Lozito was brutally attacked by a wanted fugitive while he was aboard an uptown bound number 3 train in the County, City and State of New York on February 12, 2011 at approximately 8:45 a.m. The then fugitive and now convicted felon with a 225 year sentence, Maksim Gelman (Gelman), boarded the train after murdering four (4) people and assaulting several others within a short twenty-eight (28) hour time span. During his last burst of terror, Gelman was inside the front-most subway car on the number 3 train at the same time as Mr. Lozito and two (2) New York City Police Officers, P.O. Terrance Howell and P.O. Tamara Taylor. The officers were notified of reports that Gelman was on foot in the subway between 34th Street and 42nd Street. In pursuit of Gelman, the officers boarded the first car and proceeded to enter the motorman's booth at the front end of the subway car. The subway car slowly proceeded into the tunnel between 34th Street and 42nd Street and came to a stop between stations. At this point, Mr. Lozito had no interaction with the police officers nor Gelman. Gelman, who was in fact on board the same subway car, approached the closed motorman's booth and claimed that he was a police officer. Denied from entering, Gelman turned around and walked towards Mr. Lozito. Another passenger approached the motorman's booth and excitedly motioned for the officers to come out. Gelman randomly confronted Mr. Lozito without provocation.

Check one:   ☒ **FINAL DISPOSITION**      ☐ **NON-FINAL DISPOSITION**
Check if appropriate:   ☐ **DO NOT POST**   ☐ **REFERENCE**

By plaintiffs' account, Gelman stood before him and proclaimed "you're gonna die, you're gonna die." (Deft Mot, Exh E, p 17). Then Gelman lunged at Mr. Lozito with an eight (8) inch knife cutting and stabbing him on the face, hands, neck, and head (*see id* at 17-19). Mr. Lozito heroically maneuvered the knife away from Gelman and subdued him on the subway floor. The officers left the motorman's booth and restrained Gelman in handcuffs. Mr. Lozito claimed the police officers did not emerge from the motorman's booth to apprehend Gelman until the attack on him was underway.

Officer Howell's recollection of the events described how he observed something made of metal in Gelman's hands when Gelman approached the motorman's booth (*see* Deft Mot, Exh F, p 2). Officer Howell yelled "gun" and took cover in the motorman's booth (*see id*.). Officer Howell ordered Gelman to drop his weapon, an order that was ignored, and he proceeded to "physically remove and recover the knife from [Gelman's] hand." (*id.* at 2, para 9). Officer Howell placed Gelman in handcuffs.

The crux of Mr. Lozito's claim lies in the seconds that it took the police officers to intervene and eventually apprehend Gelman. Plaintiffs claimed that the officers negligently secured their own safety in the motorman's booth while observing the attack on Mr. Lozito. Plaintiffs also claimed the police officers were negligent in failing to recognize Gelman when they boarded the train and in failing to heed the warnings made by another passenger (*see* Deft Mot, Exh B, para 18).

The attack on Mr. Lozito was shocking and horrific, as was every confrontation that Gelman had during his twenty-eight (28) hour crime spree. The crimes against Mr. Lozito were made even more compelling by his own narrative provided in his opposition. Mr. Lozito's *pro se* opposition papers are thoughtful, eloquently written, and demonstrated his zest and love of life which propelled him to survive the attack by Gelman and defend himself. Mr. Lozito described in dramatic detail the blows and defensive maneuvers he used to disarm and take down Gelman. His statements ring true and appear highly credible.

However, it is well settled that absent a special relationship, discretionary governmental functions such as the provision of police protection are immune from tort liability (*see Valdez v City of New York*, 18 NY3d 69 [2011]; *Cuffy v City of New York*, 69 NY2d 255 [1987]; *Kircher v City of Jamestown*, 74 NY2d 251 [1989] *Yearwood v Town of Brighton*, 64 NY2d 667 [1984]). Despite even very sympathetic facts, public policy demands that a damaged plaintiff be able to identify the duty owed specifically to him or her, not a general duty to society at large (*see Lauer v City of New York*, 95 NY2d 95 [2000]; *Johnson v Jamaica Hosp.*, 62 NY2d 523, 527 [1984]; *Palsgraf v Long Is. R.R. Co.*, 248 NY 339 [1928]). "This is especially so where an individual seeks recovery out of the public purse." (*see Lauer v City of New York*, 95 NY2d at 100). The law is abundantly clear that no liability flows from negligence in the performance of a police function unless there is a special relationship (*see Yearwood v Town of Brighton*, 64 NY2d 667). Even giving Mr. Lozito every favorable inference (*see Derdiarian v Felix Contr. Corp.*, 51 NY2d 308 [1987]), this court nonetheless is bound to grant the defendants' motion to dismiss; plaintiffs have failed to allege a *prima facie* case of negligence as these facts do not establish a special relationship.

The criteria for establishing a special relationship were set forth by the Court of Appeals in *Cuffy v City of New York*, 69 NY2d 255. "The elements of this 'special relationship' are: (1) an assumption by the municipality, through promises or actions, of an affirmative duty to act on behalf of the party who was injured; (2) knowledge on the part of the municipality's agents that inaction could lead to harm; (3) some form of direct contact between the municipality's agents and the injured party; and (4) that party's justifiable reliance on the municipality's affirmative undertaking" (*Id.* at 260). While plaintiffs pointed to the officers' close proximity to the attack and their perceived ability to prevent it, proximity does not create a special relationship (*see id.*). Mr. Lozito conceded that he had no communication or contact with the police officers before the attack took place. The first prong of the *Cuffy* elements was not met here. No direct promises of protection were made to Mr. Lozito nor were there direct actions taken to protect Mr. Lozito prior to the attack. Therefore, a special duty did not exist.

Ultimately, this case must be dismissed as a matter of law (*see id*; *Valdez v City of New York*, 18 NY3d 69; *Blackstock v Board of Educ. of the City of New York*, 84 AD3d 524 [1st Dept 2011]). The dismissal of this lawsuit does not lessen Mr. Lozito's bravery or the pain of his injuries. It merely provides a resolution to this litigation.

Accordingly, the defendant's motion is granted and the complaint is dismissed.

Dated: July 18, 2013

Margaret A. Chan , J.S.C.

MARGARET A. CHAN
J.S.C.

FILED

JUL 25 2013

NEW YORK
COUNTY CLERK'S OFFICE

# EXHIBIT 16

KeyCite Yellow Flag - Negative Treatment

**Declined to Extend by** Gallashaw v. City of Philadelphia, E.D.Pa., March 9, 2011

444 A.2d 1
District of Columbia Court of Appeals.

Carolyn WARREN, et al., Appellants,
v.
DISTRICT OF COLUMBIA, et al., Appellees.
Wilfred NICHOL, Appellant,
v.
DISTRICT OF COLUMBIA METROPOLITAN
POLICE DEPARTMENT, et al., Appellees.

Nos. 79-6, 79-394.   |   Argued En Banc
April 13, 1981.   |   Decided Dec. 21, 1981.

Suits against District of Columbia and individual members of metropolitan police department for negligent failure to provide adequate police services were dismissed by the Superior Court, Joseph M. Hannon and William C. Pryor, JJ., and plaintiffs appealed. The Court of Appeals, Nebeker, J., held that: (1) fact that police answered call and arrived outside premises which were scene of burglary and assaults did not give rise to special duty on part of police toward victims therein, and police officers were not answerable in damages for failing to ascertain that assaults were continuing upon victims therein, or for leaving premises without so ascertaining, and (2) where unknown occupants in vehicle which rear-ended another proceeded to beat operator of foremost vehicle, duty of officer arriving on scene was directly related to his official and general duty to investigate offenses, and his directing companion of assault victim to cease efforts to identify assailants, and thus to break off violent confrontation, related solely to his duty to public generally and possessed no additional element necessary to create overriding special relationship and duty to particular persons, and gave rise to no liability.

Affirmed.

Kelly, J., filed opinion concurring in part and dissenting in part in which Mack, J., joined.

Newman, C. J., filed statement concurring in part and dissenting in part.

West Headnotes (3)

[1]   **District of Columbia**
      Officers, Agents, and Employees
      132  District of Columbia
      132k7  Officers, Agents, and Employees
      Government and its agents are under no general duty to provide public services, such as police protection, to any particular individual citizen, but, rather, duty to provide public services is owed to public at large, and, absent special relationship between police and individual, no specific legal duty exists.

      61 Cases that cite this headnote

[2]   **District of Columbia**
      Officers, Agents, and Employees
      132  District of Columbia
      132k7  Officers, Agents, and Employees
      That police answered call and arrived outside premises which were scene of burglary and assaults did not give rise to special duty on part of police toward victims therein, and police officers were not answerable in damages for failing to ascertain that assaults were continuing upon victims therein, or for leaving premises without so ascertaining.

      28 Cases that cite this headnote

[3]   **District of Columbia**
      Officers, Agents, and Employees
      132  District of Columbia
      132k7  Officers, Agents, and Employees
      Where unknown occupants in vehicle which rear-ended another proceeded to beat operator of foremost vehicle, duty of officer arriving on scene was directly related to his official and general duty to investigate offenses, and his directing companion of assault victim to cease efforts to identify assailants, and thus to break off violent confrontation, related solely to his duty to public generally and possessed no additional element necessary to create overriding special relationship and duty to particular persons, and gave rise to no liability.

28 Cases that cite this headnote

**Attorneys and Law Firms**

**\*1** Stephen A. Friedman, Washington, D. C., for appellants.

Charles L. Reischel, Deputy Corp. Counsel, with whom Judith W. Rogers, Corp. Counsel, and David P. Sutton, Asst. Corp. Counsel, Washington, D. C., were on the petition, for appellees.

Before NEWMAN, Chief Judge, and KELLY, KERN, NEBEKER, HARRIS, MACK and FERREN, Associate Judges.

**Opinion**

NEBEKER, Associate Judge:

Appellants Carolyn Warren, Miriam Douglas, and Joan Taliaferro in No. 79-6, and appellant Wilfred Nichol in No. 79-394 sued the District of Columbia and individual members of the Metropolitan Police Department for negligent failure to provide adequate police services. The respective trial judges held that the police were under no specific legal duty to provide protection to the individual appellants and dismissed the complaints for failure to state a claim upon which relief could be granted. Super.Ct.Civ.R. 12(b)(6). However, in a split decision a three-judge division of this court determined that appellants Warren, Taliaferro and Nichol were owed a special duty of care by the police department and reversed the trial court rulings. The division unanimously concluded that appellant Douglas failed to fit within the class of persons to whom a special duty was owed, and affirmed the lower court's dismissal of her complaint. The court en banc, on petitions for rehearing, vacated the panel's decision. After reargument, notwithstanding our sympathy for appellants who were the tragic victims of despicable criminal acts, we affirm the judgments of dismissal.

**Appeal No. 79-6**

In the early morning hours of March 16, 1975, appellants Carolyn Warren, Joan Taliaferro, and Miriam Douglas were asleep in their rooming house at 1112 Lamont Street, N.W. Warren and Taliaferro shared a room on the third floor of the house; Douglas shared a room on the second floor with her four-year-old daughter. The women were awakened by the sound of the back door being broken down by two men later identified as Marvin Kent and James Morse. The men entered Douglas' second floor room, where Kent forced Douglas to sodomize him and Morse raped her.

Warren and Taliaferro heard Douglas' screams from the floor below. Warren telephoned the police, told the officer on duty that the house was being burglarized, and requested immediate assistance. The department employee told her to remain quiet and assured her that police assistance would be dispatched promptly. Warren's call was received at Metropolitan Police Department Headquarters at 6:23 a. m., and was recorded as a burglary in progress. At 6:26 a. m., a call was dispatched to officers on the street as a "Code 2" assignment, although calls of a crime in progress should be given priority and designated as "Code 1." Four police cruisers responded to the broadcast; three to the Lamont Street address and one to another address to investigate a possible suspect.

Meanwhile, Warren and Taliaferro crawled from their window onto an adjoining roof and waited for the police to arrive. While there, they saw one policeman drive through the alley behind their house and proceed to the front of the residence without stopping, leaning out the window, or getting out of the car to check the back entrance of the house. A second officer apparently knocked on the door in front of the residence, but left when he received no answer. The three officers departed the scene at 6:33 a. m., five minutes after they arrived.

Warren and Taliaferro crawled back inside their room. They again heard Douglas' continuing screams; again called the police; told the officer that the intruders had entered the home, and requested immediate assistance. Once again, a police officer assured them that help was on the way. This second call was received at 6:42 a. m. and recorded merely as "investigate the trouble"-it was never dispatched to any police officers.

Believing the police might be in the house, Warren and Taliaferro called down to Douglas, thereby alerting Kent to their presence. Kent and Morse then forced all three women, at knifepoint, to accompany them to Kent's apartment. For the next fourteen hours the women were held captive, raped, robbed, beaten, forced to commit sexual acts upon each other, and made to submit to the sexual demands of Kent and Morse.

Appellants' claims of negligence included: the dispatcher's failure to forward the 6:23 a. m. call with the proper degree of urgency; *3 the responding officers' failure to follow standard police investigative procedures, specifically their failure to check the rear entrance and position themselves properly near the doors and windows to ascertain whether there was any activity inside; and the dispatcher's failure to dispatch the 6:42 a. m. call.

**Appeal No. 79-394**

On April 30, 1978, at approximately 11:30 p. m., appellant Nichol stopped his car for a red light at the intersection of Missouri Avenue and Sixteenth Street, N.W. Unknown occupants in a vehicle directly behind appellant struck his car in the rear several times, and then proceeded to beat appellant about the face and head breaking his jaw.

A Metropolitan Police Department officer arrived at the scene. In response to the officer's direction, appellant's companion ceased any further efforts to obtain identification information of the assailants. When the officer then failed to get the information, leaving Nichol unable to institute legal action against his assailants, Nichol brought a negligence action against the officer, the Metropolitan Police Department and the District of Columbia.

[1] [2] The trial judges correctly dismissed both complaints. In a carefully reasoned Memorandum Opinion, Judge Hannon based his decision in No. 79-6 on "the fundamental principle that a government and its agents are under no general duty to provide public services, such as police protection, to any particular individual citizen." See p. 4, infra. The duty to provide public services is owed to the public at large, and, absent a special relationship between the police and an individual, no specific legal duty exists. Holding that no special relationship existed between the police and appellants in No. 79-6, Judge Hannon concluded that no specific legal duty existed. We hold that Judge Hannon was correct and adopt the relevant portions of his opinion. Those portions appear in the following Appendix.[1]

[3] Judge Pryor, then of the trial court, ruled likewise in No. 79-394 on the basis of Judge Hannon's opinion. In No. 79-394, a police officer directed Nichol's companion to cease efforts to identify the assailants and thus to break off the violent confrontation. The officer's duty to get that identification was one directly related to his official and general duty to investigate the offenses. His actions and

failings were solely related to his duty to the public generally and possessed no additional element necessary to create an overriding special relationship and duty.[2]

Here the effort to separate the hostile assailants from the victims-a necessary part of the on-scene responsibility of the police-adds nothing to the general duty owed the public and fails to create a relationship which imposes a special legal duty such as that created when there is a course of conduct, special knowledge of possible harm, or the actual use of individuals in the investigation. See Falco v. City of New York, 34 A.D.2d 673, 310 N.Y.S.2d 524 (App.Div.1970), aff'd, 29 N.Y.2d 918, 329 N.Y.S.2d 97, 279 N.E.2d 854 (1972) (police officer's *4 statement to injured motorcyclist that he would obtain name of motorist who struck the motorcycle was a gratuitous promise and did not create a special legal duty); Jackson v. Heyman, 126 N.J.Super. 281, 314 A.2d 82 (Super.Ct.Law Div.1973) (police officers' investigation of vehicle accident where pedestrian was a minor child did not create a special legal duty to child's parents who were unsuccessful in their attempt to recover damages because police failed to identify drivers of vehicle). We hold that Judge Pryor did not err in dismissing No. 79-394 for failure to state a claim.

In either case, it is easy to condemn the failings of the police. However, the desire for condemnation cannot satisfy the need for a special relationship out of which a duty to specific persons arises. In neither of these cases has a relationship been alleged beyond that found in general police responses to crimes. Civil liability fails as a matter of law.

### APPENDIX

### SUPERIOR COURT OF THE DISTRICT OF COLUMBIA CIVIL DIVISION

Civil Action No. 4695-76

CAROLYN WARREN, et al., Plaintiffs,

v.

DISTRICT OF COLUMBIA, et al., Defendants.

## MEMORANDUM OPINION

The Court, however, does not agree that defendants owed a specific legal duty to plaintiffs with respect to the allegations made in the amended complaint for the reason that the District of Columbia appears to follow the well-established rule that official police personnel and the government employing them are not generally liable to victims of criminal acts for failure to provide adequate police protection. Compare Rieser v. District of Columbia, 183 U.S.App.D.C. 375, 390-91, 563 F.2d 462, 477-78 (1977) (rehearing en banc granted and panel opinion vacated on other grounds; panel opinion reinstated in pertinent part, 188 U.S.App.D.C. 384, 580 F.2d 641 (647) (1978)); Westminster Investing Corp. v. G. C. Murphy Co., 140 U.S.App.D.C. 247, 259-50, 434 F.2d 521, 523-24 (1970) and Yohanan v. Wells, No. 78-0671 (D.D.C. June 28, 1978), with Massengill v. Yuma County, 104 Ariz. 518, 456 P.2d 376 (1969) (en banc ); Riss v. City of New York, 22 N.Y.2d 579, 293 N.Y.S.2d 897, 240 N.E.2d 860 (1968); Annot., 46 A.L.R.3d 1084 (1972) and Annot., 41 A.L.R.3d 700 (1972). This uniformly accepted rule rests upon the fundamental principle that a government and its agents are under no general duty to provide public services, such as police protection, to any particular individual citizen. Turner v. United States, 248 U.S. 354, 357-58, 39 S.Ct. 109, 110, 63 L.Ed. 291 (1919); Rieser v. District of Columbia, supra.

A publicly maintained police force constitutes a basic governmental service provided to benefit the community at large by promoting public peace, safety and good order. The extent and quality of police protection afforded to the community necessarily depends upon the availability of public resources and upon legislative or administrative determinations concerning allocation of those resources. Riss v. City of New York, supra. The public, through its representative officials, recruits, trains, maintains and disciplines its police force and determines the manner in which personnel are deployed. At any given time, publicly furnished police protection may accrue to the personal benefit of individual citizens, but at all times the needs and interests of the community at large predominate. Private resources and needs have little direct effect upon the nature of police services provided to the public. Accordingly, courts have without exception concluded that when a municipality or other governmental entity undertakes to furnish police services, it assumes a duty only to the public at large and not to individual members of the community. E.g., Trautman v. City of Stamford, 32 Conn.Supp. 258, 350 A.2d 782

(1975); *5 Henderson v. City of St. Petersburg, 247 So.2d 23 (Fla.Dist.Ct.App.1971); Massengill v. Yuma County, supra, and Riss v. City of New York, supra. Dereliction in the performance of police duties may, therefore, be redressed only in the context of a public prosecution and not in a private suit for money damages. Massengill, supra.

This rule of duty owed to the public at large has been most frequently applied in cases involving complaints of inadequate protection during urban riots or mob violence. Many of these cases challenge the preparedness of the police to handle such situations, while others, such as Westminster Investing Corp. v. G. C. Murphy Co., supra, challenge the tactical decisions made to curtail or remove police protection from the riot areas. In Westminster, officials of the Metropolitan Police Department of the District of Columbia had decided to limit police presence in the area of the Murphy Company's store during the firey 1968 riots. Murphy's store was destroyed and the company filed a claim against the District of Columbia contending that the police department had deliberately or negligently abandoned its policing obligations during the riots and thereby permitted rioters to destroy Murphy's property. In affirming the dismissal of Murphy's claim against the District, the United States Court of Appeals for the District of Columbia Circuit held that the District of Columbia had no direct legal obligation to Murphy and that Murphy, therefore, had "no substantive right to recover the damages resulting from failure of (the) government or its officers to keep the peace." Id. at 252, 434 F.2d at 526, quoting Turner v. United States, supra (248 U.S.) at 358 (39 S.Ct. at 110).

Courts have also found no private duty and no liability in an assortment of other situations which involved allegedly inadequate police protection. In Henderson v. City of St. Petersburg, supra, plaintiff had contacted the St. Petersburg police department and made arrangements for specific police protection while making deliveries in a dark and secluded part of the city. Plaintiff had been previously attacked while making such deliveries and, accordingly, relied upon the assurances of police personnel that officers would be on the scene. Following carefully the instructions given him by the police, plaintiff was, nonetheless, shot by assailants. The order dismissing plaintiff's complaint against the city was affirmed on the grounds that, in the absence of a special relationship, not present in the case, the police department was under no duty to protect plaintiff Henderson.

It was in Massengill v. Yuma County, supra, that the Arizona Supreme Court, in a unanimous en banc decision, affirmed the dismissal of a complaint alleging that a deputy sheriff and the county employing him were negligent in failing to apprehend two reckless drivers. According to the complaint, the deputy sheriff saw two youths leave a local tavern and drive their cars away at excessive speeds. The deputy sheriff then allegedly followed the two cars, watching them weave back and forth, drive on the wrong side of the road and attempt to pass on a hill. The officer made no attempt to apprehend the drivers or prevent their reckless conduct. Shortly thereafter the two reckless drivers collided with an oncoming vehicle causing the deaths of five of the six persons involved. The Arizona Superior Court had concluded that the duty of defendants to arrest the reckless drivers was a duty owed to the general public and not to the deceased occupants of the oncoming vehicle. The Arizona Supreme Court agreed. Accord, Trautman v. City of Stamford, supra. (Footnote 1 omitted.)

