# EXHIBIT 1



# Commonwealth University

## Umesh Sanuja Heendeniya

having fulfilled the requirements of the faculty has been declared a graduate of the University with the degree of

### Bachelor of Science

Given at Richmond, Virginia, on the thirteenth day of May, 2000

*Dean, College of Humanities and Sciences*

*Ewen C. Timon*
*President of the University*

*Edward Lough*
*Rector of the Board of Visitors*

# EXHIBIT 2

| CAUTION: NOT TO BE USED FOR IDENTIFICATION PURPOSES | THIS IS AN IMPORTANT RECORD. SAFEGUARD IT. | ANY ALTERATIONS IN SHADED AREAS RENDER FORM VOID |

## CERTIFICATE OF RELEASE OR DISCHARGE FROM ACTIVE DUTY

| 1. NAME (Last, First, Middle) HEENDENIYA, UMESH S. | 2. DEPARTMENT, COMPONENT AND BRANCH USMCR | 3. SOCIAL SECURITY NO. REDACTED |
|---|---|---|

| 8.a. GRADE, RATE OR RANK PFC | 4.b PAY GRADE E-2 | 5. DATE OF BIRTH (YYMMDD) REDACTED | 6. RESERVE OBLIG. TERM. DATE Year 06  Month 05  Day 21 |
|---|---|---|---|

| 7.a. PLACE OF ENTRY INTO ACTIVE DUTY RICHMOND MEPS, VA 23240 | 7.b. HOME OF RECORD AT TIME OF ENTRY (City and state, or complete address if known) 4945 SUBURBAN AVENUE, RICHMOND, VA 23230 |
|---|---|

| 8.a. LAST DUTY ASSIGNMENT AND MAJOR COMMAND  RUC 33808 ASLT PHIB SCOL BN, MCB, CAMPEN, CA 92055-5041 | 8.b. STATION WHERE SEPARATED  RUC 33808 ASLT PHIB SCOL BN, MCB, CAMPEN, CA 92055-5041 |
|---|---|

| 9. COMMAND TO WHICH TRANSFERRED 4TH AABN, 4TH MARDIV, NORFOLK, VA MCC-SDR | 10. SGLI COVERAGE  None Amount: $200,000 |
|---|---|

| 11. PRIMARY SPECIALTY (List number, title and years and months in specialty. List additional specialty numbers and titles involving periods of one or more years.)  1833- ASSAULT AMPHIBIAN VEHICLE CREWMAN  00 YEARS 00 MONTHS | 12. RECORD OF SERVICE | Year(s) | Month(s) | Day(s) |
|---|---|---|---|---|
| | a. Date Entered AD This Period | 98 | 06 | 02 |
| | b. Separation Date This Period | 98 | 12 | 19 |
| | c. Net Active Service This Period | 00 | 06 | 17 |
| | d. Total Prior Active Service | 00 | 00 | 00 |
| | e. Total Prior Inactive Service | 00 | 00 | 10 |
| | f. Foreign Service | 00 | 00 | 00 |
| | g. Sea Service | 00 | 00 | 00 |
| | h. Effective Date of Pay Grade | 98 | 06 | 02 |

| 13. DECORATIONS, MEDALS, BADGES, CITATIONS AND CAMPAIGN RIBBONS AWARDED OR AUTHORIZED (All periods of service) |
|---|
| NONE |

| 14. MILITARY EDUCATION (Course title, number of weeks, and month and year completed) |
|---|
| SCHOOL OF INFANTRY CAMP LEJEUNE NC MARINE COMBAT TRAINING (M92) 02 WEEKS 9/98, SCHOOLS BATTALION CAMP PENDLETON CA ASSAULT AMPHIBIAN CREWMAN COURSE (AHY) 10 WEEKS 12/98 |

| 15.a. MEMBER CONTRIBUTED TO POST-VIETNAM ERA VETERANS' EDUCATIONAL ASSISTANCE PROGRAM | Yes | No X | 15.b. HIGH SCHOOL GRADUATE OR EQUIVALENT | Yes X | No | 16. DAYS ACCRUED LEAVE PAID SLB: 00.0    RLB: 06.5 |
|---|---|---|---|---|---|---|

| 17. MEMBER WAS PROVIDED COMPLETE DENTAL EXAMINATION AND ALL APPROPRIATE DENTAL SERVICES AND TREATMENT WITHIN 90 DAYS PRIOR TO SEPARATION | X Yes | No |
|---|---|---|

| 18. REMARKS |
|---|
| |

| 19.a MAILING ADDRESS AFTER SEPARATION (Include Zip Code)  4945 SUBURBAN AVENUE, RICHMOND, VA 23230 | 19.b. NEAREST RELATIVE (Name and address - include Zip Code) YAMUNA HEENDENIYA (M) SAME AS BLK 19A |
|---|---|

| 20. MEMBER REQUESTS COPY 6 BE SENT TO    VA    DIR. OF VET AFFAIRS  X Yes   No | 22. OFFICIAL AUTHORIZED TO SIGN (Typed name, grade, title and signature) |
|---|---|
| 21. SIGNATURE OF MEMBER BEING SEPARATED | R. A. RICKMAN, CWO2, PERSO |

DD Form 214, NOV 88   S/N 0102-LF-006-5500  Previous editions are obsolete.        MEMBER - 1

CAUTION: NOT TO BE USED FOR IDENTIFICATION PURPOSES     THIS IS AN IMPORTANT RECORD. SAFEGUARD IT.     ANY ALTERATIONS IN SHADED AREAS RENDER FORM VOID

# CERTIFICATE OF RELEASE OR DISCHARGE FROM ACTIVE DUTY

| 1. NAME (Last, First, Middle) | 2. DEPARTMENT, COMPONENT AND BRANCH | 3. SOCIAL SECURITY NO. |
|---|---|---|
| HERNDENIYA, UMESH S. | USMCR | REDACTED |

| 4.a. GRADE, RATE OR RANK | 4.b. PAY GRADE | 5. DATE OF BIRTH (YYMMDD) | 6. RESERVE OBLIG. TERM. DATE | | |
|---|---|---|---|---|---|
| PFC | E-2 | REDACTED | Year 06 | Month 05 | Day 21 |

| 7.a. PLACE OF ENTRY INTO ACTIVE DUTY | 7.b. HOME OF RECORD AT TIME OF ENTRY (City and state, or complete address if known) |
|---|---|
| RICHMOND MEPS, VA 23240 | 4945 SUBURBAN AVENUE, RICHMOND, VA 23230 |

| 8.a. LAST DUTY ASSIGNMENT AND MAJOR COMMAND | 8.b. STATION WHERE SEPARATED |
|---|---|
| RUC 33808 ASLT PHIB SCOL BN, MCB, CAMPEN, CA 92055-5041 | RUC 33808 ASLT PHIB SCOL BN, MCB, CAMPEN, CA 92055-5041 |

| 9. COMMAND TO WHICH TRANSFERRED | 10. SGLI COVERAGE | None |
|---|---|---|
| 4TH AABN, 4TH MARDIV, NORFOLK, VA NCC-SDR | Amount: $200,000 | |

| 11. PRIMARY SPECIALTY (List number, title and years and months in specialty. List additional specialty numbers and titles involving periods of one or more years.) | 12. RECORD OF SERVICE | Year(s) | Month(s) | Day(s) |
|---|---|---|---|---|
| 1833- ASSAULT AMPHIBIAN VEHICLE CREWMAN 00 YEARS 00 MONTHS | a. Date Entered AD This Period | 98 | 06 | 02 |
| | b. Separation Date This Period | 98 | 12 | 19 |
| | c. Net Active Service This Period | 00 | 06 | 17 |
| | d. Total Prior Active Service | 00 | 00 | 00 |
| | e. Total Prior Inactive Service | 00 | 00 | 10 |
| | f. Foreign Service | 00 | 00 | 00 |
| | g. Sea Service | 00 | 00 | 00 |
| | h. Effective Date of Pay Grade | 98 | 06 | 02 |

**13. DECORATIONS, MEDALS, BADGES, CITATIONS AND CAMPAIGN RIBBONS AWARDED OR AUTHORIZED (All periods of service)**

NONE

**14. MILITARY EDUCATION (Course title, number of weeks, and month and year completed)**

SCHOOL OF INFANTRY CAMP LEJEUNE NC MARINE COMBAT TRAINING (M92) 02 WEEKS 9/98, SCHOOLS BATTALION CAMP PENDLETON CA ASSAULT AMPHIBIAN CREWMAN COURSE (AHY) 10 WEEKS 12/98

| 15.a. MEMBER CONTRIBUTED TO POST-VIETNAM ERA VETERANS' EDUCATIONAL ASSISTANCE PROGRAM | Yes | No X | 15.b. HIGH SCHOOL GRADUATE OR EQUIVALENT | Yes X | No | 16. DAYS ACCRUED LEAVE PAID SLB: 00.0 ELB: 06.5 |
|---|---|---|---|---|---|---|

| 17. MEMBER WAS PROVIDED COMPLETE DENTAL EXAMINATION AND ALL APPROPRIATE DENTAL SERVICES AND TREATMENT WITHIN 90 DAYS PRIOR TO SEPARATION | X Yes | No |
|---|---|---|

**18. REMARKS**

| 19.a. MAILING ADDRESS AFTER SEPARATION (Include Zip Code) | 19.b. NEAREST RELATIVE (Name and address - include Zip Code) |
|---|---|
| 4945 SUBURBAN AVENUE, RICHMOND, VA 23230 | YAMINA HERNDENIYA (M) |

| 20. MEMBER REQUESTS COPY 6 BE SENT TO | VA DIR. OF VET AFFAIRS | X Yes | No | 22. OFFICIAL AUTHORIZED TO SIGN (Typed name, grade, title and signature) |
|---|---|---|---|---|
| 21. SIGNATURE OF MEMBER BEING SEPARATED | | | | R. A. RICKMAN, CWO2, PERSO |

| SPECIAL ADDITIONAL INFORMATION (For use by authorized agencies only) | |
|---|---|
| 23. TYPE OF SEPARATION RELEASE FROM ACTIVE DUTY | 24. CHARACTER OF SERVICE (Include upgrades) HONORABLE |
| 25. SEPARATION AUTHORITY MARCORSEPMAN PAR 1005 | 26. SEPARATION CODE MBK1     27. REENTRY CODE N/A |
| 28. NARRATIVE REASON FOR SEPARATION COMPLETION OF ACTIVE SERVICE REQUIRED FOR TRAINING | |
| 29. DATES OF TIME LOST DURING THIS PERIOD NONE | 30. MEMBER REQUESTS COPY 4 USH Initials |



**UNITED STATES MARINE CORPS**

COMPANY "A" (~)
4TH ASSAULT AMPHIBIAN BATTALION
4TH MARINE DIVISION
NAVAL AND MARINE CORPS RESERVE CENTER
7690 SHORE DRIVE, SUITE 100
NORFOLK, VA 23521-3298

IN REPLY REFER TO:

1900
ADMIN
4 Apr 01

From: Commanding Officer/Inspector-Instructor, Company A(~),
      4th Assault Amphibian Battalion, 4th Marine Division, FMF,
      7690 Shore Drive, Ste 100, Norfolk, VA 23521-3298
To:   Commandant of the Marine Corps (MMSR), Headquarters,
      U.S. Marine Corps, Harry Lee Hall, 17 Lejeune Road,
      Quantico, VA 22134-5104

Subj: DISCHARGE OF LANCE CORPORAL UMESH S. HEENDENIYA
      313 06 4095/1833 USMCR BY REASON OF PHYSICAL
      DISQUALIFICATION

Ref: (a) MCO P1900.16E
     (b) CO/I-I ltr 1900 Admin ltr 1900 ADMIN of 8 Mar 01

1.  All provisions of the reference were complied with and
completed on <u>17 Mar 01</u>.

2.  Lance Corporal Umesh S. Heendeniya was discharged from the
Select Marine Corps Reserve on <u>4 Apr 01</u>.

3.  As required by the references, the following information is
provided:

    a.  Type of Separation:  Administrative

    b.  Character of Service:  Honorable

    c.  Separation Authority:  Chief, BuMed&Surg ltr 6110/252 25/
REM/A0009476 of 10 Jan 01

    d.  Separation Code:  JFR3

K.M. Lewton
K. M. LEWTON

Copy to:
CG, MARFORRES (Code 7AA)
BUMED (02D)

# EXHIBIT 3

# ISLAND COUNSELING CENTER, P.C.
## 108 Grove Street, 2nd Floor
### Worcester, MA  01605
### TEL: 508-753-3220
### FAX: 508-753-3224

July 6, 2012

Reference:     Umesh Heendeniya
               DOB:  Redacted

To Whom It May Concern:

Mr. Heendeniya has been under my psychiatric care since 10/26/07.  He is diagnosed with
Postraumatic Stress Disorder, Bipolar Disorder, Not Otherwise Specified, and Impulse Control
Disorder.  He was also diagnosed with Attention Deficit Hyperactivity Disorder in 2000 by a
psychiatrist in Virginia.  He endorses difficulty focusing, and attention, takes longer to complete
tasks, and difficulty with multitasking.  He is currently prescribed Trileptal, Xanax, Lamictal,
Lexapro, Strattera, and Risperdal.

Sincerely,

Kimberly Lovett, M.D.
Psychiatrist

:
:
:
:
:
:

Tampa Palms Professional Center
17407 Bridge Hill Court, Unit A
Tampa, FL 33647
(813) 971-1800
(813) 971-1804 (fax)

# Marina Waisman, M.D.

October 5, 2015

Mr. Heendeniya has been under my care for the treatment of Posttraumatic Stress Disorder and Bipolar type II Disorder since 11/10/2014.

He is currently taking the following medications for the treatment of the above stated conditions:

Risperidone 1 mg once a day
Trileptal 300 mg once a day
Strattera 60 mg once a day
Alprazolam 0.5 mg once a day
Lexapro 20 mg once a day
Lamietal 150 mg once a day

Sincerely,

Marina Waisman, M.D.

# EXHIBIT 4

Jan 09 20 02:38p     Mark E. Munson M.D.     905-029-7922     p.2

STILLWATER MEDICAL CENTER
P.O. BOX 2408
STILLWATER, OK  74076
(405) 372-1480

OPERATIVE REPORT
COPY

**PATIENT NAME:**   HEENDENIYA, UMESH S.

**ROOM #:**  OP

**DATE OF BIRTH:**  redacted

**SEX:**  M

**SSN #:**  redacted

**BILLING #:**       411719

**PATIENT TYPE:**  S    **HISTORY:**

**DATE:**  08/24/95

**PREOPERATIVE DIAGNOSIS:**        Probable cartilage tear, right knee.

**POSTOPERATIVE DIAGNOSIS:**       Articular cartilage patellar fracture
                                   with multiple loose bodies.

**NAME OF OPERATION:**             Arthroscopic shaving and debridement and
                                   loose body removal of right knee.

**DESCRIPTION OF OPERATION:**      SURGEON:  Mark E. Munson, M.D.
                                   ANESTHESIA:  Dr. Kerr, general.
                                   ASSISTANT:  None.

**OPERATIVE INDICATIONS:**  I have explained treatment alternatives,
risks and benefits to Mr. Heendeniya including both operative and
nonoperative treatment.  He understands possible complications of
surgery which could include infection, neurovascular damage, chronic
stiffness and pain, blood clots, heart attack, stroke, limb loss and
death and he wishes to proceed with surgery as scheduled.

**PROCEDURE NOTE:**  The patient was taken to the operating room and
placed on the table in the supine position.  Following satisfactory
induction of general endotracheal anesthesia, the patient's right
lower extremity was prepped with sterile Betadine scrub and solution
and draped in the usual sterile fashion.  While under anesthesia with
examination under flexion and rotation he had significant crepitus in
the right knee.  Following elevation of the tourniquet to 300 mmHg
the arthroscope was introduced through the inferolateral port, probed
through the inferomedial port and irrigation through the
superolateral port.  The interarticular contents were inspected and
the medial compartment was found to be normal.  The meniscus was
probed and palpated and found to be stable and normal.  The articular
surface of the medial compartment was normal.  The intercondylar
notch was inspected and the cruciate ligaments were intact.  The
lateral compartment was inspected in the figure four position and
again the meniscus was entirely normal as was the articular surface.
Following this attention was turned to the suprapatellar pouch which
was normal.  However when looking at the under surface of the patella
and the patellofemoral joint.  The patient was found to have two
small and one large loose body connected by synovium which were along
the inferior pole of the patella and appeared to have been from an
articular cartilage fracture of the medial aspect of the patella.

Continued...

OPERATIVE REPORT

Jan 08 20 03:13p       Mark E. Munson M.D.          405-824-7422              p.2

PATIENT NAME:  HEENDENIYA, UMESH S.              BILLING #:  411719
PAGE 2                                            ROOM #:  OP

These fragments were loose and so they were removed following which
they were sent to pathology.  The articular surface was smoothed with
a patellar shaver and the patient had exposed bone along the medial
facet of the patella suggesting a poor prognosis with possible long
term stiffness or even post traumatic arthritis.  The lateral surface
of the patella was fairly normal.  The femoral groove also showed
minimal damage.  No other abnormalities were identified and following
shaving and debridement, the instruments were removed.  The wounds
were irrigated and closed with interrupted sutures of 4-0 Prolene,
dressed with adaptic 4 x 4s, soft roll and an Ace bandage.  The
patient tolerated the procedure well. Blood loss was minimal and he
was returned to the Recovery room in satisfactory condition.

                                        Mark E. Munson, M.D.

MEM/daw
Job #:
DC:  08/24/95
TR:  08/24/95

cc: Dr. Hansen at OSU
    Mark E. Munson, M.D.