The general duty owed to the public may become a specific duty owed to an individual if the police and the individual are in a special relationship different from that existing between the police and citizens generally. Thus, when the New York police department solicited confidential information to aid in apprehension of gangster Willie Sutton, the police assumed a special duty to the informant who came forward. Schuster v. City of New York, 5 N.Y.2d 75, 180 N.Y.S.2d 265, 154 N.E.2d 534 (1958). Similarly, a special relationship was created when the police arranged a confrontation between a suspect and a witness to a crime, *6 thereby giving the suspect an opportunity to assault the witness. Gardner v. Village of Chicago Ridge, 71 Ill.App.2d 373, 219 N.E.2d 147 (1966). In McCorkle v. City of Los Angeles, 70 Cal.2d 252, 74 Cal.Rptr. 389, 449 P.2d 453 (1969), a police officer investigating a traffic accident led plaintiff into the middle of the highway where plaintiff was then struck by another car. The California Court found that a special duty had been created by the officer's affirmative conduct. Likewise, a parole officer was held to have been in a special relationship with individuals operating a foster home and, therefore, under an obligation to disclose the violent character of a juvenile whom he sought to place in the foster home. Johnson v. State, 69 Cal.2d 782, 73 Cal.Rptr. 240, 447 P.2d 352 (1968).[2] The United States Court of Appeals for the District of Columbia recognized a similar special relationship between a government mental hospital and the family of a violent, assaultive patient who the hospital planned to discharge and who the hospital knew had previously attacked family members. Hicks v. United States, 167 U.S.App.D.C. 169, 511 F.2d 407 (1975).

Plaintiffs in this action contend that they, too, entered a special relationship with the police when Warren and Taliaferro telephoned to request assistance. Courts which have had the opportunity to consider comparable situations have concluded that a request for aid is not in itself sufficient to create a special duty. In Riss v. City of New York, supra, the plaintiff had complained to the police numerous times about a rejected suitor who had threatened her repeatedly. In response to plaintiff's desperate pleas for help, the police rendered only nominal assistance and refused to help plaintiff further. Plaintiff received a "last chance" threat from the suitor and once more called the police without success. The following day, the suitor carried out his threat by "having a hired thug throw lye in (plaintiff's) face." Id. at 584, 293 N.Y.S.2d at 900, 240 N.E.2d at 862. Distinguishing Schuster v. City of New York, supra, the Court held that plaintiff's pleas for help did not create a special relationship between herself and the police and could not serve as the basis of liability.

The plaintiff in Antique Arts Corporation v. City of Torrance, 39 Cal.App.3d 588, 114 Cal.Rptr. 332 (1974), arranged to have its burglar alarm directly wired to the Torrance police station. Plaintiff contended that the alarm went off during the course of a burglary but the police dispatcher negligently delayed ten minutes before transmitting the alert, thereby allowing the burglars to escape with plaintiff's goods. Plaintiff argued that the alarm hookup created a special relationship with the police, but the Court rejected this contention, concluding that "an alert from an alarm, irrespective of how transmitted, is no more than a complaint that a crime has been or is being committed." Id. at 592, 114 Cal.Rptr. at 334.

As noted above, the Florida Appeals Court dismissed the complaint in Henderson v. City of St. Petersburg, supra, notwithstanding plaintiff's having requested and specifically discussed plans for police protection. After reviewing cases in which the police or other government agency were under a 'special duty' different from that owed to the public generally, the Florida Court concluded that a request for police protection, even when accompanied by a promise that protection would be provided, does not create the "special duty" necessary to establish tort liability. Id. at 25.

Plaintiffs have adopted a more novel theory in an attempt to distinguish this case from those discussed above. Plaintiffs contend *7 that although the Metropolitan Police

Department may not have been under a specific duty to these plaintiffs at the time of the initial telephone complaint, the police undertook an obligation by taking some action toward rendering assistance. Plaintiffs seem to be saying that no liability would have attached had the police operator refused plaintiffs' call, had the dispatcher refused to transmit the message, or had the officers refused to respond. However, plaintiffs' argument continues, once the operator, dispatcher and officers took some action to assist plaintiffs, they all became personally answerable in money damages for failing to render assistance adequate to meet plaintiffs' needs. Without any supporting authority, plaintiffs contend that defendant police employees were "at least" in the position of volunteers and must be held liable as volunteers for any damages resulting from their negligent omissions. Plaintiffs' argument misapprehends both the legal status of the police officer and the legal status of the volunteer.

In the classic case, H. R. Moch Co., Inc. v. Rensselaer Water Co., 247 N.Y. 160, 159 N.E. 896 (1928), then Judge Cardozo delineated the liability of a volunteer:

> It is ancient learning that one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all .... The hand once set to a task may not always be withdrawn with impunity though liability would fail if it had never been applied at all.... If conduct has gone forward to such a stage that inaction would commonly result, not negatively merely in withholding a benefit, but positively or actively in working an injury, there exists a relation out of which arises a duty to go forward. (Id. at 167, 159 N.E. at 898.)

The Moch case involved a suit against a water company for failure to supply adequate water to fight a city fire. Judge Cardozo found that the failure to provide adequate water to fight the fire constituted, at most, a nonactionable withholding of a benefit. Whatever the omissions and failures of the defendant police officers in this action, those alleged omissions and failures, too, constituted no more than a similar withholding of a benefit.

Moreover, volunteer liability is premised in large part upon the assumption that the volunteer is free to assess each rescue situation, weigh the risks involved, and determine whether to

shoulder the obligation or leave it to someone else.[3]  Police officers clearly are not in a position to make such choices on a case by case basis and it would be absurd to presume that an individual assumes a permanent "volunteer" status when he becomes a police officer. Again, in the words of Judge Cardozo:

> An intention to assume an obligation of indefinite extension to every member of the public is seen to be the more improbable when we recall the crushing burden that the obligation would impose.... A promisor will not be deemed to have had in mind the assumption of a risk so overwhelming for any trivial reward. (Id. at 165-166, 159 N.E. at 897-98.)

Plaintiffs have also construed the issues in this case as giving rise to "negligent performance of police duties." In an attempt to avoid the overwhelming case law barring private suits over negligent omissions in the performance of police duties, plaintiffs seek to bring this action within the orbit of cases allowing recovery for injuries caused by negligent acts of police officers in the performance of their official duties. The cases cited by plaintiffs include the negligent handling of a police dog, negligent operation of a police vehicle, and the negligent use of a police weapon. Such cases involve acts of affirmative negligence, for which anyone-police or civilian-would be liable: negligent handling of an attack dog, negligent operation of a motor vehicle, and negligent use of a firearm. Those acts  *8  of ordinary negligence do not change in character because they happen to have been committed by a police officer in the course of his duties. However, the allegations of negligence in the present case derive solely from defendants' status as police employees and from plaintiffs' contention that defendants failed to do what reasonably prudent police employees would have done in similar circumstances. The difference is between ordinary negligence on the one hand and a novel sort of professional malpractice on the other. A person does not, by becoming a police officer, insulate himself from any of the basic duties which everyone owes to other people, but neither does he assume any greater obligation to others individually. The only additional duty undertaken by accepting employment as a police officer is the duty owed to the public at large.

The public duty concept has drawn some criticism for purportedly creating the rule that: " 'Because we owe a duty to everybody, we owe it to nobody.' " Riss v. City of New York, supra at 585, 293 N.Y.S.2d at 901, 240 N.E.2d at 862 (Keating, J., dissenting). A duty owed to the public, however, is no less enforceable because it is owed to "everybody."

Public officials at all levels remain accountable to the public and the public maintains elaborate mechanisms to enforce its rights-both formally in the courts and less formally through internal disciplinary proceedings. In the case of the Metropolitan Police Department, officers are subject to criminal charges and a penalty of two years imprisonment for failure to arrest law breakers. D.C.Code 1973, s 4-143. Additionally, officers are answerable to their superiors and ultimately to the public through its representatives, for dereliction in their assigned duties. D.C.Code 1973, s 4-121.

The absence of a duty specifically enforceable by individual members of the community is not peculiar to public police services. Our representative form of government is replete with duties owed to everyone in their capacity as citizens but not enforceable by anyone in his capacity as an individual. Through its representatives, the public creates community service; through its representatives, the public establishes the standards which it demands of its employees in carrying out those services and through its representatives, the public can most effectively enforce adherence to those standards of competence. As members of the general public, individuals forego any direct control over the conduct of public employees in the same manner that such individuals avoid any direct responsibility for compensating public employees.

Plaintiffs in this action would have the Court and a jury of twelve additional community representatives join in the responsibility of judging the adequacy of a public employee's performance in office. Plaintiffs' proposition would lead to results which the Massengill Court aptly described as "staggering." Massengill v. Yuma County, supra at 523, 456 P.2d at 381. In this case plaintiffs ask the Court and jury to arrogate to themselves the power to determine, for example, whether defendant Officer Thompson acted in a manner consistent with good police practice when he volunteered to stake out a suspect's house rather than volunteering to report to the crime scene. Consistent with this contention then, should a Court and jury also undertake to sift through clues known to the police in order to determine whether a criminal could reasonably have been apprehended before committing a second crime? Should a Court also be empowered to evaluate, in the context of a tort action, the handling of a major fire and determine whether the hoses were properly placed and the firemen correctly allocated? Might a Court also properly entertain a tort claim over a school teacher's ability to teach seventh grade English or over a postman's failure to deliver promptly an important piece of mail?

Establishment by the Court of a new, privately enforceable duty to use reasonable diligence in the performance of public functions would not likely improve services rendered to the public. The creation of direct, personal accountability between each government employee and every member of the community would effectively bring the *9 business of government to a speedy halt, "would dampen the ardor of all but the most resolute, or the most irresponsible in the unflinching discharge of their duties,"[4] and dispatch a new generation of litigants to the courthouse over grievances real and imagined. An enormous amount of public time and money would be consumed in litigation of private claims rather than in bettering the inadequate service which draws the complaints. Unable to pass the risk of litigation costs on to their "clients," prudent public employees would choose to leave public service.

Although recognizing the obligation of public employees to perform their duties fully and adequately, the law properly does not permit that obligation to be enforced in a private suit for money damages. Accordingly, the Court concludes that plaintiffs have failed to state claims upon which relief may be granted and accordingly, the action is dismissed as to all defendants. (Footnote 5 omitted.)
JOSEPH M. HANNON

Judge

Dated: November 21, 1978

KELLY, Associate Judge, with whom MACK, Associate Judge, joins, concurring in part and dissenting in part:
The basic premise underlying the dismissals of these complaints is correct: unless a "special duty" to a particular individual can be shown, public officials and governmental units owe only a general, nonactionable duty to members of the public to provide services such as fire and police protection. Chandler v. District of Columbia, D.C.App., 404 A.2d 964 (1979); Duran v. City of Tucson, 20 Ariz.App. 22, 509 P.2d 1059 (1973); Trautman v. City of Stamford, 32 Conn.Supp. 258, 350 A.2d 782 (1975); Trujillo v. City of Albuquerque, 93 N.M. 564, 603 P.2d 303 (App.1979); 18 E. McQuillan, Municipal Corporations ss 53.04a, b (3d ed. 1977). As stated in 2 T. Colley, Law of Torts:
The rule of official responsibility, then, appears to be this: That if the duty which the official authority imposes upon an officer is a duty to the public, a failure to perform it, or an

inadequate or erroneous performance, must be a public, not an individual injury, and must be redressed, if at all, in some form of public prosecution. On the other hand, if the duty is a duty to the individual, then a neglect to perform it, or to perform it properly, is an individual wrong, and may support an individual action for damages. "The failure of a public officer to perform a public duty can constitute an individual wrong only when some person can show that in the public duty was involved also a duty to himself as an individual, and that he has suffered a special and peculiar injury by reason of its nonperformance." (Id. s 300, at 385-86 (4th ed. 1932); citation and footnotes omitted.)

This general duty/special duty dichotomy is illustrated by our decision in Chandler v. District of Columbia, supra. There, the District of Columbia, for financial reasons, decided to close several randomly chosen fire stations, one of which was near Mrs. Chandler's home. After a fire broke out in her home and her two children died from smoke inhalation, Mrs. Chandler sued for wrongful death, alleging that her children's deaths resulted from the District's negligence in closing the fire station. Recognizing the general rule of municipal nonliability, this court found that the facts of Mrs. Chandler's case did not give rise to a special duty or "special relationship." Id. at 966-67. By way of further analysis, fire protection services are meant to benefit the community as a whole, and because Mrs. Chandler's children were members of the general public, with nothing to single them out as specific individuals to whom a duty was owed, no special duty had arisen. Without the critical element of duty, an action in negligence does not lie. [1]

**\*10** The same reasoning applies in police protection cases. For example, in Trautman v. City of Stamford, supra, a plaintiff who was struck by a car while standing on a public sidewalk sued the city and two police officers, alleging a negligent failure to stop drag racing on the street adjacent to the sidewalk. In finding that no special duty was owed the plaintiff, the court stated, "the allegations of the instant case nowhere assert any conduct directed specifically by the defendant police officers toward the plaintiff individually. The conduct of the defendant patrolmen is directed ... toward the general public of which the plaintiff happened to be a part at the time in question." Id. 32 Conn.Supp. at 259, 350 A.2d at 783. The same rule has been applied in finding no special duty to protect a young man from violence in a city park, Trujillo v. City of Albuquerque, supra ; to warn a motel employee of suspicious persons in the motel parking lot, Sapp

v. City of Tallahassee, 348 So.2d 363 (Fla.Dist.Ct.App.1977); to arrest a drunk driver whose car collided with the plaintiff's decedent's car, Massengill v. Yuma County, 104 Ariz. 518, 456 P.2d 376 (1969); to protect a young lady from the threats of her estranged boyfriend, Riss v. City of New York, 22 N.Y.2d 579, 293 N.Y.S.2d 897, 240 N.E.2d 860 (1968); and to protect property during a civil disturbance, Westminster Investing Corp. v. G. C. Murphy Co., 140 U.S.App.D.C. 247, 434 F.2d 521 (1970).

The general, nonactionable duty to provide police services may narrow, however, to a special, actionable duty if two factors are present. First, there must be some form of privity between the police department and the victim that sets the victim apart from the general public. See, e.g., City of Tampa v. Davis, 226 So.2d 450, 454 (Fla.Dist.Ct.App.1969). That is, the victim must become a reasonably foreseeable plaintiff. Second, there must be specific assurances of protection that give rise to justifiable reliance by the victim. See, e.g., Sapp v. City of Tallahassee, supra at 365-66.

In Bloom v. City of New York, 78 Misc.2d 1077, 357 N.Y.S.2d 979 (1974), several store owners sued the city for negligent failure to protect their property during a civil disturbance in 1968. The complaints alleged that city officials gave specific assurances of police protection, but negligently failed to take steps to carry out the promises. The city moved to dismiss the complaint, relying on the general rule of municipal nonliability. The court denied the motion, easily distinguishing the case from those cases in which there is no special duty:

> In the case at bar it is alleged that the plaintiffs were ready, willing and able to protect their premises but that they were restrained by the police who assured them that proper police protection would be provided. There is therefore alleged an affirmative series of acts by which the city assumed a special duty .... (Id. at 1078, 357 N.Y.S.2d at 981.)

See also Silverman v. City of Fort Wayne, 171 Ind.App. 415, 357 N.E.2d 285 (Ind.App.1976) (dismissal of negligence complaint arising from failure to protect property during riot reversed in light of personal promise of protection). [2]

In Florence v. Goldberg, 44 N.Y.2d 189, 404 N.Y.S.2d 583, 375 N.E.2d 763 (1978), the police department voluntarily

assigned a school crossing guard to cover a particularly busy intersection in Brooklyn. For the first two weeks of school, the infant plaintiff's mother accompanied him to school and saw a guard at the intersection every day. When the mother accepted employment, she sent the child to school by himself, relying on the guard's presence at the intersection. **\*11** One day, the guard was ill and the police department failed to provide a replacement or to notify school officials that there would be no guard at the crossing. The child was struck by a taxi cab as he tried to cross the street alone; the mother sued the city in negligence. Upholding a jury verdict for the child, the court emphasized two factors distinguishing that case from general duty cases. First, the duty assumed by the police was a limited one; it was directed toward a specific class of individuals rather than toward the public in general. Id. at 196-97, 404 N.Y.S.2d at 587, 375 N.E.2d at 767. Second, the mother had witnessed the provision of services and had relied to her detriment on the guard's performance. Id. The combination of these two factors led the court to conclude that the general duty to provide police services had become a special duty owed to that child.[3]

As both the Bloom and Florence courts noted, the concept of special duty is actually no more than an application of the cardinal principal of tort law that, even where no duty to act may exist originally, once one undertakes to act, he has a duty to do so with due care. Florence v. Goldberg, supra at 196, 404 N.Y.S.2d at 587, 375 N.E.2d at 766; Bloom v. City of New York, supra at 1079, 357 N.Y.S.2d at 981. Cf. Security National Bank v. Lish, D.C.App., 311 A.2d 833, 834 (1973) ("(o)ne who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all.") (quoting Glanzer v. Shepard, 233 N.Y. 236, 239, 135 N.E. 275, 276 (1922)). More precisely, one who begins to perform a service to another, whether gratuitously or not must perform with reasonable care; thus, he subjects himself to liability for any harm suffered because the other reasonably and foreseeably relied upon the actor's performance. See W. Prosser, The Law of Torts s 56 (4th ed. 1972); 2 F. Harper and F. James, The Law of Torts s 18.6 (1956); 2 Restatement (Second) of Torts s 323 (1965). In the words of Chief Judge Cardozo:

> If conduct has gone forward to such a stage that inaction would commonly result, not negatively merely in withholding a benefit, but positively or actively in working an injury, there exists a relation out of which arises a duty to go forward. (Moch Co. v. Rensselaer Water

Co., 247 N.Y. 160, 167, 159 N.E. 896, 898 (1928); citation omitted.)

This is not, of course, a theory of strict liability; the actor need only do that which is reasonable under the circumstances. Prosser, supra.

To summarize, there are two prerequisites to a finding of a special duty. First, there must be direct contact or some other form of privity between the victim and the police department so that the victim becomes a reasonably foreseeable plaintiff. Second, there must be specific assurances of police services that create justifiable reliance by the victim. Without both of these elements, the duty to provide police services remains a general, nonactionable duty to the public at large.

## II

In reviewing the trial courts' grants of the motions to dismiss, "we must accept every well-pleaded allegation of material fact ... as true and indulge all reasonable inferences which may arise therefrom." Early Settlers Insurance Co. v. Schweid, D.C.App., 221 A.2d 920, 922 (1966). The dismissals will be sustained only if it appears "beyond doubt that the plaintiff(s) can prove no set of facts in support of (their claims) which would entitle (them) to relief." Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 101-102, 2 L.Ed.2d 80 (1957). See also Owens v. Tiber Island Condominium Association, D.C.App., 373 A.2d 890, 893 (1977).

**\*12** Under this standard of review, I would hold that the complaints of appellants Warren, Taliaferro (No. 79-6), and Nichol (No. 79-394), contain facts that, if proved, are sufficient to establish that the Police Department owed each a special duty. Appellants Warren's and Taliaferro's urgent telephone calls to the Metropolitan Police Department removed them from the broad class of the general public. Appellant Nichol's direct contact with the officer on the scene of the assault made him a reasonably foreseeable plaintiff. Any duty assumed by the police from those points on was not a duty to the community as a whole, but a specific duty to identifiable persons.

All three of these appellants have also alleged specific assurances of police protection that may have created justifiable reliance on their parts. When a police department employee tells frantic callers that help is on the way, as in No.

79-6, or that he will obtain vital information for an injured person, as in No. 79-394, it is reasonably foreseeable that the persons so assured may forego, to their detriment, other avenues of help. Once the police embarked upon services under circumstances where it was reasonably foreseeable that a citizen might rely on their performance, they assumed a duty to perform with due care.

Appellant Douglas does not fit within the class of persons to whom a special duty was owed. Although she arguably meets the first prerequisite, [4] she does not fulfill the second. Because she was unaware of either the telephone calls to the police or the police's assurances to the other women, she could not have justifiably relied to her detriment on those assurances. Therefore, the dismissal as to her must be affirmed.

I do not ignore appellees' "floodgates of litigation" argument and have carefully considered the trial judge's fear that "(t)he creation of a direct, personal accountability between each government employee and every member of the community would effectively bring the business of government to a speedy halt ... and dispatch a new generation of litigants to the courthouse over grievances real and imagined." [5] The duty which I recognize in this opinion will not create such broad liability. Moreover, the argument

assumes that a strict liability standard is to be imposed and that the courts would prove completely unable to apply general principles of tort liability in a reasonable fashion in the context of actions arising from the negligent acts of police ... personnel. The argument is ... made as if there were no such legal principles as fault, proximate cause or foreseeability, all of which operate to keep liability within reasonable bounds. No one is contending that the police must be at the scene of every potential crime .... They need only act as a reasonable man would under the circumstances. (Riss v. City of New York, supra at 586, 293 N.Y.S.2d at 902, 240 N.E.2d at 863 (Keating, J., dissenting).)

In my judgment, the complaints of appellants Warren, Taliaferro and Nichol contain sufficient facts from which they may prove that a special duty was owed to them; consequently, the trial judges erred in dismissing their complaints for failure to state a claim upon which relief could be granted. To me, also, gratuitous comments about condemning the recognized "failings" of the police in these cases is no substitute for an independent and objective decisional analysis of an important and sensitive issue.

NEWMAN, Chief Judge, concurring in part and dissenting in part:

I concur in the majority opinion as to appellant Nichol (No. 79-394). I join the dissent as to appellants Warren, Douglas and Taliaferro (No. 79-6).

---

Footnotes

1   Having based his dismissal on an absence of duty, Judge Hannon found it unnecessary to decide the adequacy of the notice to the District of Columbia under D.C.Code 1973, s 12-309. Consequently, we do not review that issue on appeal.