OPERATIVE REPORT

PATHOLOGY, INC.
DOCTORS BUILDING
14 . W. 6TH AVE SUITE #6    371 /759
STILLWATER, OKLA. 74074

SURGICAL PATHOLOGY

NAME: HEENDENIYA, UMESH S.
MRNO: 00000082495  D.O.B.: redacted
SPECIMEN RECEIVED:    8/23/95.    PHYSICIAN: KUNKOVE, MARK S.
OPERATION:
CLINICAL DIAGNOSIS:   CARTILAGE TEAR & LT. KNEE

SPECIMEN/TISSUE:      LOOSE BODIES RIGHT KNEE

-----------------------------------------------------------------
GROSS DESCRIPTION:

    The specimen consists of several fragments of cartilage and
    bone.  The largest piece measuring

DIAGNOSIS:

    RESECTION, OSTEOCARTILAGENOUS BODIES, RIGHT KNEE

HEENDENIYA, UMESH S.
95S-02808
82495

**TUCKAHOE SURGERY CENTER**
**8919 THREE CHOPT ROAD**
**RICHMOND, VA 23229**

## OPERATIVE REPORT

**NAME:**   UMESH HEENDENIYA

**DATE:**   DECEMBER 21, 1999

**ACCOUNT #:**   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

**SURGEON:**   JOEL B. GONZALES, M.D.

**PRE-OP DX:**   PATELLOFEMORAL DJD RIGHT KNEE

**POST-OP DX:**   SAME PLUS DJD MEDIAL FEMORAL CONDYLE, ANTERIOR CRUCIATE LIGAMENT DEFICIENT KNEE, AND PATELLAR MALTRACKING

**PROCEDURE:**   ARTHROSCOPIC LATERAL RELEASE, DEBRIDEMENT OF PATELLOFEMORAL JOINT AND DEBRIDEMENT OF ANTERIOR SCAR

**ANESTHESIA:**   GENERAL

**FINDINGS:**

1. GRADE IV CHANGES PATELLA AND LATERAL EDGE OF TROCHLEA
2. LATERALLY TRACKING PATELLA
3. NORMAL MEDIAL AND LATERAL MENISCI
4. ABUNDANT SCAR LATERAL COMPARTMENT AND LATERAL GUTTER
5. ANTERIOR CRUCIATE LIGAMENT DEFICIENT KNEE

**DESCRIPTION OF PROCEDURE:**   The patient was taken to the operating room and given 1 gram of Ancef intravenously. After the uneventful induction of general anesthesia, a well-padded tourniquet was placed on the right upper thigh. Tourniquet was inflated to 350mm of Hg, after exsanguinating with an Esmarch bandage. Standard anterolateral and anteromedial portals were used after the sterile prep and drape. The above findings were noted. The extensive scar was removed with a shaver. This was in the lateral and anterior gutters. The anterior cruciate ligament was also noted to be peeled off the back of the femur and scarred down to the posterior cruciate ligament. There was a large Grade IV deficit on

TUCKAHOE SURGERY CENTER
OPERATIVE REPORT CONTINUED
Umesh Hosadenlya
December 21, 1999

the lateral femoral condyle on the superolateral edge. There was a corresponding lesion on the patella. there was patella alta and lateral patellar tracking. After the shaver was used to debride as much tissue as could be removed from the peripatellar area, a Mayo scissors were used to subcutaneously and the lateral retinaculum was released. a drain was placed. All portals were closed in routine fashion. 30cc of 0.5% Marcaine with epinephrine was placed in the knee while the drain was clamped off. Sterile dressings were applied. Tourniquet was deflated. The patient was emerged from anesthesia and transferred to recovery room in stable condition.

_____

Joel B. Gonzales, M.D.

JBG/tms
D: 12/21/99
T: 12/21/99
JN: 01-02411

ORTHOPEDIC ASSOCIATES OF NORTHERN BERKSHIRE · 77 Hospital Avenue, NORTH ADAMS MA 01247-2550

**HEENDENIYA, UMESH (Id #216664, dob:** redacted

## Encounters and Procedures

### Clinical Encounter Summaries

Encounter Date: 05/01/2014

#### Patient

| | | | |
|---|---|---|---|
| Name | HEENDENIYA, UMESH (43, M) ID# 216664 | Appt. Date/Time | 05/01/2014 04:00PM |
| DOB | 05/05/1970 | Service Dept. | Main Office |
| Provider | SUK NAMKOONG, MD | | |
| Insurance | Med Primary: MEDICARE B-MA: NATIONAL GOVERNMENT SERVICES | | |
| | Insurance # : 313054095A | | |
| | Med Secondary: MEDICAID-MA:MASS HEALTH (WAM) | | |
| | Insurance # : 100037605167 | | |
| | Prescription: ARGSDIR - Member is eligible. | | |

#### Chief Complaint

Followup: Osteoarthritis of knee

#### HPI

**Knee**

Reported by patient.

Location: bilateral (right worse than left)
Quality: aching; throbbing
Severity: mild; moderate
Timing: gradual
Context: cannot identify
Alleviating Factors: rest
Aggravating Factors: walking; ROM; bikgin
Associated Symptoms: no numbness; no tingling; no swelling; no redness; no warmth; no ecchymosis; **popping/clicking**
Previous Surgery: surgical procedure: **(right knee arthroscopy X2); date: (1995,1999)**
Previous Injections: helped temporarily; helped significantly
Previous PT: none
Notes: The patient states the injection was very helpful but is wearing off a bit. He states riding a bicycle was more bothersome than walking for him

#### Vitals

None recorded.

#### Allergies

Allergies not reviewed (last reviewed 03/20/2014)
NKDA

#### Medications

Medications not reviewed (last reviewed 03/20/2014)

| Name | Date | |
|---|---|---|
| acyclovir 800 mg tablet | 01/17/14 | filled |
| alprazolam 0.5 mg tablet | 04/03/14 | filled |
| escitalopram 20 mg tablet | 04/03/14 | filled |
| fenofibrate 54 mg tablet | 04/01/14 | filled |
| lamotrigine 150 mg tablet | 04/03/14 | filled |
| metformin 500 mg tablet | 04/01/14 | filled |
| oxcarbazepine 300 mg tablet | 04/03/14 | filled |
| risperidone 2 mg tablet | 04/01/14 | filled |
| simvastatin 20 mg tablet | 04/01/14 | filled |
| Strattera 60 mg capsule | 04/07/14 | filled |

#### Problems

• Osteoarthritis of knee

#### ROS

None recorded.

ORTHOPEDIC ASSOCIATES OF NORTHERN BERKSHIRE • 77 Hospital Avenue, NORTH ADAMS MA 01247-2550

HEENDENIYA, UMESH (Id #216664, dob:    redacted

**Physical Exam**

Patient is a 43-year-old male.

Constitutional: General Appearance: healthy-appearing, NAD, and normal body habitus.

Gait and Station: Appearance: normal gait, no limp, and ambulates with no assitive devices.

Knees: Inspection Right: no deformity, mass, induration, warmth, or erythema and **swelling (minimal)**. Inspection Left: no deformity, mass, induration, warmth, erythema, or swelling.

Psychiatric: Orientation: oriented to time, place, and person. Mood and Affect: normal mood and affect and active and alert.

**Assessment / Plan**

bilateral knee osteoarthritis

**1. Osteoarthritis of knee**
    715.16: Osteoarthrosis, localized, primary, lower leg

**Discussion**
**Patient Instructions**
    activity as tolerated

**Discussion Notes**
    The patient will continue with his activities but is wary about staying within a comfortable level.  We will hold on another injection for now.  I will see him back in 3-4 months

**Return to Office**
  • Suk Namkoong, MD for ESTABLISHED PATIENT at Main Office on 09/15/2014 at 04:00 PM

**Encounter Sign-Off**
Encounter signed-off by Suk Namkoong, MD, 05/02/2014.

Encounter performed and documented by Suk Namkoong, MD
Encounter reviewed & signed by Suk Namkoong, MD on 05/02/2014 at 10:04am

Encounter Date: 03/20/2014

**Patient**

| | | | |
|---|---|---|---|
| Name | HEENDENIYA, UMESH (43, M) ID# 216664 | Appt. Date/Time | 03/20/2014 03:00PM |
| DOB | redacted | Service Dept. | Main Office |
| Provider | SUK NAMKOONG, MD | | |
| Insurance | Med Primary: MEDICARE B-MA: NATIONAL GOVERNMENT SERVICES | | |

    Insurance # : 313064095A
    Med Secondary: MEDICAID-MA:MASS HEALTH (WAM)
    Insurance # : 100037605167
    Prescription: ARGSDIR - Member is eligible.

**Chief Complaint**

Bilateral Knee

**HPI**

**Knee**
    Reported by patient.

    Location: bilateral (right worse than left)
    Quality: aching; throbbing
    Severity: moderate
    Duration: 3 months
    Timing: gradual
    Context: cannot identify
    Alleviating Factors: rest
    Aggravating Factors: walking; ROM
    Associated Symptoms: no numbness; no tingling; no swelling; no redness; no warmth; no ecchymosis; popping/clicking
    Previous Surgery: surgical procedure: **(right knee arthroscopy X2)**; date: (1995,1999)
    Prior imaging: no recent studies
    Previous injections: none
    Previous PT: none

ORTHOPEDIC ASSOCIATES OF NORTHERN BERKSHIRE • 77 Hospital Avenue, NORTH ADAMS MA 01247-2550

**HEENDENIYA, UMESH (id #216664, dob:** ( redacted

Notes: The patient has had increasing knee pain for the past 3 months. He denies any injury. He usually walks in his apartment for 15-20 minutes but cannot do that because of pain. He does not hurt at rest. The right knee is worse than the left and both knees crack and pop a lot. He had 2 arthroscopies on the right side for torn cartilage

## Vitals

| 03/20/2014 03:37 pm | | | | | |
|---|---|---|---|---|---|
| Ht: | 5 ft 11 in | Wt: | 190 lbs | BMI: | 26.5 |
| BP: | 118/90 | | | | |

## Allergies

Reviewed Allergies
NKDA

## Medications

Reviewed Medications

| Name | Date | |
|---|---|---|
| acyclovir 800 mg tablet | 01/17/14 | filled |
| alprazolam 0.5 mg tablet | 03/05/14 | filled |
| escitalopram 20 mg tablet | 03/05/14 | filled |
| fenofibrate 54 mg tablet | 03/05/14 | filled |
| lamotrigine 150 mg tablet | 03/06/14 | filled |
| metformin 500 mg tablet | 03/05/14 | filled |
| oxcarbazepine 300 mg tablet | 03/07/14 | filled |
| risperidone 2 mg tablet | 03/05/14 | filled |
| simvastatin 20 mg tablet | 03/05/14 | filled |
| Strattera 60 mg capsule | 03/06/14 | filled |

## Problems

• Osteoarthritis of knee

## ROS

Patient reports no fever. He reports no dry eyes. He reports no difficulty hearing. He reports no frequent nosebleeds. He reports no sore throat. He reports no chest pain. He reports no cough. He reports no abdominal pain.

## Physical Exam

Patient is a 43-year-old male.

**Constitutional:** General Appearance: healthy-appearing, NAD, and normal body habitus.

**Gait and Station:** Appearance: normal gait, no limp, and ambulates with no assitive devices.

**Knees:** Inspection Right: no deformity, mass, induration, warmth, or erythema and swelling (minimal). Inspection Left: no deformity, mass, induration, warmth, erythema, or swelling. Bony Palpation Right: no tenderness of the medial joint line or the lateral joint line. Bony Palpation Left: no tenderness of the medial joint line or the lateral joint line. Soft Tissue Palpation Right: no tenderness of the quadriceps tendon, the lateral patellar retinaculum, the medial patellar retinaculum, the prepatellar bursa, or the patellar tendon. Soft Tissue Palpation Left: no tenderness of the quadriceps tendon, the lateral patellar retinaculum, the medial patellar retinaculum, the prepatellar bursa, or the patellar tendon. Active Range of Motion Right: crepitus, flexion (130 deg), and pain at extreme limits of range (flexion) and extension normal. Active Range of Motion Left: flexion normal, extension normal, and crepitus. Stability Right: Lachman test negative. Stability Left: Lachman test negative.

**Psychiatric:** Orientation: oriented to time, place, and person. Mood and Affect: normal mood and affect and active and alert.

## Procedure Documentation

**Steroid Injection/Major Joint or Bursa:**

After discussion of the risks and benefits, the patient elected to proceed with a corticosteroid injection into the right knee. Confirmed that the patient does not have history of prior adverse reactions, active infections, or relevant allergies. There was no effusion, erythema, or warmth, and the skin was clear.
The skin was sterilized with betadine. A 21 gauge needle was inserted into the joint via an anterolateral approach. The site was injected with a mixture of _6__ mg betamethasone and _9__ cc 1% lidocaine. The injection was completed without complication, and a bandage was applied.

ORTHOPEDIC ASSOCIATES OF NORTHERN BERKSHIRE • 77 Hospital Avenue, NORTH ADAMS MA 01247-2550

**HEENDENIYA, UMESH (id #216664, dob:** redacted

The patient tolerated the procedure well and was instructed to avoid strenuous activity for the next 24-48 hours and to use ice, NSAIDs, or Tylenol for pain as needed. The patient will call immediately with any signs of infection or allergic reaction.

### Assessment / Plan

bilateral knee osteoarthritis

**1. Osteoarthritis of knee**
    715.16: Osteoarthrosis, localized, primary, lower leg
  • X-RAY, KNEE
    Side: BILATERAL Views (X-RAY, KNEE): AP, Lateral, Sunrise & PA Flexion
  • JOINT INJECTIONS: AFTER YOUR VISIT

### Discussion
**Patient Instructions**
    low impact activities, injection

### Discussion Notes
I recommended trying to do low impact exercises, such as an exercise bicycle for exercise. I also recommended trying an injection on the right side. The patient agreed. He will followup in 6 weeks

### Return to Office
  • Suk Namkoong, MD for ESTABLISHED PATIENT at Main Office on 04/28/2014 at 03:45 PM

### Results / Interpretations

X-RAY, KNEE
• Side: BILATERAL, Views (X-RAY, KNEE): AP, Lateral, Sunrise & PA Flexion
tricompartmental arthritis with spurring on the right-worst in patellofemoral; mainly patellofemoral arthritis on left

**Encounter Sign-Off**
Encounter signed-off by Suk Namkoong, MD, 03/20/2014.

Encounter performed and documented by Suk Namkoong, MD
Encounter reviewed & signed by Suk Namkoong, MD on 03/20/2014 at 5:02pm

# EXHIBIT 5



# DAVIS HOSPITAL AND MEDICAL CENTER
(801)807-1000

1600 West Antelope Drive
Layton, Utah 84041

## DEPARTMENT OF DIAGNOSTIC IMAGING

| | |
|---|---|
| Patient: | HEENDENIYA, UMESH M |
| Sex: | M |
| Date of Birth/Age: | redacted /35Y |
| X-ray Number: | 99326806962 |
| Ref. Physician: | TRENTDRASMUSSENMD |
| Room Number: | EDD |
| Date of Procedure: | 02/02/2006 |

EXAMINATION: MRI LUMBAR SPINE W/O
ORDERING DIAGNOSIS: BACK PAIN

MRI OF THE LUMBAR SPINE 2/2/2006

CLINICAL HISTORY: Back pain.

TECHNIQUE: A multiplanar MRI of the lumbar spine was performed.

FINDINGS: The marrow signal is within normal limits. There is some dehydration of the disc space at L4-5. The cauda equina and thecal sac are within normal limits.

Axial images are as follows:
L2-3: The disc space and neural foramina are within normal limits.

L3-4: The disc space and neural foramina are within normal limits. There are mild degenerative changes of the facets.

L4-5: There is a posterior and left-sided disc bulge. This is below the L4 exiting nerve rootlets. There is some impingement upon the thecal sac at this level due to the diffuse bulge. The focal disc herniation on the right side of the superior aspect of L5, measures approximately 5.9 mm. This is adjacent to the right L5 nerve rootlet and it could affect the exiting right L5 nerve rootlet. The S1 nerve rootlets are within normal limits. Degenerative changes are seen in the facets at L5-S1.

IMPRESSION
1) Focal disc herniation appreciated along the right paracentral region of the superior aspect of L5, which could affect the L5 nerve rootlet.
2) Diffuse left and posterior bulge at L4-5, which is inferior to the exiting nerve rootlets at this site and findings may represent a complex disc bulge and herniation at this level. The Emergency Room physician was notified of the findings.

Sandra Althaus, M.D.
FINAL COPY IS ELECTRONICALLY SIGNED AND STATES FINAL AT BOTTOM OF REPORT

| | |
|---|---|
| Patient Name: HEENDENIYA, UMESH M | Davis Hospital and Medical Center |
| MRN: 328187 | 1600 W. Antelope Dr. Layton, UT 84041 |

## DEPARTMENT OF DIAGNOSTIC IMAGING

**DAVIS HOSPITAL AND MEDICAL CENTER**
1600 West Antelope Drive Layton, UT 84041   (801) 807-7177

Name: Heendeniya, Umesh M
Accnt. #
DOB: redacted  Sex
MR # D000328187

**NURSING DOCUMENTATION OF THE MEDICAL C___**

Date: _____ Time: _____

**General Appearance:** ☑ WNL   ☐ Signs of Abuse
   Distress: ☑ NAD/mild/moderate/severe   Gait: Steady/unaided Ataxic Antalgic Assistive Device Irregular NonAmbulatory   Hygiene status: Clean, Dirty, Unkempt
   Nutritional status: ☐ Normal  Obese  Morbidly Obese  Cachetic   ☐ Recent unexplained change in weight or appetite.

**Psychosocial/ Functional:** ☑ WNL   ☐ Needs assistance with self care issues prior to discharge.
   ☐ Affect, Behavior, Communication appropriate for age and environment   No _____
   Extended care facility  Lives alone  ADL assistance in home   ☐ Recent change in mobility or ADL in the past 30 days.