2   It can be seen from cases in which a special duty has been found that an additional element has been injected above the existing general public duty. E.g., Florence v. Goldberg, 44 N.Y.2d 189, 404 N.Y.S.2d 583, 375 N.E.2d 763 (1978) (school crossing guard course of conduct and police requiring replacement of absent guard together with reliance); McCorkle v. City of Los Angeles, 70 Cal.2d 252, 74 Cal.Rptr. 389, 449 P.2d 453 (1969) (en banc) (use of auto accident victim to aid police investigation by walking to point of impact in street); Johnson v. States, 69 Cal.2d 782, 73 Cal.Rptr. 240, 447 P.2d 352 (1968) (en banc) (placement of youth with known homicidal tendencies in foster home); Gardner v. Village of Chicago Ridge, 71 Ill.App.2d 373, 219 N.E.2d 147 (1966) (return of victim to scene for "show up" identification of still violent assault suspects); Schuster v. City of New York, 5 N.Y.2d 75, 180 N.Y.S.2d 265, 154 N.E.2d 534 (1958) (recruitment of citizen informant in national organized violent crime case).

2   A similar factual situation is presented in Rieser v. District of Columbia, supra. This case involved a woman who was raped and murdered by a District of Columbia parolee who had been assisted by a parole officer in obtaining employment at the apartment complex where the murder took place. The decedent's father filed suit for damages under the District of Columbia Wrongful Death Act against the owners of the apartment complex, the parolee, the parole officer and the District of Columbia. The Court of Appeals, MacKinnon, Circuit Judge, held inter alia that an actionable duty exists where a special relationship has been established between the governmental unit and plaintiff.

3   The District of Columbia Court of Appeals recently refrained from implying an adoption of the rescue doctrine in this jurisdiction. Gillespie v. Washington, D.C.App., 395 A.2d (18) 21 (1978). This Court's discussion of the rescue doctrine and its applicability to plaintiffs' claim should likewise not be considered an adoption of the doctrine.

4        Gregoire v. Biddle, 177 F.2d 579, 581 (2d Cir. 1949).

1        The Chandler case was also decided on the basis of sovereign immunity; because the decision to close the stations was a discretionary act, the city could not be sued. Id. at 966. See generally Wade v. District of Columbia, D.C.App., 310 A.2d 857 (1973) (en banc). As the Chandler court noted, the questions of sovereign immunity and duty require separate analysis. Chandler, supra at 966. No question of sovereign immunity is raised in these appeals.

2        The allegations of specific assurances of protection in Bloom and Silverman distinguish those cases from Westminster Investing Corp. v. G. C. Murphy Co., supra, a case relied on by the trial judge in No. 79-6. The plaintiffs in Westminster were members of the general public, to whom no promises of protection had been made, and to whom the District therefore owed no special duty.

3        Appellees attempt to distinguish Florence from the case at bar by arguing that the police in Florence breached a statutory duty to provide crossing guards. It is clear from the opinion, however, that the police department regulations referred to by appellees dealt only with the procedures to be followed if a school guard, once gratuitously assigned, was unable to report for duty. The initial assumption of the duty to provide a crossing guard was completely voluntary. Florence, supra 44 N.Y.2d at 196, 404 N.Y.S.2d at 587, 375 N.E.2d at 767.

4        Whether she removed herself from the class of the general public is, as stated, a factual question: from the point of view of the police department, with its knowledge from the telephone call, was appellant Douglas a foreseeable victim or merely still a member of the general public?

5        See Appendix infra at 4.

---

**End of Document**                                    © 2013 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 17

Town of Castle Rock, Colo. v. Gonzales, 545 U.S. 748 (2005)

125 S.Ct. 2796, 162 L.Ed.2d 658, 73 USLW 4611, 05 Cal. Daily Op. Serv. 5642...

🏴 KeyCite Yellow Flag - Negative Treatment
**Distinguished by** Vives v. City of New York, 2nd Cir.(N.Y.), May 1, 2008

125 S.Ct. 2796
Supreme Court of the United States

TOWN OF CASTLE ROCK, COLORADO, Petitioner,
v.
Jessica GONZALES, individually and as next best
friend of her deceased minor children, Rebecca
Gonzales, Katheryn Gonzales, and Leslie Gonzales.

No. 04-278.   |   Argued March 21,
2005.   |   Decided June 27, 2005.

**Synopsis**
**Background:** Wife brought civil rights action against
municipality and police officers based on officers' refusal to
enforce domestic abuse restraining order against husband.
The United States District Court for the District of Colorado,
Wiley Daniel, J., dismissed the action for failure to state a
claim. The Tenth Circuit Court of Appeals, 307 F.3d 1258,
reversed. Upon rehearing en banc, the Tenth Circuit Court of
Appeals, Seymour, Circuit Judge, 366 F.3d 1093, reversed the
District Court's decision and remanded.

**Holdings:** Following grant of certiorari, the United States
Supreme Court, Justice Scalia held that:

[1] Supreme Court would not defer to the Tenth Circuit Court
of Appeals' determination that Colorado law gave wife a right
to have police enforce restraining order;

[2] Colorado law did not create personal entitlement to police
enforcement of restraining orders; and

[3] wife did not have protected property interest in police
enforcement of restraining order.

Reversed.

Justice Souter filed concurring opinion, in which Justice
Breyer joined.

Justice Stevens filed dissenting opinion, in which Justice
Ginsburg joined.

**West Headnotes (12)**

[1]   **Constitutional Law**
      ⚖ Rights, Interests, Benefits, or Privileges
      Involved in General

      92 Constitutional Law
      92XXVII Due Process
      92XXVII(B) Protections Provided and
      Deprivations Prohibited in General
      92k3868 Rights, Interests, Benefits, or Privileges
      Involved in General
      92k3869 In general
          (Formerly 92k252.5)
      The procedural component of the Due Process
      Clause does not protect everything that might be
      described as a benefit. U.S.C.A. Const.Amend.
      14.

      23 Cases that cite this headnote

[2]   **Constitutional Law**
      ⚖ Benefits, rights and interests in

      92 Constitutional Law
      92XXVII Due Process
      92XXVII(B) Protections Provided and
      Deprivations Prohibited in General
      92k3868 Rights, Interests, Benefits, or Privileges
      Involved in General
      92k3874 Property Rights and Interests
      92k3874(3) Benefits, rights and interests in
          (Formerly 92k277(1))
      To have a protected property interest in a benefit,
      for due process purposes, a person must have
      more than an abstract need or desire and more
      than a unilateral expectation of it. U.S.C.A.
      Const.Amend. 14.

      51 Cases that cite this headnote

[3]   **Constitutional Law**
      ⚖ Benefits, rights and interests in

      92 Constitutional Law
      92XXVII Due Process
      92XXVII(B) Protections Provided and
      Deprivations Prohibited in General

Case 5:15-cv-01238-GTS-TWD   Document 21-6   Filed 03/25/16   Page 40 of 87

**Town of Castle Rock, Colo. v. Gonzales, 545 U.S. 748 (2005)**

125 S.Ct. 2796, 162 L.Ed.2d 658, 73 USLW 4611, 05 Cal. Daily Op. Serv. 5642...

92k3868  Rights, Interests, Benefits, or Privileges
Involved in General
92k3874  Property Rights and Interests
92k3874(3)  Benefits, rights and interests in
    (Formerly 92k277(1))
To have a protected property interest in a benefit,
for due process purposes, a person must have
a legitimate claim of entitlement to it. U.S.C.A.
Const.Amend. 14.

79 Cases that cite this headnote

**[4]     Constitutional Law**
    Source of right or interest

92  Constitutional Law
92XXVII  Due Process
92XXVII(B)  Protections Provided and
Deprivations Prohibited in General
92k3868  Rights, Interests, Benefits, or Privileges
Involved in General
92k3874  Property Rights and Interests
92k3874(2)  Source of right or interest
    (Formerly 92k277(1))
Property interests, in the due process context,
are created and their dimensions are defined by
existing rules or understandings that stem from an
independent source such as state law. U.S.C.A.
Const.Amend. 14.

64 Cases that cite this headnote

**[5]     Constitutional Law**
    Rights, Interests, Benefits, or Privileges
Involved in General

92  Constitutional Law
92XXVII  Due Process
92XXVII(B)  Protections Provided and
Deprivations Prohibited in General
92k3868  Rights, Interests, Benefits, or Privileges
Involved in General
92k3869  In general
    (Formerly 92k252.5)
A benefit is not a protected entitlement, for due
process purposes, if government officials may
grant or deny it in their discretion. U.S.C.A.
Const.Amend. 14.

89 Cases that cite this headnote

**[6]     Constitutional Law**

    Source of right or interest

92  Constitutional Law
92XXVII  Due Process
92XXVII(B)  Protections Provided and
Deprivations Prohibited in General
92k3868  Rights, Interests, Benefits, or Privileges
Involved in General
92k3874  Property Rights and Interests
92k3874(2)  Source of right or interest
    (Formerly 92k277(1))
Although the underlying substantive interest in
property is created by an independent source such
as state law, federal constitutional law determines
whether that interest rises to the level of a
legitimate claim of entitlement protected by the
Due Process Clause. U.S.C.A. Const.Amend. 14.

97 Cases that cite this headnote

**[7]     Federal Courts**
    Review on Certiorari

170B  Federal Courts
170BVII  Supreme Court
170BVII(B)  Review of Decisions of Courts of
Appeals
170Bk460  Review on Certiorari
170Bk460.1  In general
The Supreme Court would not defer to the
Tenth Circuit Court of Appeals' determination
that Colorado law gave wife a right to have
police enforce a domestic abuse restraining order
against her husband, for purpose of determining
ultimate question of whether wife had protected
property interest in police enforcement, in wife's
civil rights action against police and municipality,
arising from failure to enforce order; the Court of
Appeals' opinion did not draw upon state-specific
case law or expertise, but instead relied upon
language that appeared in many state restraining
law statutes. U.S.C.A. Const.Amend. 14; West's
C.R.S.A. § 18-6-803.5(3)(a, b).

33 Cases that cite this headnote

**[8]     Constitutional Law**
    Orders for protection

**Municipal Corporations**
    Injuries by Mobs or Other Wrongdoers

92  Constitutional Law

**Town of Castle Rock, Colo. v. Gonzales, 545 U.S. 748 (2005)**

125 S.Ct. 2796, 162 L.Ed.2d 658, 73 USLW 4611, 05 Cal. Daily Op. Serv. 5642...

92XXVII  Due Process
92XXVII(G)  Particular Issues and Applications
92XXVII(G)25  Other Particular Issues and Applications
92k4488  Orders for protection
    (Formerly 92k277(1))
268  Municipal Corporations
268XII  Torts
268XII(A)  Exercise of Governmental and Corporate Powers in General
268k740  Injuries by Mobs or Other Wrongdoers
268k740(1)  In general

Colorado law did not create a personal entitlement to police enforcement of domestic abuse restraining orders, for purpose of determining whether wife had protected property interest in police enforcement of restraining order against husband, in civil rights action against police and municipality, arising from failure to enforce it; although restraining order statute provided that police "shall use" every reasonable means to enforce a restraining order, tradition of police discretion coexisted with similar mandatory arrest provisions, enforcement was not always possible or practical, statute provided for alternative to immediate enforcement, which was the seeking of an arrest warrant, an entitlement to procedure only, and although statute provided for a protected person's direct power to initiate contempt proceedings against restrained person if order was violated, it did not expressly give protected person a right to request or demand an arrest. U.S.C.A. Const.Amend. 14; West's C.R.S.A. §§ 18-6-803.5(3)(a, b), 18-6-803.6(1).

97 Cases that cite this headnote

**[9]  Constitutional Law**
⬤ Rights, Interests, Benefits, or Privileges Involved in General

92  Constitutional Law
92XXVII  Due Process
92XXVII(B)  Protections Provided and Deprivations Prohibited in General
92k3868  Rights, Interests, Benefits, or Privileges Involved in General
92k3869  In general
    (Formerly 92k252.5)

A person cannot safely be deemed "entitled" to something, for purpose of determining whether

person has protected due process interest, when the identity of the alleged entitlement is vague. U.S.C.A. Const.Amend. 14.

7 Cases that cite this headnote

**[10]  Constitutional Law**
⬤ Orders for protection
**Municipal Corporations**
⬤ Injuries by Mobs or Other Wrongdoers

92  Constitutional Law
92XXVII  Due Process
92XXVII(G)  Particular Issues and Applications
92XXVII(G)25  Other Particular Issues and Applications
92k4488  Orders for protection
    (Formerly 92k277(1))
268  Municipal Corporations
268XII  Torts
268XII(A)  Exercise of Governmental and Corporate Powers in General
268k740  Injuries by Mobs or Other Wrongdoers
268k740(1)  In general

Wife did not have protected property interest in police enforcement of restraining order, issued pursuant to Colorado law, against her husband, and thus, she could not prevail in civil rights action against police and municipality for an alleged due process violation, arising from failure to enforce it; even assuming that Colorado law created an entitlement to police enforcement of the restraining order, it was an indirect benefit, rather than a direct benefit. U.S.C.A. Const.Amend. 14; West's C.R.S.A. § 18-6-803.5(3)(a, b).

52 Cases that cite this headnote

**[11]  Constitutional Law**
⬤ Protections Provided and Deprivations Prohibited in General

92  Constitutional Law
92XXVII  Due Process
92XXVII(B)  Protections Provided and Deprivations Prohibited in General
92k3865  In general
    (Formerly 92k278(1), 92k255(1))

An indirect and incidental result of the government's enforcement action does not amount to a deprivation of any interest in life,

**Town of Castle Rock, Colo. v. Gonzales, 545 U.S. 748 (2005)**

125 S.Ct. 2796, 162 L.Ed.2d 658, 73 USLW 4611, 05 Cal. Daily Op. Serv. 5642...

liberty, or property, for due process purposes. U.S.C.A. Const.Amend. 14.

12 Cases that cite this headnote

**[12]   Constitutional Law**
      👉  Investigative activity in general

92  Constitutional Law
92XXVII  Due Process
92XXVII(H)  Criminal Law
92XXVII(H)3  Law Enforcement
92k4521  Conduct of Police and Prosecutors in General
92k4523  Investigative activity in general
(Formerly 92k252.5)
A state-law created benefit that a third party may receive from having someone else arrested for a crime generally does not trigger protections under the Due Process Clause, neither in its procedural nor in its substantive manifestations. U.S.C.A. Const.Amend. 14.

43 Cases that cite this headnote

**\*\*2798  \*748 Syllabus [*]**

Respondent filed this suit under 42 U.S.C. § 1983 alleging that petitioner violated the Fourteenth Amendment's Due Process Clause when its police officers, acting pursuant to official policy or custom, failed to respond to her repeated reports over several hours that her estranged husband had taken their three children in violation of her restraining order against him. Ultimately, the husband murdered the children. The District Court granted the town's motion to dismiss, but an en banc majority of the Tenth Circuit reversed, finding that respondent had alleged a cognizable procedural due process claim because a Colorado statute established the state legislature's clear intent to require police to enforce restraining orders, and thus its intent that the order's recipient have an entitlement to its enforcement. The court therefore ruled, among other things, that respondent had a protected property interest in the enforcement of her restraining order.

*Held:* Respondent did not, for Due Process Clause purposes, have a property interest in police enforcement of the restraining order against her husband. Pp. 2802-2810.

(a) The Due Process Clause's procedural component does not protect everything \*\*2799 that might be described as a government "benefit": "To have a property interest in a benefit, a person ... must ... have a legitimate claim of entitlement to it." *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548. Such entitlements are created by existing rules or understandings stemming from an independent source such as state law. *E.g., ibid.* Pp. 2802-2803.

(b) A benefit is not a protected entitlement if officials have discretion to grant or deny it. See, *e.g., Kentucky Dept. of Corrections v. Thompson*, 490 U.S. 454, 462-463, 109 S.Ct. 1904, 104 L.Ed.2d 506. It is inappropriate here to defer to the Tenth Circuit's determination that Colorado law gave respondent a right to police enforcement of the restraining order. This Court therefore proceeds to its own analysis. Pp. 2803-2804.

(c) Colorado law has not created a personal entitlement to enforcement of restraining orders. It does not appear that state law truly made such enforcement *mandatory.* A well-established tradition of police \*749 discretion has long coexisted with apparently mandatory arrest statutes. Cf. *Chicago v. Morales*, 527 U.S. 41, 47, n. 2, 62, n. 32, 119 S.Ct. 1849, 144 L.Ed.2d 67. Against that backdrop, a true mandate of police action would require some stronger indication than the Colorado statute's direction to "use every reasonable means to enforce a restraining order" or even to "arrest ... or ... seek a warrant." A Colorado officer would likely have some discretion to determine that-despite probable cause to believe a restraining order has been violated-the violation's circumstances or competing duties counsel decisively against enforcement in a particular instance. The practical necessity for discretion is particularly apparent in a case such as this, where the suspected violator is not actually present and his whereabouts are unknown. In such circumstances, the statute does not appear to require officers to arrest but only to seek a warrant. That, however, would be an entitlement to nothing but procedure, which cannot be the basis for a property interest. Pp. 2804-2808.

(d) Even if the statute could be said to make enforcement "mandatory," that would not necessarily mean that respondent has an entitlement to enforcement. Her alleged interest stems not from common law or contract, but only from a State's *statutory* scheme. If she was given a statutory entitlement, the Court would expect to see some indication of that in the statute itself. Although the statute spoke

Case 5:15-cv-01238-GTS-TWD   Document 21-6   Filed 03/25/16   Page 43 of 87

**Town of Castle Rock, Colo. v. Gonzales, 545 U.S. 748 (2005)**

125 S.Ct. 2796, 162 L.Ed.2d 658, 73 USLW 4611, 05 Cal. Daily Op. Serv. 5642...

of "protected person[s]" such as respondent, it did so in connection with matters other than a right to enforcement. Most importantly, it spoke directly to the protected person's power to "initiate" contempt proceedings if the order was issued in a civil action, which contrasts tellingly with its conferral of a power merely to "request" initiation of criminal contempt proceedings-and even more dramatically with its complete silence about any power to "request" (much less demand) that an arrest be made. Pp. 2808-2809.

(e) Even were the Court to think otherwise about Colorado's creation of an entitlement, it is not clear that an individual entitlement to enforcement of a restraining order could constitute a "property" interest for due process purposes. Such a right would have no ascertainable monetary value and would arise incidentally, not out of some new species of government benefit or service, but out of a function that government actors have always performed-arresting people when they have probable cause. A benefit's indirect nature was fatal to a due process claim in *O'Bannon v. Town Court Nursing Center,* 447 U.S. 773, 787, 100 S.Ct. 2467, 65 L.Ed.2d 506. Here, **2800 as there, "[t]he simple distinction between government action that directly affects a citizen's legal rights ... and action that is directed against a third party and affects the citizen only ... incidentally, provides *750 a sufficient answer to" cases finding government-provided services to be entitlements. *Id.,* at 788, 100 S.Ct. 2467. Pp. 2809-2810.

366 F.3d 1093, reversed.

SCALIA, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, KENNEDY, SOUTER, THOMAS, and BREYER, JJ., joined. SOUTER, J., filed a concurring opinion, in which BREYER, J., joined, *post,* p. 2811. STEVENS, J., filed a dissenting opinion, in which GINSBURG, J., joined, *post,* p. 2813.

**Attorneys and Law Firms**

John P. Elwood, for the United States as amicus curiae, by special leave of the Court, supporting the petitioner.

Thomas S. Rice, Eric M. Ziporin, Counsel of Record, Senter, Goldfarb & Rice, L.L.C., Denver, Colorado, John C. Eastman, c/o Chapman University School of Law, Orange, CA, Erik S. Jaffe, Erik S. Jaffe, P.C., Washington, D.C., Counsel for Petitioners.

Brian J. Reichel, Counsel of Record, Law Office of Brian J. Reichel, Broomfield, CO, David T. Odom, Odom & Associates, P.C., Naperville, IL, Counsel for Respondent.

**Opinion**

Justice SCALIA delivered the opinion of the Court.

We decide in this case whether an individual who has obtained a state-law restraining order has a constitutionally *751 protected property interest in having the police enforce the restraining order when they have probable cause to believe it has been violated.

**I**

The horrible facts of this case are contained in the complaint that respondent Jessica Gonzales filed in Federal District Court. (Because the case comes to us on appeal from a dismissal of the complaint, we assume its allegations are true. See *Swierkiewicz v. Sorema N. A.,* 534 U.S. 506, 508, n. 1, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).) Respondent alleges that petitioner, the town of Castle Rock, Colorado, violated the Due Process Clause of the Fourteenth Amendment to the United States Constitution when its police officers, acting pursuant to official policy or custom, failed to respond properly to her repeated reports that her estranged husband was violating the terms of a restraining order. [1]

The restraining order had been issued by a state trial court several weeks earlier in conjunction with respondent's divorce proceedings. The original form order, issued on May 21, 1999, and served on respondent's husband on June 4, 1999, commanded him not to "molest or disturb the **2801 peace of [respondent] or of any child," and to remain at least 100 yards from the family home at all times. 366 F.3d 1093, 1143 (C.A.10 2004) (en banc) (appendix to dissenting opinion of O'Brien, J.). The bottom of the preprinted form noted that the reverse side contained "IMPORTANT NOTICES FOR RESTRAINED PARTIES AND LAW ENFORCEMENT OFFICIALS." *Ibid.* (emphasis deleted). The preprinted *752 text on the back of the form included the following "WARNING":

"**A KNOWING VIOLATION OF A RESTRAINING ORDER IS A CRIME .... A VIOLATION WILL ALSO CONSTITUTE CONTEMPT OF COURT. YOU MAY BE ARRESTED** WITHOUT NOTICE IF A LAW

**Town of Castle Rock, Colo. v. Gonzales, 545 U.S. 748 (2005)**

125 S.Ct. 2796, 162 L.Ed.2d 658, 73 USLW 4611, 05 Cal. Daily Op. Serv. 5642...

ENFORCEMENT OFFICER HAS PROBABLE CAUSE TO BELIEVE THAT YOU HAVE KNOWINGLY VIOLATED THIS ORDER." *Id.,* at 1144 (emphasis in original).