**Barriers to Learning s/o Communication:** ☑ WNL
   ☐ None/No Deficit
   Physical Limitation  Emotional   Cultural   Religious/Spiritual   Suspected Low Literacy   Memory Changes
   Language Barrier  Family/companion/no interpreter  Hospital Interpreter  Hearing Impairment   Visual Impairment

**Respiratory:** ☑ WNL
   Airway:  Clear   At Risk   Compromised   Respiratory Quality:  Unlabored  Labored  mild/moderate/severe
   Breath Sounds:  Clear Bilat   Shallow  Tachypneic  Apneic

| | | |
|---|---|---|
| Decreased | RUL RML RLL LUL LLL | |
| Absent | RUL RML RLL LUL LLL | |
| Rales | RUL RML RLL LUL LLL | |
| Wheezes | RUL RML RLL LUL LLL | |
| Rhonchi | RUL RML RLL LUL LLL | |

   Accessory Muscle Use/Retractions/Positional Support/Nasal Flaring/Grunting/

**Cardiovascular:** ☑ WNL
   Skin:  Warm  Dry  Pink  Pale  Cyanotic  Jaundiced  Flushed  Mottled  Hot  Cool  Clammy  Diaphoretic
   Pulses:  Present  Strong  Equal = Radial  Brachial  Carotid  Femoral  Popliteal  Posterior Tibial  Dorsalis Pedis
      Weak  Thready  Bounding  Tachycardic  Irregular
   Capillary Refill:  Brisk  Delayed
   Heart Sounds:  S1 S2  Murmur  Gallop

**Neuro:** ☑ WNL   ① numbness ② tingling
   Orientation:  ☐ Alert/Oriented x3   Disoriented to person/place/time   Nonverbal   ☐ Decreased LOC   Unresponsive
   LOC:  MAEW  Weakness  Sensory Loss  Contractures  Speech difficulty  Lethargic  Syncopal  Vertigo/Dizziness
      Alert  Somnolent  Drowsy  Confused  Combative  Agitated  Other _____
   Pupils:  PERRL ___mm  fixed/reactive   Photophobia reported   Visual change reported
   Neck pain/tenderness  Vertigo/Syncopal  Tinnitus   Seizure Activity  Posturing  Decorticate/Decerebrate
   HA onset  acute/gradual   Similar to previous HA   Pain location/radiation: _____
   Facial Droop  Drooling   Swallowing difficulty   Loss of consciousness prior to arrival _____

**ENT:** ☐ WNL   ☑ Deferred   ☐ Denies c/o _____
   Eyes:  Red   Tearing   Drainage   Irritated  Conjunctiva Swollen   Vision Change Reported   Blind
   Ears:  Ache   Drainage   Tinnitus   New onset hearing impairment   Hard of hearing   Deaf
   Nose:  Congestion  Drainage
   Throat:  Sore Throat  Cough   Painful swallowing / drooling _____
   Tenderness over Sinuses   maxillary/frontal
   FB Suspected / Known   Eye/Ear/Nose/Throat

**Musculoskeletal:** ☐ WNL   ☑ Deferred   *Stated L4 or L5 Herniated Disk revealed from MRI on Thursday 3 days ago*
   ☐ Gross motor/sensory intact, MAEW
   R/L UE: Pain at rest/with PROM/AROM   Abn ROM   Edema  Ecchymosis  Laceration  Deformity  Weakness   *seen at Dr*
   R/L LE: Pain at rest/with PROM/AROM   Abn ROM   Edema  Ecchymosis  Laceration  Deformity  Weakness
   Weight bearing capability   Splint or assistive device on arrival

**Psychiatric:** ☐ WNL   ☑ Deferred   *Started P.T. on Friday    Also R/O ② Sciatica ② sided Back pk*
   ☐ Affect: Pleasant/appropriate/positive eye contact   Flat/nonverbal   Hostile   Fearful
   Hallucinations  Violent Behavior   Reported Depression   Suicidal Ideation w/ Plan   Suicidal Ideation w/o Plan
   Substance Abuse Reported/Evidenced _____

**Integumentary:** ☑ WNL   ☐ Deferred
   ☐ Pink, warm, dry
   Ecchymosis  Abrasion  Laceration  Rash  Lesion  Ulcer  Wound   ☐ Cyanosis   ☐ Petichae
   Location/description: _____

**Gastrointestinal:** ☑ WNL   ☐ Deferred
   ☐ Abdomen soft/nontender/bowel sounds present  Diarrhea  Emesis  Nausea  Cramping  Constipation  Distention
   Tenderness _____   Bowel Sounds  Hyperactive  Hypoactive  Absent _____
   Pain Location: RUQ RLQ LUQ LLQ epigastric suprapubic   Pain Quality: Sharp Stabbing Aching Burning Constant Intermittent

**GYN:** ☑ WNL   ☐ Deferred   ☐ Denies c/o _____
   Frequency  Burning  Dysuria  Hematuria  Oliguria  Incontinence  Flank Pain  R  L   Scrotal pain
   Vaginal Bleeding - Spotting  Heavy - # of pads used _____   Vaginal discharge _____
   Penile bleeding  discharge _____   Genital injury _____

Signature:  *HBarney*

Name: Heendeniya, Umesh M
Accnt. #
DOB: 05/05/1970  Sex: M
MR # D000328187

# DAVIS HOSPITAL AND MEDICAL CENTER
1600 West Antelope Drive Layton, UT 84041   (801) 807-7177

Name: Heendeniya, Umesh M
Acent. #

DOB: 0 ̄ redacted Se
MR # D000328167

## PHYSICIAN ORDER FORM GENERAL MEDICINE

| LABORATORY ORDERS | | | RADIOLOGY ORDERS | | | NURSING PROCEDURES |
|---|---|---|---|---|---|---|
| Order Time | Lab Test | Time Order Sent | Order Time | X-Ray | Time order Sent | |
| | CBC | | | KUB | | ☐ Cardiac monitor |
| | BMP | | | Abd-flat/upright | | ☐ Pulse Oximetry |
| | CMP | | | CXR- PA/lateral | | ☐ Continuous BP monitoring |
| | PT/PTT | | | IVP | | ☐ Oxygen: |
| | Liver profile | | | US: ☐ GB ☐ sorta | | ☐ Foley Catheter |
| | Amylase | | | ☐ kidney ☐ pancreas | | ☐ NGT tube |
| | Lipase | | | CT SCAN: ☐ abdomen ☐ pelvis | | ☐ Intravenous line |
| | Serum preg test | | | ☐ head | | ☐ hep lock ☐ fluid: |
| | Urinalysis | | | contrast: ☐ IV ☐ po ☐ none | | RATE: |
| | Urine C and S | | | CARDIOPULMONARY | | |
| | Urine preg test | | Order Time | Test | Time order Sent | |
| | Blood cultures | | | EKG | | |
| | Thyroid profile | | | ABG | | |
| | drug levels: | | | Sputum gm stain/CS | | |
| | Hemocult | | | | | |

## MEDICATION ORDERS

| Order Time | Medication | Admin Time | Nurse | Re-Assessment |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

SCHARGE INSTRUCTIONS

Dx— Knoww herniated disc
(x Lortab 5/16 )
follow up w/ Dr Chan
(Aabadong)

RSE SIGNATURE
NP SIGNATURE
YSICIAN SIGNATURE
6 NWS, Inc. Content by EDCare.

☐ I HAVE PERFORMED A MEDICAL SCREENING EVALUATION

☐ NO EMERGENCY MEDICAL CONDITION EXISTS   2/5/2008

☑ FURTHER EVALUATION NEEDED

SIGNATURE                    TIME 2145

```
DATE   05/12/14 @ 2209      Berkshire Medical Center EDM **LIVE 5 5*              PAGE 1
USER   MPELKEY2                EMERGENCY DEPARTMENT RECORD          EC3
```

| | |
|---|---|
| Patient   HEENDENIYA,UMESH | Birthdate  redacted        Unit #  M000837770<br>Age/Sex  44/M |

## Chief Complaint
  BACK PAIN (C)

## Vitals
Recorded   05/12/14 @

| | | |
|---|---|---|
| PULSE | 88 | ESI  4 |
| BP | 142 / 88 | |
| RESP | 18 | |
| O2 SAT | 95 | |
| TEMP | 98 3 | |
| WT | 195 lbs | |
| PAIN SCALE | 0-10 Scale | |
| PAIN PRESENT | Y | |

HEENDENIYA UMESH
M000729840.. M000837770
06/08/70 44 M   ERM BE  05/12/14
A                          P POP,NONE ONI

## Allergies
  CODED
  No Known Allergies(Y)

Triage Decision Complaint Description

## HPI
  Chief Complaint Description
     c/o back pain, Hx L3 herniated disc 2006, today moved out of appt and pain
     progressed to intolerable   pain decreases when laying flat

## Past Medical History
  Hypercholesterolemia
  Diabetes(type 2)
  Bipolar Disorder, Depression, Post Traumatic Stress Disorder
  Knee Replacement(R knee Sx 1995, 1999   )

## Home Medications

| Medication | | | |
|---|---|---|---|
| Simvastatin (Simvastatin) | 80 MG  TABLET   80 MG  TABLET  80 | DAILY |
| Metformin Hcl (Metformin Hcl) | 500 MG  TABLET   500 MG  TABLET | DAILY |
| Fenofibrate,Micronized (Fenofi | 134 MG  CAPSULE   134 MG  CAPSULE | DAILY |
| Lamotrigine (Lamotrigine) | 25 MG  TABLET   25 MG  TABLET | DAILY |
| Oxcarbazepine (Trileptal) | 150 MG  TAB   150 MG  TAB | DAILY |
| Alprazolam (Xanax) | 1 MG  TABLET   1 MG  TABLET  1 | DAILY |
| Escitalopram (Lexapro) | 5 MG  TABLET   5 MG  TABLET  5 | DAILY |
| Risperidone (Risperdal) | 0 25 MG  TAB   0 25 MG  TAB | DAILY |
| Atomoxatine Hcl (Strattera) | 80 MG  CAPSULE   80 MG  CAPSULE  80 | DAILY |

## Nursing Notes

EDM PAT zcus ed chart record w doc

DATE: 06/11/14 @ 0018        Berkshire Medical Center EDM **LIVE 5.5*        PAGE 1
USER: EDM MNR                   Patient Summary Report

Patient: HEENENEIYA, UMESH                Age/Sex: 44/M         Acct No: M00672984036
ED Provider: BOND, NESTOR O PA - ED                            Unit No: M000837770

ED Physician: BOND, NESTOR O PA - ED, AH          Arrival Date/Time: 05/12/14 - 2144
Practitioner:                                     Triage Date/Time: 05/12/14 - 2157
Nurse: Alison Zamboni, RN                         Date of Birth:   redacted

Stated Complaint: BACK PAIN
Chief Complaint: Back Pain or Injury              Priority: 4

ED Physician: BOND, NESTOR O PA - ED, AH          Arrival Date/Time: 05/12/14 - 2144
Practitioner:                                     Triage Date/Time: 05/12/14 - 2157
Nurse: Alison Zamboni, RN                         Date of Birth: 05/05/1970

Stated Complaint: BACK PAIN
Chief Complaint: Back Pain or Injury              Priority: 4
Status Event History:
      05/12/14   2144 Awaiting Triage
                 2205 With Triage
                 2224 Waiting in Waiting Room
                 2319 Room Assigned
                 2323 In Room
                 2324 With Nurse
      05/13/14   0024 With Doctor
                 0409 Chart Complete

Allergy/Adverse Reaction                          Type      Severity  Date
No Known Allergies                                Allergy             01/16/14

05/12/14 2157 Melissa Pelkey
Pulse Rate (adult) 88
Pulse Rhythm Regular
Respiratory Rate 18
Temperature (Fahrenheit) 98.3

05/13/14 0218 Alison Larabee
Blood Pressure Systolic 121
Blood Pressure Diastolic 79

05/13/14 0218 Alison Larabee
Pulse Rate (adult) 64
Respiratory Rate 16

| Ordered | Procedure Name | Ordering Provider | E-Signed |
|---|---|---|---|
| 05/13/14 0131 | Morphine Inj (Morphine Inj) | BOND, NESTOR O PA - ED, AH | Yes |
| 05/13/14 0131 | Diazepam (Valium) | BOND, NESTOR O PA - ED, AH | Yes |
| 05/13/14 0131 | CT Lumbar Spine Wo | BOND, NESTOR O PA - ED, AH | Yes |
| 05/13/14 0131 | Na (Ns) | BOND, NESTOR O PA - ED, AH | Yes |
| 05/13/14 0149 | Lyme with Ehrlichia & Babesia | BOND, NESTOR O PA - ED, AH | Yes |
| 05/13/14 0149 | Hydrocodone/Apap 5/325 Disp... | BOND, NESTOR O PA - ED, AH | Yes |

```
DATE: 06/11/14 @ 0018      Berkshire Medical Center EDM **LIVE 5.5*                PAGE 2
USER: EDM MNR                      Patient Summary Report
```

Patient: HEENDENIYA,UMESH              Age/Sex: 44/M              Acct No: M00672984036
ED Provider: BOND,NESTOR O PA - ED                               Unit No: M000837770

| | | |
|---|---|---|
| 05/13/14 0149 Cyclobenzaprine 10 Mg Disp ... | BOND,NESTOR O PA - ED, AH | Yes |
| 05/13/14 0302 Morphine Inj (Morphine Inj) | BOND,NESTOR O PA - ED, AH | Yes |
| 05/13/14 0322 Oxycodone/Apap Disp Pack (P... | BOND,NESTOR O PA - ED, AH | Yes |
| 05/13/14 0322 Ibuprofen 600Mg Tab Disp Pa... | BOND,NESTOR O PA - ED, AH | Yes |
| 05/13/14 0322 Prednisone Tab (Deltasone Tab) | BOND,NESTOR O PA - ED, AH | Yes |
| 05/13/14 0322 Cyclobenzaprine 10 Mg Disp ... | BOND,NESTOR O PA - ED, AH | Yes |

05/12/14  2157    Triage: Adult                                    Melissa Pelkey, RN
**COMPLAINT HISTORY:**
**Onset/Description** c/o back pain, Hx L3 herniated disc 2006, today moved out of appt and
                      pain progressed to intolerable.  pain decreases when laying flat.
**NEUROLOGICAL STATUS:**
**Loss of Consciousness** N
**Oriented To** Person, Place, Time
**Patient at Baseline Orientation per Care Giver or Referral** Y
**VITAL SIGNS Vital Signs:**
**Temperature (Fahrenheit)** 98.3
**Temperature (Calculated Celsius)** 36.8
**Temperature Source** Oral
**Pulse Rate (adult)** 88
**Pulse Rhythm** Regular
**Respiratory Rate** 18
**Pulse Oximetry** 95
**Oxygen Delivery Mode** Room Air
**BLOOD PRESSURE Blood Pressure:**
**Systolic** 142
**Diastolic** 88
**Location** Right Arm
**Position** Sitting
**PAIN SCALE Pain Scale:**
**Pain Present** Y
**Scale Used** 0-10 Scale
**PAIN Pain:**
**Location Modifier** Medial
**Location** Back
**Pain Intensity** 7
**Description** Aching, Throbbing, Spasm
**IMMUNIZATIONS Immunizations:**
**Patient / Family reports childhood Immunizations Up to Date** Y
**SOCIAL HISTORY Social History:**
**Alcohol Use** N
**Substance Use** N
**Suspected Victim of Abuse, Neglect, or Violence *** N
**Feels Personally Threatened in Home Environment*** N
**Has Thoughts of Harming Self or Others** N
**HEIGHT & WEIGHT Height & Weight:**
**Height (Feet)** 5
**Height (Inches)** 11
**Height (Calculated Centimeters)** 180.340000
**Weight (Pounds)** 195
**Weight in Calculated Kilograms** 88.4504985
**Weight (Calculated Grams)** 88450.4985
**Weight Measurement Method** Self Reported
**FEMALE Female:**

```
DATE: 06/11/14 @ 0018      Berkshire Medical Center EDM **LIVE 5.5*                    PAGE 3
USER: EDM MNR                        Patient Summary Report
```

Patient: HEENDENIYA,UMESH                  Age/Sex: 44/M              Acct No: M00672984036
ED Provider: BONE,NESTOR O PA - ED                                   Unit No: M000837770

**05/12/14  2157   Past Medical History**                              *Melissa Pelkey, RN*
**MISCELLANEOUS HISTORY:**
Cancer N
**CARDIAC HISTORY:**
Hypercholesterolemia Y
**ENDOCRINE HISTORY:**
Diabetes Y
Comment type 2
**MUSCULOSKELETAL HISTORY:**
Degenerative Disk Disease
Comment L3 herniated Disc
Knee Replacement Y
Comment R knee Sx 1995, 1999.
**PSYCHO/SOCIAL HISTORY:**
Bipolar Disorder Y
Depression Y
Post Traumatic Stress Disorder Y

**05/13/14  0218   Vital Signs: Adult**                                 *Alison Larabee, RN*
**Pulse:**
Pulse Rate (adult) 64
**Respirations:**
Respiratory Rate 16
**Oxygen Delivery:**
Pulse Oximetry 96
Oxygen Delivery Mode Room Air
**Blood Pressure:**
Systolic 121
Diastolic 79
Position Supine
**Pain:**
Pain Intensity 4

**05/13/14  0406   Disposition/Departure**                            *Alison Zamboni, RN*
**Disposition:**
Disposition Time 0341
Patient verbalises expectations of home care instructions Y
IV Removed Y
Has the IVF Downtime been charted YES
Pain Intensity Moderate (4-6)
Discharge Condition Stable
Nursing Assessment on Departure see RN notes

MEDICATIONS

Medication
    Sch Date-Time  Ordered Dose  Admin Dose
    Doc Date-Time  Given - Reason          Site      User
MORPHINE 4 MG/ML INJECTION (MORPHINE INJ) IVP/STAT/STA
    05/13/14-0129   4 MG          4 MG
    05/13/14-0146   Y                            Brian Barber
    Pain Intensity: 8

DIAZEPAM 2 MG TAB (VALIUM) PO/STAT/STA
    05/13/14-0129   2 MG          2 MG
    05/13/14-0146   Y                            Brian Barber

NS 1,000 ML (NS 1,000 ML) IV/.Q0M/ONE

```
DATE: 06/11/14 @ 0018      Berkshire Medical Center EDM **LIVE 5.5*              PAGE 4
USER: EDM MNR                      Patient Summary Report
```

**Patient:** KEENDENTYA,UMESH                    **Age/Sex:** 44/M                    **Acct No:** M00672984036
**ED Provider:** BOND,NESTOR O PA - ED                                             **Unit No:** M000837770

**Medication**

```
    Sch Date-Time  Ordered Dose  Admin Dose
    Doc Date-Time  Given - Reason          Site        User
    05/13/14 0310K                999 MLS/HR
    05/13/14 0310K Y                                   Brian Barber
```

**Entered by Bonnie J Gardner on 05/12/14 at 2232**
  Pt aware of wait in waiting room.

**Entered by Alison Larabee, RN on 05/13/14 at 0208**
  Pt to CT via wheel chair.

**Entered by Alison Zamboni, RN on 05/13/14 at 0310**
  Report from Brian B, RN.

**Entered by Alison Zamboni, RN on 05/13/14 at 0335**
  Pt medicated with 40mg prednisone. Pt tol well. Reviewed f/up needs. To-go meds given. Pt
  demonstrates steady gait. Denies questions.