The preprinted text on the back of the form also included a **"NOTICE TO LAW ENFORCEMENT OFFICIALS,"** which read in part:

"YOU SHALL USE EVERY REASONABLE MEANS TO ENFORCE THIS RESTRAINING ORDER. YOU SHALL ARREST, OR, IF AN ARREST WOULD BE IMPRACTICAL UNDER THE CIRCUMSTANCES, SEEK A WARRANT FOR THE ARREST OF THE RESTRAINED PERSON WHEN YOU HAVE INFORMATION AMOUNTING TO PROBABLE CAUSE THAT THE RESTRAINED PERSON HAS VIOLATED OR ATTEMPTED TO VIOLATE ANY PROVISION OF THIS ORDER AND THE RESTRAINED PERSON HAS BEEN PROPERLY SERVED WITH A COPY OF THIS ORDER OR HAS RECEIVED ACTUAL NOTICE OF THE EXISTENCE OF THIS ORDER." *Ibid.* (same).

On June 4, 1999, the state trial court modified the terms of the restraining order and made it permanent. The modified order gave respondent's husband the right to spend time with his three daughters (ages 10, 9, and 7) on alternate weekends, for two weeks during the summer, and, " 'upon reasonable notice,' " for a midweek dinner visit " 'arranged by the parties' "; the modified order also allowed him to visit *753 the home to collect the children for such "parenting time." *Id.,* at 1097 (majority opinion).

According to the complaint, at about 5 or 5:30 p.m. on Tuesday, June 22, 1999, respondent's husband took the three daughters while they were playing outside the family home. No advance arrangements had been made for him to see the daughters that evening. When respondent noticed the children were missing, she suspected her husband had taken them. At about 7:30 p.m., she called the Castle Rock Police Department, which dispatched two officers. The complaint continues: "When [the officers] arrived ..., she showed them a copy of the TRO and requested that it be enforced and the three children be returned to her immediately. [The officers] stated that there was nothing they could do about the TRO and suggested that [respondent] call the Police Department again if the three children did not return home by 10:00 p.m." App. to Pet. for Cert. 126a.[2]

At approximately 8:30 p.m., respondent talked to her husband on his cellular telephone. He told her "he had the three children [at an] amusement park in Denver." *Ibid.* She called the police again and **2802 asked them to "have someone check for" her husband or his vehicle at the amusement park and "put out an [all points bulletin]" for her husband, but the officer with whom she spoke "refused to do so," again telling her to "wait until 10:00 p.m. and see if" her husband returned the girls. *Id.,* at 126a-127a.

At approximately 10:10 p.m., respondent called the police and said her children were still missing, but she was now told to wait until midnight. She called at midnight and told the dispatcher her children were still missing. She went to her husband's apartment and, finding nobody there, called the police at 12:10 a.m.; she was told to wait for an officer to arrive. When none came, she went to the police station at *754 12:50 a.m. and submitted an incident report. The officer who took the report "made no reasonable effort to enforce the TRO or locate the three children. Instead, he went to dinner." *Id.,* at 127a.

At approximately 3:20 a.m., respondent's husband arrived at the police station and opened fire with a semiautomatic handgun he had purchased earlier that evening. Police shot back, killing him. Inside the cab of his pickup truck, they found the bodies of all three daughters, whom he had already murdered. *Ibid.*

On the basis of the foregoing factual allegations, respondent brought an action under Rev. Stat. § 1979, 42 U.S.C. § 1983, claiming that the town violated the Due Process Clause because its police department had "an official policy or custom of failing to respond properly to complaints of restraining order violations" and "tolerate[d] the non-enforcement of restraining orders by its police officers." App. to Pet. for Cert. 129a.[3] The complaint also alleged that the town's actions "were taken either willfully, recklessly or with such gross negligence as to indicate wanton disregard and deliberate indifference to" respondent's civil rights. *Ibid.*

Before answering the complaint, the defendants filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). The District Court granted the motion, concluding that, whether construed as making a substantive due process or procedural due process claim, respondent's complaint failed to state a claim upon which relief could be granted.

**Town of Castle Rock, Colo. v. Gonzales, 545 U.S. 748 (2005)**

125 S.Ct. 2796, 162 L.Ed.2d 658, 73 USLW 4611, 05 Cal. Daily Op. Serv. 5642...

A panel of the Court of Appeals affirmed the rejection of a substantive due process claim, but found that respondent had alleged a cognizable procedural due process claim. 307 F.3d 1258 (C.A.10 2002). On rehearing en banc, a divided *755 court reached the same disposition, concluding that respondent had a "protected property interest in the enforcement of the terms of her restraining order" and that the town had deprived her of due process because "the police never 'heard' nor seriously entertained her request to enforce and protect her interests in the restraining order." 366 F.3d, at 1101, 1117. We granted certiorari. 543 U.S. 955, 125 S.Ct. 417, 160 L.Ed.2d 316 (2004).

## II

The Fourteenth Amendment to the United States Constitution provides that a State shall not "deprive any person of life, liberty, or property, without due process of law." Amdt. 14, § 1. In 42 U.S.C. § 1983, Congress has created a federal cause of action for "the deprivation of any rights, privileges, or immunities secured by the **2803 Constitution and laws." Respondent claims the benefit of this provision on the ground that she had a property interest in police enforcement of the restraining order against her husband; and that the town deprived her of this property without due process by having a policy that tolerated nonenforcement of restraining orders.

As the Court of Appeals recognized, we left a similar question unanswered in *DeShaney v. Winnebago County Dept. of Social Servs.,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), another case with "undeniably tragic" facts: Local child-protection officials had failed to protect a young boy from beatings by his father that left him severely brain damaged. *Id.,* at 191–193, 109 S.Ct. 998. We held that the so-called "substantive" component of the Due Process Clause does not "requir[e] the State to protect the life, liberty, and property of its citizens against invasion by private actors." *Id.,* at 195, 109 S.Ct. 998. We noted, however, that the petitioner had not properly preserved the argument that—and we thus "decline[d] to consider" whether—state "child protection statutes gave [him] an 'entitlement' to receive protective services in accordance with the terms of the statute, an entitlement which would enjoy due process protection." *Id.,* at 195, n. 2, 109 S.Ct. 998.

[1]  [2]  [3]  [4]  *756 The procedural component of the Due Process Clause does not protect everything that might be described as a "benefit": "To have a property interest in

a benefit, a person clearly must have more than an abstract need or desire" and "more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Such entitlements are, " 'of course, ... not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.' " *Paul v. Davis,* 424 U.S. 693, 709, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976) (quoting *Roth, supra,* at 577, 92 S.Ct. 2701); see also *Phillips v. Washington Legal Foundation,* 524 U.S. 156, 164, 118 S.Ct. 1925, 141 L.Ed.2d 174 (1998).

### A

[5]  Our cases recognize that a benefit is not a protected entitlement if government officials may grant or deny it in their discretion. See, *e.g., Kentucky Dept. of Corrections v. Thompson,* 490 U.S. 454, 462–463, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989). The Court of Appeals in this case determined that Colorado law created an entitlement to enforcement of the restraining order because the "court-issued restraining order ... specifically dictated that its terms must be enforced" and a "state statute command[ed]" enforcement of the order when certain objective conditions were met (probable cause to believe that the order had been violated and that the object of the order had received notice of its existence). 366 F.3d, at 1101, n. 5; see also *id.,* at 1100, n. 4; *id.,* at 1104–1105, and n. 9. Respondent contends that we are obliged "to give deference to the Tenth Circuit's analysis of Colorado law on" whether she had an entitlement to enforcement of the restraining order. Tr. of Oral Arg. 52.

[6]  We will not, of course, defer to the Tenth Circuit on the ultimate issue: whether what Colorado law has given respondent constitutes a property interest for purposes of the Fourteenth Amendment. That determination, despite its *757 state-law underpinnings, is ultimately one of federal constitutional law. "Although the underlying substantive interest is created by 'an independent source such as state law,' *federal constitutional law* **2804 determines whether that interest rises to the level of a 'legitimate claim of entitlement' protected by the Due Process Clause." *Memphis Light, Gas & Water Div. v. Craft,* 436 U.S. 1, 9, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978) (quoting *Roth, supra,* at 577, 92 S.Ct. 2701; emphasis added); cf. *United States ex rel. TVA v. Powelson,* 319 U.S. 266, 279, 63 S.Ct. 1047, 87 L.Ed.

**Town of Castle Rock, Colo. v. Gonzales, 545 U.S. 748 (2005)**

125 S.Ct. 2796, 162 L.Ed.2d 658, 73 USLW 4611, 05 Cal. Daily Op. Serv. 5642...

1390 (1943). Resolution of the federal issue begins, however, with a determination of what it is that state law provides. In the context of the present case, the central state-law question is whether Colorado law gave respondent a right to police enforcement of the restraining order. It is on this point that respondent's call for deference to the Tenth Circuit is relevant.

**[7]** We have said that a "presumption of deference [is] given the views of a federal court as to the law of a State within its jurisdiction." *Phillips, supra,* at 167, 118 S.Ct. 1925. That presumption can be overcome, however, see *Leavitt v. Jane L.,* 518 U.S. 137, 145, 116 S.Ct. 2068, 135 L.Ed.2d 443 (1996) *(per curiam),* and we think deference inappropriate here. The Tenth Circuit's opinion, which reversed the Colorado District Judge, did not draw upon a deep well of state-specific expertise, but consisted primarily of quoting language from the restraining order, the statutory text, and a state-legislative-hearing transcript. See 366 F.3d, at 1103-1109. These texts, moreover, say nothing distinctive to Colorado, but use mandatory language that (as we shall discuss) appears in many state and federal statutes. As for case law: The only state-law cases about restraining orders that the Court of Appeals relied upon were decisions of Federal District Courts in Ohio and Pennsylvania and state courts in New Jersey, Oregon, and Tennessee. *Id.,* at 1104-1105, n. 9, 1109. [4] Moreover, if we were simply to accept **\*758** the Court of Appeals' conclusion, we would necessarily have to decide conclusively a federal constitutional question (*i.e.,* whether such an entitlement constituted property under the Due Process Clause and, if so, whether petitioner's customs or policies provided too little process to protect it). We proceed, then, to our own analysis of whether Colorado law gave respondent a right to enforcement of the restraining order. [5]

### B

**[8]** The critical language in the restraining order came not from any part of the order itself (which was signed by the state-court trial judge and directed to the restrained party, respondent's husband), but from the preprinted notice to law-enforcement personnel that appeared on **\*\*2805** the back of the order. See *supra,* at 2801. That notice effectively restated the statutory provision describing "peace officers' duties" related to the crime of violation of a restraining order. At the time of the conduct at issue in this case, that provision read as follows:

"(a) Whenever a restraining order is issued, the protected person shall be provided with a copy of such **\*759** order. *A peace officer shall use every reasonable means to enforce a restraining order.*

"(b) *A peace officer shall arrest, or, if an arrest would be impractical under the circumstances, seek a warrant for the arrest of a restrained person* when the peace officer has information amounting to probable cause that:

"(I) The restrained person has violated or attempted to violate any provision of a restraining order; and

"(II) The restrained person has been properly served with a copy of the restraining order or the restrained person has received actual notice of the existence and substance of such order.

"(c) In making the probable cause determination described in paragraph (b) of this subsection (3), a peace officer shall assume that the information received from the registry is accurate. *A peace officer shall enforce a valid restraining order whether or not there is a record of the restraining order in the registry.*" Colo.Rev.Stat. § 18-6-803.5(3) (Lexis 1999) (emphases added).

The Court of Appeals concluded that this statutory provision-especially taken in conjunction with a statement from its legislative history, [6] and with another statute restricting **\*760** criminal and civil liability for officers making arrests [7] -established the Colorado Legislature's clear intent "to alter the fact that the police were not enforcing domestic abuse restraining orders," and thus its intent "that the recipient of a domestic abuse restraining order have an entitlement to its enforcement." 366 F.3d, at 1108. Any other result, it said, "would render domestic abuse restraining orders utterly valueless." *Id.,* at 1109.

This last statement is sheer hyperbole. Whether or not respondent had a right to enforce the restraining order, it rendered certain otherwise lawful conduct by her husband both criminal and in contempt of court. See §§ 18-6-803.5(2) (a), (7). The creation of grounds on which he could be arrested, criminally prosecuted, and held in contempt was hardly "valueless"-even if the prospect of those sanctions ultimately failed to prevent him from committing three murders and a suicide.

**Town of Castle Rock, Colo. v. Gonzales, 545 U.S. 748 (2005)**

125 S.Ct. 2796, 162 L.Ed.2d 658, 73 USLW 4611, 05 Cal. Daily Op. Serv. 5642...

We do not believe that these provisions of Colorado law truly made enforcement of restraining orders *mandatory*. A well established tradition of police discretion has **\*\*2806** long coexisted with apparently mandatory arrest statutes.

> "In each and every state there are long-standing statutes that, by their terms, seem to preclude nonenforcement by the police.... However, for a number of reasons, including their legislative history, insufficient resources, and sheer physical impossibility, it has been recognized that such statutes cannot be interpreted literally.... [T]hey clearly do not mean that a police officer may not lawfully decline to ... make an arrest. As to third parties in these states, the full-enforcement statutes simply have no effect, and their significance is **\*761** further diminished." 1 ABA Standards for Criminal Justice 1-4.5, commentary, pp. 1-124 to 1-125 (2d ed.1980) (footnotes omitted).

The deep-rooted nature of law-enforcement discretion, even in the presence of seemingly mandatory legislative commands, is illustrated by *Chicago v. Morales,* 527 U.S. 41, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999), which involved an ordinance that said a police officer " 'shall order' " persons to disperse in certain circumstances, *id.,* at 47, n. 2, 119 S.Ct. 1849. This Court rejected out of hand the possibility that "the municipal language of the ordinance ... afford[ed] the police *no* discretion." *Id.,* at 62, n. 32, 119 S.Ct. 1849. It is, the Court proclaimed, simply "common sense that *all* police officers must use some discretion in deciding when and where to enforce city ordinances." *Ibid.* (emphasis added).

Against that backdrop, a true mandate of police action would require some stronger indication from the Colorado Legislature than "shall use every reasonable means to enforce a restraining order" (or even "shall arrest ... or ... seek a warrant"), §§ 18-6-803.5(3)(a), (b). That language is not perceptibly more mandatory than the Colorado statute which has long told municipal chiefs of police that they "shall pursue and arrest any person fleeing from justice in any part of the state" and that they "shall apprehend any person in the act of committing any offense ... and, forthwith and without any warrant, bring such person before a ... competent authority for examination and trial." Colo.Rev.Stat. § 31-4-112 (Lexis 2004). It is hard to imagine that a Colorado peace officer would not have some discretion to determine that-despite probable cause to believe that a restraining order has been violated-the circumstances of the violation or the competing duties of that officer or his agency counsel decisively against enforcement in a particular instance.[8]  **\*762** The practical

necessity for discretion is particularly apparent in a case such as this one, where the suspected violator is not actually present and his whereabouts are unknown. Cf. *Donaldson v. Seattle,* 65 Wash.App. 661, 671-672, 831 P.2d 1098, 1104 (1992) ("There is a vast difference between a mandatory duty to arrest [a violator who is on the scene] and a mandatory duty to conduct a follow up investigation [to locate an absent violator].... A mandatory duty to investigate ... would be completely open-ended as to priority, duration and intensity").

The dissent correctly points out that, in the specific context of domestic violence, mandatory-arrest statutes have been found **\*\*2807** in some States to be more mandatory than traditional mandatory-arrest statutes. *Post,* at 2816-2819 (opinion of STEVENS, J.). The Colorado statute mandating arrest for a domestic-violence offense is different from but related to the one at issue here, and it includes similar though not identical phrasing. See Colo.Rev.Stat. § 18-6-803.6(1) (Lexis 1999) ("When a peace officer determines that there is probable cause to believe that a crime or offense involving domestic violence ... has been committed, the officer shall, without undue delay, arrest the person suspected of its commission ... "). Even in the domestic-violence context, however, it is unclear how the mandatory-arrest paradigm applies to cases in which the offender is not present to be arrested. As the dissent explains, *post,* at 2817, and n. 8, much of the impetus for mandatory-arrest statutes and policies derived from the idea that it is better for police officers to arrest the aggressor in a domestic-violence incident than to attempt to mediate the dispute or merely to ask the offender to leave the scene. Those other options are only available, of course, when the offender is present at the **\*763** scene. See Hanna, No Right to Choose: Mandated Victim Participation in Domestic Violence Prosecutions, 109 Harv. L.Rev. 1849, 1860 (1996) ("[T]he clear trend in police practice is to arrest the batterer *at the scene* ... " (emphasis added)).

As one of the cases cited by the dissent, *post,* at 2818-2819, recognized, "there will be situations when no arrest is possible, *such as when the alleged abuser is not in the home.*" *Donaldson,* 65 Wash.App., at 674, 831 P.2d, at 1105 (emphasis added). That case held that Washington's mandatory-arrest statute required an arrest only in "cases where the offender is on the scene," and that it "d[id] not create an on-going mandatory duty to conduct an investigation" to locate the offender. *Id.,* at 675, 831 P.2d, at 1105. Colorado's restraining-order statute appears to contemplate a similar distinction, providing that when

---

**Town of Castle Rock, Colo. v. Gonzales, 545 U.S. 748 (2005)**

125 S.Ct. 2796, 162 L.Ed.2d 658, 73 USLW 4611, 05 Cal. Daily Op. Serv. 5642...

arrest is "impractical"-which was likely the case when the whereabouts of respondent's husband were unknown-the officers' statutory duty is to "seek a warrant" rather than "arrest." § 18-6-803.5(3)(b).

[9] Respondent does not specify the precise means of enforcement that the Colorado restraining-order statute assertedly mandated-whether her interest lay in having police arrest her husband, having them seek a warrant for his arrest, or having them "use every reasonable means, up to and including arrest, to enforce the order's terms," Brief for Respondent 29-30. [9] Such indeterminacy is not the hallmark of a duty that is mandatory. Nor can someone be safely deemed "entitled" to something when the identity of the alleged entitlement is vague. See *Roth*, 408 U.S., at 577, 92 S.Ct. 2701 (considering *764 whether "certain benefits" were "secure[d]" by rule or understandings); cf. *Natale v. Ridgefield*, 170 F.3d 258, 263 (C.A.2 1999) ("There is no reason ... to restrict the 'uncertainty' that will preclude existence of a federally protectable property interest to the uncertainty that inheres in [the] exercise of discretion"). The dissent, after suggesting various formulations **2808 of the entitlement in question, [10] ultimately contends that the obligations under the statute were quite precise: either make an arrest or (if that is impractical) seek an arrest warrant, *post*, at 2820. The problem with this is that the seeking of an arrest warrant would be an entitlement to nothing but procedure-which we have held inadequate even to support standing, see *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); much less can it be the basis for a property interest. See *post*, at 2811-2813 (SOUTER, J., concurring). After the warrant is sought, it remains within the discretion of a judge whether to grant it, and after it is granted, it remains within the discretion of the police whether and when to execute it. [11] Respondent would have been assured nothing but the seeking of a warrant. This is not the sort of "entitlement" out of which a property interest is created.

Even if the statute could be said to have made enforcement of restraining orders "mandatory" because of the domestic-violence context of the underlying statute, that would not *765 necessarily mean that state law gave *respondent* an entitlement to *enforcement* of the mandate. Making the actions of government employees obligatory can serve various legitimate ends other than the conferral of a benefit on a specific class of people. See, *e.g.*, *Sandin v. Conner*, 515 U.S. 472, 482, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995) (finding no constitutionally protected liberty interest in prison regulations phrased in mandatory terms, in part because

"[s]uch guidelines are not set forth solely to benefit the prisoner"). The serving of public rather than private ends is the normal course of the criminal law because criminal acts, "besides the injury [they do] to individuals, ... strike at the very being of society; which cannot possibly subsist, where actions of this sort are suffered to escape with impunity." 4 W. Blackstone, Commentaries on the Laws of England 5 (1769); see also *Huntington v. Attrill*, 146 U.S. 657, 668, 13 S.Ct. 224, 36 L.Ed. 1123 (1892). This principle underlies, for example, a Colorado district attorney's discretion to prosecute a domestic assault, even though the victim withdraws her charge. See *People v. Cunefare*, 102 P.3d 302, 311-312 (Colo.2004) (en banc) (Bender, J., concurring in part, dissenting in part, and dissenting in part to the judgment).

Respondent's alleged interest stems only from a State's *statutory* scheme-from a restraining order that was authorized by and tracked precisely the statute on which the Court of Appeals relied. She does not assert that she has any common-law or contractual entitlement to enforcement. If she was given a statutory entitlement, we would expect to see some indication of that in the statute itself. Although Colorado's statute spoke of "protected person[s]" such as respondent, it did so in connection with matters other than a right to enforcement. It said that a "protected person shall be **2809 provided with a copy of [a restraining] order" when it is issued, § 18-6-803.5(3)(a); that a law enforcement agency "shall make all reasonable efforts to contact the protected party upon the arrest of the restrained person," § 18-6-803.5(3)(d); and that the agency "shall give [to the protected *766 person] a copy" of the report it submits to the court that issued the order, § 18-6-803.5(3)(e). Perhaps most importantly, the statute spoke directly to the protected person's power to "initiate contempt proceedings against the restrained person if the order [was] issued in a civil action or request the prosecuting attorney to initiate contempt proceedings if the order [was] issued in a criminal action." § 18-6-803.5(7). The protected person's express power to "initiate" civil contempt proceedings contrasts tellingly with the mere ability to "request" initiation of criminal contempt proceedings-and even more dramatically with the complete silence about any power to "request" (much less demand) that an arrest be made.