REPORTED MEDICATIONS

| Prescription/Reported Meds | Type | Issued | Provider | Entered |
|---|---|---|---|---|
| Simvastatin (Simvastatin)  80 Mg Tablet<br>  80 MG PO DAILY<br>    <Last Taken> => 05/11/14 2000 | Reported | | | 05/12/14 |
| Metformin Hcl (Metformin Hcl)  500 Mg Tablet<br>  <Unknown Dose> PO DAILY<br>    <Last Taken> => <Unknown Dose> 05/11/14 2000 | Reported | | | 05/12/14 |
| Fenofibrate,Micronized (Fenofibrate)  134 Mg Capsule<br>  <Unknown Dose> PO DAILY<br>    <Last Taken> => <Unknown Dose> 05/11/14 2000 | Reported | | | 05/12/14 |
| Lamotrigine (Lamotrigine)  25 Mg Tablet<br>  <Unknown Dose> PO DAILY<br>    <Last Taken> => <Unknown Dose> 05/11/14 2000 | Reported | | | 05/12/14 |
| Oxcarbazepine (Trileptal)  150 Mg Tab<br>  <Unknown Dose> PO DAILY<br>    <Last Taken> => <Unknown Dose> 05/11/14 2000 | Reported | | | 05/12/14 |
| Alprazolam (Xanax)  1 Mg Tablet<br>  1 MG PO DAILY<br>    <Last Taken> => <Unknown Dose> 05/11/14 2000 | Reported | | | 05/12/14 |
| Escitalopram (Lexapro)  5 Mg Tab<br>  5 MG PO DAILY<br>    <Last Taken> => 05/11/14 2000 | Reported | | | 05/12/14 |
| Risperidone (Risperdal)  0.25 Mg Tab<br>  MG PO DAILY<br>    <Last Taken> => 05/11/14 2000 | Reported | | | 05/12/14 |
| Atomoxetine Hcl (Strattera)  80 Mg Capsule<br>  80 MG PO DAILY<br>    <Last Taken> => 05/11/14 2000 | Reported | | | 05/12/14 |

**Primary Impression:**
Low back pain
**Secondary Impressions:**

```
DATE: 06/11/14 @ 0018        Berkshire Medical Center EDM **LIVE 5.5*              PAGE 5
USER: EDM MNR                    Patient Summary Report
```

| Patient: HEENDENIYA,UMESH | Age/Sex: 44/M | Acct No: M00672984036 |
| ED Provider: BOND,NESTOR O PA - ED | | Unit No: M000837770 |

**Disposition:** HOME, SELF-CARE          **Departure Date/Time:** 05/13/14 - 0207
**Comment:** departed at 0341
**Condition:** Stable

| MPELKEY2 | Melissa Pelkey |
| BBARBER | Brian Barber |
| AZAMBONI | Alison Zamboni |
| ALARABEE | Alison Larabee |

Medical Records' copy
Berkshire Medical Center

Report Status: Signed

Berkshire Medical Center

EMERGENCY DEPARTMENT PROGRESS NOTE

Medical Record #: M000837770
Patient: HEENDENIYA,UMESH
DOB:     redacted       Acct. #: M00672984036
Date of Service: 05/12/14
Attending Physician: BOND,NESTOR O PA - ED

## HISTORY OF PRESENT ILLNESS:

The patient, Umesh Heendeniya , is a 44 year old male seen on May 13, 2014 for stated complaint of
Back Pain. Pt has chronic back pain for the past 8 years, he was diagnosed with L3 herniated disc. Pt
has been living with pain even has adjusted to sleeping on floor to help with pain. Today pt was
moving and on his drive out of town his pain became unbearable so he decided to come to ER. Pt has
not had any bowel or bladder dysfunction, no radiating pain.
**Time Seen by Provider:** 00:24
**Mode of Arrival:** Ambulatory
**Chief Complaint:** Back Pain or Injury
**Stated Complaint:** BACK PAIN
**Location of occurrence:** Home
**Information Provided By:** Patient, Family Member (step mom)
**History Limitations:** no limitations

   **Location:** back
   **Onset:** weeks
   **Timing:** constant
   **Intensity (1 to 10):** 9
   **Quality:** sharp
   **Context:** back pain
   **Exacerbated by:** movement
   **Relieved by:** nothing
**Coded Allergies:**
   No Known Allergies (Verified , ., 1/16/14)
**Home meds reviewed in EMR:** Yes

## REVIEW OF SYSTEMS:

**ROS limitations:** no limitations
**CONSTITUTIONAL:** No recent illness, No fever, No sweating, No malaise, No fatigue, No weight gain, No
weight loss, No chills, No change in appetite, No night sweats, No changes in blood sugar, No general
weakness, No changes in blood pressure, No recent surgery, No other
**RESPIRATORY:** No shortness of breath, No wheezing, No coughing, No sputum production, No hemoptysis,
No pleurisy, No other
**GASTROINTESTINAL:** No hematemesis, No hematochezia, No melena, No diarrhea, No constipation, No
abdominal distention, No other, No dysphagia, No abdominal pain, No nausea, No vomiting, No change in

Berkshire Medical Center                                          Page: 1 of 5
Name: HEENDENIYA,UMESH DOB: redacted · PCP:PCP,NONE-ONLY USE AS PRIM MD
Esigned by:BOND,NESTOR O PA - ED DT/TM Esigned:05/13/14 0321
Esigned by: DT/TM Esigned:
Account #: M00672984036  Medical Record #: M000837770
Report #: 0513-0042 **Report's Status: Signed**
DICTATED BY: BOND,NESTOR O PA - ED For

Medical Records' copy
Berkshire Medical Center

bowel habits
**MUSCULOSKELETAL:** back pain
**SKIN:** No rash, No skin lesions, No skin changes, No redness, No laceration, No abrasion, No burn, No tear, No discoloration, No other
**NEUROLOGICAL:** No headache, No focal weakness, No numbness/paresthesias, No speech disturbance, No memory problems, No dizziness, No lightheadedness, No loss of consciousness, No head injury, No problems with balance, No altered mental status, No seizure, No other

## PAST MEDICAL HISTORY:
**Records reviewed:** EMR for this encounter, nurses notes
hypercholesterolemia, diabetes (type 2), No cancer
bipolar disorder, depression, PTSD
**SOCIAL HISTORY:** no alcohol use, no substance use
**IMMUNIZATIONS:** immunizations up to date

## EXAM:
Height:71 in, Weight:195 lb

Vital Signs

| Date Time | Temp | Pulse | Resp | B/P | Pulse Ox | O2 Delivery | O2 Flow Rate | FiO2 |
|-----------|------|-------|------|--------|----------|-------------|--------------|------|
| 5/13/14 02:18 | | 64 | 16 | 121/79 | 96 | Room Air | | |
| 5/12/14 21:57 | 98.2 | 88 | 18 | 142/88 | 95 | Room Air | | |

**EXAM:**
alert and oriented times three, no acute distress
**Exam Limitations:** no limitations
**GENERAL:** alert
**ENT:** mucous membranes moist
**NECK:** supple, normal inspection, full range of motion
**RESPIRATORY:** lung sounds clear to auscultation, breath sounds equal bilaterally
**CARDIOVASCULAR:** regular rate and rhythm, full equal and symmetrical pulses
**ABDOMEN:** soft, normal bowel sounds, No tenderness, No distension, No rebound, No rigidity, No guarding, No pulsatile mass, No masses palpable, No organomegaly, No hepatomegaly, No splenomegaly, No Murphy's sign, No McBurney's point, No Psoas sign, No Obturator sign, No other
**BACK:** full range of motion, midline vertebra point tenderness (lumbar spine), other (straight leg test is positive on right leg at 45 degrees, left leg is positive at 90 degrees, strong dorsiflexion and plantarflexion)

Berkshire Medical Center
Name: HEENDENIYA,UMESH DOB: redacted   PCP:PCP,NONE-ONLY USE AS PRIM MD
Esigned by:BOND,NESTOR O PA - ED DT/TM Esigned:05/13/14 0321
Esigned by: DT/TM Esigned:
Account #: M006872984036  Medical Record #: M000837770
Report #: 0513-0042 **Report's Status: Signed**
DICTATED BY: BOND,NESTOR O PA - ED For

Page: 2 of 5

Medical Records' copy
Berkshire Medical Center

Page: 3 of 5



1 - tender

**MUSCULOSKELETAL:** normal range of motion
**SKIN:** warm, dry, intact
**NEUROLOGIC:** awake, alert, oriented times four, clear fluent speech, normal motor strength, moving all extremities
**PSYCHIATRIC:** normal mood and affect

## TESTS:
## MEDICATIONS:

| Medications (Trade) | Dose Ordered | Sig/Sch Route | Start Time Stop Time | Status | Last Admin Dose Admin |
|---|---|---|---|---|---|
| Morphine Sulfate (Morphine Inj) | 4 mg | STAT  STAT IVP | 5/13/14 01:29 5/13/14 01:32 | DC | 5/13/14 01:46 |
| Diazepam 2 mg | 2 mg | STAT  STAT PO | 5/13/14 01:29 5/13/14 01:33 | DC | 5/13/14 01:46 |
| Sodium Chloride (NS) | 1,000 ml @ 0 mls/hr | Q0M ONCE IV | 5/13/14 01:30 5/13/14 01:34 | DC | 5/13/14 01:47 |
| Acetaminophen/ Hydrocodone Bitart (Vicodin Disp Pack (6 Tabs)) | TAKE _1___ TABLET... | TAKE HOME PACK ONCE PO | 5/13/14 02:00 5/13/14 02:00 | DC | |
| Cyclobenzaprine HCl | TAKE _1___ TABLET | TAKE HOME PACK ONCE PO | 5/13/14 02:00 5/13/14 02:00 | DC | |

Berkshire Medical Center                                                    Page: 3 of 5
Name: HEENDENIYA,UMESH DOB: redacted    PCP:PCP,NONE-ONLY USE AS PRIM MD
Esigned by:BOND,NESTOR O PA - ED DT/TM Esigned:05/13/14 0321
Esigned by: DT/TM Esigned:
Account #: M00672984036  Medical Record #: M000837770
Report #: 0513-0042 **Report's Status: Signed**
DICTATED BY: BOND,NESTOR O PA - ED For

Medical Records' copy
Berkshire Medical Center

| (Flexeril 10 Mg (3 Tab/Disp Pak)) | ORA... | | | | | |
|---|---|---|---|---|---|---|
| Morphine Sulfate (Morphine Inj) | 4 mg | ONCE  ONCE IVP | 5/13/14 03:15 5/13/14 03:16 | | 5/13/14 03:12 |

**CT/US/MR :**
  **Imaging Modality:** CT
   **Body Area/Test Name:** lumbar spine
  **Imaging test read:** report viewed by me
**Progress/Reading**
degenerative changes and disc bulging L4-5 and L5-S1: partial sacralization L5, no fracture

## Core Measures
**Core Measures Reviewed:** None applicable

## MEDICAL DECISION MAKING:
**COURSE:**
pt feel better after pain medication, he will be discharged with percocet, flexeril, prednisone and ibuprofen
**Counseled Patient/Family:** imaging results, diagnosis, follow up

## DISPOSITION SUMMARY:
**DIAGNOSIS/IMPRESSION:**
     **Primary Impression:** Low back pain
**DISPOSITION:** Home, Self Care
**Condition:** Stable
**REFERRALS:**
PCP,NONE-ONLY USE AS PRIM MD (PCP)
**Patient Instructions:** Back Pain, Adult

**Additional Instructions:**
rest, apply ice and heat to back, stretch and follow up with doctor
**Scripts**
Prednisone Tab 20 Mg Tab2 Tab PO DAILY  #8 TAB
    Prov:BOND,NESTOR O PA - ED          5/13/14
Ibuprofen 800 Mg Tablet1 Tab PO TIDPRN  #30 TAB
    AS NEEDED FOR PAIN
    Prov:BOND,NESTOR O PA - ED          5/13/14
Cyclobenzaprine Hcl (Flexeril)5 Mg Tablet1 Tab PO TIDPRN  #14 TAB
    AS NEEDED FOR PAIN
    Prov:BOND,NESTOR O PA - ED          5/13/14
Oxycodone/Acetaminophen 5-325 Mg (Percocet 5-325 Mg)1 Tab Tab1 Tab PO Q4HPRN  #20 TAB
    AS NEEDED FOR PAIN
    Prov:BOND,NESTOR O PA - ED          5/13/14
**I reviewed the documentation:** No scribe was used.

‗‗

Berkshire Medical Center                                      Page: 4 of 5
Name: HEENDENIYA,UMESH DOB: redacted  PCP:PCP,NONE-ONLY USE AS PRIM MD
Esigned by:BOND,NESTOR O PA - ED DT/TM Esigned:05/13/14 0321
Esigned by: DT/TM Esigned:
Account #: M00672984036  Medical Record #: M000837770
Report #: 0513-0042 **Report's Status: Signed**
DICTATED BY: BOND,NESTOR O PA - ED For
.

Medical Records' copy
Berkshire Medical Center

PCP COPY: Pcp,None-Only Use As Prim MD
**Copies to:**
CC1:
CC2:
CC3:
CC4:


BOND,NESTOR O PA - ED                          May 13, 2014 02:32

PCP COPY: PCP,NONE-ONLY USE AS PRIM MD

Berkshire Medical Center
Name: HEENDENIYA,UMESH DOB: redacted    PCP:PCP,NONE-ONLY USE AS PRIM MD
Esigned by:BOND,NESTOR O PA - ED DT/TM Esigned:05/13/14 0321
Esigned by: DT/TM Esigned:
Account #: M00672984036  Medical Record #: M000837770
Report #: 0513-0042 **Report's Status: Signed**
DICTATED BY: BOND,NESTOR O PA - ED For

Berkshire Medical Center
DIAGNOSTIC IMAGING DEPARTMENT
725 North Street, Pittsfield, MA. 01201 - 413-447-3233

Patient: HEENDENIYA,UMESH
Phone: (508)630-6757
Exam Date:05/13/14
Exam: CT Lumbar Spine Wo

Attending M.D.:

D.O.B.:redacted     Age/Sex: 44/M

Ordering M.D.:BOND,NESTOR O PA - ED
E.D. Attending M.D.: BOND,NESTOR O PA - ED
Primary Care M.D.: PCP,NONE-ONLY USE AS PRIM MD

X-Ray #: M000837770

Location: ECC.BE
Other Location:

Clinical History:
pain

CT SCAN OF THE LUMBAR SPINE WITHOUT CONTRAST.

Technique:
Unenhanced CT of the lumbar spine was performed and reconstructed in the axial, coronal and
sagittal plane.

Comparison: No relevant prior examination.

Findings:
Levoconvex scoliotic curvature of the lumbar spine measures Cobb angle of 16 degrees.
Vertebral body height and alignment are normal. There is transitional anatomy of the
lumbosacral junction with partial sacralization of S1 on the right. Small somewhat rudimentary
ribs are present at the T12 level. The numbering is based upon the assumption of 5 lumbar type
vertebral bodies with the last rib-bearing vertebral body being designated as T12.

No acute fracture or subluxation. Bone mineralization is normal. At L3-L4 there is a small
right paracentral and foraminal disc protrusion resulting in mild deformity of the ventral
thecal sac and mild right neuroforaminal encroachment.

There is moderate degeneration of the L4-L5 intervertebral disc with left lateral endplate
osteophytes causing mild left neuroforaminal encroachment.

The remainder of the intervertebral discs appear essentially unremarkable.

Paravertebral soft tissue structures appear normal.

IMPRESSION:

Transitional shape of L5 which is sacralized on the right.

Small right paracentral disc herniation at L3-L4 causing minimal deformity of the ventral

Report #: 0513-0035          Page: 1 of 2

thecal sac and mild right neuroforaminal encroachment.

This study has been interpreted and dictated at Berkshire Medical Center.