The creation of a personal entitlement to something as vague and novel as enforcement of restraining orders cannot "simply g[o] without saying." *Post*, at 2821, n. 16 (STEVENS, J., dissenting). We conclude that Colorado has not created such an entitlement.

Case 5:15-cv-01238-GTS-TWD   Document 21-6   Filed 03/25/16   Page 49 of 87

**Town of Castle Rock, Colo. v. Gonzales, 545 U.S. 748 (2005)**

125 S.Ct. 2796, 162 L.Ed.2d 658, 73 USLW 4611, 05 Cal. Daily Op. Serv. 5642...

## C

**[10]** Even if we were to think otherwise concerning the creation of an entitlement by Colorado, it is by no means clear that an individual entitlement to enforcement of a restraining order could constitute a "property" interest for purposes of the Due Process Clause. Such a right would not, of course, resemble any traditional conception of property. Although that alone does not disqualify it from due process protection, as *Roth* and its progeny show, the right to have a restraining order enforced does not "have some ascertainable monetary value," as even our "*Roth*-type property-as-entitlement" cases have implicitly required. Merrill, The Landscape of Constitutional Property, 86 Va. L.Rev. 885, 964 (2000).[12] Perhaps most radically, the alleged property *767 interest here arises *incidentally*, not out of some new species of government benefit or service, but out of a function that government actors have always performed-to wit, arresting people who they have probable cause to believe have committed a criminal offense.[13]

**\*\*2810 [11]** The indirect nature of a benefit was fatal to the due process claim of the nursing-home residents in *O'Bannon v. Town Court Nursing Center,* 447 U.S. 773, 100 S.Ct. 2467, 65 L.Ed.2d 506 (1980). We held that, while the withdrawal of "direct benefits" (financial payments under Medicaid for certain medical services) triggered due process protections, *id.,* at 786-787, 100 S.Ct. 2467, the same was not true for the "indirect benefit[s]" conferred on Medicaid patients when the Government enforced "minimum standards of care" for nursing-home facilities, *id.,* at 787, 100 S.Ct. 2467. "[A]n indirect and incidental result of the Government's enforcement action ... does not amount to a deprivation of any interest in life, liberty, or property." *Ibid.* In this case, as in *O'Bannon,* "[t]he simple distinction between government action that directly affects a citizen's legal rights ... and action that is directed against a third party and affects the citizen only indirectly or incidentally, provides a sufficient answer to" respondent's reliance on cases that found government-provided *768 services to be entitlements. *Id.,* at 788, 100 S.Ct. 2467. The *O'Bannon* Court expressly noted, *ibid.,* that the distinction between direct and indirect benefits distinguished *Memphis Light, Gas & Water Div. v. Craft,* 436 U.S. 1, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978), one of the government-services cases on which the dissent relies, *post,* at 2822.

## III

We conclude, therefore, that respondent did not, for purposes of the Due Process Clause, have a property interest in police enforcement of the restraining order against her husband. It is accordingly unnecessary to address the Court of Appeals' determination (366 F.3d, at 1110-1117) that the town's custom or policy prevented the police from giving her due process when they deprived her of that alleged interest. See *American Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 61, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999).[14]

**[12]** In light of today's decision and that in *DeShaney,* the benefit that a third party may receive from having someone else arrested for a crime generally does not trigger protections under the Due Process Clause, neither in its procedural nor in its "substantive" manifestations. This result reflects our continuing reluctance to treat the Fourteenth Amendment as " 'a font of tort law,' " *Parratt v. Taylor,* 451 U.S. 527, 544, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981) (quoting *Paul v. Davis,* 424 U.S., at 701, 96 S.Ct. 1155), but it does not mean States are powerless to provide victims with personally enforceable remedies. Although the framers of the Fourteenth Amendment and the Civil Rights Act of 1871, 17 Stat. 13 (the original source of § 1983), did not create a system by which police departments are generally held financially accountable for crimes that better policing might have *769 prevented, the people of Colorado are free to craft such a system under state law. Cf. *DeShaney,* 489 U.S., at 203, 109 S.Ct. 998.[15]

**\*\*2811** The judgment of the Court of Appeals is

*Reversed.*

Justice SOUTER, with whom Justice BREYER joins, concurring.

I agree with the Court that Jessica Gonzales has shown no violation of an interest protected by the Fourteenth Amendment's Due Process Clause, and I join the Court's opinion. The Court emphasizes the traditional public focus of law enforcement as reason to doubt that these particular legal requirements to provide police services, however unconditional their form, presuppose enforceable individual rights to a certain level of police protection. *Ante,* at 2808. The *770 Court also notes that the terms of the Colorado statute involved here recognize and preserve the

Case 5:15-cv-01238-GTS-TWD   Document 21-6   Filed 03/25/16   Page 50 of 87

**Town of Castle Rock, Colo. v. Gonzales, 545 U.S. 748 (2005)**

125 S.Ct. 2796, 162 L.Ed.2d 658, 73 USLW 4611, 05 Cal. Daily Op. Serv. 5642...

traditional discretion afforded law enforcement officers. *Ante*, at 2805-2808, and n. 8. Gonzales's claim of a property right thus runs up against police discretion in the face of an individual demand to enforce, and discretion to ignore an individual instruction not to enforce (because, say, of a domestic reconciliation); no one would argue that the beneficiary of a Colorado order like the one here would be authorized to control a court's contempt power or order the police to refrain from arresting. These considerations argue against inferring any guarantee of a level of protection or safety that could be understood as the object of a "legitimate claim of entitlement," *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), in the nature of property arising under Colorado law.[*] Consequently, the classic predicate for federal due process protection of interests under state law is missing.

Gonzales implicitly recognizes this, when she makes the following argument:

> "Ms. Gonzales alleges that ... she was denied the process laid out in the statute. The police did not consider her request in a timely fashion, but instead repeatedly required her to call the station over several hours. The statute promised a process by which her restraining order would be given vitality through careful and prompt consideration of an enforcement request .... Denial of that process drained all of the value from her property interest in the restraining order." Brief for Respondent 10.

The argument is unconventional because the state-law benefit for which it claims federal procedural protection is itself a variety of procedural regulation, a set of rules to be followed by officers exercising the State's executive power: use **\*771** all reasonable means to enforce, arrest upon demonstrable probable cause, get a warrant, and so on, see *ante,* at 2800-2801.

When her argument is understood as unconventional in this sense, a further reason **\*\*2812** appears for rejecting its call to apply *Roth,* a reason that would apply even if the statutory mandates to the police were absolute, leaving the police with no discretion when the beneficiary of a protective order insists upon its enforcement. The Due Process Clause extends procedural protection to guard against unfair deprivation by state officials of substantive state-law property rights or entitlements; the federal process protects the property created by state law. But Gonzales claims a property interest in a state-mandated process in and of itself. This argument is at odds with the rule that "[p]rocess is not an end in

itself. Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement." *Olim v. Wakinekona,* 461 U.S. 238, 250, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983); see also *Doe v. District of Columbia,* 93 F.3d 861, 868 (C.A.D.C.1996) *(per curiam); Doe v. Milwaukee County,* 903 F.2d 499, 502-503 (C.A.7 1990). In putting to rest the notion that the scope of an otherwise discernible property interest could be limited by related state-law procedures, this Court observed that "[t]he categories of substance and procedure are distinct .... 'Property' cannot be defined by the procedures provided for its deprivation." *Cleveland Bd. of Ed. v. Loudermill,* 470 U.S. 532, 541, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). Just as a State cannot diminish a property right, once conferred, by attaching less than generous procedure to its deprivation, *ibid.,* neither does a State create a property right merely by ordaining beneficial procedure unconnected to some articulable substantive guarantee. This is not to say that state rules of executive procedure may not provide significant reasons to infer an articulable property right meant to be protected; but it is to say that we have not identified property **\*772** with procedure as such. State rules of executive procedure, however important, may be nothing more than rules of executive procedure.

Thus, in every instance of property recognized by this Court as calling for federal procedural protection, the property has been distinguishable from the procedural obligations imposed on state officials to protect it. Whether welfare benefits, *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), attendance at public schools, *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), utility services, *Memphis Light, Gas & Water Div. v. Craft,* 436 U.S. 1, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978), public employment, *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), professional licenses, *Barry v. Barchi,* 443 U.S. 55, 99 S.Ct. 2642, 61 L.Ed.2d 365 (1979), and so on, the property interest recognized in our cases has always existed apart from state procedural protection before the Court has recognized a constitutional claim to protection by federal process. To accede to Gonzales's argument would therefore work a sea change in the scope of federal due process, for she seeks federal process as a substitute simply for state process. (And she seeks damages under Rev. Stat. § 1979, 42 U.S.C. § 1983, for denial of process to which she claimed a federal right.) There is no articulable distinction between the object of Gonzales's asserted entitlement and the process she desires in order to protect her entitlement; both amount to certain steps to be taken by the police to protect her family and herself.

Town of Castle Rock, Colo. v. Gonzales, 545 U.S. 748 (2005)

125 S.Ct. 2796, 162 L.Ed.2d 658, 73 USLW 4611, 05 Cal. Daily Op. Serv. 5642...

Gonzales's claim would thus take us beyond *Roth* or any other recognized theory of Fourteenth Amendment due process, by collapsing the distinction between property protected and the process that protects it, and would federalize every mandatory state-law direction to executive officers whose performance on the job can **\*\*2813** be vitally significant to individuals affected.

The procedural directions involved here are just that. They presuppose no enforceable substantive entitlement, and *Roth* does not raise them to federally enforceable status in the name of due process.

**\*773** Justice STEVENS, with whom Justice GINSBURG joins, dissenting.

The issue presented to us is much narrower than is suggested by the far-ranging arguments of the parties and their *amici*. Neither the tragic facts of the case, nor the importance of according proper deference to law enforcement professionals, should divert our attention from that issue. That issue is whether the restraining order entered by the Colorado trial court on June 4, 1999, created a "property" interest that is protected from arbitrary deprivation by the Due Process Clause of the Fourteenth Amendment.

It is perfectly clear, on the one hand, that neither the Federal Constitution itself, nor any federal statute, granted respondent or her children any individual entitlement to police protection. See *DeShaney v. Winnebago County Dept. of Social Servs.*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). Nor, I assume, does any Colorado statute create any such entitlement for the ordinary citizen. On the other hand, it is equally clear that federal law imposes no impediment to the creation of such an entitlement by Colorado law. Respondent certainly could have entered into a contract with a private security firm, obligating the firm to provide protection to respondent's family; respondent's interest in such a contract would unquestionably constitute "property" within the meaning of the Due Process Clause. If a Colorado statute enacted for her benefit, or a valid order entered by a Colorado judge, created the functional equivalent of such a private contract by granting respondent an entitlement to mandatory individual protection by the local police force, that state-created right would also qualify as "property" entitled to constitutional protection.

I do not understand the majority to rule out the foregoing propositions, although it does express doubts. See *ante*, at

2809 ("[I]t is by no means clear that an individual entitlement to enforcement of a restraining order could constitute a **\*774** 'property' interest"). Moreover, the majority does not contest, see *ante*, at 2810, that if respondent did have a cognizable property interest in this case, the deprivation of that interest violated due process. As the Court notes, respondent has alleged that she presented the police with a copy of the restraining order issued by the Colorado court and requested that it be enforced. *Ante*, at 2800, n. 1. In response, she contends, the officers effectively ignored her. If these allegations are true, a federal statute, Rev. Stat. § 1979, 42 U.S.C. § 1983, provides her with a remedy against the petitioner, even if Colorado law does not. See *Cleveland Bd. of Ed. v. Loudermill*, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985).

The central question in this case is therefore whether, as a matter of Colorado law, respondent had a right to police assistance comparable to the right she would have possessed to any other service the government or a private firm might have undertaken to provide. See *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) ( "Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support **\*\*2814** claims of entitlement to those benefits").

There was a time when our tradition of judicial restraint would have led this Court to defer to the judgment of more qualified tribunals in seeking the correct answer to that difficult question of Colorado law. Unfortunately, although the majority properly identifies the "central state-law question" in this case as "whether Colorado law gave respondent a right to police enforcement of the restraining order," *ante*, at 2804, it has chosen to ignore our settled practice by providing its *own* answer to that question. Before identifying the flaws in the Court's ruling on the merits, I shall briefly comment on our past practice.

**\*775 I**

The majority's decision to plunge ahead with its own analysis of Colorado law imprudently departs from this Court's longstanding policy of paying "deference [to] the views of a federal court as to the law of a State within its jurisdiction." *Phillips v. Washington Legal Foundation*, 524 U.S. 156, 167,

Case 5:15-cv-01238-GTS-TWD   Document 21-6   Filed 03/25/16   Page 52 of 87

**Town of Castle Rock, Colo. v. Gonzales, 545 U.S. 748 (2005)**

125 S.Ct. 2796, 162 L.Ed.2d 658, 73 USLW 4611, 05 Cal. Daily Op. Serv. 5642...

118 S.Ct. 1925, 141 L.Ed.2d 174 (1998); see also *Bishop v. Wood*, 426 U.S. 341, 346, and n. 10, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976) (collecting cases). This policy is not only efficient, but it reflects "our belief that district courts and courts of appeals are better schooled in and more able to interpret the laws of their respective States." *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 500-501, 105 S.Ct. 2794, 86 L.Ed.2d 394 (1985); *Hillsborough v. Cromwell*, 326 U.S. 620, 629-630, 66 S.Ct. 445, 90 L.Ed. 358 (1946) (endorsing "great deference to the views of the judges of those courts 'who are familiar with the intricacies and trends of local law and practice' "). Accordingly, we have declined to show deference only in rare cases in which the court of appeals' resolution of state law was "clearly wrong" or otherwise seriously deficient. See *Brockett*, 472 U.S., at 500, n. 9, 105 S.Ct. 2794; accord, *Leavitt v. Jane L.*, 518 U.S. 137, 145, 116 S.Ct. 2068, 135 L.Ed.2d 443 (1996) *(per curiam).*

Unfortunately, the Court does not even attempt to demonstrate that the six-judge en banc majority was "clearly wrong" in its interpretation of Colorado's domestic restraining order statute; nor could such a showing be made. For it is certainly *plausible* to construe *"shall* use every reasonable means to enforce a restraining order" and *"shall* arrest," Colo.Rev.Stat. §§ 18-6-803.5(3)(a)-(b) (Lexis 1999) (emphasis added), as conveying mandatory directives to the police, particularly when the same statute, at other times, tellingly employs different language that suggests police discretion, see § 18-6-803.5(6)(a) ( "A peace officer *is authorized to* use every reasonable means to protect ... "; "Such peace officer *may* transport ... " (emphasis added)).[1] Moreover, unlike *776 today's decision, the Court of Appeals was attentive to the legislative history of the statute, focusing on a statement by the statute's sponsor in the Colorado House, *ante*, at 2805, n. 6 (quoting statement), which it took to "emphasiz[e] the importance of the police's mandatory enforcement of domestic restraining orders." 366 F.3d 1093, 1107 (C.A.10 2004) (en banc). Far from overlooking the traditional presumption of police discretion, then, the Court of Appeals' diligent analysis of the statute's text, purpose, and history led it to conclude that **2815 the Colorado Legislature intended precisely to abrogate that presumption in the specific context of domestic restraining orders. That conclusion is eminently reasonable and, I believe, worthy of our deference.[2]

**II**

Even if the Court had good reason to doubt the Court of Appeals' determination of state law, it would, in my judgment, be a far wiser course to certify the question to the *777 Colorado Supreme Court.[3] Powerful considerations support certification in this case. First, principles of federalism and comity favor giving a State's high court the opportunity to answer important questions of state law, particularly when those questions implicate uniquely local matters such as law enforcement and might well require the weighing of policy considerations for their correct resolution.[4] See *Elkins v. Moreno*, 435 U.S. 647, 662, n. 16, 98 S.Ct. 1338, 55 L.Ed.2d 614 (1978) *(sua sponte* certifying a question of state law because it is "one in which state governments have the highest interest"); cf. *Arizonans for Official English v. Arizona*, 520 U.S. 43, 77, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997) ("Through certification of novel or unsettled questions of state law for authoritative answers by a State's highest court, a federal court may save 'time, energy, and resources, and hel[p] build a cooperative judicial federalism' " (brackets in original)).[5] *778 Second, by certifying **2816 a potentially dispositive state-law issue, the Court would adhere to its wise policy of avoiding the unnecessary adjudication of difficult questions of constitutional law. See *Elkins*, 435 U.S., at 661-662, 98 S.Ct. 1338 (citing constitutional avoidance as a factor supporting certification). Third, certification would promote both judicial economy and fairness to the parties. After all, the Colorado Supreme Court is the ultimate authority on the meaning of Colorado law, and if in later litigation it should disagree with this Court's provisional state-law holding, our efforts will have been wasted and respondent will have been deprived of the opportunity to have her claims heard under the authoritative view of Colorado law. The unique facts of this case only serve to emphasize the importance of employing a procedure that will provide the correct answer to the central question of state law. See *Brockett*, 472 U.S., at 510, 105 S.Ct. 2794 (O'CONNOR, J., concurring) ("Speculation by a federal court about the meaning of a state statute in the absence of a prior state court adjudication is particularly gratuitous when, as is the case here, the state courts stand willing to address questions of state law on certification from a federal court").[6]

**\*779 III**

Three flaws in the Court's rather superficial analysis of the merits highlight the unwisdom of its decision to answer the state-law question *de novo.* First, the Court places undue

weight on the various statutes throughout the country that seemingly mandate police enforcement but are generally understood to preserve police discretion. As a result, the Court gives short shrift to the unique case of "mandatory arrest" statutes in the domestic violence context; States passed a wave of these statutes in the 1980's and 1990's with the unmistakable goal of eliminating police discretion in this area. Second, the Court's formalistic analysis fails to take seriously the fact that the Colorado statute at issue in this case was enacted for the benefit of the narrow class of persons who are beneficiaries of domestic restraining orders, and that the order at issue in this case was specifically intended to provide protection to respondent and her children. Finally, the Court is simply wrong to assert that a citizen's interest in the government's commitment to provide police enforcement in certain defined circumstances does not resemble any "traditional conception of property," *ante,* at 2809; in fact, a citizen's property interest in such a commitment is just as concrete and worthy of protection as her interest in any other important service the government or a private firm has undertaken to provide.

**\*\*2817** In 1994, the Colorado General Assembly passed omnibus legislation targeting domestic violence. The part of the legislation at issue in this case mandates enforcement of a domestic restraining order upon probable cause of a violation, § 18-6-803.5(3), while another part directs that police officers "shall, without undue delay, arrest" a suspect upon "probable cause to believe that a crime or offense of domestic violence **\*780** has been committed," § 18-6-803.6(1). [7] In adopting this legislation, the Colorado General Assembly joined a nationwide movement of States that took aim at the crisis of police underenforcement in the domestic violence sphere by implementing "mandatory arrest" statutes. The crisis of underenforcement had various causes, not least of which was the perception by police departments and police officers that domestic violence was a private, "family" matter and that arrest was to be used as a last resort. Sack, Battered Women and the State: The Struggle for the Future of Domestic Violence Policy, 2004 Wis. L.Rev. 1657, 1662-1663 (hereinafter Sack); *id.,* at 1663 ("Because these cases were considered noncriminal, police assigned domestic violence calls low priority and often did not respond to them for several hours or ignored them altogether"). In response to these realities, and emboldened by a well-known 1984 experiment by the Minneapolis police department, [8] "many states enacted mandatory **\*781** arrest statutes under which a police officer must arrest an abuser when the officer has probable cause to believe that a domestic assault

has occurred or that a protection order has been violated." Developments in the Law: Legal Responses to Domestic Violence, 106 Harv. L.Rev. 1498, 1537 (1993). The purpose of these statutes was precisely to "counter police resistance to arrests in domestic violence cases by removing or restricting police officer discretion; mandatory arrest policies would increase police response and reduce batterer recidivism." Sack 1670.

Thus, when Colorado passed its statute in 1994, it joined the ranks of 15 States **\*\*2818** that mandated arrest for domestic violence offenses and 19 States that mandated arrest for domestic restraining order violations. See Developments in the Law, 106 Harv. L.Rev., at 1537, n. 68 (noting statutes in 1993); N. Miller, Institute for Law and Justice, A Law Enforcement and Prosecution Perspective 7, and n. 74, 8, and n. 90 (2003), http://www.ilj. org/dv/dvvawa2000.htm (as visited June 24, 2005, and available in Clerk of Court's case file) (listing Colorado among the many States that currently have mandatory arrest statutes). [9]

Given the specific purpose of these statutes, there can be no doubt that the Colorado Legislature used the term "shall" advisedly in its domestic restraining order statute. While **\*782** "shall" is probably best read to mean "may" in other Colorado statutes that seemingly mandate enforcement, cf. Colo.Rev.Stat. § 31-4-112 (Lexis 2004) (police "*shall suppress* all riots, disturbances, and breaches of the peace, *shall apprehend* all disorderly persons in the city ..." (emphases added)), it is clear that the elimination of police discretion was integral to Colorado and its fellow States' solution to the problem of underenforcement in domestic violence cases. [10] Since the text of Colorado's statute perfectly captures this legislative purpose, it is hard to imagine what the Court has in mind when it insists on "some stronger indication from the Colorado Legislature." *Ante,* at 2806.