Accession Number: 6411650.001
Transcribed by; KW
Interpreting Physician: WINGER, DAVID I MD
Rec'd in meditech on : 05/13/14 0956
Signed by: WINGER,DAVID I MD
Technologist: HC
Exam CPT #: 72131,Order #: 0513-0051
Report #: 0513-0035  Acct#: M00672984036  Med Rec#:M000837770
Report Status: Signed

 **Berkshire Health Systems, Inc.**

Date: 05/12/14
Account Num: M00672984036
Med Rec Num: M000837770
Patient: HEENDENIYA,UMESH
Location: ECC.BE
Physician: BOND,NESTOR O PA - ED

# Patient Visit Information

## You were seen today for:

Low back pain

## Staff

Your caregivers today were:

| | |
|---|---|
| Physician | BOND,NESTOR O PA - ED |
| Nurse | AZ |

## Patient Instructions Reviewed

Back Pain, Adult

   received 05/13/14 - 0322

## Activity Restrictions or Additional Instructions

rest, apply ice and heat to back, stretch and follow up with doctor

## Medication Dose and Instructions

Cyclobenzaprine Hcl (Flexeril) 1 TAB, ORAL THREE TIMES A DAY AS NEEDED#14
Ibuprofen 1 TAB, ORAL THREE TIMES A DAY AS NEEDED#30
Oxycodone/Acetaminophen 5-325 Mg (Percocet 5-325 Mg) 1 TAB, ORAL EVERY FOUR HOURS AS NEEDED#20
Prednisone Tab 2 TAB, ORAL DAILY#8

## Follow-up

Please contact the following to make an appointment for follow-up care:

   PCP,NONE-ONLY USE AS PRIM MD

Note: Your health care plan may require a referral from your primary care provider prior to making an appointment.

# EXHIBIT 6

For Umesh Heendeniya, Date of Birth:  redacted

Asha A. Naidu, MD
190 Groton Road, Suite 290, Ayer, MA 01432
978-772-1277

8/16/2012

Regarding: Umesh  Heendeniya (DOB: redacted )

To Whom It May Concern:

Mr. Heendeniya is a patient of mine and has been under my care since 6/3/2008. He has been diagnosed with Diabetes, and Hypercholesterolemia. Mr. Heendenyia is currently taking metformin to help control his blood sugar, and simvastation to control his high cholesterol.

Sincerely,

Asha A. Naidu, MD



**FLORIDA HOSPITAL**
ZEPHYRHILLS

Physician Group

9/24/15

Regarding: Umesh Heendeniya DOB: 5/5/1970

To Whom It May Concern:

Mr. Heendeniya is a patient of mine and has been under my care since 5/22/15. He has been diagnosed with diabetes, hypercholesterolemia, and neuropathy. Mr. Heendeniya is currently taking Metformin to help control his blood sugar. Simvastatin, Vascepa and Fenofibrate to control his high cholesterol. He is also taking Neurontin for neuropathy.

Sincerely,

Stacy Taylor HODO

Stacy Taylor Hunt, DO

# EXHIBIT 7

IN THE DISTRICT COURT OF THE 9th JUDICIAL DISTRICT OF
THE STATE OF OKLAHOMA SITTING IN AND FOR PAYNE COUNTY

THE STATE OF OKLAHOMA,                )
                                      )
              Plaintiff,              )
                                      )
vs.                                   )        Case No. CF-95-466
                                      )
UMESH HEENDENIYA,                     )
                                      )
              Defendant.              )

## VERDICT

### MURDER in the first degree

We, the jury, empaneled and sworn in the above-entitled cause, do, upon our oaths, find
as follows:

Defendant is:

_____  Guilty and fix punishment at _____.

__X__  Not Guilty.

                                   redacted
                                   FOREPERSON

CR 10-14

State of Oklahoma
County of Payne
I, Lisa S. Lambert, Court Clerk, in and for Payne County,
OK, do hereby certify that the above and foregoing is a true
and correct copy of the official instrument now on file and
of record in my office at Stillwater, OK, in testimony hereof
I have hereunto set my hand and affixed my official seal
this ___ day of _____ 20___
                LISA S. LAMBERT, Court Clerk

# EXHIBIT 8

**VERIFICATION OF CRIME/ LOST PROPERTY**
PD 545-061 (Rev. 9-95-15)

Search and service fee of $15.00 MUST accompany this application. Except that CRIME VICTIMS will be entitled to a FREE COPY of this report. MAKE CHECK OR MONEY ORDER PAYABLE TO THE POLICE DEPARTMENT, CITY OF NEW YORK. Mail all requests to the Police Department, Criminal Records Section, P.O. Box 2526, New York 10272-2526. No refund of the search and service fee will be made in any case. ALL APPLICANTS must enclose a stamped self-addressed envelope.

Complaint Number: 64130
Precinct of Record: 68 th Precinct 

Mail record to: Umesh Heendeniya ( victim )
188 Stearns Road
Marlborough , MA-01752

1. Exact location where crime/loss took place

2. Date reported to Police: 07/07/04   Time (if known) 1740   a.prox.2 PM   This report concerns: ☑ Crime  ☐ Lost Property  ☐ Other (describe)

3. Full name and address of complainant/victim as reported to Police Department
Umesh Heendeniya  1918 Briarcliff Road, Richmond, VA-23225

Date and Time of Crime/Loss of Property or other then date of record: 7/7/04   Time 140

Name of officer who received your report, if known.

Any additional information which may aid in searching for your record: the attacker - a white male or older of Italian race by the name of Vinny - approached me with a knife and then stabbed both front tires of my Dodge Ram-1500 pickup with his knife.

*INSTRUCTIONS: In order to find this record you MUST furnish all information requested above, particularly the complaint number and precinct of record (Occurrence). Verification of your request cannot be made without this information. The complaint number may be obtained by calling the precinct or detective squad concerned during the hours of 8 a.m. to 5 p.m. Do Not Detach—Submit in Duplicate.

Applicant's signature: Umesh Heendeniya   Date 11/17/2006

**FOR POLICE DEPARTMENT USE ONLY**

FOLLOWING IS A VERIFICATION OF THE ABOVE REQUEST
MOTOR VEHICLES

CURRENCY

JEWELRY

FURS—CLOTHING

FIREARMS

OFFICE EQUIPMENT

T.V., RADIOS, CAMERAS, ETC.

HOUSEHOLD GOODS

CONSUMABLE GOODS

MISCELLANEOUS

BRIEFLY DESCRIBE MANNER OF CRIME/LOSS OF PROPERTY
Menacing/Street
See narrative attach

**NARRATIVE:**
AT T/P/O ABOVE COMPL STATES LISTED PERP DID THREATEN PHYSICAL HARM AFTER BRIEF TRAFFIC INCIDENT. COMPL FURTHER STATES PERP EXITED HIS VEHICLE, SLASHED FRONT TIRES WITH KNIFE AND PROCEEDED TO MENACE COMPL WHILE VERBALLY THREATENING HIM WITH PHYSICAL HARM. VEHICLE FLED N/B ON FORT HAMILTON PARKWAY IN A VAN BLUE/GREEN IN COLOR WITH POSSIBLE NY REG BZF3240 OR BZE3240.

ALARM NO.   Report verified by   Date 12/01/06

# EXHIBIT 9

## Detail For Response ID: 199184504549297358.3

| | |
|---|---|
| Creation Date And Time | 09/11/2014 15:56:04 |
| First Dispatched | 09/11/2014 16:04:32 [508s Create To Dispatch] |
| First Arrived | 09/11/2014 16:16:28 [716s Dispatch To Arrived] |
| Sequence Number | HCSO:2014:197096 |
| Primary Resource | 1223 |
| | Kramer, Richard (HCSO239) |
| | Boylan, James (HCSO362) |
| Status | Disposed |
| Response Type | Information |
| Location | POWELL RD/ENDSLEY RD |
| Address | |
| Zone | 1-5 |
| Priority | 5 Priority 5 |
| Call Origin | P911 |
| Caller Name | |
| Caller Number | |
| Case Numbers | |
| Disposition Codes | Assistance Rendered |

### First Statuses Per Resource

| | | |
|---|---|---|
| 1223 | Dispatch | 09/11/2014 16:04:32 |
| 1223 | 10-51 | 09/11/2014 16:05:45 |



LANA KAYE ERICKSON
MY COMMISSION # EE173330
EXPIRES February 27, 2016
FloridaNotaryService.com
(407) 398-0153

Record of Hernando
County Sheriff Office

I attest to the authenticity of this seal

Lane Ericksm

Records Custodian of Hernando County
Sheriff's Office Designee

Certified on 8/15/15

Notary
Notary stamp or seal

Record of Hernando
County Sheriff Office

I attest to the authenicity of this seal

A.M. Erickson

Records Custodian of Hernando County,
Sheriff's Office Designee,

Certified on _4/5/15_

| 1223 | 10-97 | 09/11/2014 16:16:28 |
| 1223 | 10-98 | 09/11/2014 16:40:52 |

## Notes

| 09/11/2014 15:54:30 | hdoyle | What does the suspect vehicle look like?--WHI CAR 4DR |
| 09/11/2014 15:55:09 | hdoyle | What is the vehicle description? Make, model, color, year, tag #, etc.--LAST PART OF TAG 2YG |
| 09/11/2014 15:55:36 | hdoyle | What is the driver doing? How is the vehicle reckless?--MADE CALLER RUN OFF THE RDWAY AND DAMAGED HIS VEH |
| 09/11/2014 15:56:02 | hdoyle | Time lapse?--NOW |
| 09/11/2014 15:56:11 | hdoyle | CALLER IS FOLLOWING VEH |
| 09/11/2014 15:56:25 | hdoyle | PASSING GRASS FINCH |
| 09/11/2014 15:56:30 | hdoyle | SB ON EMERSON |
| 09/11/2014 15:57:25 | hdoyle | TURNED ON POWELL |
| 09/11/2014 15:57:33 | hdoyle | WB ON POWELL |
| 09/11/2014 15:58:13 | hdoyle | CALLER IS FOLLOWING IN A 2005 GRN TOY COROLLA |
| 09/11/2014 15:58:48 | hdoyle | TURNING ONTO ENDSLEY SB |
| 09/11/2014 15:58:53 | hdoyle | Address of HCSO:2014:197096 has been modified from |
| 09/11/2014 15:58:56 | hdoyle | Address of HCSO:2014:197096 has been modified from |
| 09/11/2014 15:59:46 | hdoyle | CALLER HAS BEEN NON STOP HONKING HIS HORN TRYING TO GET THE VEH TO STOP |



LANA KAYE ERICKSON
MY COMMISSION # EE173330
EXPIRES February 27, 2016
(407) 398-0153   FloridaNotaryService.com

| 09/11/2014 16:00:53 | hdoyle | TURNING WB ONTO SATURN |
|---|---|---|
| 09/11/2014 16:01:47 | hdoyle | POSS A WHI DODGE 4DR CAR |
| 09/11/2014 16:01:58 | hdoyle | NOW NB ON RACKLEY |
| 09/11/2014 16:02:51 | dsouth | CALLER IN THE WHI DODGE LL |
| 09/11/2014 16:03:16 | dsouth | ADV THAT SHE ACCIDENTALLY RAN HIM OFF OF THE ROAD DUE TO A BLIND SPOT |
| 09/11/2014 16:03:29 | dsouth | CALLER NOW ADV THAT SHE DOES NOT WANT TO GO HOME BECAUSE THE SUBJ IS NOW FOLLOWING |
| 09/11/2014 16:03:42 | dsouth | CALLER IS<br><br>... CALLER ALSO HAS KIDS IN THE CAR |
| 09/11/2014 16:04:04 | dsouth | CALLER DOES NOT WANT TO STOP AT ALL |
| 09/11/2014 16:04:39 | dsouth | CALLER IS CONCERNED AND DOES NOT WANT TO STOP BECAUSE HE IS FOLLOWING HER |
| 09/11/2014 16:05:14 | hdoyle | CALLER WILL BE AT |
| 09/11/2014 16:05:35 | hdoyle | 1025 |
| 09/11/2014 16:06:25 | dsouth | 1045          REF THE INCIDENT |
| 09/11/2014 16:40:36 | rkramer | Response HCSO:2014:197096. Call code changed from Reckless Driver to Information. |
| 09/11/2014 16:40:36 | PPSS | HCSO:2014:197096 Priority 3 Priority 3 has been changed to 5 Priority 5 Agent:rkramer Workstation:HCSO-06886 |



LANA KAYE ERICKSON
MY COMMISSION # EE173330
EXPIRES February 27, 2016
(407) 398-0183   FloridaNotaryService.com

Record of Hernando
County Sheriff Office

I Attest to the authenticity of this seal

Records Custodian of Hernando County
Sheriff's Office Designee

Certified on

Notary

# EXHIBIT 10

Your Injury Info                                                    https://claims.geico.com/YourInjuryInfo.aspx

 Medical Info

## Medical Claim Status

| | |
|---|---|
| **Medical Claim Status:** | Open |
| **Total Billed:** | $21,382.23 |
| **Total Paid:** | $9,475.37 |

Your medical claim is being handled by Ann Allred. Get Contact Info.

Do you have new information about your treatment? Send a treatment update

 **FAQ**

› How long should it take to review and pay medical bills?

› How can I send you my medical bills?

› Will my examiner be notified of my uploaded bills?
See More FAQ

 Resource Center

› About the Claims Process

› How an Accident Affects My Rate

› Insurance Terms

› Reporting a Claim Online

› About GEICO Auto Repair Xpress®

## Medical Providers
**OTHER**

Total for this provider:  $6.32 Billed  $5.06 Paid

| Service Date | Bill Amount | Paid Amount | Status | EOB | Details |
|---|---|---|---|---|---|
| 10/01/2014 | $6.32 | $5.06 | Paid | Not Available | View |

### National Radiology Consultants Pa

Total for this provider:  $230.00 Billed  $184.00 Paid

| Service Date | Bill Amount | Paid Amount | Status | EOB | Details |
|---|---|---|---|---|---|

2/4/2015 8:13 PM

# EXHIBIT 11

CUSTOMER #: 127773                    113520              **ED MORSE**

                                                         BUICK · MAZDA · SUZUKI · GMC.
                                     *INVOICE*
                                                         10133 US Highway 19
                                                         Port Richey, FL 34668
                                     PAGE 1              (727) 862-5411
                                                         MV-24547

BUS:                CELL:              SERVICE ADVISOR: 16211 STEVEN A. JOHNSON

| COLOR | YEAR | MAKE/MODEL | VIN | LICENSE | MILEAGE IN / OUT | TAG |
|---|---|---|---|---|---|---|
|  | 05 | TOYOTA COROLLA |  |  | 140285/140285 |  |

| DEL. DATE | PROD. DATE | WARR. EXP. | PROMISED | PO NO. | RATE | PAYMENT | INV. DATE |
|---|---|---|---|---|---|---|---|
| 21OCT14 DD |  |  | 17:30 30OCT14 |  |  | 221G | 30OCT14 |

| R.O. OPENED | READY | OPTIONS: | ENG:1.8 Liter DOHC |
|---|---|---|---|
| 13:07 21OCT14 | 13:06 30OCT14 |  |  |

| LINE OPCODE TECH TYPE HOURS |  | LIST | NET | TOTAL |
|---|---|---|---|---|
| A REPAIR PER BODY SHOP EST |  |  |  |  |
|    BODYEST REPAIR PER BODY SHOP EST |  |  |  |  |
|       14967    CBM |  |  | 660.00 | 660.00 |
|       6 90467A008 RETAINER |  | 0.89 | 0.89 | 5.34 |
|       14 90467-10183 CLIP |  | 1.12 | 1.12 | 15.68 |
|       1 TO1039107 HOLE CVR |  | 30.00 | 30.00 | 30.00 |

PARTS:   51.02   LABOR:    660.00   OTHER:     0.00   TOTAL LINE A:   711.02
*******************************************************
B BODY PAINT
   BODYPNT BODY PAINT

|       15880    CBP |  |  | 519.20 | 519.20 |

PARTS:    0.00   LABOR:    519.20   OTHER:     0.00   TOTAL LINE B:   519.20
*******************************************************
C** SUSPENSION ALIGNMENT
   DSGM GENERAL MAINTENANCE

|       14800CBMEC |  |  | 69.95 | 69.95 |

PARTS:    0.00   LABOR:     69.95   OTHER:     0.00   TOTAL LINE C:    69.95
*******************************************************
MISC PAINT AND MATERIALS
         CMAT                              309.30   309.30
SUBL R M P AUTOMOTIVE INC NO INVOICE # VIN 5C431943
         CBM                               466.80   466.80

Thank you for the opportunity to service your
vehicle today. Your satisfaction is our #1
Goal. If you are not "COMPLETELY SATISFIED"
with your service experience Please contact
Joe Humet by telephone at 727-862-5411 or by
email at joehumet@edmorse.com

**WARRANTY STATEMENT AND DISCLAIMER: PLEASE SEE THE DEALERSHIP'S LIMITED WARRANTY ON THE REVERSE SIDE OF THIS REPAIR INVOICE.**

By signing below, you acknowledge that you were notified of and authorized the Dealership to perform the services/repairs itemized in this invoice and that you received for had the opportunity to inspect) any replaced parts as requested by you. The vehicle is being returned to you in exchange for your payment of the Amount Due.

| DESCRIPTION | TOTALS |
|---|---|
| LABOR AMOUNT | 1249.15 |
| PARTS AMOUNT | 51.02 |
| GAS. OIL. LUBE | 0.00 |
| SUBLET AMOUNT | 466.80 |
| MISC. CHARGES * | 309.30 |
| TOTAL CHARGES | 2076.27 |
| LESS INSURANCE | 0.00 |
| SALES TAX | 145.34 |
| PLEASE PAY THIS AMOUNT | 2221.61 |

ALL PARTS ARE NEW UNLESS OTHERWISE INDICATED.