While Colorado case law does not speak to the question, it is instructive that other state courts interpreting their analogous statutes have not only held that they eliminate the police's traditional discretion to refuse enforcement, but have **\*783** also recognized that they create rights enforceable against the police under state law. For example, in *Nearing v. Weaver,* 295 Or. 702, 670 P.2d 137 (1983) (en banc), the court held that although the common law of negligence did not support a suit against the police for failing to enforce a domestic restraining order, the statute's mandatory directive formed the basis for the suit because it was "a specific duty imposed

Case 5:15-cv-01238-GTS-TWD   Document 21-6   Filed 03/25/16   Page 54 of 87
**Town of Castle Rock, Colo. v. Gonzales, 545 U.S. 748 (2005)**
125 S.Ct. 2796, 162 L.Ed.2d 658, 73 USLW 4611, 05 Cal. Daily Op. Serv. 5642...

by statute for the benefit of individuals previously **\*\*2819** identified by judicial order." *Id.,* at 707, 670 P.2d, at 140. [11] In *Matthews v. Pickett County,* 996 S.W.2d 162 (Tenn.1999) (on certification to the Sixth Circuit), the court confirmed that the statute mandated arrest for violations of domestic restraining orders, and it held that the "public duty" defense to a negligence action was unavailable to the defendant police officers because the restraining order had created a "special duty" to protect the plaintiff. *Id.,* at 165. See also *Campbell v. Campbell,* 294 N.J.Super. 18, 24, 682 A.2d 272, 274 (1996) (domestic restraining order statute "allows no discretion" with regard to arrest; "[t]he duty imposed on the police officer is ministerial"); *Donaldson v. Seattle,* 65 Wash.App. 661, 670, 831 P.2d 1098, 1103 (1992) ( "Generally, where an officer has legal grounds to make an arrest he has considerable discretion to do so. In regard to domestic violence, the rule is the reverse. If the officer has the legal grounds to arrest pursuant to the statute, he has a mandatory duty to make the arrest"). To what extent the Colorado Supreme Court would agree with the views of these courts is, of course, an open question, but it does seem rather brazen for the majority to assume that the Colorado Supreme Court **\*784** would repudiate this consistent line of persuasive authority from other States.

Indeed, the Court fails to come to terms with the wave of domestic violence statutes that provides the crucial context for understanding Colorado's law. The Court concedes that, "in the specific context of domestic violence, mandatory-arrest statutes have been found in some States to be more mandatory than traditional mandatory-arrest statutes," *ante,* at 2806-2807, but that is a serious understatement. The difference is not a matter of degree, but of kind. Before this wave of statutes, the legal rule was one of discretion; as the Court shows, the "traditional," general mandatory arrest statutes have always been understood to be "mandatory" in name only, see *ante,* at 2805-2806. The innovation of the domestic violence statutes was to make police enforcement, not "more mandatory," but simply *mandatory.* If, as the Court says, the existence of a protected "entitlement" turns on whether "government officials may grant or deny it in their discretion," *ante,* at 2803, the new mandatory statutes undeniably create an entitlement to police enforcement of restraining orders.

Perhaps recognizing this point, the Court glosses over the dispositive question-whether the police enjoyed discretion to deny enforcement-and focuses on a different question-which "precise means of enforcement," *ante,* at 2807, were called

for in this case. But that question is a red herring. The statute directs that, upon probable cause of a violation, "a peace officer shall arrest, or, if an arrest would be impractical under the circumstances, seek a warrant for the arrest of a restrained person." Colo.Rev.Stat. § 18-6-803.5(3)(b) (Lexis 1999). Regardless of whether the enforcement called for in this case was arrest or the seeking of an arrest warrant (the answer to that question probably changed over the course of the night as the respondent gave the police more information about the husband's whereabouts), the crucial point is that, under the statute, the police were *required* to provide enforcement; *they lacked the discre* **\*\*2820** *tion to do nothing.* **\*785**

[12] The Court suggests that the fact that "enforcement" may encompass different acts infects any entitlement to enforcement with "indeterminacy." *Ante,* at 2807. But this objection is also unfounded. Our cases have never required the object of an entitlement to be some mechanistic, unitary thing. Suppose a State entitled every citizen whose income was under a certain level to receive health care at a state clinic. The provision of health care is not a unitary thing-doctors and administrators must decide what tests are called for and what procedures are required, and these decisions often involve difficult applications of judgment. But it could not credibly be said that a citizen lacks an entitlement to health care simply because the content of that entitlement is not the same in every given situation. Similarly, the enforcement of a restraining order is not some amorphous, indeterminate thing. Under the statute, if the police have probable cause that a violation has occurred, enforcement consists of either making an immediate arrest or seeking a warrant and then executing an arrest-traditional, well-defined tasks that law enforcement officers perform every day. [13]

**\*\*2821** **\*786** The Court similarly errs in speculating that the Colorado Legislature may have mandated police enforcement of restraining orders for "various legitimate ends other than the conferral of a benefit on a specific class of people," *ante,* at 2808; see also *ibid.* (noting that the "serving of public rather than private ends is the normal course of the criminal law"). While the Court's concern would have some bite were we **\*787** faced with a broadly drawn statute directing, for example, that the police "*shall suppress* all riots," there is little doubt that the statute at issue in this case conferred a benefit "on a specific class of people"-namely, recipients of domestic restraining orders. Here, respondent applied for and was granted a restraining order from a Colorado trial judge, who found a risk of "irreparable injury" and found that "physical or emotional harm" would result if the husband were not excluded from the family home. 366

Case 5:15-cv-01238-GTS-TWD   Document 21-6   Filed 03/25/16   Page 55 of 87

Town of Castle Rock, Colo. v. Gonzales, 545 U.S. 748 (2005)
125 S.Ct. 2796, 162 L.Ed.2d 658, 73 USLW 4611, 05 Cal. Daily Op. Serv. 5642...

F.3d, at 1143 (appendix to dissent of O'Brien, J.). As noted earlier, the restraining order required that the husband not "molest or disturb" the peace of respondent and the daughters, and it ordered (with limited exceptions) that the husband stay at least 100 yards away from the family home. *Ibid.* [14] It also directed the police to "use every reasonable means to enforce this ... order," and to arrest or seek a warrant upon probable cause of a violation. *Id.,* at 1144. Under the terms of the statute, when the order issued, respondent and her daughters became " 'protected person[s].' " § 18-6-803.5(1.5)(a) ( " 'Protected person' means the person or persons identified in the restraining order as the person or persons for whose benefit the restraining order was issued"). [15] The statute criminalized the knowing violation of the restraining order, § 18-6-803.5(1), and, as already discussed, the statute (as **\*788** well as the order itself) mandated police enforcement, §§ 18-6-803.5(3)(a)-(b). [16]

**\*\*2822** Because the statute's guarantee of police enforcement is triggered by, and operates only in reference to, a judge's granting of a restraining order in favor of an identified " 'protected person,' " there is simply no room to suggest that such a person has received merely an " 'incidental' " or " 'indirect' " benefit, see *ante,* at 2810. As one state court put it, domestic restraining order statutes "identify with precision when, to whom, and under what circumstances police protection must be afforded. The legislative purpose in requiring the police to enforce individual restraining orders clearly is to protect the named persons for whose protection the order is issued, not to protect the community at large by general law enforcement activity." *Nearing,* 295 Or., at 712, 670 P.2d, at 143. [17] Not only does the Court's doubt about **\*789** whether Colorado's statute created an entitlement in a protected person fail to take seriously the purpose and nature of restraining orders, but it fails to account for the decisions by other state courts, see *supra,* at 2818-2819, that recognize that such statutes and restraining orders create individual rights to police action.

## IV

Given that Colorado law has quite clearly eliminated the police's discretion to deny enforcement, respondent is correct that she had much more than a "unilateral expectation" that the restraining order would be enforced; rather, she had a "legitimate claim of entitlement" to enforcement. *Roth,* 408 U.S., at 577, 92 S.Ct. 2701. Recognizing respondent's

property interest in the enforcement of her restraining order is fully consistent with our precedent. This Court has "made clear that the property interests protected by procedural due process extend well beyond actual ownership of real estate, chattels, or money." *Id.,* at 571-572, 92 S.Ct. 2701. The "types of interests protected as 'property' are varied and, as often as not, intangible, relating 'to the whole domain of social and economic fact.' " *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 430, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982); see also *Perry v. Sindermann,* 408 U.S. 593, 601, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) (" '[P]roperty' interests subject to procedural due process protection are not limited by a few rigid, technical forms. Rather, 'property' denotes a broad range of interests that are secured by 'existing rules or understandings' "). Thus, our cases have found "property" interests in a number of state-conferred benefits and services, including welfare benefits, *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); disability benefits, *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); public education, *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975); utility services, *Memphis Light, Gas & Water Div. v. Craft,* 436 U.S. 1, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978); government employment, *Cleveland Bd. of Ed. v.* **\*790** *Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985), as well as in other entitlements that defy easy categorization, see, *e.g.,* **\*\*2823** *Bell v. Burson,* 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971) (due process requires fair procedures before a driver's license may be revoked pending the adjudication of an accident claim); *Logan,* 455 U.S., at 431, 102 S.Ct. 1148 (due process prohibits the arbitrary denial of a person's interest in adjudicating a claim before a state commission).

Police enforcement of a restraining order is a government service that is no less concrete and no less valuable than other government services, such as education. [18] The relative novelty of recognizing this type of property interest is explained by the relative novelty of the domestic violence statutes creating a mandatory arrest duty; before this innovation, the unfettered discretion that characterized police enforcement defeated any citizen's "legitimate claim of entitlement" to this service. Novel or not, respondent's claim finds strong support in the principles that underlie our due process jurisprudence. In this case, Colorado law *guaranteed* the provision of a certain service, in certain defined circumstances, to a certain class of beneficiaries, and respondent reasonably relied on that guarantee. As we observed in *Roth,* "[i]t is a purpose of the ancient institution of property to protect those claims upon which people rely

125 S.Ct. 2796, 162 L.Ed.2d 658, 73 USLW 4611, 05 Cal. Daily Op. Serv. 5642...

in their daily lives, reliance that must not be arbitrarily undermined." *791 408 U.S., at 577, 92 S.Ct. 2701. Surely, if respondent had contracted with a private security firm to provide her and her daughters with protection from her husband, it would be apparent that she possessed a property interest in such a contract. Here, Colorado undertook a comparable obligation, and respondent-with restraining order in hand-justifiably relied on that undertaking. Respondent's claim of entitlement to this promised service is no less legitimate than the other claims our cases have upheld, and no less concrete than a hypothetical agreement with a private firm.[19] The **2824 fact that it is based on a statutory enactment and a judicial order entered for her special protection, rather than on a formal contract, does not provide a principled basis for refusing to consider it "property" worthy of constitutional protection.[20]

### *792   V

Because respondent had a property interest in the enforcement of the restraining order, state officials could not deprive her of that interest without observing fair procedures.[21] Her description of the police behavior in this case and the

department's callous policy of failing to respond properly to reports of restraining order violations clearly alleges *793 a due process violation. At the very least, due process requires that the relevant state decisionmaker *listen* to the claimant and then *apply the relevant criteria* in reaching his decision.[22] The failure to observe these **2825 minimal procedural safeguards creates an unacceptable risk of arbitrary and "erroneous deprivation[s]," *Mathews,* 424 U.S., at 335, 96 S.Ct. 893. According to respondent's complaint-which we must construe liberally at this early stage in the litigation, see *Swierkiewicz v. Sorema N. A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)-the process she was afforded by the police constituted nothing more than a " 'sham or a pretense.' " *Joint Anti-Fascist Refugee Comm. v. McGrath,* 341 U.S. 123, 164, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring).

Accordingly, I respectfully dissent.

### Parallel Citations

125 S.Ct. 2796, 162 L.Ed.2d 658, 73 USLW 4611, 05 Cal. Daily Op. Serv. 5642, 05 Daily Journal D.A.R. 7653, 18 Fla. L. Weekly Fed. S 511

#### Footnotes

\*   The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

1   Petitioner claims that respondent's complaint "did not allege ... that she ever notified the police of her contention that [her husband] was actually in violation of the restraining order." Brief for Petitioner 7, n. 2. The complaint does allege, however, that respondent "showed [the police] a copy of the [temporary restraining order (TRO) ] and requested that it be enforced." App. to Pet. for Cert. 126a. At this stage in the litigation, we may assume that this reasonably implied the order was being violated. See *Steel Co. v. Citizens for Better Environment,* 523 U.S. 83, 104, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998).

2   It is unclear from the complaint, but immaterial to our decision, whether respondent showed the police only the original *TRO" or also the permanent, modified restraining order that had superseded it on June 4.

3   Three police officers were also named as defendants in the complaint, but the Court of Appeals concluded that they were entitled to qualified immunity, 366 F.3d 1093, 1118 (C.A.10 2004) (en banc). Respondent did not file a cross-petition challenging that aspect of the judgment.

4   Most of the Colorado-law cases cited by the Court of Appeals appeared in footnotes declaring them to be irrelevant because they involved only substantive due process (366 F.3d, at 1100-1101, nn. 4-5), or statutes without restraining orders (*id.,* at 1101, n. 5), or Colorado's Government Immunity Act, which the Court of Appeals concluded applies "only to ... state tort law claims" (*id.,* at 1108-1109, n. 12). Our analysis is likewise unaffected by the Immunity Act or by the way that Colorado has dealt with substantive due process or cases that do not involve restraining orders.

5   In something of an anyone-but-us approach, the dissent simultaneously (and thus unpersuasively) contends not only that this Court should certify a question to the Colorado Supreme Court, *post,* at 2815-2816 (opinion of STEVENS, J.), but also that it should defer to the Tenth Circuit (which itself did not certify any such question), *post,* at 2814-2815. No party in this case has requested certification, even as an alternative disposition. See Tr. of Oral Arg. 56 (petitioner's counsel "disfavor[ing]" certification); *id.,* at 25-26 (counsel for the United States arguing against certification). At oral argument, in fact, respondent's counsel declined Justice STEVENS' invitation to request it. *Id.,* at 53.

**Town of Castle Rock, Colo. v. Gonzales, 545 U.S. 748 (2005)**

125 S.Ct. 2796, 162 L.Ed.2d 658, 73 USLW 4611, 05 Cal. Daily Op. Serv. 5642...

6   The Court of Appeals quoted one lawmaker's description of how the bill " 'would really attack the domestic violence problems' ":
    " '[T]he entire criminal justice system must act in a consistent manner, which does not now occur. The police must make probable cause arrests. The prosecutors must prosecute every case. Judges must apply appropriate sentences, and probation officers must monitor their probationers closely. And the offender needs to be sentenced to offender-specific therapy.
    " '[T]he entire system must send the same message ... [that] violence is criminal. And so we hope that House Bill 1253 starts us down this road.' " 366 F.3d, at 1107 (quoting Tr. of Colorado House Judiciary Hearings on House Bill 1253, Feb. 15, 1994; emphasis deleted).

7   Under Colo.Rev.Stat. § 18-6-803.5(5) (Lexis 1999), "[a] peace officer arresting a person for violating a restraining order or otherwise enforcing a restraining order" was not to be held civilly or criminally liable unless he acted "in bad faith and with malice" or violated "rules adopted by the Colorado supreme court."

8   Respondent in fact concedes that an officer may "properly" decide not to enforce a restraining order when the officer deems "a technical violation" too "immaterial" to justify arrest. Respondent explains this as a determination that there is no probable cause. Brief for Respondent 28. We think, however, that a determination of no probable cause to believe a violation has occurred is quite different from a determination that the violation is too insignificant to pursue.

9   Respondent characterizes her entitlement in various ways. See Brief for Respondent 12 (" 'entitlement' to receive protective services"); *id.,* at 13 ("interest in police enforcement action"); *id.,* at 14 ("specific government benefit" consisting of "the government service of enforcing the objective terms of the court order protecting her and her children against her abusive husband"; *id.,* at 32 ("[T]he restraining order here mandated the arrest of Mr. Gonzales under specified circumstances, or at a minimum required the use of reasonable means to enforce the order").

10   See *post,* at 2813 ("entitlement to police protection"); *ibid.* ("entitlement to mandatory individual protection by the local police force"); *ibid.* ("a right to police assistance"); *post,* at 2816 ("a citizen's interest in the government's commitment to provide police enforcement in certain defined circumstances"); *post,* at 2822 ("respondent's property interest in the enforcement of her restraining order"); *post,* at 2823 (the "service" of "protection from her husband"); *post,* at 2824 ("interest in the enforcement of the restraining order").

11   The dissent asserts that the police would lack discretion in the execution of this warrant, *post,* at 2820, n. 12, but cites no statute mandating immediate execution. The general Colorado statute governing arrest provides that police "may arrest" when they possess a warrant "commanding" arrest. Colo.Rev.Stat. § 16-3-102(1) (Lexis 1999).

12   The dissent suggests that the interest in having a restraining order enforced does have an ascertainable monetary value, because one may "contract with a private security firm ... to provide protection" for one's family. *Post,* at 2813, 2823, and n. 19. That is, of course, not as precise as the analogy between public and private schooling that the dissent invokes. *Post,* at 2823-2824, n. 19. Respondent probably could have hired a private firm to guard her house, to prevent her husband from coming onto the property, and perhaps even to search for her husband after she discovered that her children were missing. Her alleged entitlement here, however, does not consist in an abstract right to "protection," but (according to the dissent) in enforcement of her restraining order through the arrest of her husband, or the seeking of a warrant for his arrest, after she gave the police probable cause to believe the restraining order had been violated. A private person would not have the power to arrest under those circumstances because the crime would not have occurred in his presence. Colo.Rev.Stat. § 16-3-201 (Lexis 1999). And, needless to say, a private person would not have the power to obtain an arrest warrant.

13   In other contexts, we have explained that "a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another." *Linda R.S. v. Richard D.,* 410 U.S. 614, 619, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973).

14   Because we simply do not address whether the process would have been adequate if respondent had had a property interest, the dissent is correct to note that we do not "contest" the point, *post,* at 2813. Of course we do not *accept* it either.

15   In Colorado, the general statutory immunity for government employees does not apply when "the act or omission causing ... injury was willful and wanton." Colo.Rev.Stat. § 24-10-118(2)(a) (Lexis 1999). Respondent's complaint does allege that the police officers' actions "were taken either willfully, recklessly or with such gross negligence as to indicate wanton disregard and deliberate indifference to" her civil rights. App. to Pet. for Cert. 128a.
    The state cases cited by the dissent that afford a cause of action for police failure to enforce restraining orders, *post,* at 2818-2819, 2820-2821, n. 13, vindicate state common-law or statutory tort claims-not procedural due process claims under the Federal Constitution. See *Donaldson v. Seattle,* 65 Wash.App. 661, 831 P.2d 1098 (1992) (city could be liable under some circumstances for *per se* negligence in failing to meet statutory duty to arrest); *Matthews v. Pickett County,* 996 S.W.2d 162 (Tenn.1999) (county could be liable under Tennessee's Governmental Tort Liability Act where restraining order created a special duty); *Campbell v. Campbell,* 294 N.J.Super. 18, 682 A.2d 272 (1996) (rejecting four specific defenses under the New Jersey Tort Claims Act in negligence action against individual officers); *Sorichetti v. New York,* 65 N.Y.2d 461, 492 N.Y.S.2d 591, 482 N.E.2d 70 (1985) (city breached duty of care arising from special relationship between police and victim); *Nearing v. Weaver,* 295 Or. 702, 670 P.2d 137 (1983) (en banc) (statutory duty to individual plaintiffs arising independently of tort-law duty of care).

**Town of Castle Rock, Colo. v. Gonzales, 545 U.S. 748 (2005)**

125 S.Ct. 2796, 162 L.Ed.2d 658, 73 USLW 4611, 05 Cal. Daily Op. Serv. 5642...

\*   Gonzales does not claim to have a protected liberty interest.

1   The Court of Appeals also looked to other provisions of the statute to inform its analysis. In particular, it reasoned that a provision that gave police officers qualified immunity in connection with their enforcement of restraining orders, see Colo.Rev.Stat. § 18-6-803.5(5) (Lexis 1999), supported the inference that the Colorado Legislature intended mandatory enforcement. See 366 F.3d 1093, 1108 (C.A.10 2004) (en banc).

2   The Court declines to show deference for the odd reason that, in its view, the Court of Appeals did not "draw upon a deep well of state-specific expertise," *ante,* at 2804, but rather examined the statute's text and legislative history and distinguished arguably relevant Colorado case law. See *ante,* at 2804, and n. 4. This rationale makes a mockery of our traditional practice, for it is precisely when there is no state law on point that the presumption that circuits have local expertise plays any useful role. When a circuit's resolution of a novel question of state law is grounded on a concededly complete review of all the pertinent state-law materials, that decision is entitled to deference. Additionally, it should be noted that this is not a case in which the Court of Appeals and the District Court disagreed on the relevant issue of state law; rather, those courts disagreed only over the extent to which a probable-cause determination requires the exercise of discretion. Compare 366 F.3d, at 1105-1110, with App. to Pet. for Cert. 122a (District Court opinion).

3   See Colo. Rule App. Proc. 21.1(a) (Colorado Supreme Court may answer questions of law certified to it by the Supreme Court of the United States or another federal court if those questions "may be determinative of the cause" and "as to which it appears to the certifying court there is no controlling precedent in the decisions of the [Colorado] Supreme Court").

4   See *Westminster v. Dogan Constr. Co.,* 930 P.2d 585, 590 (Colo.1997) (en banc) (in interpreting an ambiguous statute, the Colorado Supreme Court will consider legislative history and the "consequences of a particular construction"); *ibid.* (" 'Because we also presume that legislation is intended to have just and reasonable effects, we must construe statutes accordingly and apply them so as to ensure such results' "). Additionally, it is possible that the Colorado Supreme Court would have better access to (and greater facility with) relevant pieces of legislative history beyond those that we have before us. That court may also choose to give certain evidence of legislative intent greater weight than would be customary for this Court. See, *e.g.,* Brief for Peggy Kerns et al. as *Amici Curiae* (bill sponsor explaining the Colorado General Assembly's intent in passing the domestic restraining order statute).