FILE COPY BODY

DealerCAP

# EXHIBIT 12



www.hernandosheriff.org

SHERIFF
Al Nienhuis

Hernando County Sheriff's Office

P.O. BOX 10070 – BROOKSVILLE, FL 34603-0070    FAX 352 796-0493    PHONE 352 754-6830

March 23, 2015

To: Umesh Heendeniya

This is in response to your request dated March 21, 2015, pursuant to the Florida
Constitution Article I, section 24, and Florida's Public Records Law, Florida Statute
Chapter 119.

1.  Information on deputies that would identify the location of their home addresses is
    exempt under Florida State Statute 119.071(4)(d)(2).

Reference items numbered two through six; the Hernando County Sheriff's Office has
no records responsive to these requests.

Sincerely,

Lana Erickson
Records Manager
Hernando County Sheriff's Office

LAURA B. JONES
Commission # EE 117744
Expires August 21, 2015
Bonded Thru Troy Fain Insurance 800-385-7019

Record of Hernando
County Sheriff Office

I attest to the authenticity of this seal

Records Custodian of Hernando County
Sheriff's Office Designee

Certified on  3-23-15

Notary  Laura B. Jones

Notary Stamp or seal

# EXHIBIT 13



**Terry L. Rhodes**
Executive Director

2900 Apalachee Parkway
Tallahassee, Florida 32399-0500
www.flhsmv.gov

March 23, 2015

Umesh Heendeniya

Dear Mr. Heendeniya:

Thank you for your recent request regarding motor vehicle/vessel records.

We regret to inform you that the department cannot process your request.  The personal information you are requesting is that of law enforcement personnel.  Pursuant to Section 119.071, Section 4, Part 2d, Florida Statutes, this information is exempt from the provisions of Section 119.07(1), Florida Statutes.

The Driver Privacy Protection Act, 18 United States Code, Sections 2721-2725 (DPPA), exempts personal information contained in motor vehicle or driver license records from disclosure except to individuals/companies which qualify under any of the 15 exceptions outlined therein.  Personal information includes social security number, driver license/identification (ID) card number, name, address, telephone number and medical or disability information.

RECORDS INFORMATION & RESEARCH UNIT
2900 APALACHEE PARKWAY, MS91
TALLAHASSEE, FL  32399
(850) 617-2908

ktg

# EXHIBIT 14

# Zero for Hero: Judge Snubs Man Hurt Stopping 'Butcher of Brighton Beach'

By Julia Marsh
July 26, 2013 | 4:00am
http://www.nypost.com/2013/07/26/zero-for-hero-judge-snubs-man-hurt-stopping-butcher-of-brighton-beach/




NYPD SCREW Joseph Lozito (above) sued the NYPD for not helping him when he fought killer Maksim Gelman

He's a bona-fide hero who stopped the so-called "Butcher of Brighton Beach" at the end of a 28-hour city killing spree — but a Manhattan judge yesterday said a father of two is entitled to zero from the city for his injuries in the harrowing 2011 subway encounter.

Joseph Lozito sued the NYPD in January 2012, claiming police officers did nothing to help him as he confronted violent madman Maksim Gelman on a packed No. 3 train.

But Judge Margaret Chan tossed the case yesterday, saying that while she lauded Lozito's bravery, cops did not have a specific charge of saving him from Gelman.

**Because "no direct promises of protection were made to Mr. Lozito," the police had "no special duty" to protect him.**

The psycho killer was sentenced to 200 years to life in prison for carving up Lozito with a knife and killing four other people in a drug-fueled spree.

Chan added, "The dismissal of this lawsuit does not lessen Mr. Lozito's bravery or the pain of his injuries. It merely provides a resolution to this litigation."

Lozito, 42, a martial-arts enthusiast, claimed cops hid in the motorman's cab while he disarmed Gelman as the madman slashed at his face, hands, neck and head.

"Mr. Lozito heroically maneuvered the knife away from Gelman and subdued him on the subway floor," Chan wrote in the Manhattan Supreme Court decision.



Maksim Gelman

# EXHIBIT 15

# SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY

PRESENT:  Hon. Margaret A. Chan                    PART 52
                          *Justice*                              *INDEX* 101088/12

                                                        MOTION DATE   **4/22/13**
                                                        MOTION SEQ. NO.  **002**

JOSEPH LOZITO and ANDREA LOZITO,
                                    **Plaintiffs,**

                        - vs. -

THE CITY OF NEW YORK, THE NEW YORK CITY
POLICE DEPARTMENT, and NEW YORK TRANSIT
AUTHORITY,
                        **Defendants.**   **F I L E D**

                                                        PAPERS NUMBERED

                                        JUL 25 2013
Moving Papers..................................................................................... 1
                                        NEW YORK
Opposition Papers ......................................COUNTY CLERK'S OFFICE........ 2

Reply Papers........................................................................................ 3

     Defendant City of New York (the City) moved to dismiss this action and plaintiffs submitted opposition *pro se*, although they had an attorney of record. The City served its reply papers on the attorney of record. The motion was held in abeyance until the plaintiffs and their counsel submitted a Consent to Withdraw as Attorney dated April 10, 2013. The City has since provided its reply papers to the Lozitos. Plaintiffs also mailed an unsolicited letter to this Court dated April 23, 2013. This letter was not considered by the court as the motion was fully submitted. The decision on this motion to dismiss is as follows:

     This is an action to recover for personal injures sustained by Mr. Lozito and a derivative action by Ms. Lozito. Mr. Lozito was brutally attacked by a wanted fugitive while he was aboard an uptown bound number 3 train in the County, City and State of New York on February 12, 2011 at approximately 8:45 a.m. The then fugitive and now convicted felon with a 225 year sentence, Maksim Gelman (Gelman), boarded the train after murdering four (4) people and assaulting several others within a short twenty-eight (28) hour time span. During his last burst of terror, Gelman was inside the front-most subway car on the number 3 train at the same time as Mr. Lozito and two (2) New York City Police Officers, P.O. Terrance Howell and P.O. Tamara Taylor. The officers were notified of reports that Gelman was on foot in the subway tunnels between 34th Street and 42nd Street. In pursuit of Gelman, the officers boarded the first car and proceeded to enter the motorman's booth at the front end of the subway car. The subway car slowly proceeded into the tunnel between 34th Street and 42nd Street and came to a stop between stations. At this point, Mr. Lozito had no interaction with the police officers nor Gelman. Gelman, who was in fact on board the same subway car, approached the closed motorman's booth and claimed that he was a police officer. Denied from entering, Gelman turned around and walked towards Mr. Lozito. Another passenger approached the motorman's booth and excitedly motioned for the officers to come out. Gelman randomly confronted Mr. Lozito without provocation.

Check one:  ☒ FINAL DISPOSITION      ☐ NON-FINAL DISPOSITION
Check if appropriate:  ☐ DO NOT POST   ☐ REFERENCE

By plaintiffs' account, Gelman stood before him and proclaimed "you're gonna die, you're gonna die." (Deft Mot, Exh E, p 17). Then Gelman lunged at Mr. Lozito with an eight (8) inch knife cutting and stabbing him on the face, hands, neck, and head (*see id* at 17-19). Mr. Lozito heroically maneuvered the knife away from Gelman and subdued him on the subway floor. The officers left the motorman's booth and restrained Gelman in handcuffs. Mr. Lozito claimed the police officers did not emerge from the motorman's booth to apprehend Gelman until the attack on him was underway.

Officer Howell's recollection of the events described how he observed something made of metal in Gelman's hands when Gelman approached the motorman's booth (*see* Deft Mot, Exh F, p 2). Officer Howell yelled "gun" and took cover in the motorman's booth (*see id.*). Officer Howell ordered Gelman to drop his weapon, an order that was ignored, and he proceeded to "physically remove and recover the knife from [Gelman's] hand." (*id.* at 2, para 9). Officer Howell placed Gelman in handcuffs.

The crux of Mr. Lozito's claim lies in the seconds that it took the police officers to intervene and eventually apprehend Gelman. Plaintiffs claimed that the officers negligently secured their own safety in the motorman's booth while observing the attack on Mr. Lozito. Plaintiffs also claimed the police officers were negligent in failing to recognize Gelman when they boarded the train and in failing to heed the warnings made by another passenger (*see* Deft Mot, Exh B, para 18).

The attack on Mr. Lozito was shocking and horrific, as was every confrontation that Gelman had during his twenty-eight (28) hour crime spree. The crimes against Mr. Lozito were made even more compelling by his own narrative provided in his opposition. Mr. Lozito's *pro se* opposition papers are thoughtful, eloquently written, and demonstrated his zest and love of life which propelled him to survive the attack by Gelman and defend himself. Mr. Lozito described in dramatic detail the blows and defensive maneuvers he used to disarm and take down Gelman. His statements ring true and appear highly credible.

However, it is well settled that absent a special relationship, discretionary governmental functions such as the provision of police protection are immune from tort liability (*see Valdez v City of New York*, 18 NY3d 69 [2011]; *Cuffy v City of New York*, 69 NY2d 255 [1987]; *Kircher v City of Jamestown*, 74 NY2d 251 [1989] *Yearwood v Town of Brighton*, 64 NY2d 667 [1984]). Despite even very sympathetic facts, public policy demands that a damaged plaintiff be able to identify the duty owed specifically to him or her, not a general duty to society at large (*see Lauer v City of New York*, 95 NY2d 95 [2000]; *Johnson v Jamaica Hosp.*, 62 NY2d 523, 527 [1984]; *Palsgraf v Long Is. R.R. Co.*, 248 NY 339 [1928]). "This is especially so where an individual seeks recovery out of the public purse." (*see Lauer v City of New York*, 95 NY2d at 100). The law is abundantly clear that no liability flows from negligence in the performance of a police function unless there is a special relationship (*see Yearwood v Town of Brighton*, 64 NY2d 667). Even giving Mr. Lozito every favorable inference (*see Derdiarian v Felix Contr. Corp.*, 51 NY2d 308 [1987]), this court nonetheless is bound to grant the defendants' motion to dismiss; plaintiffs have failed to allege a *prima facie* case of negligence as these facts do not establish a special relationship.

The criteria for establishing a special relationship were set forth by the Court of Appeals in *Cuffy v City of New York*, 69 NY2d 255. "The elements of this 'special relationship' are: (1) an assumption by the municipality, through promises or actions, of an affirmative duty to act on behalf of the party who was injured; (2) knowledge on the part of the municipality's agents that inaction could lead to harm; (3) some form of direct contact between the municipality's agents and the injured party; and (4) that party's justifiable reliance on the municipality's affirmative undertaking" (*Id.* at 260). While plaintiffs pointed to the officers' close proximity to the attack and their perceived ability to prevent it, proximity does not create a special relationship (*see id.*). Mr. Lozito conceded that he had no communication or contact with the police officers before the attack took place. The first prong of the *Cuffy* elements was not met here. No direct promises of protection were made to Mr. Lozito nor were there direct actions taken to protect Mr. Lozito prior to the attack. Therefore, a special duty did not exist.

Ultimately, this case must be dismissed as a matter of law (*see Id; Valdez v City of New York*, 18 NY3d 69; *Blackstock v Board of Educ. of the City of New York*, 84 AD3d 524 [1st Dept 2011]). The dismissal of this lawsuit does not lessen Mr. Lozito's bravery or the pain of his injuries. It merely provides a resolution to this litigation.

Accordingly, the defendant's motion is granted and the complaint is dismissed.

Dated: July 18, 2013

Margaret A. Chan , J.S.C.

MARGARET A. CHAN
J.S.C.

FILED

JUL 25 2013

NEW YORK
COUNTY CLERK'S OFFICE

# EXHIBIT 16

Warren v. District of Columbia, 444 A.2d 1 (1981)

KeyCite Yellow Flag - Negative Treatment
Declined to Extend by Gallashaw v. City of Philadelphia, E.D.Pa., March 9, 2011

444 A.2d 1
District of Columbia Court of Appeals.

Carolyn WARREN, et al., Appellants,

v.

DISTRICT OF COLUMBIA, et al., Appellees.
Wilfred NICHOL, Appellant,

v.

DISTRICT OF COLUMBIA METROPOLITAN
POLICE DEPARTMENT, et al., Appellees.

Nos. 79-6, 79-394.   |   Argued En Banc
April 13, 1981.   |   Decided Dec. 21, 1981.

Suits against District of Columbia and individual members of metropolitan police department for negligent failure to provide adequate police services were dismissed by the Superior Court, Joseph M. Hannon and William C. Pryor, JJ., and plaintiffs appealed. The Court of Appeals, Nebeker, J., held that: (1) fact that police answered call and arrived outside premises which were scene of burglary and assaults did not give rise to special duty on part of police toward victims therein, and police officers were not answerable in damages for failing to ascertain that assaults were continuing upon victims therein, or for leaving premises without so ascertaining, and (2) where unknown occupants in vehicle which rear-ended another proceeded to beat operator of foremost vehicle, duty of officer arriving on scene was directly related to his official and general duty to investigate offenses, and his directing companion of assault victim to cease efforts to identify assailants, and thus to break off violent confrontation, related solely to his duty to public generally and possessed no additional element necessary to create overriding special relationship and duty to particular persons, and gave rise to no liability.

Affirmed.

Kelly, J., filed opinion concurring in part and dissenting in part in which Mack, J., joined.

Newman, C. J., filed statement concurring in part and dissenting in part.

West Headnotes (3)

[1]  **District of Columbia**
⬤— Officers, Agents, and Employees

132 District of Columbia
132k7 Officers, Agents, and Employees
Government and its agents are under no general duty to provide public services, such as police protection, to any particular individual citizen, but, rather, duty to provide public services is owed to public at large, and, absent special relationship between police and individual, no specific legal duty exists.

61 Cases that cite this headnote

[2]  **District of Columbia**
⬤— Officers, Agents, and Employees

132 District of Columbia
132k7 Officers, Agents, and Employees
That police answered call and arrived outside premises which were scene of burglary and assaults did not give rise to special duty on part of police toward victims therein, and police officers were not answerable in damages for failing to ascertain that assaults were continuing upon victims therein, or for leaving premises without so ascertaining.

28 Cases that cite this headnote

[3]  **District of Columbia**
⬤— Officers, Agents, and Employees

132 District of Columbia
132k7 Officers, Agents, and Employees
Where unknown occupants in vehicle which rear-ended another proceeded to beat operator of foremost vehicle, duty of officer arriving on scene was directly related to his official and general duty to investigate offenses, and his directing companion of assault victim to cease efforts to identify assailants, and thus to break off violent confrontation, related solely to his duty to public generally and possessed no additional element necessary to create overriding special relationship and duty to particular persons, and gave rise to no liability.

**Warren v. District of Columbia, 444 A.2d 1 (1981)**

28 Cases that cite this headnote

**Attorneys and Law Firms**

*1 Stephen A. Friedman, Washington, D. C., for appellants.

Charles L. Reischel, Deputy Corp. Counsel, with whom Judith W. Rogers, Corp. Counsel, and David P. Sutton, Asst. Corp. Counsel, Washington, D. C., were on the petition, for appellees.

Before NEWMAN, Chief Judge, and KELLY, KERN, NEBEKER, HARRIS, MACK and FERREN, Associate Judges.

**Opinion**

NEBEKER, Associate Judge:

Appellants Carolyn Warren, Miriam Douglas, and Joan Taliaferro in No. 79-6, and appellant Wilfred Nichol in No. 79-394 sued the District of Columbia and individual members of the Metropolitan Police Department for negligent failure to provide adequate police services. The respective trial judges held that the police were under no specific legal duty to provide protection to the individual appellants and dismissed the complaints for failure to state a claim upon which relief could be granted. Super.Ct.Civ.R. 12(b)(6). However, in a split decision a three-judge division of this court determined that appellants Warren, Taliaferro and Nichol were owed a special duty of care by the police department and reversed the trial court rulings. The division unanimously concluded that appellant Douglas failed to fit within the class of persons to whom a special duty was owed, and affirmed the lower court's dismissal of her complaint. The court en banc, on petitions for rehearing, vacated the panel's decision. After reargument, notwithstanding our sympathy for appellants who were the tragic victims of despicable criminal acts, we affirm the judgments of dismissal.

**Appeal No. 79-6**

In the early morning hours of March 16, 1975, appellants Carolyn Warren, Joan Taliaferro, and Miriam Douglas were asleep in their rooming house at 1112 Lamont Street, N.W. Warren and Taliaferro shared a room on the third floor of the house; Douglas shared a room on the second floor with her four-year-old daughter. The women were awakened by the sound of the back door being broken down by two men later identified as Marvin Kent and James Morse. The men entered Douglas' second floor room, where Kent forced Douglas to sodomize him and Morse raped her.

Warren and Taliaferro heard Douglas' screams from the floor below. Warren telephoned the police, told the officer on duty that the house was being burglarized, and requested immediate assistance. The department employee told her to remain quiet and assured her that police assistance would be dispatched promptly. Warren's call was received at Metropolitan Police Department Headquarters at 6:23 a. m., and was recorded as a burglary in progress. At 6:26 a. m., a call was dispatched to officers on the street as a "Code 2" assignment, although calls of a crime in progress should be given priority and designated as "Code 1." Four police cruisers responded to the broadcast; three to the Lamont Street address and one to another address to investigate a possible suspect.

Meanwhile, Warren and Taliaferro crawled from their window onto an adjoining roof and waited for the police to arrive. While there, they saw one policeman drive through the alley behind their house and proceed to the front of the residence without stopping, leaning out the window, or getting out of the car to check the back entrance of the house. A second officer apparently knocked on the door in front of the residence, but left when he received no answer. The three officers departed the scene at 6:33 a. m., five minutes after they arrived.

Warren and Taliaferro crawled back inside their room. They again heard Douglas' continuing screams; again called the police; told the officer that the intruders had entered the home, and requested immediate assistance. Once again, a police officer assured them that help was on the way. This second call was received at 6:42 a. m. and recorded merely as "investigate the trouble"-it was never dispatched to any police officers.