5   Citing similar considerations, the Second Circuit certified questions of state law to the Connecticut Supreme Court when it was faced with a procedural due process claim involving a statute that arguably mandated the removal of children upon probable cause of child abuse. See *Sealed v. Sealed,* 332 F.3d 51 (C.A.2 2003). The Connecticut Supreme Court accepted certification and held that the provision was discretionary, not mandatory. See *Teresa T. v. Ragaglia,* 272 Conn. 734, 865 A.2d 428 (2005).

6   The Court is correct that I would take an "anyone-but-us approach," *ante,* at 2804, n. 5, to the question of *who* decides the issue of Colorado law in this case. Both options I favor-deferring to the Circuit's interpretation or, barring that, certifying to the Colorado Supreme Court-recognize the comparative expertise of another tribunal on questions of state law. And both options offer their own efficiencies. By contrast, the Court's somewhat overconfident "only us" approach lacks any cogent justification. The fact that neither party requested certification certainly cannot be a sufficient reason for dismissing that option. As with abstention, the considerations that weigh in favor of certification-federal-state comity, constitutional avoidance, judicial efficiency, the desire to settle correctly a recurring issue of state law-transcend the interests of individual litigants, rendering it imprudent to cast them as gatekeepers to the procedure. See, *e.g., Elkins v. Moreno,* 435 U.S. 647, 662, 98 S.Ct. 1338, 55 L.Ed.2d 614 (1978) (certifying state-law issue absent a request from the parties); *Aldrich v. Aldrich,* 375 U.S. 249, 84 S.Ct. 305, 11 L.Ed.2d 304 (1963) *(per curiam)* (same); see also 17A C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 4248, p. 176 (2d ed. 1988) ("Ordinarily a court will order certification on its own motion").

7   See Fuller & Stansberry, 1994 Legislature Strengthens Domestic Violence Protective Orders, 23 Colo. Lawyer 2327 (1994) ("The 1994 Colorado legislative session produced several significant domestic abuse bills that strengthened both civil and criminal restraining order laws and procedures for victims of domestic violence"); *id.,* at 2329 ("Although many law enforcement jurisdictions already take a proactive approach to domestic violence, arrest and procedural policies vary greatly from one jurisdiction to another. H.B. 94-1253 mandates the arrest of domestic violence perpetrators and restraining order violaters. H.B. 94-1090 repeals the requirement that protected parties show a copy of their restraining order to enforcing officers. In the past, failure to provide a copy of the restraining order has led to hesitation from police to enforce the order for fear of an illegal arrest. The new statute also shields arresting officers from liability; this is expected to reduce concerns about enforcing the mandatory arrest requirements" (footnotes omitted)).

8   See Sack 1669 ("The movement to strengthen arrest policies was bolstered in 1984 by the publication of the results of a study on mandatory arrest in domestic violence cases that had been conducted in Minneapolis. In this study, police handled randomly assigned domestic violence offenders by using one of three different responses: arresting the offender, mediating the dispute or requiring the offender to leave the house for eight hours. The study concluded that in comparison with the other two responses, arrest had a significantly greater impact on reducing domestic violence recidivism. The findings from the Minneapolis study were used by the U.S. Attorney General in a report issued in 1984 that recommended, among other things, arrest in domestic violence cases as the

**Town of Castle Rock, Colo. v. Gonzales, 545 U.S. 748 (2005)**

125 S.Ct. 2796, 162 L.Ed.2d 658, 73 USLW 4611, 05 Cal. Daily Op. Serv. 5642...

standard law enforcement response" (footnotes omitted)); see also Zorza, The Criminal Law of Misdemeanor Domestic Violence, 1970-1990, 83 J.Crim. L. & C. 46, 63-65 (1992) (tracing history of mandatory arrest laws and noting that the first such law was implemented by Oregon in 1977).

9   See also Brief for International Municipal Lawyers Association et al. as *Amici Curiae* 6 ("Colorado is not alone in mandating the arrest of persons who violate protective orders. Some 19 states require an arrest when a police officer has probable cause to believe that such orders have been violated" (collecting statutes)).

10  See Note, Mandatory Arrest: A Step Toward Eradicating Domestic Violence, But is It Enough? 1996 U. Ill. L.Rev. 533, 541-542, 544-546 (describing the problems that attend a discretionary arrest regime: "Even when probable cause is present, police officers still frequently try to calm the parties and act as mediators .... Three studies found the arrest rate to range between 3% and 10% when the decision to arrest is left to police discretion. Another study found that the police made arrests in only 13% of the cases where the victim had visible injuries .... Police officers often employ irrelevant criteria such as the 'reason' for the abuse or the severity of the victim's injuries in making their decision to arrest .... Some [officers] may feel strongly that police should not interfere in family arguments or lovers' quarrels. Such attitudes make police much more likely to investigate intent and provocation, and consider them as mitigating factors, in responding to domestic violence calls than in other types of cases" (footnotes omitted)); see also Walsh, The Mandatory Arrest Law: Police Reaction, 16 Pace L.Rev. 97, 98 (1995). Cf. Sack 1671-1672 ("Mandatory arrest policies have significantly increased the number of arrests of batterers for domestic violence crimes .... In New York City, from 1993, the time the mandatory arrest policy was instituted, to 1999, felony domestic violence arrests increased 33%, misdemeanor domestic violence arrests rose 114%, and arrests for violation of orders of protection were up 76%" ).

11  The Oregon Supreme Court noted that the "widespread refusal or failure of police officers to remove persons involved in episodes of domestic violence was presented to the legislature as the main reason for tightening the law so as to require enforcement of restraining orders by mandatory arrest and custody." *Nearing,* 295 Or., at 709, 670 P.2d, at 142.

12  Under the Court's reading of the statute, a police officer with probable cause is mandated to seek an arrest warrant if arrest is "impractical under the circumstances," but then enjoys unfettered discretion in deciding whether to *execute* that warrant. *Ante,* at 2807-2808. This is an unlikely reading given that the statute was motivated by a profound distrust of police discretion in the domestic violence context and motivated by a desire to improve the protection given to holders of domestic restraining orders. We do not have the benefit of an authoritative construction of Colorado law, but I would think that if an estranged husband harassed his wife in violation of a restraining order, and then absconded after she called the police, the statute would not only obligate the police to seek an arrest warrant, but also obligate them to execute it by making an arrest. In any event, under respondent's allegations, by the time the police were informed of the husband's whereabouts, an arrest was practical and, under the statute's terms, mandatory.

13  The Court wonders "how the mandatory-arrest paradigm applies to cases in which the offender is not present to be arrested." *Ante,* at 2807. Again, questions as to the *scope* of the obligation to provide enforcement are far afield from the key issue-whether there exists an entitlement to enforcement. In any event, the Court's speculations are off base. First, this is not a case like *Donaldson v. Seattle,* 65 Wash.App. 661, 831 P.2d 1098 (1992), in which the restrained person violated the order and then left the scene. Here, not only did the husband violate the restraining order by coming within 100 yards of the family home, but he continued to violate the order while his abduction of the daughters persisted. This is because the restraining order prohibited him from "molest[ing] or disturb[ing] the peace" of the daughters. See 366 F.3d, at 1143 (appendix to dissent of O'Brien, J.). Because the "scene" of the violation was wherever the husband was currently holding the daughters, this case does not implicate the question of an officer's duties to arrest a person who has left the scene and is no longer in violation of the restraining order. Second, to the extent that arresting the husband was initially "impractical under the circumstances" because his whereabouts were unknown, the Colorado statute (unlike some other States' statutes) expressly addressed that situation-it *required* the police to seek an arrest warrant. Third, the Court is wrong to suggest that this case falls outside the core situation that these types of statutes were meant to address. One of the well-known cases that contributed to the passage of these statutes involved facts similar to this case. See *Sorichetti v. New York City,* 65 N.Y.2d 461, 467, 492 N.Y.S.2d 591, 482 N.E.2d 70, 74 (1985) (police officers at police station essentially ignored a mother's pleas for enforcement of a restraining order against an estranged husband who made threats about their 6-year-old daughter; hours later, as the mother persisted in her pleas, the daughter was found mutilated, her father having attacked her with a fork and a knife and attempted to saw off her leg); Note, 1996 U. Ill. L.Rev., at 539 (noting *Sorichetti* in the development of mandatory arrest statutes); see also Sack 1663 (citing the police's failure to respond to domestic violence calls as an impetus behind mandatory arrest statutes). It would be singularly odd to suppose that in passing its sweeping omnibus domestic violence legislation, the Colorado Legislature did not mean to require enforcement in the case of an abduction of children in violation of a restraining order.

14  The order also stated: "If you violate this order thinking that the other party or child named in this order has given you permission, you are wrong, and can be arrested and prosecuted. The terms of this order cannot be changed by agreement of the other party or the child(ren). Only the court can change this order." 366 F.3d, at 1144 (appendix to dissent of O'Brien, J.).

Case 5:15-cv-01238-GTS-TWD Document 21-6 Filed 03/25/16 Page 60 of 87
**Town of Castle Rock, Colo. v. Gonzales, 545 U.S. 748 (2005)**
125 S.Ct. 2796, 162 L.Ed.2d 658, 73 USLW 4611, 05 Cal. Daily Op. Serv. 5642...

15    A concern for the " 'protected person' " pervades the statute. For example, the statute provides that a "peace officer may transport, or obtain transportation for, the alleged victim to shelter. Upon the request of the protected person, the peace officer may also transport the minor child of the protected person, who is not an emancipated minor, to the same shelter ...." § 18-6-803.5(6)(a).

16    I find it neither surprising nor telling, cf. *ante*, at 2809, that the statute requires the restraining order to contain, "in capital letters and bold print," a "notice" informing protected persons that they can demand or request, respectively, civil and criminal contempt proceedings. § 18-6-803.5(7). While the legislature may have thought that these legal remedies were not popularly understood, a person's right to "demand" or "request" police enforcement of a restraining order simply goes without saying given the nature of the order and its language. Indeed, for a holder of a restraining order who has read the order's emphatic language, it would likely come as quite a shock to learn that she has no right to demand enforcement in the event of a violation. To suggest that a protected person has no such right would posit a lacuna between a protected person's rights and an officer's duties-a result that would be hard to reconcile with the Colorado Legislature's dual goals of putting an end to police indifference and empowering potential victims of domestic abuse.

17    See also *Matthews v. Pickett County*, 996 S.W.2d 162, 165 (Tenn.1999) ("The order of protection in this case was not issued for the public's protection in general. The order of protection specifically identified Ms. Matthews and was issued solely for the purpose of protecting her. Cf. *Ezell [v. Cockrell*, 902 S.W.2d 394, 403 (Tenn.1995)] (statute prohibiting drunk driving does not specify an individual but undertakes to protect the public in general from intoxicated drivers)"); *Sorichetti*, 65 N.Y.2d, at 469, 492 N.Y.S.2d 591, 482 N.E.2d, at 75 ("The [protective] order evinces a preincident legislative and judicial determination that its holder should be accorded a reasonable degree of protection from a particular individual").

18    The Court mistakenly relies on *O'Bannon v. Town Court Nursing Center*, 447 U.S. 773, 100 S.Ct. 2467, 65 L.Ed.2d 506 (1980), in explaining why it is "by no means clear that an individual entitlement to enforcement of a restraining order could constitute a 'property' interest for purposes of the Due Process Clause." *Ante*, at 2809. In *O'Bannon*, the question was essentially whether certain regulations provided nursing-home residents with an entitlement to continued residence in the home of their choice. 447 U.S., at 785, 100 S.Ct. 2467. The Court concluded that the regulations created no such entitlement, but there was no suggestion that Congress could not create one if it wanted to. In other words, *O'Bannon* did not address a situation in which the underlying law created an entitlement, but the Court nevertheless refused to treat that entitlement as a property interest within the meaning of the Due Process Clause.

19    As the analogy to a private security contract demonstrates, a person's interest in police enforcement has " 'some ascertainable monetary value,' " *ante*, at 2809. Cf. Merrill, The Landscape of Constitutional Property, 86 Va. L.Rev. 885, 964, n. 289 (2000) (remarking, with regard to the property interest recognized in *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), that "any parent who has contemplated sending their children to private schools knows that public schooling has a monetary value"). And while the analogy to a private security contract need not be precise to be useful, I would point out that the Court is likely incorrect in stating that private security guards could not have arrested the husband under the circumstances, see *ante*, at 2809, n. 12. Because the husband's ongoing abduction of the daughters would constitute a knowing violation of the restraining order, see n. 13, *supra*, and therefore a crime under the statute, see § 18-6-803.5(1), a private person who was at the scene and aware of the circumstances of the abduction would have authority to arrest. See § 16-3-201 ("A person who is not a peace officer may arrest another person when any crime has been or is being committed by the arrested person in the presence of the person making the arrest"). Our cases, of course, have never recognized any requirement that a property interest possess " 'some ascertainable monetary value.' " Regardless, I would assume that respondent would have paid the police to arrest her husband if that had been possible; at the very least, the entitlement has a monetary value in that sense.

20    According to Justice SOUTER, respondent has asserted a property interest in merely a "state-mandated process," *ante*, at 2812 (concurring opinion), rather than in a state-mandated "substantive guarantee," *ibid*. This misunderstands respondent's claim. Putting aside the inartful passage of respondent's brief that Justice SOUTER relies upon, *ante*, at 2811, it is clear that respondent is in fact asserting a substantive interest in the "enforcement of the restraining order," Brief for Respondent 10. Enforcement of a restraining order is a tangible, substantive act. If an estranged husband violates a restraining order by abducting children, and the police succeed in enforcing the order, the person holding the restraining order has undeniably just received a substantive benefit. As in other procedural due process cases, respondent is arguing that the police officers failed to follow fair procedures in ascertaining whether the statutory criteria that trigger their obligation to provide enforcement-*i.e.*, an outstanding order plus probable cause that it is being violated-were satisfied in her case. Cf. *Carey v. Piphus*, 435 U.S. 247, 266-267, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978) (discussing analytic difference between the denial of fair process and the denial of the substantive benefit itself). It is Justice SOUTER, not respondent, who makes the mistake of "collapsing the distinction between property protected and the process that protects it," *ante*, at 2812.

     Justice SOUTER also errs in suggesting that respondent cannot have a property interest in enforcement because she would not be authorized to instruct the police to refrain from enforcement in the event of a violation. *Ante*, at 2811. The right to insist on the provision of a service is separate from the right to refuse the service. For example, compulsory attendance laws deny minors the right to refuse to attend school. Nevertheless, we have recognized that minors have a property interest in public education and that school officials must therefore follow fair procedures when they seek to deprive minors of this valuable benefit through suspension.

**Town of Castle Rock, Colo. v. Gonzales, 545 U.S. 748 (2005)**

125 S.Ct. 2796, 162 L.Ed.2d 658, 73 USLW 4611, 05 Cal. Daily Op. Serv. 5642...

See *Goss,* 419 U.S. 565, 95 S.Ct. 729. In the end, Justice SOUTER overlooks the core purpose of procedural due process-ensuring that a citizen's reasonable reliance is not frustrated by arbitrary government action.

21   See *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 432, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982) (" ' "While the legislature may elect not to confer a property interest, ... it may not constitutionally authorize the deprivation of such an interest, once conferred, without appropriate procedural safeguards" ' ").

22   See *Fuentes v. Shevin,* 407 U.S. 67, 81, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972) ("[W]hen a person has an opportunity to speak up in his own defense, and *when the State must listen to what he has to say,* substantively unfair and simply mistaken deprivations of property interests can be prevented" (emphasis added)); *Bell v. Burson,* 402 U.S. 535, 542, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971) ("It is a proposition which hardly seems to need explication that a hearing which excludes consideration of an element essential to the decision whether licenses of the nature here involved shall be suspended does not meet [the] standard [of due process]"); *Goldberg v. Kelly,* 397 U.S. 254, 271, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) ("[T]he decisionmaker's conclusion as to a recipient's eligibility must rest solely on the legal rules and evidence adduced at the hearing"); cf. *ibid.* ("[O]f course, an impartial decision maker is essential").

**End of Document**                                    © 2012 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 18

# MASSACHUSETTS APPEALS COURT
# CIVIL DOCKETING STATEMENT

Caption used in the trial court

Docket Number _____ 2013-P-0379 _____

Plaintiff(s):   Umesh Heendeniya.

v.

Defendant(s):  Capgemini U.S. LLC, Hireright Inc., Hewitt Associates LLC.

**Party Information**

Name of the appellant(s) on whose behalf this statement is being filed:

Umesh Heendeniya

**Attorney Information**

Name  N/A _____   BBO#  000000 _____

☒  Or, check this box if you are self-represented and provide your name  Umesh Heendeniya

**Trial Court, Board or Agency Information**

Court Department │ Superior Court │      County   │ Middlesex County │

Docket Number(s) MICV-2011-1697-A _____

Specify the name and the role of each judge whose orders are at issue on appeal [not applicable for appeals directly from a board or agency]:

Judge, first and last name  Hon. Merita Hopkins        Role │ Heard Motion │

Judge, first and last name  Hon. Douglas Wilkins       Role │ Heard Motion │

Judge, first and last name  Hon. Douglas Wilkins       Role │ Entered Judgment │

Was the case or any information in the record designated as impounded in the trial court? (see Instructions, # 8)   │ No │

If the case is impounded or partially impounded, explain why and specify which documents are impounded:

│ N/A

2

**Nature of the Case**

Select the most appropriate description, or enter description: | Common Law Torts, M.G.L. c. 93 sections 50-68, M.G.L. c. 151B |

**Perfection of Appeal**

Is the appeal from a final judgment, i.e., judgment disposing of all parties and claims?   ● Yes   ○ No

If no, identify the basis on which the interlocutory order is immediately appealable. | N/A |

Docketing Date of Judgment or Interlocutory Order Appealed | Sep 27, 2012 |

*Motion to extend time for filing Notice of Appeal granted by Hon. Kimberly Budd*

Date Notice of Appeal Filed | Nov 20, 2012 |

*on Nov. 14, 2012.*

| Type of Motion | Check if filed | | Date Served (not date filed) |
|---|---|---|---|
| Motion for Judgment | ○ Yes | ● No | |
| Motion to Amend or Make Additional Findings | ○ Yes | ● No | |
| Motion to Alter or Amend Judgment | ○ Yes | ● No | |
| Motion for New Trial | ○ Yes | ● No | |
| Other (specify)   Jgmt. Mot. to Dismiss | ● Yes | ○ No | Sep 27, 2012 |

**Appellate Issues**

Provide a short statement of the anticipated issue(s) on appeal (Note: This statement is for informational purposes only and failure to raise an issue here will not preclude an appellant from raising additional or more specific issues in its brief. Appellants in child welfare appeals are exempt from this requirement):

List of issues will be provided later.

Due to documented mental disabilities, Plaintiff-Appellant will be requesting disability accommodation from the Mass. Appellate Court and thus a significant time extension to prepare, research, write, and file the appellate brief and record appendix.

**Related Appeals**

Are there any pending, past, or anticipated future appeals or original appellate proceedings that involve these parties or this case which have been entered in the Appeals Court or Supreme Judicial Court?   ○ Yes   ● No

Do you know of any pending appeals raising related issues?   ○ Yes   ● No

If you answered yes to either question, provide the case name and docket number and describe below the related matter or issue:

N/A

3

Respectfully Submitted,

N/A
_____
Signature

_____
Address
321 River Street
North Adams
MA - 01247

_____
BBO Number
000000
_____


# CERTIFICATE OF SERVICE

Pursuant to Mass.R.A.P. 13(d), I hereby certify, under the penalties of perjury, that on this date of   March 18, 2013
I have made service of a copy of the "Massachusetts Appeals Court Docketing Statement filed on behalf of

Umesh Heendeniya
_____ ," upon the attorney of record for each party, or if the party
has no attorney then I made service directly to the self-represented party, by ○ hand delivery   ● first class mail   ● e-mail
to the following person(s) and address(es). Note: Service may be made by e-mail only with the consent of each party or
opposing counsel:

Ms. Victoria Steinberg, Esq.
Collora LLP
100 High Street, 20th floor
Boston, MA-02110.
vsteinberg@collorallp.com
617-371-1003

Mr. Michael Thompson, Esq.
Foley & Lardner LLP
111 Huntington Avenue
Boston, MA-02199
mxthompson@foley.com
617-502-3262

/s/ Umesh Heendeniya
_____
Signature

321 River Street
North Adams
MA - 01247

_____
Address

413-650-5545
_____
Telephone

4

# EXHIBIT 19

# $140 Million Expansion Underway at St. Joseph's Hospital

**By Megan Coleman**
**Friday, April 20th 2012**
http://www.cnycentral.com/news/local/140-million-expansion-underway-at-st-josephs-hospital


St. Joseph's Hospital second phase expansion groundbreaking

Fri, 20 Apr 2012 16:58:31 GMT — The second phase of construction is underway at St. Joseph's Hospital Health Center.

**St. Joe's hosted a groundbreaking ceremony this morning to mark the start of the $140 million expansion project, which is a nearly 50 percent larger investment than the first phase**.

The expansion includes construction of operating rooms, a PeriAnesthesia Care Unit (PACU), Intensive Care Units, medical-surgical private patient rooms, family waiting areas and a central sterile unit. The expansion also features a greenway connection to North side businesses, green space and campus lighting added to the North end of St. Joseph's Prospect Hill campus.

The project will generate 400 long-term construction jobs and 150 new, permanent health care jobs.

The new surgical suite will include 14 operating rooms. Each one twice as big to accommodate today's state-of-the-art medical technology and larger surgical teams. The PeriAnesthesia Care Unit (PACU) will be expanded from 16 to 25 patient beds and will increase annual capacity from 10,500 to 14,000 patients. The PACU is designed to enhance care for patients just before and right after surgery.

The new Central Sterile Unit will be nearly four times larger than the current, 40-year-old unit. "Green" instrument washers will save water and electricity.

The expanded Medical and Surgical Intensive Care Units will include 38 private rooms. Each will be larger than the existing semi-private rooms.