Believing the police might be in the house, Warren and Taliaferro called down to Douglas, thereby alerting Kent to their presence. Kent and Morse then forced all three women, at knifepoint, to accompany them to Kent's apartment. For the next fourteen hours the women were held captive, raped, robbed, beaten, forced to commit sexual acts upon each other, and made to submit to the sexual demands of Kent and Morse.

Appellants' claims of negligence included: the dispatcher's failure to forward the 6:23 a. m. call with the proper degree of urgency; *3 the responding officers' failure to follow standard police investigative procedures, specifically their failure to check the rear entrance and position themselves properly near the doors and windows to ascertain whether there was any activity inside; and the dispatcher's failure to dispatch the 6:42 a. m. call.

**Appeal No. 79-394**

On April 30, 1978, at approximately 11:30 p. m., appellant Nichol stopped his car for a red light at the intersection of Missouri Avenue and Sixteenth Street, N.W. Unknown occupants in a vehicle directly behind appellant struck his car in the rear several times, and then proceeded to beat appellant about the face and head breaking his jaw.

A Metropolitan Police Department officer arrived at the scene. In response to the officer's direction, appellant's companion ceased any further efforts to obtain identification information of the assailants. When the officer then failed to get the information, leaving Nichol unable to institute legal action against his assailants, Nichol brought a negligence action against the officer, the Metropolitan Police Department and the District of Columbia.

[1] [2] The trial judges correctly dismissed both complaints. In a carefully reasoned Memorandum Opinion, Judge Hannon based his decision in No. 79-6 on "the fundamental principle that a government and its agents are under no general duty to provide public services, such as police protection, to any particular individual citizen." See p. 4, infra. The duty to provide public services is owed to the public at large, and, absent a special relationship between the police and an individual, no specific legal duty exists. Holding that no special relationship existed between the police and appellants in No. 79-6, Judge Hannon concluded that no specific legal duty existed. We hold that Judge Hannon was correct and adopt the relevant portions of his opinion. Those portions appear in the following Appendix.[1]

[3] Judge Pryor, then of the trial court, ruled likewise in No. 79-394 on the basis of Judge Hannon's opinion. In No. 79-394, a police officer directed Nichol's companion to cease efforts to identify the assailants and thus to break off the violent confrontation. The officer's duty to get that identification was one directly related to his official and general duty to investigate the offenses. His actions and

failings were solely related to his duty to the public generally and possessed no additional element necessary to create an overriding special relationship and duty.[2]

Here the effort to separate the hostile assailants from the victims-a necessary part of the on-scene responsibility of the police-adds nothing to the general duty owed the public and fails to create a relationship which imposes a special legal duty such as that created when there is a course of conduct, special knowledge of possible harm, or the actual use of individuals in the investigation. See Falco v. City of New York, 34 A.D.2d 673, 310 N.Y.S.2d 524 (App.Div.1970), aff'd, 29 N.Y.2d 918, 329 N.Y.S.2d 97, 279 N.E.2d 854 (1972) (police officer's *4 statement to injured motorcyclist that he would obtain name of motorist who struck the motorcycle was a gratuitous promise and did not create a special legal duty); Jackson v. Heyman, 126 N.J.Super. 281, 314 A.2d 82 (Super.Ct.Law Div.1973) (police officers' investigation of vehicle accident where pedestrian was a minor child did not create a special legal duty to child's parents who were unsuccessful in their attempt to recover damages because police failed to identify drivers of vehicle). We hold that Judge Pryor did not err in dismissing No. 79-394 for failure to state a claim.

In either case, it is easy to condemn the failings of the police. However, the desire for condemnation cannot satisfy the need for a special relationship out of which a duty to specific persons arises. In neither of these cases has a relationship been alleged beyond that found in general police responses to crimes. Civil liability fails as a matter of law.


### APPENDIX

### SUPERIOR COURT OF THE DISTRICT OF COLUMBIA CIVIL DIVISION


Civil Action No. 4695-76


CAROLYN WARREN, et al., Plaintiffs,


v.


DISTRICT OF COLUMBIA, et al., Defendants.

Warren v. District of Columbia, 444 A.2d 1 (1981)

## MEMORANDUM OPINION

The Court, however, does not agree that defendants owed a specific legal duty to plaintiffs with respect to the allegations made in the amended complaint for the reason that the District of Columbia appears to follow the well-established rule that official police personnel and the government employing them are not generally liable to victims of criminal acts for failure to provide adequate police protection. Compare Rieser v. District of Columbia, 183 U.S.App.D.C. 375, 390-91, 563 F.2d 462, 477-78 (1977) (rehearing en banc granted and panel opinion vacated on other grounds; panel opinion reinstated in pertinent part, 188 U.S.App.D.C. 384, 580 F.2d 641 (647) (1978)); Westminster Investing Corp. v. G. C. Murphy Co., 140 U.S.App.D.C. 247, 259-50, 434 F.2d 521, 523-24 (1970) and Yohanan v. Wells, No. 78-0671 (D.D.C. June 28, 1978), with Massengill v. Yuma County, 104 Ariz. 518, 456 P.2d 376 (1969) (en banc ); Riss v. City of New York, 22 N.Y.2d 579, 293 N.Y.S.2d 897, 240 N.E.2d 860 (1968); Annot., 46 A.L.R.3d 1084 (1972) and Annot., 41 A.L.R.3d 700 (1972). This uniformly accepted rule rests upon the fundamental principle that a government and its agents are under no general duty to provide public services, such as police protection, to any particular individual citizen. Turner v. United States, 248 U.S. 354, 357-58, 39 S.Ct. 109, 110, 63 L.Ed. 291 (1919); Rieser v. District of Columbia, supra.

A publicly maintained police force constitutes a basic governmental service provided to benefit the community at large by promoting public peace, safety and good order. The extent and quality of police protection afforded to the community necessarily depends upon the availability of public resources and upon legislative or administrative determinations concerning allocation of those resources. Riss v. City of New York, supra. The public, through its representative officials, recruits, trains, maintains and disciplines its police force and determines the manner in which personnel are deployed. At any given time, publicly furnished police protection may accrue to the personal benefit of individual citizens, but at all times the needs and interests of the community at large predominate. Private resources and needs have little direct effect upon the nature of police services provided to the public. Accordingly, courts have without exception concluded that when a municipality or other governmental entity undertakes to furnish police services, it assumes a duty only to the public at large and not to individual members of the community. E.g., Trautman v. City of Stamford, 32 Conn.Supp. 258, 350 A.2d 782

(1975); *5 Henderson v. City of St. Petersburg, 247 So.2d 23 (Fla.Dist.Ct.App.1971); Massengill v. Yuma County, supra, and Riss v. City of New York, supra. Dereliction in the performance of police duties may, therefore, be redressed only in the context of a public prosecution and not in a private suit for money damages. Massengill, supra.

This rule of duty owed to the public at large has been most frequently applied in cases involving complaints of inadequate protection during urban riots or mob violence. Many of these cases challenge the preparedness of the police to handle such situations, while others, such as Westminster Investing Corp. v. G. C. Murphy Co., supra, challenge the tactical decisions made to curtail or remove police protection from the riot areas. In Westminster, officials of the Metropolitan Police Department of the District of Columbia had decided to limit police presence in the area of the Murphy Company's store during the firey 1968 riots. Murphy's store was destroyed and the company filed a claim against the District of Columbia contending that the police department had deliberately or negligently abandoned its policing obligations during the riots and thereby permitted rioters to destroy Murphy's property. In affirming the dismissal of Murphy's claim against the District, the United States Court of Appeals for the District of Columbia Circuit held that the District of Columbia had no direct legal obligation to Murphy and that Murphy, therefore, had "no substantive right to recover the damages resulting from failure of (the) government or its officers to keep the peace." Id. at 252, 434 F.2d at 526, quoting Turner v. United States, supra (248 U.S.) at 358 (39 S.Ct. at 110).

Courts have also found no private duty and no liability in an assortment of other situations which involved allegedly inadequate police protection. In Henderson v. City of St. Petersburg, supra, plaintiff had contacted the St. Petersburg police department and made arrangements for specific police protection while making deliveries in a dark and secluded part of the city. Plaintiff had been previously attacked while making such deliveries and, accordingly, relied upon the assurances of police personnel that officers would be on the scene. Following carefully the instructions given him by the police, plaintiff was, nonetheless, shot by assailants. The order dismissing plaintiff's complaint against the city was affirmed on the grounds that, in the absence of a special relationship, not present in the case, the police department was under no duty to protect plaintiff Henderson.

It was in Massengill v. Yuma County, supra, that the Arizona Supreme Court, in a unanimous en banc decision, affirmed the dismissal of a complaint alleging that a deputy sheriff and the county employing him were negligent in failing to apprehend two reckless drivers. According to the complaint, the deputy sheriff saw two youths leave a local tavern and drive their cars away at excessive speeds. The deputy sheriff then allegedly followed the two cars, watching them weave back and forth, drive on the wrong side of the road and attempt to pass on a hill. The officer made no attempt to apprehend the drivers or prevent their reckless conduct. Shortly thereafter the two reckless drivers collided with an oncoming vehicle causing the deaths of five of the six persons involved. The Arizona Superior Court had concluded that the duty of defendants to arrest the reckless drivers was a duty owed to the general public and not to the deceased occupants of the oncoming vehicle. The Arizona Supreme Court agreed. Accord, Trautman v. City of Stamford, supra. (Footnote 1 omitted.)

The general duty owed to the public may become a specific duty owed to an individual if the police and the individual are in a special relationship different from that existing between the police and citizens generally. Thus, when the New York police department solicited confidential information to aid in apprehension of gangster Willie Sutton, the police assumed a special duty to the informant who came forward. Schuster v. City of New York, 5 N.Y.2d 75, 180 N.Y.S.2d 265, 154 N.E.2d 534 (1958). Similarly, a special relationship was created when the police arranged a confrontation between a suspect and a witness to a crime, *6 thereby giving the suspect an opportunity to assault the witness. Gardner v. Village of Chicago Ridge, 71 Ill.App.2d 373, 219 N.E.2d 147 (1966). In McCorkle v. City of Los Angeles, 70 Cal.2d 252, 74 Cal.Rptr. 389, 449 P.2d 453 (1969), a police officer investigating a traffic accident led plaintiff into the middle of the highway where plaintiff was then struck by another car. The California Court found that a special duty had been created by the officer's affirmative conduct. Likewise, a parole officer was held to have been in a special relationship with individuals operating a foster home and, therefore, under an obligation to disclose the violent character of a juvenile whom he sought to place in the foster home. Johnson v. State, 69 Cal.2d 782, 73 Cal.Rptr. 240, 447 P.2d 352 (1968).[2] The United States Court of Appeals for the District of Columbia recognized a similar special relationship between a government mental hospital and the family of a violent, assaultive patient who the hospital planned to discharge and who the hospital knew had previously attacked family

members. Hicks v. United States, 167 U.S.App.D.C. 169, 511 F.2d 407 (1975).

Plaintiffs in this action contend that they, too, entered a special relationship with the police when Warren and Taliaferro telephoned to request assistance. Courts which have had the opportunity to consider comparable situations have concluded that a request for aid is not in itself sufficient to create a special duty. In Riss v. City of New York, supra, the plaintiff had complained to the police numerous times about a rejected suitor who had threatened her repeatedly. In response to plaintiff's desperate pleas for help, the police rendered only nominal assistance and refused to help plaintiff further. Plaintiff received a "last chance" threat from the suitor and once more called the police without success. The following day, the suitor carried out his threat by "having a hired thug throw lye in (plaintiff's) face." Id. at 584, 293 N.Y.S.2d at 900, 240 N.E.2d at 862. Distinguishing Schuster v. City of New York, supra, the Court held that plaintiff's pleas for help did not create a special relationship between herself and the police and could not serve as the basis of liability.

The plaintiff in Antique Arts Corporation v. City of Torrance, 39 Cal.App.3d 588, 114 Cal.Rptr. 332 (1974), arranged to have its burglar alarm directly wired to the Torrance police station. Plaintiff contended that the alarm went off during the course of a burglary but the police dispatcher negligently delayed ten minutes before transmitting the alert, thereby allowing the burglars to escape with plaintiff's goods. Plaintiff argued that the alarm hookup created a special relationship with the police, but the Court rejected this contention, concluding that "an alert from an alarm, irrespective of how transmitted, is no more than a complaint that a crime has been or is being committed." Id. at 592, 114 Cal.Rptr. at 334.

As noted above, the Florida Appeals Court dismissed the complaint in Henderson v. City of St. Petersburg, supra, notwithstanding plaintiff's having requested and specifically discussed plans for police protection. After reviewing cases in which the police or other government agency were under a 'special duty' different from that owed to the public generally, the Florida Court concluded that a request for police protection, even when accompanied by a promise that protection would be provided, does not create the "special duty" necessary to establish tort liability. Id. at 25.

Plaintiffs have adopted a more novel theory in an attempt to distinguish this case from those discussed above. Plaintiffs contend *7 that although the Metropolitan Police

**Warren v. District of Columbia, 444 A.2d 1 (1981)**

Department may not have been under a specific duty to these plaintiffs at the time of the initial telephone complaint, the police undertook an obligation by taking some action toward rendering assistance. Plaintiffs seem to be saying that no liability would have attached had the police operator refused plaintiffs' call, had the dispatcher refused to transmit the message, or had the officers refused to respond. However, plaintiffs' argument continues, once the operator, dispatcher and officers took some action to assist plaintiffs, they all became personally answerable in money damages for failing to render assistance adequate to meet plaintiffs' needs. Without any supporting authority, plaintiffs contend that defendant police employees were "at least" in the position of volunteers and must be held liable as volunteers for any damages resulting from their negligent omissions. Plaintiffs' argument misapprehends both the legal status of the police officer and the legal status of the volunteer.

In the classic case, H. R. Moch Co., Inc. v. Rensselaer Water Co., 247 N.Y. 160, 159 N.E. 896 (1928), then Judge Cardozo delineated the liability of a volunteer:

> It is ancient learning that one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all .... The hand once set to a task may not always be withdrawn with impunity though liability would fail if it had never been applied at all.... If conduct has gone forward to such a stage that inaction would commonly result, not negatively merely in withholding a benefit, but positively or actively in working an injury, there exists a relation out of which arises a duty to go forward. (Id. at 167, 159 N.E. at 898.)

The Moch case involved a suit against a water company for failure to supply adequate water to fight a city fire. Judge Cardozo found that the failure to provide adequate water to fight the fire constituted, at most, a nonactionable withholding of a benefit. Whatever the omissions and failures of the defendant police officers in this action, those alleged omissions and failures, too, constituted no more than a similar withholding of a benefit.

Moreover, volunteer liability is premised in large part upon the assumption that the volunteer is free to assess each rescue situation, weigh the risks involved, and determine whether to shoulder the obligation or leave it to someone else.[3] Police officers clearly are not in a position to make such choices on a case by case basis and it would be absurd to presume that an individual assumes a permanent "volunteer" status when he becomes a police officer. Again, in the words of Judge Cardozo:

> An intention to assume an obligation of indefinite extension to every member of the public is seen to be the more improbable when we recall the crushing burden that the obligation would impose.... A promisor will not be deemed to have had in mind the assumption of a risk so overwhelming for any trivial reward. (Id. at 165-166, 159 N.E. at 897-98.)

Plaintiffs have also construed the issues in this case as giving rise to "negligent performance of police duties." In an attempt to avoid the overwhelming case law barring private suits over negligent omissions in the performance of police duties, plaintiffs seek to bring this action within the orbit of cases allowing recovery for injuries caused by negligent acts of police officers in the performance of their official duties. The cases cited by plaintiffs include the negligent handling of a police dog, negligent operation of a police vehicle, and the negligent use of a police weapon. Such cases involve acts of affirmative negligence, for which anyone-police or civilian-would be liable: negligent handling of an attack dog, negligent operation of a motor vehicle, and negligent use of a firearm. Those acts *8 of ordinary negligence do not change in character because they happen to have been committed by a police officer in the course of his duties. However, the allegations of negligence in the present case derive solely from defendants' status as police employees and from plaintiffs' contention that defendants failed to do what reasonably prudent police employees would have done in similar circumstances. The difference is between ordinary negligence on the one hand and a novel sort of professional malpractice on the other. A person does not, by becoming a police officer, insulate himself from any of the basic duties which everyone owes to other people, but neither does he assume any greater obligation to others individually. The only additional duty undertaken by accepting employment as a police officer is the duty owed to the public at large.

The public duty concept has drawn some criticism for purportedly creating the rule that: " 'Because we owe a duty to everybody, we owe it to nobody.' " Riss v. City of New York, supra at 585, 293 N.Y.S.2d at 901, 240 N.E.2d at 862 (Keating, J., dissenting). A duty owed to the public, however, is no less enforceable because it is owed to "everybody."

Warren v. District of Columbia, 444 A.2d 1 (1981)

Public officials at all levels remain accountable to the public and the public maintains elaborate mechanisms to enforce its rights–both formally in the courts and less formally through internal disciplinary proceedings. In the case of the Metropolitan Police Department, officers are subject to criminal charges and a penalty of two years imprisonment for failure to arrest law breakers. D.C.Code 1973, s 4-143. Additionally, officers are answerable to their superiors and ultimately to the public through its representatives, for dereliction in their assigned duties. D.C.Code 1973, s 4-121.

The absence of a duty specifically enforceable by individual members of the community is not peculiar to public police services. Our representative form of government is replete with duties owed to everyone in their capacity as citizens but not enforceable by anyone in his capacity as an individual. Through its representatives, the public creates community service; through its representatives, the public establishes the standards which it demands of its employees in carrying out those services and through its representatives, the public can most effectively enforce adherence to those standards of competence. As members of the general public, individuals forego any direct control over the conduct of public employees in the same manner that such individuals avoid any direct responsibility for compensating public employees.