The expansion also includes 72 new private patient rooms, replacing 36 semi-private rooms currently in use at the hospital. The rooms are 35 percent larger, allowing more space for families and visitors. "Private patient rooms are the wave of the future in health care," said Mary Clare Ehde, manager of patient relations. "Not only does the law require us to maintain patient privacy, but a quiet, private environment is shown to help facilitate faster, healthier recoveries. Private rooms also help to reduce spread of infection."

According to St. Joe's, Phase 2A and B together are one of the largest green health care construction projects in New York State. The project may include solar panels, daylighting views, energy conserving systems, a greenway park, site drainage, and underground water and storm water infrastructure, all of which will reduce the hospital's energy costs.

# EXHIBIT 20

# St. Joe's 'Dead' Patient Awoke as Docs Prepared to Remove Organs

By John O'Brien | jobrien@syracuse.com
on July 07, 2013 at 2:00 AM, updated July 09, 2013 at 7:05 PM
By John O'Brien and James T. Mulder
jobrien@syracuse.com  and  jmulder@syracuse.com
http://www.syracuse.com/news/index.ssf/2013/07/st_joes_fined_over_dead_patien.html

Syracuse, NY - Doctors at St. Joseph's Hospital Health Center were about to remove organs for transplant from a woman they thought was dead.

Then she opened her eyes. She was alive.

The state Health Department found St. Joe's care of patient Colleen S. Burns in 2009 unacceptable and a federal agency criticized the hospital for not properly investigating the cause. **The hospital's mishandling of the case was part of the reason the state Health Department fined St. Joe's $22,000 last September -- the largest fine levied against a Central New York hospital since 2002.**

**St. Joe's was fined $6,000 over the Burns case and $16,000 for leaving a patient unattended before she fell and injured her head in 2011.**

The state could not find a case similar to the Burns case after reviewing the past 10 years of inspection records, a spokesman said.

A series of mistakes that began shortly after Burns arrived in the emergency room suffering from a drug overdose led to the near catastrophe, the investigations showed. A review by the state Health Department found:

> *Staff skipped a recommended treatment to prevent the drugs the patient took from being absorbed by her stomach and intestines.

> *Not enough testing was done to see if she was free of all drugs.

> *Not enough brain scans were performed.

> *Doctors ignored a nurse's observations indicating Burns was not dead and her condition was improving.

The hospital made no effort to thoroughly investigate what went wrong until it was prodded by the state. The investigation did find, however that St. Joe's had acceptable organ procurement policies and procedures.

Burns, 41, of North Syracuse, recovered from her overdose of Xanax, Benadryl and a muscle relaxant and was discharged from the hospital two weeks after the near-miss in the operating room. But 16 months later, in January 2011, she committed suicide, said her mother, Lucille Kuss.

Having her daughter mistaken as dead and nearly cut open at the hospital was a horrible experience for the family, Kuss said. The doctors never explained what went wrong, she said.

"They were just kind of shocked themselves," she said. "It came as a surprise to them as well."

Burns, who had three daughters, was never upset about the incident, her mother said.

"She was so depressed that it really didn't make any difference to her," Kuss said.

Neither Burns nor any of her relatives sued St. Joe's.

St. Joe's officials would not discuss the specifics of the case. Burns' family asked them not to, hospital spokeswoman Kerri Howell said.

"St. Joseph's goal is to provide the highest quality of care to every patient, every time," Howell said in an email to The Post-Standard. The hospital works with Finger Lakes Donor Recovery Network to follow strict policies and procedures for organ donation, she said.

"These policies were followed in this case, which was complicated in terms of care and diagnosis," Howell said. "We've learned from this experience and have modified our policies to include the type of unusual circumstance presented in this case."

St. Joe's officials thought Burns suffered "cardiac death" in October 2009, according to documents obtained by The Post-Standard under the state Freedom of Information Law.

Her family had agreed to allow doctors to withdraw life support and remove her organs after they were told she was dead.

The day before her organs were to be removed, a nurse had performed a reflex test on Burns, scraping a finger on the bottom of her foot. The toes curled downward - not the expected reaction of someone who's supposed to be dead.

There were other indications that Burns had not suffered irreversible brain damage, as doctors had determined. Her nostrils flared in the prep area outside the OR. She seemed to be breathing independently from the respirator she was attached to. Her lips and tongue moved.

Twenty minutes after those observations were made, a nurse gave Burns an injection of the sedative Ativan, according to records.

In the doctors' notes, there's no mention of the sedative or any indication they were aware of her improving condition.

None of those signs stopped the organ-harvesting process. It wasn't until Burns was wheeled into the OR on Oct. 20, 2009, opened her eyes and looked at the lights above her that doctors called it off.

Burns had been in a deep coma from taking an overdose of drugs. Hospital personnel misread that as irreversible brain damage without doing enough to evaluate her condition, the state Health Department found.

The federal Centers for Medicare and Medicaid Services criticized St. Joe's response to the incident.

"Despite this sequence of events, intensive objective peer review and root cause analysis of the case was not done by the hospital's quality assurance program until prompted by the Department of Health," the federal agency's report said.

The state started investigating the case in March 2010 in response to an inquiry from The Post-Standard.

It wasn't until the day after the state made a surprise inspection that St. Joe's did any investigation, the state report said. And even then, it was cursory - a one-page document that cited "perception differences" without analyzing the cause of the mistake, the investigative findings said.

"The hospital did not undertake an intensive and critical review of the near catastrophic event in this case," the federal agency's report said. St. Joe's officials did not "identify the inadequate physician evaluations of (Burns) that occurred when nursing staff questioned possible signs of improving neurological function."

Burns did not suffer a cardiopulmonary arrest and did not have irreversible brain damage, as St. Joe's had determined, the state's report said.

"The patient did not meet criteria for withdrawal of care," the report said.

Hospital officials didn't wait long enough or conduct enough tests to determine that all of the drugs were out of Burns' system before deciding whether to take her off life support, the state said.

Lisa McGiffert, director of Consumers Union Safe Patient Project, said there is no way of knowing how often near-catastrophes like the Burns case happen because there is no system in place to collect information from hospitals about medical errors.

"These sorts of things do happen," McGiffert said. "It's pretty disturbing." Her organization believes states should require hospitals to report all such incidents soon after they happen.

"That would require people to think about how to prevent it in the future," she said. "If you don't have to account for it, that doesn't always happen."

Two medical experts who reviewed the case for The Post-Standard found it shocking, and questioned why the hospital didn't do more to ensure other patients aren't put in the same position.

**"Dead people don't curl their toes," said Dr. Charles Wetli, a nationally known forensic pathologist out of New Jersey. "And they don't fight against the respirator and want to breathe on their own."**

**Once those signs of life appeared, the organ-harvesting process should've stopped, Wetli said.**

**Wetli wondered why, after seeing signs that Burns was alive, a nurse would give Burns a sedative.**

Dr. David Mayer, general and vascular surgeon and an associate professor of clinical surgery at New York Medical College, also reviewed the records and found the use of a sedative perplexing.

"It would sedate her to the point that she would be non-reactive," Mayer said. "If you have to sedate them or give them pain medication, they're not brain dead and you shouldn't be harvesting their organs."

The hospital erred four or five times, Mayer said. He called the case a gross deviation from all prevailing and accepted standards of care.

St. Joe's submitted a plan to correct problems identified in the investigation to the state Health Department in August of 2011.

At that time the state fined St. Joe's $22,000 and ordered it to hire a consultant to review the hospital's quality assurance program and implement the consultant's recommendations.

The hospital also was ordered to hire a consulting neurologist to teach staff how to accurately diagnose brain death.

*Contact John O'Brien at jobrien@syracuse.com or 315-470-2187. Contact Jim Mulder at jmulder@syracuse.com or 315-470-2245.*

# EXHIBIT 21

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
Jacob K. Javits Federal Building, Room 37-130
26 Federal Plaza
New York, New York 10278-0063



**NORTHEAST DIVISION OF SURVEY & CERTIFICATION**

March 27, 2014

CMS Certification Number: 33-0140

Ms. Kathryn Ruscitto, MPA
Chief Executive Officer
St. Joseph's Hospital Health Center
301 Prospect Avenue
Syracuse, NY 13203

Dear Ms. Ruscitto:

The Centers for Medicare & Medicaid Services (CMS) has received the reports of the substantial allegation surveys completed by the New York State Department of Health on September 9, 2013 and February 25, 2014. Based on our review of the survey findings, we have determined that St. Joseph's Hospital Health Center is not in compliance with the following Medicare Conditions of Participation for hospitals:

> 42 CFR 482.12 Governing Body
> 42 CFR 482.13 Patient Rights
> 42 CFR 482.42 Infection Control

We have determined that the deficiencies cited are significant and limit your hospital's capacity to render adequate care and to ensure the health and safety of your patients. Enclosed is a listing of the deficiencies cited.

In accordance with Section 1865 of the Social Security Act and implementing regulations at 42 CFR 488.5, a hospital accredited by Det Norske Veritas HealthCare, Inc. is deemed to meet Medicare Conditions of Participation with the exception of Utilization Review. Section 1864(c) of the Act requires the Secretary of Health and Human Services to survey an accredited hospital participating in Medicare if there are allegations which suggest the existence of significant deficiencies which would adversely affect the health and safety of patients.

If, in the course of such a survey, the hospital is found not to meet one or more Conditions of Participation and significant deficiencies exist, Section 1865(b) of the Act provides that a hospital is no longer deemed to meet the Medicare Conditions of Participation. With notification to the accrediting body, the hospital is then placed under the survey jurisdiction of the State survey agency until the hospital is found in compliance with all Medicare Conditions of Participation.

St. Joseph's Hospital Health Center                                                                              Page 2

Therefore, based on the determination that your hospital does not comply with the above Condition and that a significant deficiency exists, your hospital is no longer deemed to meet the Medicare Conditions of Participation and is now under the survey jurisdiction of the New York State Department of Health.

We have authorized the New York State Department of Health to conduct a survey of your facility to assess compliance with **all** of the Medicare Conditions of Participation. After the survey is conducted, **you will be notified** if any additional Conditions are not met. Your hospital is subject to termination from the Medicare program for noncompliance with the Medicare Conditions of Participation.

A plan of correction is not required at this time for the deficiencies cited at the substantial allegation surveys of September 9, 2013 and February 25, 2014, although it may be to your benefit to submit one. Further, it is to your advantage to initiate corrective action on the identified deficient practices in order to bring your hospital in compliance with the regulations. Once the full survey of all the Medicare Conditions of Participation has been conducted, you will be notified by the New York State Department of Health of any deficiencies cited at that survey. At that time, an acceptable plan of correction will be required for all deficiencies cited at that survey in order to return your hospital to substantial compliance with the Medicare Conditions of Participation.

If you wish to submit a plan of correction at this time for the deficiencies cited in the surveys of September 9, 2013 and February 25, 2014, you must submit your plan of correction within ten (10) calendar days of your receipt of this letter both to the New York office of CMS and to the State survey agency at the following address:

Lynn Dey
NYS Department of Health
Hospital and Primary Care Program
Rochester Area Office
335 East Main Street
Rochester, NY 14604

Please note that plans of correction must be specific, stating exactly how the deficiency was or will be corrected and with reasonable expected completion dates. A response to each deficiency on the CMS-2567 is required, and the right side of the CMS-2567 must be used to document your plan for corrective action. The plan of correction must be signed and dated on the bottom of the first page of the CMS-2567 by the authorized official at your hospital. Additional documentation may be attached to the CMS-2567, when necessary.

St. Joseph's Hospital Health Center                                        Page 3

Under Federal regulation 42 CFR 498.3(d)(9), removal of deemed status is an administrative action, not an initial determination by the Secretary and, therefore, formal reconsideration and hearing procedures do not apply.

We have advised Det Norske Veritas HealthCare, Inc. of our determination. If you have any questions regarding this matter, please contact Elizabeth Romani at either (212) 616-2479 or Elizabeth.Romani@cms.hhs.gov.

Sincerely,

CDR Victoria Vachon, NE-BC, RAC-CT, MBA/MSN
Survey Branch Manager
Division of Survey, Certification and Enforcement

Enclosures:  Form CMS-2567, Statement of Deficiencies

# EXHIBIT 22

# Syracuse Hospital Loses $21.6 Million, Wants to Join Big Health System

By James T. Mulder | jmulder@syracuse.com
on February 17, 2015 at 8:59 AM, updated February 17, 2015 at 9:36 AM
http://www.syracuse.com/health/index.ssf/2015/02/st_joes_which_lost_216_million_last_year_looking_t o_join_big_health_system.html



St. Joseph's new patient tower *(Ellen M. Blalock | eblalock@syracuse.com)*

Syracuse, N.Y. - **St. Joseph's Hospital Health Center, which lost $21.6 million in 2014, wants to join a large nonprofit health care system**.

St. Joe's has signed a non-binding preliminary agreement to join an unnamed health organization. If the deal goes through, it will help St. Joe's sustain its mission, the hospital disclosed in its unaudited 2014 financial results posted on the Electronic Municipal Market Access website.

The hospital announced plans in 2013 to join Trinity Health, a national Catholic system that operates hospitals and other facilities in 21 states. St. Joe's and Trinity dropped that plan three months later for undisclosed reasons. But last year St. Joe's entered into an affiliation with Trinity. Under that agreement, Trinity provides St. Joe's operational and strategic advice. St. Joe's also has joined Trinity's purchasing system.

St. Joe's refused to identify who it is negotiating with and said the proposed deal would not be a merger. Trinity, through its spokeswoman Eve Pidgeon, would not say if it has a deal in the works with St. Joe's.

St. Joe's has created an entity, St. Joseph's Health, to serve as the parent company of the hospital, St. Joseph's Health Center Properties Inc. and the hospital's foundation. The change was made, in part, to "facilitate a potential transaction with a national health system if such a transaction were to occur," the hospital said in its financial report.

St. Joe's blamed most of its $21.6 million operating loss on more than $19 million in one-time costs associated with a new electronic medical record system installed last year and construction-related depreciation and interest expenses.

"2014 was a very unusual year for St. Joseph's," the hospital said in an email. "A significant portion of these non-recurring expenses are anticipated to generate a positive return in future years."

St. Joe's recently completed an overhaul of its campus that includes a $63 million tower with private patient rooms, operating rooms and an intensive care unit.

St. Joe's posted a $14.2 million gain in 2013. In its budget, St. Joe's had projected it would finish 2014 with a gain of $5.9 million.

Here are some other highlights from the financial report:

- The hospital trimmed 54 full-time jobs from its payroll last year through "attrition and efficiencies." The hospital had 3,594 full-time employees at the end of 2014. It said it is not planning job cuts or layoffs.
- St. Joe's is considering closing or limiting outpatient mental health services unless it gets additional money from the state to support these operations. It runs 12 outpatient mental health programs. In an email, the hospital said discussions with the state are going well and it expects to be able to continue these services.
- The hospital sold 9 percent of its share in SJLS LLC, a joint venture that operates five dialysis outpatient clinics, for $4.3 million on Dec. 1. to Fresenius, a national dialysis company that is St. Joe's partner in the operation. The sale reduced the hospital's ownership stake in the joint venture from 60 percent to 51 percent.
- St. Joe's operating margin tumbled from 2.37 percent in 2013 to -3.67 percent last year. A hospital's operating margin -- operating profit or loss divided by total operating revenue -- is a key indicator of its profitability and health. The median operating margin for U.S. nonprofit hospitals was 2.2 percent in 2013, according to Moody's Investors Service.
- The hospital saw a slight decline in inpatients last year. Inpatient volume dropped from 27,956 in 2013 to 27,635 in 2014. The number of outpatient surgeries dropped from 10,380 in 2013 to 9,791 in 2014, a nearly 6 percent decline.

Contact James T. Mulder anytime: Email | Twitter | 315-470-2245

# EXHIBIT 23

# Syracuse Hospital Joining Trinity Health, One of the Biggest U.S. Health Systems

By James T. Mulder | jmulder@syracuse.com
on April 28, 2015 at 11:31 AM, updated April 28, 2015 at 12:09 PM
http://www.syracuse.com/health/index.ssf/2015/04/st_joes_joining_trinity_health_one_of_the_biggest_u_s_health_care_systems.html



The new patient tower at St. Joseph's Hospital Health Center. *(Ellen M. Blalock | eblalock@syracuse.com)*

Syracuse, N.Y. -- St. Joseph's Hospital Health Center is joining Trinity Health, one of the largest health care systems in the United States.

The two organizations announced the agreement today.

St. Joe's announced plans in 2013 to join Trinity Health, a national Catholic system that operates hospitals and other facilities in 21 states. But St. Joe's and Trinity dropped that plan three months later for undisclosed reasons. Last year St. Joe's entered into an affiliation with Trinity. Under that agreement, Trinity provides St. Joe's operational and strategic advice. St. Joe's also joined Trinity's purchasing system.

The decision to join together will build on the affiliation, the organizations said.

"This will enhance St. Joseph's ability to compete in an increasingly dynamic health care environment," Kathryn Ruscitto, St. Joe's president and CEO, said in a prepared statement.

She said joining Trinity will benefit St. Joe's patients and employees by providing the clinical, operational, strategic and financial resources to continue providing a high level of care.

St. Joe's lost $21.6 million in 2014. Most of that was caused by one-time costs associated with a new electronic medical record system installed last year and construction-related depreciation and interest expenses.

Trinity, based in Livonia, Mich., has annual operating revenue of about $13.6 billion and employs about 89,000 people. Trinity already operates in New York through the Catholic Health System in Buffalo and St. Peter's Health Partners in Albany.

Contact James T. Mulder anytime: Email | Twitter | 315-470-2245

# EXHIBIT 24

### FEDERAL FIREARMS PROHIBITION UNDER 18 U.S.C. § 922(g)(4)
### PERSONS ADJUDICATED AS A MENTAL DEFECTIVE OR COMMITTED TO A MENTAL INSTITUTION

Any person who has been "adjudicated as a mental defective" or "committed to a mental institution" is prohibited under Federal law from shipping, transporting, receiving, or possessing any firearm or ammunition. Violation of this Federal offense is punishable by a fine of $250,000 and/or imprisonment of up to ten years. *See* 18 U.S.C. §§ 922(g)(4) and 924(a)(2). The terms enumerated below are located in 27 C.F.R. § 478.11.

---

A person is **"adjudicated as a mental defective"** if a court, board, commission, or other lawful authority has made a determination that a person, as a result of marked subnormal intelligence, mental illness, incompetency, condition, or disease:

- ❖ Is a danger to himself or to others;
- ❖ Lacks the mental capacity to contract or manage his own affairs;
- ❖ Is found insane by a court in a criminal case; **or**
- ❖ Is found incompetent to stand trial, or not guilty by reason of lack of mental responsibility, pursuant to articles 50a and 72b of the Uniform Code of Military Justice, 10 U.S.C. §§ 850a, 876b.

A person is **"committed to a mental institution"** if that person has been formally committed to a mental institution by a court, board, commission, or other lawful authority.
The term *includes* a commitment:

- ❖ To a mental institution involuntarily;
- ❖ For mental defectiveness or mental illness; or
- ❖ For other reasons, such as for drug use.

The term *does not include* a person in a mental institution for observation or a voluntary admission.

The term **"lawful authority"** means an entity having legal authority to make adjudications or commitments.

The term **"mental institution"** includes mental health facilities, mental hospitals, sanitariums, psychiatric facilities, and other facilities that provide diagnoses by licensed professionals of mental retardation or mental illness, including a psychiatric ward in a general hospital.



#### *AFFIRMATIVE DEFENSES*
A person is *not prohibited* under 18 U.S.C. § 922(g)(4) if:

The person received relief from Federal firearms disabilities under 18 U.S.C. § 922(g)(4) by:

- ❖ The Bureau of Alcohol, Tobacco, Firearms and Explosives under 18 U.S.C. § 925(c); **or**
- ❖ A proper Federal or State authority under a relief from disabilities program that meets the requirements of the NICS Improvement Amendments Act of 2007, Public Law 110-180.

The mental health adjudication or commitment was imposed by a Federal department or agency, **and** the:

- ❖ Adjudication or commitment was set aside or expunged;
- ❖ Person was fully released from mandatory treatment, supervision, or monitoring;
- ❖ Person was found to no longer suffer from the disabling mental health condition;
- ❖ Person has otherwise been found to be rehabilitated; or
- ❖ Adjudication or commitment was based solely on a medical finding without opportunity for hearing by the Federal department or agency with proper jurisdiction.

---

**For further information about section 922(g)(4) or other firearms prohibitions, please contact your local field office of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) by calling (800) 800-3855.**

ATF Information 3310.4
Revised May 2009



ORIGIN ID:KYOA

SHIP DATE: 24MAR16
ACTWGT: 2.40 LB
CAD: /PD61822
DIMS: 0x0x0 IN

UNITED STATES US

BILL SENDER

TO

**FEDERAL COURTHOUSE /7TH FLOOR**
**100 S CLINTON STREET NORTHERN**

**SYRACUSE NY 13261**
(111) 111-1111

FedEx
Express

E

FRI – 25 MAR 10:30A
**PRIORITY OVERNIGHT**

TRK#
0200   **8079 5407 6370**

**XH LKPA**

13261
NY-US   SYR

---

FedEx **NEW** Package
Express US Airbill    8079 5407 6370

From  02/24/2016

Sender Name  Umesh Heendeniya    508 263-0145

Company  Pro Se Litigant

Address  P.O. Box 5104

City  Spring Hill    State  FL    ZIP  34611

To
Recipient's Name  Ci    Phone  315-234-8500 ext. 7.

Company  Seventh Fl.

Federal District Court
Address  Northern District of NY

Address  100 South Clinton Street

City  Syracuse    State  NY    ZIP  13261

8079 5407 6370

644

Ali

# FedEx

## Express

Attn: Civil Clerk
NDNY
Syracuse
NY-13261

Small Pa

Align bottom of peel-and-stick airbill or pouch...

Align top of FedEx Express® Shipping label here.