Plaintiffs in this action would have the Court and a jury of twelve additional community representatives join in the responsibility of judging the adequacy of a public employee's performance in office. Plaintiffs' proposition would lead to results which the Massengill Court aptly described as "staggering." Massengill v. Yuma County, supra at 523, 456 P.2d at 381. In this case plaintiffs ask the Court and jury to arrogate to themselves the power to determine, for example, whether defendant Officer Thompson acted in a manner consistent with good police practice when he volunteered to stake out a suspect's house rather than volunteering to report to the crime scene. Consistent with this contention then, should a Court and jury also undertake to sift through clues known to the police in order to determine whether a criminal could reasonably have been apprehended before committing a second crime? Should a Court also be empowered to evaluate, in the context of a tort action, the handling of a major fire and determine whether the hoses were properly placed and the firemen correctly allocated? Might a Court also properly entertain a tort claim over a school teacher's ability to teach seventh grade English or over a postman's failure to deliver promptly an important piece of mail?

Establishment by the Court of a new, privately enforceable duty to use reasonable diligence in the performance of public functions would not likely improve services rendered to the public. The creation of direct, personal accountability between each government employee and every member of the community would effectively bring the *9 business of government to a speedy halt, "would dampen the ardor of all but the most resolute, or the most irresponsible in the unflinching discharge of their duties,"[4] and dispatch a new generation of litigants to the courthouse over grievances real and imagined. An enormous amount of public time and money would be consumed in litigation of private claims rather than in bettering the inadequate service which draws the complaints. Unable to pass the risk of litigation costs on to their "clients," prudent public employees would choose to leave public service.

Although recognizing the obligation of public employees to perform their duties fully and adequately, the law properly does not permit that obligation to be enforced in a private suit for money damages. Accordingly, the Court concludes that plaintiffs have failed to state claims upon which relief may be granted and accordingly, the action is dismissed as to all defendants. (Footnote 5 omitted.)
JOSEPH M. HANNON

Judge

Dated: November 21, 1978

KELLY, Associate Judge, with whom MACK, Associate Judge, joins, concurring in part and dissenting in part:
The basic premise underlying the dismissals of these complaints is correct: unless a "special duty" to a particular individual can be shown, public officials and governmental units owe only a general, nonactionable duty to members of the public to provide services such as fire and police protection. Chandler v. District of Columbia, D.C.App., 404 A.2d 964 (1979); Duran v. City of Tucson, 20 Ariz.App. 22, 509 P.2d 1059 (1973); Trautman v. City of Stamford, 32 Conn.Supp. 258, 350 A.2d 782 (1975); Trujillo v. City of Albuquerque, 93 N.M. 564, 603 P.2d 303 (App.1979); 18 E. McQuillan, Municipal Corporations ss 53.04a, b (3d ed. 1977). As stated in 2 T. Colley, Law of Torts:
The rule of official responsibility, then, appears to be this: That if the duty which the official authority imposes upon an officer is a duty to the public, a failure to perform it, or an

**Warren v. District of Columbia, 444 A.2d 1 (1981)**

inadequate or erroneous performance, must be a public, not an individual injury, and must be redressed, if at all, in some form of public prosecution. On the other hand, if the duty is a duty to the individual, then a neglect to perform it, or to perform it properly, is an individual wrong, and may support an individual action for damages. "The failure of a public officer to perform a public duty can constitute an individual wrong only when some person can show that in the public duty was involved also a duty to himself as an individual, and that he has suffered a special and peculiar injury by reason of its nonperformance." (Id. s 300, at 385-86 (4th ed. 1932); citation and footnotes omitted.)

This general duty/special duty dichotomy is illustrated by our decision in Chandler v. District of Columbia, supra. There, the District of Columbia, for financial reasons, decided to close several randomly chosen fire stations, one of which was near Mrs. Chandler's home. After a fire broke out in her home and her two children died from smoke inhalation, Mrs. Chandler sued for wrongful death, alleging that her children's deaths resulted from the District's negligence in closing the fire station. Recognizing the general rule of municipal nonliability, this court found that the facts of Mrs. Chandler's case did not give rise to a special duty or "special relationship." Id. at 966-67. By way of further analysis, fire protection services are meant to benefit the community as a whole, and because Mrs. Chandler's children were members of the general public, with nothing to single them out as specific individuals to whom a duty was owed, no special duty had arisen. Without the critical element of duty, an action in negligence does not lie. [1]

*10  The same reasoning applies in police protection cases. For example, in Trautman v. City of Stamford, supra, a plaintiff who was struck by a car while standing on a public sidewalk sued the city and two police officers, alleging a negligent failure to stop drag racing on the street adjacent to the sidewalk. In finding that no special duty was owed the plaintiff, the court stated, "the allegations of the instant case nowhere assert any conduct directed specifically by the defendant police officers toward the plaintiff individually. The conduct of the defendant patrolmen is directed ... toward the general public of which the plaintiff happened to be a part at the time in question." Id. 32 Conn.Supp. at 259, 350 A.2d at 783. The same rule has been applied in finding no special duty to protect a young man from violence in a city park, Trujillo v. City of Albuquerque, supra; to warn a motel employee of suspicious persons in the motel parking lot, Sapp

v. City of Tallahassee, 348 So.2d 363 (Fla.Dist.Ct.App.1977); to arrest a drunk driver whose car collided with the plaintiff's decedent's car, Massengill v. Yuma County, 104 Ariz. 518, 456 P.2d 376 (1969); to protect a young lady from the threats of her estranged boyfriend, Riss v. City of New York, 22 N.Y.2d 579, 293 N.Y.S.2d 897, 240 N.E.2d 860 (1968); and to protect property during a civil disturbance, Westminster Investing Corp. v. G. C. Murphy Co., 140 U.S.App.D.C. 247, 434 F.2d 521 (1970).

The general, nonactionable duty to provide police services may narrow, however, to a special, actionable duty if two factors are present. First, there must be some form of privity between the police department and the victim that sets the victim apart from the general public. See, e.g., City of Tampa v. Davis, 226 So.2d 450, 454 (Fla.Dist.Ct.App.1969). That is, the victim must become a reasonably foreseeable plaintiff. Second, there must be specific assurances of protection that give rise to justifiable reliance by the victim. See, e.g., Sapp v. City of Tallahassee, supra at 365-66.

In Bloom v. City of New York, 78 Misc.2d 1077, 357 N.Y.S.2d 979 (1974), several store owners sued the city for negligent failure to protect their property during a civil disturbance in 1968. The complaints alleged that city officials gave specific assurances of police protection, but negligently failed to take steps to carry out the promises. The city moved to dismiss the complaint, relying on the general rule of municipal nonliability. The court denied the motion, easily distinguishing the case from those cases in which there is no special duty:

> In the case at bar it is alleged that the plaintiffs were ready, willing and able to protect their premises but that they were restrained by the police who assured them that proper police protection would be provided. There is therefore alleged an affirmative series of acts by which the city assumed a special duty .... (Id. at 1078, 357 N.Y.S.2d at 981.)

See also Silverman v. City of Fort Wayne, 171 Ind.App. 415, 357 N.E.2d 285 (Ind.App.1976) (dismissal of negligence complaint arising from failure to protect property during riot reversed in light of personal promise of protection). [2]

In Florence v. Goldberg, 44 N.Y.2d 189, 404 N.Y.S.2d 583, 375 N.E.2d 763 (1978), the police department voluntarily

Case 5:15-cv-01238-GTS-TWD   Document 55-1   Filed 07/18/16   Page 73 of 75
Case 5:15-cv-01238-GTS-TWD   Document 21-6   Filed 03/25/16   Page 35 of 87

Warren v. District of Columbia, 444 A.2d 1 (1981)

assigned a school crossing guard to cover a particularly busy intersection in Brooklyn. For the first two weeks of school, the infant plaintiff's mother accompanied him to school and saw a guard at the intersection every day. When the mother accepted employment, she sent the child to school by himself, relying on the guard's presence at the intersection. *11 One day, the guard was ill and the police department failed to provide a replacement or to notify school officials that there would be no guard at the crossing. The child was struck by a taxi cab as he tried to cross the street alone; the mother sued the city in negligence. Upholding a jury verdict for the child, the court emphasized two factors distinguishing that case from general duty cases. First, the duty assumed by the police was a limited one; it was directed toward a specific class of individuals rather than toward the public in general. Id. at 196-97, 404 N.Y.S.2d at 587, 375 N.E.2d at 767. Second, the mother had witnessed the provision of services and had relied to her detriment on the guard's performance. Id. The combination of these two factors led the court to conclude that the general duty to provide police services had become a special duty owed to that child.[3]

As both the Bloom and Florence courts noted, the concept of special duty is actually no more than an application of the cardinal principal of tort law that, even where no duty to act may exist originally, once one undertakes to act, he has a duty to do so with due care. Florence v. Goldberg, supra at 196, 404 N.Y.S.2d at 587, 375 N.E.2d at 766; Bloom v. City of New York, supra at 1079, 357 N.Y.S.2d at 981. Cf. Security National Bank v. Lish, D.C.App., 311 A.2d 833, 834 (1973) ("(o)ne who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all.") (quoting Glanzer v. Shepard, 233 N.Y. 236, 239, 135 N.E. 275, 276 (1922)). More precisely, one who begins to perform a service to another, whether gratuitously or not must perform with reasonable care; thus, he subjects himself to liability for any harm suffered because the other reasonably and foreseeably relied upon the actor's performance. See W. Prosser, The Law of Torts s 56 (4th ed. 1972); 2 F. Harper and F. James, The Law of Torts s 18.6 (1956); 2 Restatement (Second) of Torts s 323 (1965). In the words of Chief Judge Cardozo:

> If conduct has gone forward to such a stage that inaction would commonly result, not negatively merely in withholding a benefit, but positively or actively in working an injury, there exists a relation out of which arises a duty to go forward. (Moch Co. v. Rensselaer Water

Co., 247 N.Y. 160, 167, 159 N.E. 896, 898 (1928); citation omitted.)

This is not, of course, a theory of strict liability; the actor need only do that which is reasonable under the circumstances. Prosser, supra.

To summarize, there are two prerequisites to a finding of a special duty. First, there must be direct contact or some other form of privity between the victim and the police department so that the victim becomes a reasonably foreseeable plaintiff. Second, there must be specific assurances of police services that create justifiable reliance by the victim. Without both of these elements, the duty to provide police services remains a general, nonactionable duty to the public at large.

II

In reviewing the trial courts' grants of the motions to dismiss, "we must accept every well-pleaded allegation of material fact ... as true and indulge all reasonable inferences which may arise therefrom." Early Settlers Insurance Co. v. Schweid, D.C.App., 221 A.2d 920, 922 (1966). The dismissals will be sustained only if it appears "beyond doubt that the plaintiff(s) can prove no set of facts in support of (their claims) which would entitle (them) to relief." Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 101-102, 2 L.Ed.2d 80 (1957). See also Owens v. Tiber Island Condominium Association, D.C.App., 373 A.2d 890, 893 (1977).

*12 Under this standard of review, I would hold that the complaints of appellants Warren, Taliaferro (No. 79-6), and Nichol (No. 79-394), contain facts that, if proved, are sufficient to establish that the Police Department owed each a special duty. Appellants Warren's and Taliaferro's urgent telephone calls to the Metropolitan Police Department removed them from the broad class of the general public. Appellant Nichol's direct contact with the officer on the scene of the assault made him a reasonably foreseeable plaintiff. Any duty assumed by the police from those points on was not a duty to the community as a whole, but a specific duty to identifiable persons.

All three of these appellants have also alleged specific assurances of police protection that may have created justifiable reliance on their parts. When a police department employee tells frantic callers that help is on the way, as in No.

Warren v. District of Columbia, 444 A.2d 1 (1981)

79-6, or that he will obtain vital information for an injured person, as in No. 79-394, it is reasonably foreseeable that the persons so assured may forego, to their detriment, other avenues of help. Once the police embarked upon services under circumstances where it was reasonably foreseeable that a citizen might rely on their performance, they assumed a duty to perform with due care.

Appellant Douglas does not fit within the class of persons to whom a special duty was owed. Although she arguably meets the first prerequisite,[4] she does not fulfill the second. Because she was unaware of either the telephone calls to the police or the police's assurances to the other women, she could not have justifiably relied to her detriment on those assurances. Therefore, the dismissal as to her must be affirmed.

I do not ignore appellees' "floodgates of litigation" argument and have carefully considered the trial judge's fear that "(t)he creation of a direct, personal accountability between each government employee and every member of the community would effectively bring the business of government to a speedy halt ... and dispatch a new generation of litigants to the courthouse over grievances real and imagined."[5] The duty which I recognize in this opinion will not create such broad liability. Moreover, the argument

assumes that a strict liability standard is to be imposed and that the courts would prove completely unable to apply general principles of tort liability in a reasonable fashion in the context of actions arising from the negligent acts of police ... personnel. The argument is ... made as if there were no such legal principles as fault, proximate cause or foreseeability, all of which operate to keep liability within reasonable bounds. No one is contending that the police must be at the scene of every potential crime .... They need only act as a reasonable man would under the circumstances. (Riss v. City of New York, supra at 586, 293 N.Y.S.2d at 902, 240 N.E.2d at 863 (Keating, J., dissenting).)

In my judgment, the complaints of appellants Warren, Taliaferro and Nichol contain sufficient facts from which they may prove that a special duty was owed to them; consequently, the trial judges erred in dismissing their complaints for failure to state a claim upon which relief could be granted. To me, also, gratuitous comments about condemning the recognized "failings" of the police in these cases is no substitute for an independent and objective decisional analysis of an important and sensitive issue.

NEWMAN, Chief Judge, concurring in part and dissenting in part:
I concur in the majority opinion as to appellant Nichol (No. 79-394). I join the dissent as to appellants Warren, Douglas and Taliaferro (No. 79-6).

---

Footnotes

1    Having based his dismissal on an absence of duty, Judge Hannon found it unnecessary to decide the adequacy of the notice to the District of Columbia under D.C.Code 1973, s 12-309. Consequently, we do not review that issue on appeal.

2    It can be seen from cases in which a special duty has been found that an additional element has been injected above the existing general public duty. E.g., Florence v. Goldberg, 44 N.Y.2d 189, 404 N.Y.S.2d 583, 375 N.E.2d 763 (1978) (school crossing guard course of conduct and police requiring replacement of absent guard together with reliance); McCorkle v. City of Los Angeles, 70 Cal.2d 252, 74 Cal.Rptr. 389, 449 P.2d 453 (1969) (en banc) (use of auto accident victim to aid police investigation by walking to point of impact in street); Johnson v. States, 69 Cal.2d 782, 73 Cal.Rptr. 240, 447 P.2d 352 (1968) (en banc) (placement of youth with known homicidal tendencies in foster home); Gardner v. Village of Chicago Ridge, 71 Ill.App.2d 373, 219 N.E.2d 147 (1966) (return of victim to scene for "show up" identification of still violent assault suspects); Schuster v. City of New York, 5 N.Y.2d 75, 180 N.Y.S.2d 265, 154 N.E.2d 534 (1958) (recruitment of citizen informant in national organized violent crime case).

2    A similar factual situation is presented in Rieser v. District of Columbia, supra. This case involved a woman who was raped and murdered by a District of Columbia parolee who had been assisted by a parole officer in obtaining employment at the apartment complex where the murder took place. The decedent's father filed suit for damages under the District of Columbia Wrongful Death Act against the owners of the apartment complex, the parolee, the parole officer and the District of Columbia. The Court of Appeals, MacKinnon, Circuit Judge, held inter alia that an actionable duty exists where a special relationship has been established between the governmental unit and plaintiff.

3    The District of Columbia Court of Appeals recently refrained from implying an adoption of the rescue doctrine in this jurisdiction. Gillespie v. Washington, D.C.App., 395 A.2d (18) 21 (1978). This Court's discussion of the rescue doctrine and its applicability to plaintiffs' claim should likewise not be considered an adoption of the doctrine.

**Warren v. District of Columbia, 444 A.2d 1 (1981)**

---

4     Gregoire v. Biddie, 177 F.2d 579, 581 (2d Cir. 1949).

1     The Chandler case was also decided on the basis of sovereign immunity; because the decision to close the stations was a discretionary act, the city could not be sued. Id. at 966. See generally Wade v. District of Columbia, D.C.App., 310 A.2d 857 (1973) (en banc). As the Chandler court noted, the questions of sovereign immunity and duty require separate analysis. Chandler, supra at 966. No question of sovereign immunity is raised in these appeals.

2     The allegations of specific assurances of protection in Bloom and Silverman distinguish those cases from Westminster Investing Corp. v. G. C. Murphy Co., supra, a case relied on by the trial judge in No. 79-6. The plaintiffs in Westminster were members of the general public, to whom no promises of protection had been made, and to whom the District therefore owed no special duty.

3     Appellees attempt to distinguish Florence from the case at bar by arguing that the police in Florence breached a statutory duty to provide crossing guards. It is clear from the opinion, however, that the police department regulations referred to by appellees dealt only with the procedures to be followed if a school guard, once gratuitously assigned, was unable to report for duty. The initial assumption of the duty to provide a crossing guard was completely voluntary. Florence, supra 44 N.Y.2d at 196, 404 N.Y.S.2d at 587, 375 N.E.2d at 767.

4     Whether she removed herself from the class of the general public is, as stated, a factual question: from the point of view of the police department, with its knowledge from the telephone call, was appellant Douglas a foreseeable victim or merely still a member of the general public?

5     See Appendix infra at 4.

---

**End of Document**                              © 2013 Thomson Reuters. No claim to original U.S. Government Works.